The Honorable Robert S. Lasnik
Consideration Date: May 24, 2019

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AMAZON.COM, INC., a Delaware corporation, AMAZON TECHNOLOGIES, INC., a Nevada corporation; and AMAZON SERVICES, LLC, a Nevada limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>FBA STORES, LLC, a limited liability company; FBA DISTRIBUTORS, LLC, a limited liability company; FBA ADVANTAGE, LLC, a limited liability company; AWS, LLC, a limited liability company; ONLINE AUCTION LEARNING CENTER, INC., a corporation; CHRISTOPHER BOWSER, an individual; ADAM BOWSER, an individual; and DOE Companies 1 – 20,<br><br>Defendants. | CASE NO. 2:17-cv-01830-RSL<br><br>DECLARATION OF PHILIP S. McCUNE IN SUPPORT OF MOTION TO LIFT STAY AND TO DISMISS ALL CLAIMS PURSUANT TO RULE 41(A)(2) |

I, PHILIP S. McCUNE, hereby declare as follows:

1.      I am one of the attorneys for Plaintiffs Amazon.com, Inc., Amazon Technologies, Inc., and Amazon Services, LLC (collectively, "Amazon") in this action.  I make this declaration based upon my own personal knowledge of the facts and information herein.

DECLARATION OF PHILIP S. MCCUNE IN SUPPORT OF
MOTION TO LIFT STAY AND TO DISMISS ALL CLAIMS
PURSUANT TO RULE 41(A)(2) - 1
CASE NO. 2:17-cv-01830-RSL

2.      Attached hereto as Exhibit 1 is a true and correct copy of the (previously sealed) Complaint for Permanent Injunction and other Equitable Relief, filed in *Fed. Trad. Comm. v. AWS, LLC, et al.*, No. 2:18-cv-00442-JCM-PAL (D. Nev., Mar. 12, 2018) (the "FTC Action").

3.      Attached hereto as Exhibit 2 is a true and correct copy of the (previously sealed) Temporary Restraining Order entered in the FTC Action on March 14, 2018.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Stipulated Order for Permanent Injunction and Monetary Judgment entered in the FTC Action on June 15, 2018.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the Judgment and Consent Decree entered on November 7, 2018 in *State v. Bowser, et al.*, King County Superior Court Case No. 17-2-31392-1-SEA (the "AG Action").

I declare under penalty of perjury under all applicable law that, to the best of my knowledge, information and belief, the foregoing is true and correct.

EXECUTED this 26th day of April, 2019, at Seattle, Washington.

*s/ Philip S. McCune*
Philip S. McCune

DECLARATION OF PHILIP S. MCCUNE IN SUPPORT OF
MOTION TO LIFT STAY AND TO DISMISS ALL CLAIMS
PURSUANT TO RULE 41(A)(2) - 2
CASE NO. 2:17-cv-01830-RSL

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

3

4

*Counsel for Defendants*

5

Bradley S. Keller
Keith D. Petrak
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA  98104
*bkeller@byrneskeller.com*
*kpetrak@byrneskeller.com*

6

7

8

9

Charles J. Rogers
Conley Rose, P.C.
575 N. Dairy Ashford Road, Suite 1102
Houston, TX  77079
*crogers@conleyrose.com*

10

11

12

Darlene F. Ghavimi
Conley Rose, P.C.
13413 Galleria Circle, Suite 100
Austin, TX  78738
*dghavimi@conleyrose.com*

13

14

15

16

*Counsel for Receiver, Robb Evans & Associates LLC*

17

Gary Owen Caris, CA SBN 088918
Barnes & Thornburg LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
(310) 284-3880
*gcaris@btlaw.com*

18

19

20

21

22

DATED this 26th day of April, 2019.

23

*s/ Denise Brandenstein*
Denise Brandenstein

24

25

26

DECLARATION OF PHILIP S. MCCUNE IN SUPPORT OF
MOTION TO LIFT STAY AND TO DISMISS ALL CLAIMS
PURSUANT TO RULE 41(A)(2) - 3
CASE NO. 2:17-cv-01830-RSL

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

# EXHIBIT 1

1  Roberto Anguizola
   Illinois Bar # 6270874
2  (Admitted in the D. Nev. pursuant to LR IA 11-3)
   Tel. (202) 326-3284
3  Email: ranguizola@ftc.gov

4  Miry Kim
   Washington Bar # 31456
5  (Seeking admission pursuant to LR IA 11-3)
   Tel. (202) 326-3622
6  Email: mkim@ftc.gov

7  Gregory J. Evans
   DC Bar # 1033184
8  (Seeking admission pursuant to LR IA 11-3)
   Tel. (202) 326-3425
9  Email: gevans2@ftc.gov

10 Federal Trade Commission
   600 Pennsylvania Avenue, NW
11 Mail Drop CC-8528
   Washington, DC 20580

12
   Attorneys for Plaintiff
13 FEDERAL TRADE COMMISSION

14

15             UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA
16
   FEDERAL TRADE COMMISSION,
17
           Plaintiff,              **2:18-cv-00442-JCM-PAL**
18
           v.
19                                 FILED UNDER SEAL
   AWS, LLC, a Nevada limited liability company;
20                                 COMPLAINT FOR PERMANENT
   FBA DISTRIBUTORS, LLC, a Massachusetts    INJUNCTION AND OTHER
21 limited liability company;      EQUITABLE RELIEF

22 FBA STORES, LLC, a Nevada limited liability
   company;
23
   INFO PROS, LLC, a Nevada limited liability
   company;

                          1

FILED
ENTERED                    RECEIVED
                           SERVED ON
             COUNSEL/PARTIES OF RECORD

         MAR 1 2 2018

     CLERK US DISTRICT COURT
        DISTRICT OF NEVADA
BY:
                         DEPUTY

ONLINE AUCTION LEARNING CENTER,
INC., a Massachusetts corporation;

ONLINE AUCTION LEARNING CENTER,
INC., a Nevada corporation;

CHRISTOPHER F. BOWSER, individually and
as an officer of FBA DISTRIBUTORS, LLC,
FBA STORES, LLC, ONLINE AUCTION
LEARNING CENTER, INC. and ONLINE
AUCTION LEARNING CENTER, INC.;

ADAM S. BOWSER, individually and as an
officer of AWS, LLC, FBA DISTRIBUTORS,
LLC, FBA STORES, LLC, ONLINE AUCTION
LEARNING CENTER, INC. and ONLINE
AUCTION LEARNING CENTER, INC.; and

JODY MARSHALL, individually and as an
officer of INFO PROS, LLC,

     Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint in a civil action

brought under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15

U.S.C. §§ 53(b) and 57b, and the Business Opportunity Rule, 16 C.F.R. Part 437, to obtain

temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts,

restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable

relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C.

§ 45(a), and in violation of the Business Opportunity Rule, 16 C.F.R. Part 437, respectfully

alleges:

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

2.    Venue is proper in this district under 28 U.S.C. § 1391 (b)(2), (b)(3), (c)(1), (c)(2), (c)(3), and (d), and 15 U.S.C. §§ 53(b), 56(a)(2)(B) and 57b.

## SUMMARY OF THE CASE

3.    Defendants lure consumers into purchasing expensive business opportunities with purported "secrets for making money on Amazon." They represent that purchasers are likely to "create financial freedom" and earn thousands of dollars a month by implementing Defendants' "systems for success on Amazon." Contrary to Defendants' promises, most, if not virtually all, purchasers do not earn the advertised income. Moreover, many elements of Defendants' "system" violate Amazon.com Inc.'s policies. As a result, purchasers who deploy Defendants' "system" often experience problems with their Amazon stores, including suspension and the loss of their ability to sell on Amazon.com.

4.    In perpetrating their scheme, Defendants have violated the FTC Act and the Business Opportunity Rule by, among other things: (1) making false or unsubstantiated earnings claims; and (2) failing to furnish prospective purchasers with required disclosure documents.

## PLAINTIFF

5.    The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Business Opportunity Rule, 16 C.F.R. Part 437. The Business Opportunity Rule

1  addresses common deceptive or unfair practices engaged in by fraudulent business opportunity

2  sellers such as inducing consumers to pay significant sums of money by means of false or

3  unsubstantiated earnings claims.

4       6.    The FTC is authorized to initiate federal district court proceedings, by its own

5  attorneys, to enjoin violations of the FTC Act and the Business Opportunity Rule and to secure

6  such equitable relief as may be appropriate in each case, including rescission or reformation of

7  contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.

8  15 U.S.C. §§ 53(b) and 56(a)(2)(A), 56(a)(2)(B), 57b, and the Business Opportunity Rule, 16

9  C.F.R. Part 437.

10  <div align="center">**DEFENDANTS**</div>

11       7.    Defendant AWS, LLC ("AWS") is a Nevada limited liability company with its

12  principal place of business at 293 Libbey Industrial Parkway, Suite 150, Weymouth,

13  Massachusetts 02189.  AWS transacts or has transacted business in this district and throughout

14  the United States.  At times material to this Complaint, acting alone or in concert with others,

15  AWS has advertised, marketed, distributed, or sold business opportunities to consumers

16  throughout the United States.

17       8.    Defendant FBA Distributors, LLC ("FBA Distributors") is a Massachusetts

18  limited liability company with its principal place of business at 293 Libbey Industrial Parkway,

19  Suite 250, Weymouth, Massachusetts 02189.  FBA Distributors transacts or has transacted

20  business in this district and throughout the United States.  At times material to this Complaint,

21  acting alone or in concert with others, FBA Distributors has advertised, marketed, distributed, or

22  sold business opportunities to consumers throughout the United States.

23

9. Defendant FBA Stores, LLC ("FBA Stores") is a Nevada limited liability company with its principal place of business at 293 Libbey Industrial Parkway, Suite 250, Weymouth, Massachusetts 02189. FBA Stores transacts or has transacted business in this district and throughout the United States. At times material to this Complaint, acting alone or in concert with others, FBA Stores has advertised, marketed, distributed, or sold business opportunities to consumers throughout the United States.

10. Defendant Info Pros, LLC ("Info Pros") is a Nevada limited liability company with its principal place of business at 2080 N. Moapa Valley Boulevard, Logandale, Nevada 89021. Info Pros transacts or has transacted business in this district and throughout the United States. At times material to this Complaint, acting alone or in concert with others, Info Pros has advertised, marketed, distributed, or sold business opportunities to consumers throughout the United States.

11. Defendant Online Auction Learning Center, Inc. ("OALC MA") is a Massachusetts corporation with its principal place of business at 293 Libbey Industrial Parkway, Suite 250, Weymouth, Massachusetts 02189. OALC MA transacts or has transacted business in this district and throughout the United States. At times material to this Complaint, acting alone or in concert with others, OALC MA has advertised, marketed, distributed, or sold business opportunities to consumers throughout the United States.

12. Defendant Online Auction Learning Center, Inc. ("OALC NV") is a Nevada corporation with its principal place of business at 293 Libbey Industrial Parkway, Suite 250, Weymouth, Massachusetts 02189. OALC NV transacts or has transacted business in this district and throughout the United States. At times material to this Complaint, acting alone or in concert with others, OALC NV has advertised, marketed, distributed, or sold business opportunities to

1  consumers throughout the United States.

2      13.    Defendant Christopher F. Bowser is the vice president and a manager of FBA

3  Distributors, the vice president of FBA Stores, the president of OALC MA, and the president of

4  OALC NV.  At all times material to this Complaint, acting alone or in concert with others, he

5  has formulated, directed, controlled, had the authority to control, or participated in the acts and

6  practices set forth in this Complaint.  Defendant Christopher F. Bowser, in connection with the

7  matters alleged herein, transacts or has transacted business in this district and throughout the

8  United States.

9      14.    Defendant Adam S. Bowser is the manager of AWS, a manager and president of

10  FBA Distributors, manager and president of FBA Stores, the secretary and treasurer of OALC

11  MA, and the secretary and treasurer of OALC NV.  At all times material to this Complaint,

12  acting alone or in concert with others, he has formulated, directed, controlled, had the authority

13  to control, or participated in the acts and practices set forth in this Complaint.  Defendant Adam

14  S. Bowser, in connection with the matters alleged herein, transacts or has transacted business in

15  this district and throughout the United States.

16      15.    Defendant Jody Marshall is the manager of Info Pros and an owner of FBA

17  Distributors.  At all times material to this Complaint, acting alone or in concert with others, he

18  has formulated, directed, controlled, had the authority to control, or participated in the acts and

19  practices set forth in this Complaint.  Defendant Jody Marshall resides in this district and, in

20  connection with the matters alleged herein, transacts or has transacted business in this district

21  and throughout the United States.

22      16.    Defendants AWS, FBA Distributors, FBA Stores, Info Pros, OALC MA and

23  OALC NV (collectively, "Corporate Defendants") have operated as a common enterprise while

6

1    engaging in the deceptive acts and practices and other violations of law alleged below.

2    Defendants have conducted the business practices described below through an interrelated

3    network of companies that have unified advertising, common ownership, officers, managers,

4    business functions, employees, warehouse locations, and office locations.  Because these

5    Corporate Defendants have operated as a common enterprise, each of them is jointly and

6    severally liable for the acts and practices alleged below.  Defendants Christopher F. Bowser,

7    Adam S. Bowser and Jody Marshall have formulated, directed, controlled, had the authority to

8    control, or participated in the acts and practices of the Corporate Defendants that constitute the

9    common enterprise.

10                                   **COMMERCE**

11        17.    At all times material to this Complaint, Defendants have maintained a substantial

12   course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

13   15 U.S.C. § 44.

14                       **DEFENDANTS' BUSINESS ACTIVITIES**

15        18.    Since at least 2014, Defendants have advertised, marketed, distributed, promoted

16   and sold business opportunities to consumers throughout the United States.

17        19.    Defendants have marketed their business opportunities under multiple brand

18   names including: AWS, Amazon Wealth Systems, Amazing Wealth Systems, FBA Stores,

19   Insider Online Secrets, Online Auction Learning Center, and Online Seller (collectively the

20   "Amazing Wealth System").

21        20.    Defendants offer the Amazing Wealth System to consumers through a variety of

22   marketing mediums including direct mail, radio, Internet websites, videos disseminated online

23   through YouTube, social media such as Facebook, webinars, and live events.

1    21.    Defendants widely disseminate their advertising for the Amazing Wealth System

2    throughout the United States.

3    22.    Defendants promote the Amazing Wealth System in multiple languages including

4    English and Spanish.

5    23.    Defendants make earnings claims in connection with the offer for sale, sale, and

6    promotion of the Amazing Wealth System.

7    24.    In their advertising, Defendants represent that consumers who purchase and

8    deploy the Amazing Wealth System are likely to profit by selling products on Amazon.com.

9    25.    Typical representations made in Defendants' advertising include the following:

10           A.    My name is Adam Bowser, and over the past 18 years I have sold over

11                 $50 million online. I'm going to be hosting a few local workshops around

12                 the Seattle area to share my secrets for making money on Amazon. This

13                 will truly be a once-in-a-lifetime opportunity.

14           B.    Get started selling on Amazon and Make $5,000-$10,000 in the next 30

15                 days...Even if you have never sold anything online before.

16           C.    I'll be Giving you Wholesalers You can call up and Get Great Deals for

17                 Huge profits. Or just make some extra $$ to Pay Your Basic Bills.

18           D.    For years we have been helping thousands of ordinary people take their

19                 lives back and create financial freedom by implementing our systems for

20                 success on Amazon.

21           E.    Just last year we sold over $12 Million on Amazon.com. Now we want to

22                 help you become our next Amazon success story.

23

8

26.     Defendants' earnings claims regarding the Amazing Wealth System are false or unsubstantiated.

27.     Few, if any, consumers who purchase Defendants' Amazing Wealth System earn the income Defendants advertise.  Most, if not all, purchasers do not earn any income whatsoever with the Amazing Wealth System.

28.     Defendants disseminate industry financial, earnings, or performance information in connection with the offer for sale, sale, and promotion of the Amazing Wealth System while lacking written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial earnings, or performance experience of purchasers of the Amazing Wealth System.

29.     For example, in late July 2017, during a live event promoting the Amazing Wealth System held at the Carson Nuggets Casino Hotel in Carson City, Nevada, Defendants presented consumers with an "Amazon Workshop Manual" containing industry performance information showing, among other e-commerce industry statistics, millions of monthly U.S. visitors across retail websites, increasing e-commerce sales of the largest U.S. internet retailers, including Amazon, and a high average growth rate in e-commerce.  This industry information leaves consumers with the impression that they are likely to earn significant income if they purchase and implement the Amazing Wealth System.  The industry performance information contained in the "Amazon Workshop Manual" exceeds, or does not reflect, the performance experience of typical purchasers of the Amazing Wealth System.

**Amazon's Third-Party Seller Program**

30.     Amazon.com is a popular website owned and operated by Amazon.com, Inc. ("Amazon").  Millions of consumers use Amazon.com every day to purchase a wide range of products, across dozens of product categories, from Amazon and its authorized third-party sellers.

31.     Amazon's third-party seller program provides registered sellers access to Amazon's customer-base, Internet outlets, and other benefits.

32.     To sell products on Amazon.com, third-party sellers must create a "Selling on Amazon" account ("Amazon Selling Account") using Amazon's Seller Central, the Web interface where third-party sellers open and manage their Internet outlet or "Amazon Store."

33.     When they open their Amazon Selling Account, third-party sellers must agree to the Amazon Services Business Solutions Agreement ("Amazon BSA"), which governs access to and use of Amazon's services and sets forth Amazon's rules and restrictions for selling on Amazon.com.

34.     After opening an Amazon Selling Account, selling on Amazon.com involves three main steps:  (1) listing products; (2) selling the products; and (3) shipping the products to consumers.

35.     The first step in selling a product on Amazon.com requires the third-party seller to create a listing accurately identifying the product for sale.  Each product sold is assigned a unique Amazon Standard Identification Number ("ASIN").  Pursuant to the Amazon BSA, product listings must be "accurate and complete."

36.     After a product is listed, it becomes available for purchase on Amazon.com.

1    37.    Products listed for sale on Amazon.com appear on a product detail page, which

2    customers typically reach after searching for a product or category of products. The product

3    detail page includes a "Buy Box" where a listing is given prominence and where customers can

4    quickly begin the purchasing process by adding items to their electronic shopping carts. A

5    screenshot of an Amazon.com product detail page with the "Buy Box" labeled in red appears

6    below:



11

38.     Multiple sellers can offer the same product on Amazon.com.  If more than one eligible seller offers a product, they may compete for the Buy Box for that product.  Third-party sellers must meet certain performance-based requirements and metrics (e.g., order defect rate, chargeback rate, speed of delivery, and experience with the Amazon selling service) to be eligible to compete for Buy Box placement.  For many third-party sellers, Buy Box placement can lead to increased sales.

39.     Amazon encourages its customers to review the products they purchase and publishes customer reviews on product detail pages accessible from product listings on Amazon.com.  To review a product, an individual must be an Amazon.com customer and must have an Amazon.com customer account.

40.     Amazon expressly prohibits paid reviews and has developed technologies and protocols designed to detect and remove false, misleading and inauthentic reviews from Amazon.com.  Amazon routinely suspends third-party sellers that post or purchase fake reviews and has taken legal action against parties who offered to supply paid reviews on Amazon.com.

41.     Once a customer places an order on Amazon.com, Amazon notifies the third-party seller.  Orders are then fulfilled in one of two ways:  (1) by the third-party seller itself; or (2) by Amazon, if the third-party seller is using Amazon's "Fulfillment by Amazon" ("FBA") service.

42.     Amazon offers third-party sellers the option of fulfilling orders through its FBA service.  With the FBA service, third-party sellers can ship their products to one of the Amazon fulfillment centers located around the country and Amazon will pick, pack, and ship these products to the end customer.  Products offered through Amazon's FBA service are displayed with Amazon's Prime logo, indicating to customers that Amazon itself handles the shipping and

1   customer service. Products shipped from Amazon's fulfillment centers are also eligible for

2   Amazon Prime free two-day shipping for Prime members and free shipping for all customers.

3   Amazon also provides customer service for these products, handling questions, complaints,

4   returns, and refunds.

5        43.    Certain product categories are "gated" on Amazon.com (e.g., collectible coins,

6   fine art, sexual wellness, and wine), which means that third-party sellers must obtain approval

7   from Amazon before listing products in these restricted product categories. The process of

8   approving third-party sellers to sell gated products is commonly referred to as "ungating."

9   Amazon's ungating requirements vary by category and are generally designed to ensure that

10   third-party sellers and their products are reliable and genuine.

11                     **Defendants' Amazing Wealth System**

12        44.    Defendants are not affiliated with, or connected to, Amazon in any way.

13        45.    Defendants solicit prospective purchasers to enter into a new business using the

14   Amazing Wealth System to sell products as third-party sellers on Amazon.com.

15        46.    Defendants describe the Amazing Wealth System as an exclusive "plug-and-play

16   system" to assist purchasers in launching and growing a new online business selling products as

17   a third-party seller on Amazon.com.

18        47.    Defendants require prospective purchasers to make a payment to purchase the

19   Amazing Wealth System.

20        48.    Defendants represent that they or one or more designated persons, including

21   Amazon, will provide prospective purchasers of the Amazing Wealth System the following:

22        A.    An Internet outlet in the form of one or more Amazon stores or accounts

23                 where prospective purchasers will be able to sell products as third-party sellers on

Amazon.com;

    B.      Assistance to get up and running on Amazon.com;

    C.      Access to wholesalers and major suppliers;

    D.      Storage, handling, packing, labeling, shipping, and inventorying of products to sell on Amazon.com;

    E.      Exclusive access to authentic products likely to sell at "healthy" profit margins on Amazon.com;

    F.      "Tips, tricks, and techniques" to profit and out compete other third-party sellers on Amazon.com; and

    G.      Login access to the AWS Members Area, which is described as an online platform that includes step-by-step training videos, top tier wholesale suppliers that can supply purchasers with products for their online business, and tools and software to help purchasers automate, systematize, and grow their business.

49. The price of the Amazing Wealth System ranges from $995 to more than $35,000 depending on what level of "enrollment" or "package" prospective purchasers choose and what "bonuses" they select.

50. For example, the base $995 Amazing Wealth System package provides Defendants' purported "tips, tricks, and techniques" through a three-day live workshop, videos, and webinars. The higher level $34,995 "Diamond Enrollment" offers prospective purchasers "16 Personal 1 on 1 Coaching Sessions" and other purported "bonuses" such as ungating services in addition to the workshop, videos and webinars offered with the base Amazing Wealth System package.

51. During the personal coaching sessions, Defendants typically convey substantially

1 | similar strategies and content as Defendants' three-day live workshops, videos and webinars.

2 | **Defendants' Deceptive Campaigns to Recruit Consumers to Attend Live Events**

3 | 52. In an effort to lure consumers into purchasing the Amazing Wealth System,

4 | Defendants conduct free two-hour live events or "workshops."

5 | 53. Defendants have conducted live events throughout the United States and Canada

6 | including in: Austin, Texas; Baltimore, Maryland; Las Vegas, Nevada; Madison, Wisconsin;

7 | Milwaukee, Wisconsin; San Antonio, Texas; San Juan, Puerto Rico; Seattle, Washington;

8 | Louisville, Kentucky; Oakland, California; and Washington, DC.

9 | 54. Defendants promote their live events by targeting consumers that live near an

10 | upcoming live event.

11 | 55. In October 2017, Defendants disseminated promotional materials, including direct

12 | mailers, to consumers in Nevada for a live event in Las Vegas. A true and correct copy of an

13 | invitation Defendants mailed to a consumer in Reno, Nevada is attached as **Exhibit A**.

14 | 56. In November 2017, Defendants disseminated promotional materials, including

15 | direct mailers, to consumers in California's Bay Area. A true and correct copy of an invitation

16 | Defendants mailed to a consumer in the Bay Area is attached as **Exhibit B**.

17 | 57. In September 2017, Defendants disseminated Spanish language promotional

18 | materials, including direct mailers, to consumers in Puerto Rico. A true and correct copy of a

19 | Spanish language invitation Defendants mailed to a consumer in Puerto Rico is attached as

20 | **Exhibit C**.

21 | 58. Defendants' direct mail invitations typically urge consumers to call a toll-free

22 | number immediately and register to attend a free two-hour "exclusive LIVE Amazon Workshop"

23 | in their local area.

59.    Defendants' direct mail invitations typically offer the free two-hour workshops over 4-5 days at multiple hotels in the targeted area.

60.    Defendants' direct mail invitations typically include earnings claims such as "Get started selling on Amazon and Make $5,000-$10,000 in the next 30 days...Even if you have never sold anything online before."

61.    In addition to using direct mail, Defendants use email, social media and radio advertisements to promote their free two-hour workshops.

**Defendants' Free Two-Hour Workshops**

62.    During the free two-hour workshops, Defendants attempt to convince consumers to purchase their "system" and enroll in their "3-Day Amazon Profits Workshop," which they typically offer at a "special discount" of $995.

63.    Defendants make earnings claims throughout the free two-hour workshops and share examples and testimonials of purportedly successful purchasers of the Amazing Wealth System.

64.    For example, on July 7, 2017, "Skylar," one of Defendants' presenters, made the following oral representations during a free two-hour workshop held at the Renaissance Hotel in Seattle, Washington:

A.    "How many of you would love to be able to learn how you can make an extra $5,000 to $10,000 a month by spending 30 minutes to an hour a day learning and implementing a plug-and-play system I'm going to share with you here in a moment."

B.    "You're selling Amazon, you're now making more money. That means that whatever you have invested into inventory, whatever you start with,

16

1 you've gotten that money back plus a what? ... Plus a profit, or what is

2 called an ROI, which stands for a return on investment...See, in our

3 system – again, write this down – the minimum ROI, minimum net return

4 on investment that our students are making right now, their target

5 minimum net ROI, is 20 percent.  Write that down.  Twenty percent.

6 Minimum net ROI of 20 percent."

7 C. "All right, guys.  So what did John Bean do? ... Took $1,000, turned it

8 into ... $65,000.  Now, do you think that John Bean stopped there?

9 ...How many of you would not stop there by raise of hand.  See, here's

10 what we know, folks.  You go to the three-day workshop, you learn the

11 system, you start selling on Amazon, once you've made your first, second,

12 third sale, what are you proving to yourself? ... That you can do it, right,

13 that you can do it. ... So, again, like I said, John Bean started out with

14 what – with $1,000, turned that into $65,000.  Now, by the way, we're

15 going to talk about the time frame that John Bean did that in.  However, he

16 was working on a very compressed time frame because he said I don't

17 have five years, 10 years, to be able to build my retirement level up.  He

18 says, I've got to do this now."

19 65. In some instances, Defendants display an "earnings disclaimer" on a screen

20 shortly after beginning their free two-hour workshops.  One such earnings disclaimer stated:

21 Any student examples showing profits or other earnings are NOT

22 interpreted as Average [sic], or normal.  The typical, expected or

23 normal individual does not ever start a business.  So, by having a

17

1    business at all, they are already above average. All profits shown

2    are potential returns. There is no assurance that your profits and

3    income will match what we present.

4    66.    In some instances, Defendants will also make oral earnings disclaimers during the

5    course of the free two-hour workshops. For example, during a free two-hour workshop in

6    Seattle, the presenter stated as follows:

7    Just because I share with you a testimonial or an example of

8    someone that, let's say, is making $10,000 a month, am I

9    guaranteeing that you're also going to make $10,000 a month? ...

10    Absolutely not.

11    67.    Despite the brief earnings disclaimers, Defendants' presentation during the free

12    two-hour workshops leaves consumers with the net impression that they are likely to profit

13    implementing the Amazing Wealth System to sell on Amazon.

14    68.    Defendants also tell consumers who attend the free two-hour workshops that it's

15    not possible to teach them everything in two hours and that to fully understand Defendants'

16    system and receive the necessary software "tools" and access to a network of wholesalers,

17    consumers need to purchase the Amazing Wealth System and attend Defendants' "3-Day

18    Amazon Profits Workshop" ("3-Day Workshop").

19    69.    Defendants typically offer the Amazing Wealth System base package, which

20    includes enrollment in a 3-Day Workshop, for $995.

21    70.    The base Amazing Wealth System package also includes, among other things, a

22    set of books and DVDs bearing the label "Amazon Riches Home Study System."

23    71.    Defendants require consumers purchasing the Amazing Wealth System base

18

1  package to sign a purchase order. Attached as **Exhibit D** is a true and correct copy of a purchase

2  order enrolling a consumer in a 3-Day Workshop scheduled to take place in Oakland, California

3  on December 8-10, 2017.

4  <center>**Defendants' 3-Day Workshops**</center>

5       72.     Defendants hold 3-Day Workshops throughout the United States and Canada.

6       73.     Defendants typically hold their 3-Day Workshops within a month of, and in close

7  proximity to the location of, the free two-hour workshops.

8       74.     During the 3-Day Workshops, Defendants attempt to convince consumers to

9  upgrade to more expensive enrollment levels of the Amazing Wealth System and buy additional

10  products and services. A true and correct copy of a brochure Defendants distributed during a 3-

11  Day Workshop is attached as **Exhibit E.**

12       75.     Defendants typically offer "Diamond," "Platinum," and "Gold" enrollments for

13  $34,995, $19,995, and $9,995 respectively. True and correct copies of package breakdown

14  handouts used by Defendants to describe and sell higher level enrollments of the Amazing

15  Wealth System are attached as **Exhibits F and G.**

16       76.     Defendants require consumers enrolling in a higher level enrollment such as the

17  "Platinum Enrollment" to sign a written agreement. Attached as **Exhibit H** is a true and correct

18  copy of a written agreement for the "Platinum Enrollment."

19       77.     Defendants' higher level enrollments for the Amazing Wealth System typically

20  feature "Personal 1-on-1 Coaching Sessions" and other "bonuses," such as ungating services and

21  access to the "Fulfillment By Adam" service. A true and correct copy of a handout Defendants

22  use to describe some of the "bonuses" they offer is attached as **Exhibit I.**

23       78.     Defendants' Fulfillment By Adam service purportedly receives orders from

<center>19</center>

1    wholesalers exclusively on behalf of purchasers of the Amazing Wealth System and packs and

2    ships those products to Amazon's fulfillment centers.  According to Defendants, "this service is

3    designed so that [purchasers] can focus on making more money…"

4          79.    During the course of the 3-Day Workshops, Defendants repeat, reinforce, and

5    expand on the earnings claims made in their initial advertising campaign and in the free two-hour

6    workshop.  They do so through additional testimonials and specific examples designed to give

7    prospective purchasers the impression that they will likely realize high profit margins using the

8    Amazing Wealth System.

9          80.    For example, on December 8, 2017, Nathan Rossi, one of Defendants' presenters,

10    made the following oral representations during a 3-Day Workshop held at the Red Lion Hotel in

11    Oakland, California:

12          A.    "I'm going to show you how to build a business to whatever size you want

13                it to be online, on Amazon.  So whether you want an extra $20- to $30,000

14                a year or you want to create a million dollar a year business, I'm going to

15                show you how to do either of those."

16          B.    "This is you starting a legitimate e-commerce business, right?  I'm going

17                to show you some stuff this weekend that's going to blow your hair back a

18                little bit.  I'm going to show you products that are going to give you ROI

19                50, 80, 100, 200, 500 percent return on your money."

20          C.    "You see, I regularly beat Amazon because I know how to win the buy

21                box and I know their tricks.  And so I deploy the same tricks and I can

22                actually win the buy box.  So we'll get into that."

23          D.    "Whether – you know, if you come to me and say, Nathan, I'm retired,

I've got $250,000 to start this business, I've got great credit and all the time in the world, well, great, we've got a plan for that. If you come and you say, I work two jobs, I'm a single mother, my credit score starts with a decimal point and I could scrape together 500 bucks to get started, well, we've got a plan for that, too. It's a different plan and both plans will make money, but it's just different ways. What types of products should you start with, where do you begin, you know, what niches do you start with, what categories, things like that."

81.     During the 3-Day Workshops, defendants also provide consumers with "tips, tricks, and techniques" to purportedly profit and outcompete other third-party sellers on Amazon.com.

82.     Much of the information Defendants convey to consumers during the 3-Day Workshops, in their videos and webinars, and during coaching sessions is basic information regarding Amazon.com and Amazon's FBA service that is available free of charge on the "Resources and Tutorials" section of the Amazon services website.

83.     Many of the strategies and techniques Defendants urge consumers to deploy are deceptive and violate the Amazon BSA.

84.     For example, Defendants instruct purchasers of the Amazing Wealth System to obtain fraudulent or fake product reviews for the products purchasers list on Amazon.com. The posting of fraudulent reviews by third-party sellers violates Amazon's Anti-Manipulation Policy for Customer Reviews.

85.     Defendants instruct purchasers of the Amazing Wealth System to obtain and deploy multiple Amazon Selling Accounts through a variety of ruses in an effort to "win the Buy

1    Box" over other third-party sellers. Amazon strictly prohibits third-party sellers from using

2    multiple seller accounts without express permission from Amazon.

3         86.    Amazon prohibits third-party sellers from listing counterfeit or inaccurately

4    described products on Amazon.com. Nevertheless, in many instances, Defendants or

5    wholesalers recommended by the Defendants sell counterfeit or inaccurately described products

6    to purchasers of the Amazing Wealth System. As a result, many purchasers, especially those

7    relying on the Fulfillment By Adam service, list counterfeit or inaccurately described products

8    on Amazon.com, thus violating Amazon's BSA.

9         87.    According to an internal analysis conducted by Amazon, purchasers of the

10    Amazing Wealth System "are more likely than other third party sellers on Amazon to experience

11    problems with their Amazon seller accounts." *See* Complaint, *Amazon.com, Inc. v. FBA Stores,*

12    *LLC et al.*, Case No. 2:17-cv-01830-JPD (W.D. Wash. filed Dec. 6, 2017) (ECF No. 1) at 36,

13    ¶ 131. More than a quarter of the Amazing Wealth System third-party seller accounts identified

14    by Amazon "have received warnings from Amazon or been suspended, including for possible

15    trademark infringement, suspicion of product review abuse, poor delivery performance, high

16    order defect rates, or other violations of Amazon's BSA and incorporated Seller policies." *Id.*

17    The Amazing Wealth System third-party seller accounts identified by Amazon "have also

18    performed worse than other Amazon sellers, as demonstrated by their higher-than-average rate of

19    customer returns and lower average sales volume and revenue." *Id.*

20         88.    Contrary to Defendants' representations, consumers who purchase the Amazing

21    Wealth System and attempt to deploy the strategies conveyed during the 3-Day Workshops, in

22    Defendants' videos and webinars, and during the personal coaching sessions are unlikely to earn

23    the income that Defendants advertise.

22

1          **Defendants' Failure to Provide Disclosure and Earnings Claims Statements**

2          89.     Defendants fail to provide a written disclosure document to consumers prior to

3     consumers' purchase of Defendants' business opportunities as required by the Business

4     Opportunity Rule.

5          90.     Although Defendants make claims to consumers about their likely earnings, they

6     fail to provide consumers with an earnings claim statement as required by the Business

7     Opportunity Rule.

8                              **VIOLATIONS OF THE FTC ACT**

9          91.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts

10    or practices in or affecting commerce."

11         92.     Misrepresentations or deceptive omissions of material fact constitute deceptive

12    acts or practices prohibited by Section 5(a) of the FTC Act.

13                        **Count I — Misrepresentations Regarding Earnings**

14         93.     In numerous instances, in connection with the advertising, marketing, promotion,

15    offering for sale, or sale of business opportunities, Defendants have represented, directly or

16    indirectly, expressly or by implication, that consumers who purchase and use Defendants'

17    business opportunities are likely to earn a specific level or range of actual or potential sales, or

18    gross or net income or profits. Such representations include that consumers who purchase and

19    use the Amazing Wealth System are likely to earn several thousand dollars a month.

20         94.     The representations set forth in Paragraph 93 of this Complaint are false or

21    misleading or were not substantiated at the time the representations were made.

22         95.     Therefore, Defendants' representations as set forth in Paragraph 93 of this

23    Complaint constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15

23

1  U.S.C. § 45(a).

2  **VIOLATIONS OF THE BUSINESS OPPORTUNITY RULE**

3  96.    The FTC brings this action under the amended Business Opportunity Rule, 16

4  C.F.R. Part 437, which was extended in scope to cover certain work-at-home opportunities,

5  became effective on March 1, 2012, and has since that date remained in full force and effect.

6  97.    Defendants are "sellers" who have sold or offered to sell "business opportunities"

7  as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(c) and (q).  Under the Business

8  Opportunity Rule, a "seller" is a person who offers for sale or sells a business opportunity.  16

9  C.F.R. § 437.1(q).  Under the Rule, a "business opportunity" means a "commercial arrangement"

10  in which a "seller solicits a prospective purchaser to enter into a new business;" the "prospective

11  purchaser makes a required payment;" and the "seller, expressly or by implication, orally or in

12  writing, represents that the seller or one or more designated persons will … [p]rovide outlets,

13  accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for

14  the purchaser's goods or services." 16 C.F.R. 437.1 (c).

15  98.    Among other things, the Business Opportunity Rule requires sellers to provide

16  prospective purchasers with a disclosure document in the form and using the language set forth

17  in the Business Opportunity Rule and its Appendix A, and any required attachments.  In the

18  disclosure document, the seller must disclose to prospective purchasers five categories of

19  information, including basic identifying information about the seller, any earnings claims the

20  seller makes, the seller's litigation history, any cancellation and refund policy the seller offers,

21  and contact information of prior purchasers.  16 C.F.R. § 437.3(a)(1)-(5).  Furthermore, this

22  information must be disclosed at least seven (7) days before the prospective purchaser signs a

23  contract or makes a payment.  16 C.F.R. § 437.2.  The pre-sale disclosure of this information

1    enables a prospective purchaser to contact prior purchasers and take other steps to assess the

2    potential risks involved in the purchase of the business opportunity.

3         99.    Defendants have made earnings claims in connection with the sale of their

4    business opportunities, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(f).

5    Under the Business Opportunity Rule, an "earnings claim" means "any oral, written, or visual

6    representation to a prospective purchaser that conveys, expressly or by implication, a specific

7    level or range of actual or potential sales, or gross or net income or profits." 16 C.F.R. §

8    437.1(f).

9         100.   The Business Opportunity Rule prohibits sellers from making earnings claims

10   unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its

11   possession written materials to substantiate the claim at the time it is made; (3) furnishes an

12   Earnings Claim statement to prospective purchasers in conjunction with the disclosure document,

13   containing, among other things, information regarding the time frame captured by the earnings

14   claim, the characteristics of the purchasers, and the number and percentage of all persons who

15   purchased the business opportunity within the time frame who achieved at least the stated level

16   of earnings; and (4) makes written substantiation of the earnings claim available to any

17   prospective purchaser who requests it. 16 C.F.R. § 437.4(a).

18        101.   Defendants have also made earnings claims in connection with the sale of their

19   business opportunities in the general media, as defined by the Business Opportunity Rule, 16

20   C.F.R. § 437.1(h). Under the Business Opportunity Rule, "general media" means "any

21   instrumentality through which a person may communicate with the public, including, but not

22   limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and

23   mobile communications." 16 C.F.R. § 437.1(h).

1       102.    The Business Opportunity Rule prohibits sellers from making earnings claims in

2  the general media unless the seller has a reasonable basis for and written substantiation of any

3  earnings claims and states in immediate conjunction with those claims the beginning and ending

4  dates when the represented earnings were achieved, and the number and percentage of all

5  persons who purchased Defendants' business opportunity prior to that ending date who achieved

6  at least the stated level of earnings. 16 C.F.R. § 437.4(b).

7       103.    Defendants have disseminated industry financial, earnings, or performance

8  information in connection with the offering for sale, sale, or promotion of a business opportunity.

9       104.    The Business Opportunity Rule prohibits sellers from disseminating industry

10  financial, earnings, or performance information unless the seller has written substantiation

11  demonstrating that the information reflects, or does not exceed, the typical or ordinary financial

12  earnings, or performance experience of purchasers of the business opportunity being offered for

13  sale. 16 C.F.R. § 437.4(c).

14       105.    Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of

15  the Business Opportunity Rule constitutes an unfair or deceptive act or practice in or affecting

16  commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

17                      **Count II— Misrepresentations Regarding Income or Profits**

18       106.    In numerous instances, Defendants have misrepresented the amount of sales, or

19  gross or net income or profits a prospective purchaser may earn or that prior purchasers have

20  earned in connection with the offering for sale, sale, or promotion of a business opportunity.

21       107.    Defendants' acts and practices, as described in Paragraph 106 above, violate the

22  Business Opportunity Rule, 16 C.F.R. § 437.6(d) and Section 5(a) of the FTC Act, 15 U.S.C. §

23  45(a).

**Counts III—Earnings Claims to Prospective Purchasers Violations**

108.    In numerous instances, Defendants have made earnings claims to prospective purchasers in connection with the offering for sale, sale, or promotion of a business opportunity while, among other things: (1) lacking a reasonable basis for the earnings claim at the time it was made; (2) lacking written substantiation for the earnings claim at the time it was made; or (3) failing to provide an earnings claim statement to the prospective purchaser, as required by the Business Opportunity Rule.

109.    Defendants' acts and practices, as described in Paragraph 108 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(a) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count IV — General Media Earnings Claims Violations**

110.    In numerous instances, Defendants have made earnings claims in the general media in connection with the offering for sale, sale, or promotion of a business opportunity while, among other things: (1) lacking a reasonable basis for the earnings claim at the time it was made; (2) lacking written substantiation for the earnings claim at the time it was made; or (3) failing to state in immediate conjunction with those claims (i) the beginning and ending dates when the represented earnings were achieved, and (ii) the number and percentage of all persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings.

111.    Defendants' acts and practices, as described in Paragraph 110 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(b) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count V — Industry Financial, Earnings, or Performance Information Violations**

112. In numerous instances, Defendants have disseminated industry financial, earnings, or performance information in connection with the offering for sale, sale, or promotion of a business opportunity while lacking written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial earnings, or performance experience of purchasers of the business opportunity being offered for sale.

113. Defendants' acts and practices, as described in Paragraph 112 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(c) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count VI — Disclosure Document Violations**

114. In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants have failed to furnish prospective purchasers with the disclosure document and attachments required by the Business Opportunity Rule, within the time period prescribed by the Rule.

115. Defendants' acts and practices, as described in Paragraph 114 above, violate the Business Opportunity Rule, 16 C.F.R. §§ 437.2 and 437.3(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**CONSUMER INJURY**

116. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the Business Opportunity Rule. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

117.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

118.    Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the Business Opportunity Rule, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and the Business Opportunity Rule, and the Court's own equitable powers, requests that the Court:

A.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access, appointment of a receiver;

B.    Enter a permanent injunction to prevent future violations of the FTC Act and the Business Opportunity Rule by Defendants;

C.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the Business Opportunity Rule,

1  including but not limited to, rescission or reformation of contracts, restitution, the refund of

2  monies paid, and the disgorgement of ill-gotten monies; and

3       D.    Award Plaintiff the costs of bringing this action, as well as such other and

4  additional relief as the Court may determine to be just and proper.

5                             Respectfully submitted,

6                             David C. Shonka
                           Acting General Counsel

7

8  Dated: March **12**, 2018

                           Roberto Anguizola

9                             Illinois Bar # 6270874
                           (Admitted in the D. Nev. pursuant to LR IA 11-3)

10                             Tel. (202) 326-3284
                           Email: ranguizola@ftc.gov

11

12                             Miry Kim
                           Washington Bar # 31456
                           (Seeking admission pursuant to LR IA 11-3)

13                             Tel. (202) 326-3622
                           Email: mkim@ftc.gov

14

15                             Gregory J. Evans
                           DC Bar # 1033184
                           (Seeking admission pursuant to LR IA 11-3)

16                             Tel. (202) 326-3425
                           Email: gevans2@ftc.gov

17

18                             Federal Trade Commission
                           600 Pennsylvania Avenue, N.W.
                           Mail Drop CC-8528

19                             Washington, DC 20580

20                             Attorneys for Plaintiff
                           FEDERAL TRADE COMMISSION

21

22

23

# Exhibit A





**Presents**

# Live Amazon 4-Day Summit

To Register Call **909-340-9974** immediately!

Seating is limited to the first 500 registrants.

Copyright 2017 Online Auction Learning Center Inc.

Live Amazon 4-Day Summit

# LAS VEGAS

November 3-6, 2017

WELCOME
TO *Fabulous*
**LAS VEGAS**
NEVADA

# Live Amazon 4-Day Summit

## To Register Call **909-340-9974** immediately!

Seating is limited to the first 500 registrants.

### Attend Our Summit and

# Learn How to Make Amazing Wealth Using Amazon

**FOUR DAYS!**

## LAS VEGAS

# NOVEMBER 3-6, 2017

## LUXURIOUS RESORT HOTEL

AS SEEN ON

    

**Congratulations!** You invited to attend an exclusive LIVE Amazon 4-Day Summit that is coming to Las Vegas. This will truly be a once-in-a-lifetime opportunity.

At this summit you will see how to:

✔ NEGOTIATE with manufacturers, SOURCE products, and take advantage of once-in-a-lifetime business opportunities

✔ Work with our ELITE TEAM of Online Business Strategists and Professional Amazon Sellers to build your Elite Business on Amazon.

✔ Learn how you can realistically generate $10,000+ revenue on Amazon in the next 30-40 days.

✔ Start a REAL BUSINESS, and create a new source of income.

✔ Have PROFESSIONAL SELLERS ACCOUNT and be prepared to begin selling before you leave our summit.

✔ Creating your business the RIGHT WAY is very hard — we make it easy and show you what NOT to do.

✔ Reach millions of online shoppers who TRUST the Amazon brand.

✔ SAVE time, money, and effort on shipping and warehousing.

✔ Learn from our experts how to advertise within Amazon's platform your product sales and growth

✔ Learn how to utilize REAL STATISTICS, analytics, and number to make educated, profitable decisions for your business.

✔ Offer your products WORLD-WIDE to the specific people searching for them.

✔ Create YOUR OWN brands and businesses with Prime Global Source's elite training and premium resources.

✔ DON'T GET SHUT DOWN: Learn what to AVOID from our professional team to prevent Amazon closing your account and losing business

*You will not want to miss this amazing opportunity!*

*This exclusive program is limited to the first 500 registrants.*

Call Now!
909-340-9974



Case 2:18-cv-00442-JCM-PAL   Document 1   Filed 03/12/18   Page 36 of 77



# Exhibit B

Call 800-328-1244 to Register
For one of our free Amazon Workshops &
Discover How to Profit with Amazon.com



SPECIAL INVITATION
PRIVATE EVENT

**AWS**
WORKSHOP

LIVE


**AWS**

**Amazon Wealth Systems** is a highly sought after Amazon training company, who has addressed large and small audiences around the world. Having trained in 18 different countries, we have been lucky enough to share the stage with leaders such as Jack Canfield, Tony Robbins, Mark Victor Hansen, and many others.

For years we have been helping thousands of ordinary people take their lives back and create financial freedom by implementing our systems for success on Amazon. We are not affiliated with or connected to Amazon in any way, we just love Amazon. Just last year we sold over $12 Million on Amazon.com. Now we want to help you become our next Amazon success story. Come to this workshop and discover the power of Amazon FBA. Amazon has created this amazing system where they will store, inventory, ship out & handle all of your customer service for all of your orders!

# SF Bay Area



**AW**
WORKSHOP

Choose a location and call 800-328-1244 immediately!

amazon

$14,700 VALUE
EVENT CODE
NO 070516 1

GREATER SF BAY
amaz

MILPITAS
SHERATON
1801 Barber Lane
Milpitas, CA 95035
9am-11am or 12pm-2pm
Tuesday, November 18th

OAKLAND
HOLIDAY INN
77 Hegenberger Rd
Oakland, CA 94621
9am-11am or 12pm-2pm
Friday, November 17th

CROWNE PLAZA
45 John Glenn Drive
Concord, CA 94520
11am-1 or 12-2pm or 6-8pm

HOTEL SHATTUCK PLAZA
2086 Allston Way
Berkeley, CA 94704
9am-11 or 12-2pm or 6-8pm

ALVARADO
32083 Alvarado-Niles Rd
Union City, CA 94587
9am-11 or 12-2pm or 6-8pm

GREATER SF BAY
amaz

MILPITAS
SHERATON
1801 Barber Lane
Milpitas, CA 95035
9am-11am or 12pm-2pm
Tuesday, November 18th

OAKLAND
HOLIDAY INN
77 Hegenberger Rd
Oakland, CA 94621
9am-11am or 12pm-2pm
Friday, November 17th

CROWNE PLAZA
45 John Glenn Drive
Concord, CA 94520
11am-1 or 12-2pm or 6-8pm

HOTEL SHATTUCK PLAZA
2086 Allston Way
Berkeley, CA 94704
9am-11 or 12-2pm or 6-8pm

ALVARADO
32083 Alvarado-Niles Rd
Union City, CA 94587
9am-11 or 12-2pm or 6-8pm

# SPECIAL INVITATION

## Choose a location and call 800-328-1244 immediately!
### Participation is limited to the first 100 registrants.

   

**FREE VIP GIFT PACKAGE!**

All registered attendees will receive these valuable FREE gifts:
- ✔ Revealing Free Report: Online Selling Blueprint
- ✔ Revealing Free Manual: Best Selling Products on Amazon

### Plus, the first 100 callers who attend are registered to win a FREE iPad in our One-of-Twenty iPad Giveaway!!!



**FIVE DAYS ONLY!**

| CONCORD | BERKELEY | UNION CITY |
|---|---|---|
| Tuesday, November 14th | Wednesday, November 15th | Thursday, November 16th |
| CROWNE PLAZA | HOTEL SHATTUCK PLAZA | CROWNE PLAZA |
| 45 John Glenn Drive | 2086 Allston Way | 32083 Alvarado-Niles Rd |
| Concord, CA 94520 | Berkeley, CA 94704 | Union City, CA 94587 |
| 9am-11 or 12-2pm or 6-8pm | 9am-11 or 12-2pm or 6-8pm | 9am-11 or 12-2pm or 6-8pm |

| OAKLAND | MILPITAS |
|---|---|
| Friday, November 17th | Saturday, November 18th |
| HOLIDAY INN | SHERATON |
| 77 Hegenberger Road | 1801 Barber Lane |
| Oakland, CA 94621 | Milpitas, CA 95035 |
| 9am-11am or 12pm-2pm | 9am-11am or 12pm-2pm |

**Congratulations!** You've been chosen to attend an exclusive LIVE Amazon Workshop that is coming to the greater San Francisco area. My name is Adam Bowser, and over the past 18 years I have sold over $50 Million online. I'm going to be hosting a few local workshops around the SF area to share my secrets for making money on Amazon. This will truly be a once-in-a-lifetime opportunity. At this workshop you will see how to:

- ✔ Get started selling on Amazon and Make $5,000-$10,000 in the next 30 days...Even if you have never sold anything online before

- ✔ You can Create Your Own Amazon Seller's Account the Moment You Leave the Workshop

- ✔ Have Amazon Store & Inventory all of Your Products, Ship Out Your All Your Orders & We'll even show you the Hottest Products that sell the fastest on Amazon

- ✔ Start an Online Business with <u>No Money out of your pocket</u>. Setting up an Amazon Account is 100% Free

- ✔ I'll be Giving you Wholesalers You can call up and Get Great Deals for Huge profits. Or just make some extra $$ to Pay Your Basic Bills

You will not want to miss this amazing opportunity! I personally sold over $12 Million on Amazon last year and this exclusive program is limited to the first 100 registrants.

**Call 800-328-1244.** If you are not one of the first 100 registrants, your name will be put on a waiting list. You have never experienced anything like this before. We guarantee it. Don't miss this event.

Adam Bowser, Amazon Wealth Systems

AS SEEN ON     

# Exhibit C

Case 2:18-cv-00820-GRB Document 1 Filed 02/07/18 Page 45 of 237





# SPECIAL INVITATION

¡Elija un lugar y llame a 800-313-7063 de inmediato! La participación

esta limitada a los primeros 100 inscritos.

   

**FREE VIP GIFT PACKAGE!**

Todos los asistentes registrados recibirán estos valiosos regalos:
- ✔ Reporte Gratis Revelando: Modelo de Venta en Linea.
- ✔ Manual Gratis Revelando: Los Mejores Productos de Venta en Amazon

Ademas, las primeras 100 llamadas que participen están registradas para ganar un iPad GRATIS en nuestro Sorteo de Uno-de-Veinte iPads!!!!!!

## FIVE DAYS ONLY!

**SAN JUAN**
Martes, 12 de Septiembre
SHERATON OLD SAN JUAN
100 Brumbaugh St
San Juan, PR 00901
12pm-2pm or 6pm-8pm

**DORADO**
Miércoles, 13 de Septiembre
EMBASSY SUITES DORADO
201 Dorado Del Mar Blvd
Dorado, 00646, PR
12pm-2pm or 6pm-8pm

**ISLA VERDE**
Jueves, 14 de Septiembre
COURTYARD ISLA VERDE
7012 Boca de Cangrejos Ave
Isla Verde, Carolina, 00979, PR
12pm-2pm or 6pm-8pm

**ISLA VERDE**
Viernes, 15 de Septiembre
EMBASSY SUITES SAN JUAN
8000 Tartak St
Verde, Carolina, 00979, Puerto Rico
9am-11am or 12pm-2pm

**SAN JUAN**
Sábado, 16 de Septiembre
DOUBLETREE SAN JUAN GALLERY PLAZA
105 de Diego Ave
San Juan, PR 00911
9am-11am or 12pm-2pm

¡Felicidades
en VIVO de
y en los últi
tener unos
mis secreto
oportunid

- ✔ Empeza
  días... A
- ✔ Usted v
  mome
- ✔ Tenga
  todas
  calien
- ✔ Poder
  cuent
- ✔ Le voy
  ofert
  básic

Usted r
persona
progra

Llame
100 in
Nu
9d

Adam

AS
SEEN
ON

...se trata de...

...$10,000 en los próximos 30...

...línea antes

...de Amazon en el
...y tanto

...ngar y hacer inventario de sus productos, mandar
...lo hasta le mostraremos los productos más
...n más rápido en Amazon

...los en línea sin dinero de su bolsillo. Configurar una
...100% gratis

...los mayoristas que usted podrá llamár y obtener grandes
...enormes ganancias. O hacer un extra $$ para pagar sus cuentas

...va a querer perder esta increíble oportunidad! Yo vendí
...nte más de $12 millones en Amazon el año pasado y este
...exclusivo está limitado a los primeros 100 inscritos.

...800-313-7063. Si usted no es uno de los primeros
...tos, su nombre será puesto en una lista de espera.
...n experimentado nada como esto antes. Nosotros lo
...nos. No se pierda este evento.

...er, Amazon Wealth Systems







## Llame a 800-313-7063 Para Registrarse a Uno de Nuestros Entrenamientos Gratis de Amazon y Descubra Cómo Beneficiarce de Amazon.com

# AWS

**Amazon Wealth Systems** es una empresa codiciada de entrenamiento de Amazon, que ha dirigido audiencias grandes y pequeñas alrededor del mundo. Habiendo entrenado en 18 países diferentes, hemos tenido suerte de compartir escenarios con líderes como Jack Canfield, Tony Robbins, Hansen y muchos otros.

Durante años hemos estado ayudando a miles de personas com ousted a tomar sus vidas y crear libertad financiera mediante la implementación de nuestros sistemas para el éxito en Amazon. No estamos afiliados ni conectados con Amazon, pero nos encánta Amazon. Solo el año pasado vendimos más $12 millones con Amazon.com. Ahora queremos ayudarle a convertirse en nuestra próxima historia de éxito con Amazon.Venga a este taller y descubra el poder de Amazon FBA. Amazon ha creado este sistema ... broso donde se almacena, inventario, envían y todos de su servicio al cli ... para ... us pedidos!



## AWS
## WORKSHOP

Elija un taller disponib ...
**800-313-7063** de inmediato!

... on Wealth System. All rights reserved. DVD's and other ... do ... ponse the event "One of Twenty Paid Giveaway ... and ... will be provided at the event.

# Exhibit D



**AWS**
Amazing Wealth Systems

Date 11/17-117

Event Fri 9am

293 Libbey Industrial Parkkway, Ste. 150
Weymouth, MA 02189
866-319-4192
support@amazingwealthsystems.com

## PLEASE PRINT CLEARLY & PRESS HARD FOR ALL COPIES

Name ███████████

Shipping Address ████████████████████████

City N(wwk          State CA          Zip Code ███

Cell Phone ███████████     Home Phone _____

Best Email ████████████████

## ORDER INFORMATION

| Product | Delivered | To Be Shipped | Price | Total Cost |
|---|---|---|---|---|
| Amazen Worlshcl | | | $ 995 | $ 995 |
| Home Study | x | | $ 995 | $ — |
| Members Area | | | $ 995 | $ — |

| Event | | | Guest Name (Please Print) |
|---|---|---|---|
| Date Dec 8-10 | City | Oakland | TBD |
| Date | City | | |

### Payment Information

1. Date 11/17 $ 995 CC # ██████  Exp. Date 2/19
2. Date _____ $ _____ CC # _____ Exp. Date _____
3. Date _____ $ _____ CC # _____ Exp. Date _____

Name on Card : _____ Same

Billing Address (If Different From Above) _____ Same

| | |
|---|---|
| Total Cost | $ 995 |
| Payment | $ 995 |
| Outstanding | $ O |

The material purchased are copyrighted; they are for your personal use and copying them is prohibited by law. You the buyer may cancel this transaction at any time prior to midnight of the 3rd business day after the date of this transaction. See the attached terms and conditions form for an explanation of this right.

Signature (Required): _____     Date 11/17/17



**AWS**

293 Libbey Industrial Parkway, Ste.150
Weymouth, MA 0218902184
866-319-4192
support@amazingwealthsystems.com

**Event Dates & Locations**

Event dates and locations are subject to change. Non-attendance at the event does not constitute grounds for a refund, nor release from this agreement. All deposits, advance payments, finance forms and tickets are non-refundable and held as in-house credit toward future enrollment and/or purchase.

_____ (Initial Here)

**Product Return Policies and Procedures**

You, the buyer, may cancel this agreement at any time prior to midnight of the 3rd day after the date of this agreement, excluding Sundays and holidays. Should you choose to request a cancellation on or before the 3rd business day from the date of purchase, you must submit the front of this agreement along with a written request stating your reason for cancelling to return@amazonwealthsystems.com. Upon approval of your return request, you will be directed as to the instructions for returning your materials.

_____ (Initial Here)

**Declined Credit Cards and Checks**

In the event a credit card is returned as "declined", we will attempt to claim funds from your card up to three separate times before a suspension occurs. Checks may be accepted as a form of payment at our live events as a courtesy to our customers. However, you, the buyer will be solely responsible for paying all returned checks and/or bank fees, processing charges, and past monthly fees. Checks that are non-negotiable, for any reason (insufficient funds, closed accounts, stop payments, etc.) are subject to immediate collection and prosecu- tion to the fullest extent of the law, including all expenses involved in collection, and will be subject to an additional fee if the account is forwarded to a 3rd party collection agency.

_____ (Initial Here)

Dispute Resolution Policy: By executing this Purchase Order, the Customer and the Company hereby agree that any and all disputes that arise between them concerning the Purchase Order or any of the terms thereof or that concern any aspect of the relationship between the Customer and the Company, shall be decided exclusively in binding arbitration conducted by the American Arbitration Association ("AAA"). The dispute will be decided by a single arbitrator who will apply the AAA's Commercial Arbitration rules. The arbitrator does not have authority to make an order for costs or attorneys fees, and will only award contract damages if any. If, however, a party files a suit in Court in violation of this written arbitration agreement, the party that is made to defend the suit in Court is entitled to an immediate stay and dismissal of such Court proceeding, and shall be entitled to an award of all reasonable attorneys fees and costs in connection with such Court proceedings. In order to keep costs down, the arbitration will be conducted through written submissions only, and the arbitrator will not require any live hearings. Customer waives all rights to a class arbitration. Customer and Company further agree that each party will bear it's own costs and attorney's fees incurred in connection with the AAA arbitration proceeding

_____(Initial Here)

REV 10/10/17

# Exhibit E





# AWS ACADEMY
## INTRODUCTION TO COACHING







**The AWS Members Area is an online platform that delivers video training to help you launch and grow your online business. This information is broken out into several different categories:**



**Amazing Wealth Systems**

## AWS COACHING

The AWS Coaching page is filled with all types of modules, training videos, & content to help us educate you on the different areas of your online business. With step-by-step videos training you on how to run a successful online business you will have the availability to reference all the resources you need.



## WHOLESALERS

The AWS Wholesalers page is filled with top tier wholesale suppliers that you can contract with and build relationships with more companies that can consistently supply you with products for your online business.



## TOOLS & SOFTWARE

Our tools & software page has every resource our company would build out within order to help automate your business about the way. With listing, shipping tools, and many other software, painting or your objectives, you will have exactly where to go to help systematize your business as you grow.



**Students will be given login access to www.amazingwealthsystems.com to access these tools.**



2

## Personal 1-on-1 Coaching with our Amazon Experts & Access to our entire mentoring fulfillment team.



**Personal Coaching can help you acquire the skills necessary to become a successful online marketer.**

**Our Amazon expert coaches have years of experience actively running their own successful online businesses - experience that can give you the inside-track to Amazon success.**

**Working closely with your coach can help you develop the same skills and success mindset to take your business to the next level.**



AWS PERSONAL 1-ON-1 COACHING ASSISTS YOU IN TWO WAYS:

### 1. Your Amazon Expert Coach

As an AWS Coaching Client, you will have the chance to work with a top-level Amazon expert who is there to guide you along your journey to become a successful Amazon seller.

### 2. AWS Coaching Hotline

We have Amazon specialists on-call and ready to assist you Monday - Friday from 8:00am to 8:00pm (Mountain Time Zone) that can assist you with any questions you might have. This private line is reserved exclusively for coaching students.

3

 **It's All About You!**

# 2-Day On-Site 1-on-1 Office Visit  (Live Training)

**Following your 3-Day Amazon Explosion Workshop, you'll have the chance to visit the Boston office.**



Come Join Us in Boston, MA

**Contact us:**
**To help you set up your schedule and provide recommendations for flight and hotel accommodations. During these 2 days at our office. By design, the visit is highly personalized to YOUR business.**

COME VISIT US AT AWS HEADQUARTERS IN BOSTON, MASSACHUSETTS TO GAIN ACCESS TO THESE EXCLUSIVES.

**WAREHOUSE TOUR:**
You will experience hands on exactly what AWS does on a daily basis from sourcing to sorting to fulfilling thousands of products on a weekly basis. You will see exactly how a multi-million dollar business operates.

**DINNER WITH AWS TEAM:**
The night of your visit AWS team will bring you out for a great seafood dinner. You will have an opportunity to network with our team in a relaxing setting.

4







### HELD IN LAS VEGAS, CHICAGO, DALLAS, & SAN FRANCISCO

This incredible Jam- packed 4-day event is the type of signature event that can change your life.

You will seldom have the opportunity to acquire knowledge directly from wholesale suppliers that can supply your business money-making products for many years to come.

Learn exactly how AWS team interact, negotiate and acquires deals from the top suppliers in the world carrying some of the host selling products for Amazon.

BENEFITS OF THE AWS 4-DAY AMAZON SUMMIT

**TRADE SHOW EXPERIENCE:**
Trade shows are huge in this business. We will bring you with us to either a trade show we host personally for our students, or we will take you to one of the biggest in the country. The goal is to help you meet and greet with top level wholesale suppliers. This face to face interaction with suppliers will start the business relationships that can elevate your business to the next level.

**AMAZON ELITE SELLER PANEL:**
You'll have the opportunity to meet other successful online sellers in our "Network" that are looking to increase their business. At this live event you will ind top suppliers, trends and upcoming product releases that is only going to increase the amount of sales you do online.

**TRAVEL & ACCOMMODATIONS:**
We will help assist you with flights & hotel, we believe staying together as a team is essential in the trade show experience. While the fun you have with us will be world-class, make no mistake that the knowledge and experience you acquire from the event can pay for itself over and over again.



# FULFILLMENT BY ADAM

**The key component to running an online business and making money is finding products that sell with a healthy profit margin for your storefront on a weekly basis.**

**"Fulfillment by Adam" is the perfect service to enable your store to grow as profitable as you want.**



## BENEFITS OF THE FULFILLMENT BY ADAM PROGRAM:

### THE FULFILLMENT BY ADAM TEAM
Fulfillment by Adam consists of over 15 employees that have years of experience labeling, packing and shipping products all over the world. This service is designed so that you can focus on making more money in your business and letting Fulfillment by Adam service all your products to Amazon for you. The way this service works is when you purchase products from any wholesaler you visit our exclusive website and process the order through the website and tell your supplier to ship the goods to our Boston facility. There is a $0.20 per piece for every order you place which is 1/3 of the cost of any other service. This service eliminates you from ever having to pack and ship products to Amazon's fulfillment centers and the need for additional overhead.

### UPS PARTNERSHIP
AWS has partnered with UPS to offer our students the least expensive and most reliable shipping options. Utilize UPS through our site to take advantage of up to 60% discounts on shipping to us.

6

 

# CATEGORY APPROVAL AWS

## Amazon Ungating Services - Two Categories

**Diversifying your inventory is much easier when you can sell in multiple categories, which is why AWS maintains a partnership with CategoryApproved.com**

 

WHAT CATEGORY APPROVAL DOES FOR YOU:

**TWO CATEGORIES UNGATED FOR YOU:**
CategoryApproved provides ungating services to those who register with them. After applying the coupon ($400 value) given to you from AWS, you will be designated with an Ungating Specialist who will coordinate with you every step of the process.

From the initial phone call, to the confirmation email of your account approval, CategoryApproved will do all the grunt work for you. Forms, application letters, negotiations with Amazon representatives, are all handled by their experienced & well-trained staff.

**CUSTOMER SATISFACTION GUARANTEE:**
CategoryApproved aims to excel & help Amazon Sellers grow & expand their businesses. They are aware despite high success rates, Amazon will unfortunately reject some of their applications to keep category competition controlled. CategoryApproved promises to our students that if their application is rejected, Category approved will obtain approval for you in 2 categories no matter what!

7

# Exhibit F



**Continuing Education**

# CONTINUING EDUCATION
## ADVANCED EDUCATION PROGRAMS

### MASTERMIND 3X YEAR

| | Full Price | Discount |
|---|---|---|
| | INVITATION | ONLY |

| | Full Price | Discount | Onsite Investment |
|---|---|---|---|
| **DIAMOND ENROLLMENT** | | | $34,995 |
| • **16 Personal 1 on 1 Coaching Sessions** | | *Included* | |
| Held every week at a scheduled time with our Amazon Coach | | | |
| • **Access to FBA Stores Angel Supplier Rolodex** | | *Included* | |
| Lifetime supply of product with great deals for your store | | | |
| • **FBA Stores Deal Analysis & Partnering Program:** | | *Included* | |
| We will analyze any deal you get offered & partner with you on deals | | | |
| • **Fulfillment by Adam (FBA)** | | *Included* | |
| We fulfill any product orders to Amazon warehouses | | | |
| • **3 Day "Amazon Summit" Trade Show Event** | | *Included* | |
| Las Vegas ASD & CES Trade Show twice a year | | | |
| • **Unlimited Access to "The Network"** | | *Included* | |
| Wholesale products to & through our network of online sellers | | | |
| • **Ungating:** In 2 categories in first store | | *Included* | |

| | Full Price | Discount | Onsite Investment |
|---|---|---|---|
| **PLATINUM ENROLLMENT** | | | $19,995 |
| • **8 Personal 1 on 1 Coaching Sessions** | | *Included* | |
| Held every week at a scheduled time with our Amazon Coach | | | |
| • **Access to FBA Stores Angel Supplier Rolodex** | | *Included* | |
| Lifetime supply of product with great deals for your store | | | |
| • **3 Day "Amazon Summit" Trade Show Event** | | *Included* | |
| Las Vegas ASD & CES Trade Show twice a year | | | |
| • **Unlimited Access to "The Network"** | | *Included* | |
| Wholesale products to & through our network of online sellers | | | |

| | Full Price | Discount | Onsite Investment |
|---|---|---|---|
| **GOLD ENROLLMENT** | | | $9,995 |
| • **4 Personal 1 on 1 Coaching Sessions** | | *Included* | |
| Held every week at a scheduled time with our Amazon Coach | | | |
| • **Access to FBA Stores Angel Supplier Rolodex** | | *Included* | |
| Lifetime supply of product with great deals for your store | | | |
| • **Unlimited Access to "The Network"** | | *Included* | |
| Wholesale products to & through our network of online sellers | | | |

# Exhibit G



**Amazing Wealth Systems**

amazingwealthsystems.com



CONTINUING EDUCATION

Advanced Education Programs

| | Full Price | Discount |
|---|---|---|
| | INVITATION | ONLY |

## DIAMOND ENROLLMENT

| | Full Price | Discount | Onsite Investment |
|---|---|---|---|
| | | | |
| • **12 Personal 1-on-1 Coaching Sessions** <br> Held every week at a scheduled time with our Amazon Coach | | Included | |
| • **Access to AWS Angel Supplier Rolodex** <br> Lifetime supply of product suppliers with great deals for your store | | Included | |
| • **AWS Deal Analysis & Partnering Program** <br> We will analyze any deal you get offered & partner with you on deals | | Included | |
| • **Fulfillment by Adam (FBA)** <br> We fulfill product orders to Amazon warehouses for you | | Included | |
| • **Exclusive 4-Day "Amazon Summit" Event** <br> Incredible Networking and Business-building Workshop | | Included | |
| • **Unlimited Access to "The Network"** <br> Wholesale products to & through our network of online sellers | | Included | |
| • **Ungating:** in 2 categories in first store | | Included | |

## PLATINUM ENROLLMENT

| | Full Price | Discount | Onsite Investment |
|---|---|---|---|
| | | | |
| • **6 Personal 1-on-1 Coaching Sessions** <br> Held every week at a scheduled time with our Amazon Coach | | Included | |
| • **Access to AWS Angel Supplier Rolodex** <br> Lifetime supply of product suppliers with great deals for your store | | Included | |
| • **Exclusive 4-Day "Amazon Summit" Event** <br> Incredible Networking and Business-building Workshop | | Included | |
| • **Unlimited Access to "The Network"** <br> Wholesale products to & through our network of online sellers | | Included | |

## GOLD ENROLLMENT

| | Full Price | Discount | Onsite Investment |
|---|---|---|---|
| | | | |
| • **2 Personal 1-on-1 Coaching Sessions** <br> Held every week at a scheduled time with our Amazon Coach | | Included | |
| • **Access to AWS Angel Supplier Rolodex** <br> Lifetime supply of product suppliers with great deals for your store | | Included | |
| • **Unlimited Access to "The Network"** <br> Wholesale products to & through our network of online sellers | | Included | |

# Exhibit H



# "Amazing Wealth Systems" Coaching Program
### *Platinum Coaching*

**Benefits You Are Receiving as A Member of AWS Platinum Coaching Program:**

**#1 6 Weeks of Personal 1 on 1 Coaching Sessions**
- **1-ON-1 COACHING SESSIONS**
  30-60 Min One on One Calls with one of our Coaches.
- **Computer Sharing** where we can see your computer screen, control your mouse, so you will see every step.
- **Tips, tricks, and techniques** that will increase all aspects of your business.

**#2 AWS Deal Analysis & Partnering Program**
- Send any deal to deals@amazingwealthsystems.com and we'll analyze the deal and tell you if you should buy it or not.
- AWS will partner with you on approved deals that have a MOQ that is too high for you.
- Ability to Negotiate Utilizing Our Buying Power.

**#3 One Amazon Trade Show/ Summit Event**
- 4 Days, where "All In" students come to give and receive, network, and get to the next level.
- Biggest trade shows in the United States.
- (2) Tickets to 1 of our AWS Summit event and trade show for you to attend.
- Top Suppliers Trends & Upcoming Product Releases.
- Meet suppliers with the help of AWS staff and know how to negotiate and find good reputable suppliers.

**#4 Unlimited Access to "The Network"**
- Partner on deals with students inside the network.

- Access to Daily Deals.
- Leverage the Network to Sell Your bulk deals to other students, or your product.
- The Network Always has Students looking to place Capital in good Product deals.

**#5  Access to Affordable Ungating Service**
- Access to ungating service ([www.categoryapproved.com](www.categoryapproved.com)) to get any other category ungated.

**ACT NOW BONUSES** (only included the weekend of the live event)

**Bonus #1: 2 Additional Weeks of Personal 1 on 1 Coaching Sessions**

**Bonus #2: Access to AWS Angel Supplier Rolodex**
- <u>Immediate Access to Product:</u> Immediately start buying products of your choice from AWS top 15 Suppliers that they do business with every week.
- Deals with Great Profit Margins.
- Working with our team constantly to implement NEW suppliers.

**Bonus #3: Elite Coaching Hotline**
- Monday – Friday from 8am-8pm MST get a live Amazon support specialist to answer your questions and help you move forward.
- Direct Hotline just for coaching students (877-282-0817).


(BONUSES EXPIRE WITHIN 90 DAYS IF NOT SCHEDULED BEFOREHAND)

## Amazing Wealth Systems Program Terms and Conditions.

The following terms and conditions govern your relationship with AWS.

1. By signing this Agreement customer agrees to join Amazing Wealth System Program. Amazing Wealth Systems and AWS are wholly owned subsidiaries of FBA Stores, LLC. The purpose of this program is to increase customer's core competency skills to be able to successfully run an ecommerce business, properly purchase product, and to leverage AWS as a fulfillment center if needed.

2. In consideration for the training, Customer's purchase price will be $19,995.00.

3. The program includes 6 weeks of one-on-one coaching sessions that will expire 3 months after joining the program if not scheduled already. All Bonuses provided within your package will expire 90 days after joining the program if not scheduled or registered for the event before.

4. Customer will be assigned a coach and will be given a mutually agreed upon time slot when the coach will be available for calls. A phone number will be provided by the coach. If Customer neglects to call in or fails to reschedule prior to the call, the coach is under no obligation to reschedule any missed sessions and Customer's next contact with the coach will be at the regularly scheduled time.

5. Customer will receive assignments to be completed and these assignments will play a critical role in success online. Therefore, Customer hereby commits to completing all assignments given in the time frame required and to act with the information given.

6. When purchasing product from suppliers that AWS recommends, Customer understands that there potentially could be Product Policies and Procedures, which include but are not limited to; pricing guidelines, Minimum Advertised Price (MAP), Minimum Order Quantities (MOQ), and that all product orders cannot be shipped until Customer has sent in all the appropriate items in their entirety. Failure to obey the aforementioned Policies and Procedures can result in partners of AWS terminating their relationship with you.

7. Customer accepts and recognizes that other than the product return/cancellation provided herein there are no refunds for the Amazing Wealth System Program, as access to all online training materials are delivered at the point of sale.

8. AWS commits that as long as Customer applies the techniques and strategies that they teach, AWS will remain by customer's side.

9. Customer agrees to protect AWS Intellectual Property, and to maintain the confidentiality of all information shared by AWS. Amazing Wealth Systems and AWS, LLC are wholly owned subsidiaries of FBA Stores, Inc.

10. **ARBITRATION AND DAMAGES. Customer and AWS agree that any dispute, controversy or claim arising out of, relating to or about this contract, including the breach, termination or validity thereof, shall be finally resolved by AAA Arbitration. The dispute will be decided by a single arbitrator who will apply the AAA Commercial Arbitration rules. The arbitrator shall have the power to rule on any challenge to its own jurisdiction or to the validity or enforceability of any portion of the agreement to arbitrate. The parties agree to arbitrate solely on an individual basis, and that this agreement does not permit class arbitration or any claims brought as a plaintiff or class member in any class or representative arbitration proceeding. The arbitrator may not consolidate more than one**

person's claims, and may not otherwise preside over any form of a representative or class proceeding. In the event the prohibition on class arbitration is deemed invalid or unenforceable, then the remaining portions of the arbitration agreement will remain in force. Customer shall have the right to request that the arbitration be conducted through written submissions only. Any live hearing will be required to be in Boston Massachusetts. **IN NO EVENT, SHALL AWS BE LIABLE TO CUSTOMER OR ANY THIRD PARTY FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES ARISING OUT OF, OR RELATING TO, AND/OR IN CONNECTION WITH ANY BREACH OF THIS AGREEMENT, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER CUSTOMER WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (C) THE LEGAL OR EQUITABLE THEORY UPON WHICH THE CLAIM IS BASED.**

11. Except as expressly set forth in this document, AWS makes no warranties, express or implied. All other warranties, express or implied, are hereby disclaimed by AWS.

12. These terms and conditions shall be governed by and interpreted under the AWS of the State of Delaware without regard to its conflicts of law principles.

13. I understand and acknowledge that any and all testimonials shared by AWS are not typical and my results will vary depending on my product selection, effort, time, applying the principles taught, price, and marketing efforts. You, the buyer may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached Notice of Cancellation form for an explanation of this right. I acknowledge that the only representations under which I have made this purchase are those providing in writing and in this agreement.

14. AWS may provide your contact information to one of our pre-approved affiliates that we feel could potentially assist you with growing your business. If you wish to opt out of receiving third party information you may do so by emailing optout@amazingwealthsystems.com.

16. Prices are subject to change at any time and without notice.

17. If Coaching Calls are put off longer than 90 days without notice, or are not scheduled within 3 months of this contract, AWS has the right to mail you a DVD copy of the coaching sessions and consider you coaching package fulfilled.

18. Customer agrees to hold AWS, its owners and employees, and any or all companies or persons associated with the same harmless of any liability related to any of the products purchased under this agreement.

My signature below represents my agreement with each of the statements and requirements of these Terms and Conditions.

Name: (Please Print) _____

Signature:_____Date: _____

## NOTICE OF CANCELLATION:

You may cancel this transaction, without penalty or obligation, within three business days no later than midnight from the above date. If you cancel, any property traded in, any payments made by you under the contract or sale, and any negotiable instrument executed by you will be returned within 10 days following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled. If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this contract or sale, or you may, if you wish, comply with the instructions of the seller regarding the return shipment of the goods at the seller's expense and risk. If you do make the goods available to the seller and the seller does not pick them up within 20 days of the date of your notice of cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the seller, or if you agree to return the goods to the seller, and fail to do so, then you remain liable for performance of all obligations under the contract. To cancel this transaction, either (1) fax a signed and dated copy of this cancellation notice to (339)201-7683, (2) mail or deliver a signed and dated copy of this cancellation notice to AWS 293 Libbey Industrial Parkway Suite 150 Weymouth MA. 02189, or (3) email a request to returns@amazingwealthsystems.com.

I hereby cancel this transaction._____

Purchaser's' Signature (required): _____

Date (required): _____

Clearly Print Your First and Last Name (required):_____

**NOTICE OF CANCELLATION:**

You may cancel this transaction, without penalty or obligation, within three business days no later than midnight from the above date. If you cancel, any property traded in, any payments made by you under the contract or sale, and any negotiable instrument executed by you will be returned within 10 days following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled. If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this contract or sale, or you may, if you wish, comply with the instructions of the seller regarding the return shipment of the goods at the seller's expense and risk. If you do make the goods available to the seller and the seller does not pick them up within 20 days of the date of your notice of cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the seller, or if you agree to return the goods to the seller, and fail to do so, then you remain liable for performance of all obligations under the contract. To cancel this transaction, either (1) fax a signed and dated copy of this cancellation notice to (339)201-7683, (2) mail or deliver a signed and dated copy of this cancellation notice to AWS 293 Libbey Industrial Parkway Suite 150 Weymouth MA. 02189, or (3) email a request to returns@amazingwealthsystems.com.

I hereby cancel this transaction._____

Purchaser's' Signature (required): _____

Date (required): _____

Clearly Print Your First and Last Name (required):_____

# Exhibit I



## <u>Diamond Coaching Bonuses</u>

**ACT NOW BONUSES** (only included the weekend of the live event)

**Bonus #1: TWO Days in Boston with Chris and Adam's Team**

**Advanced Business Setup in our Office**
- (2) Days of Personal Coaching with Chris and Adam's team
- Complete Business Integration and Startup
- See how we operate and everything we do on a day-to-day basis
- Leave with your business set up around your schedule and lifestyle
- Night Out: Seafood Dinner on Boston Harbor

**Bonus #2: Private Labeling Marketing Campaign**
- When your business is fully operational and ready our team will help you white label or private label a product from sourcing to marketing.
- Direct Manufactures from China with sourcing we already have in place.
- The opportunity to sell a product with 100%+ markup with NO competition

**Bonus #3: 2nd Store Setup in Boston with fully loaded laptop & Mifi**
- We create your 2nd Amazon store so that you can double your income and sell your products twice as fast.  Suppliers Trends & Upcoming Product Releases
- We provide you with the 2nd computer to run and manage your business from so that you don't link both accounts together. We show you how to keep everything separate so Amazon will never link your accounts.

**Bonus #4: Elite Coaching Hotline**



## "Amazon Insider Network" Mentoring Program
### *Diamond Coaching*

**#1 16 Personal 1 on 1 Coaching Sessions**
- **1-ON-1 COACHING SESSIONS**
  - 30-60 Min One on One Calls With one of our Coaches
- **3 Life Lines** – Direct Access to your Coach, When YOU Need Him
- **Online Training** where we can see your computer screen, control your mouse, so you will understand every step.
- **Tips, tricks, and techniques** that will increase all aspects of your business.

**#2 Done 4 You WHOLESALE Fulfillment**
- <u>Immediate Access to Product With 20% Profit Margins:</u> Immediately start buying products from our Wholesale Program:
  - Done For You Deals with Great Profit Margins
  - No Monthly overhead
  - Deal Analysis Before Placing an Order
  - Access to Our Supplier Rolodex
  - Ability to Negotiate Utilizing Our Buying Power
  - Working our team constantly to implement NEW suppliers
  - Shipped right to you

**#3 (FBA) Fulfillment by Adam**
- <u>FBAMembersArea.com</u> Will fulfill all your shipments and send your products to Amazon
- FBA Warehouse To Send your Products to and we fulfill to Amazon
- We Label & Pack all your products and do all the manual labor for you
- Eliminate Shipping and Labor from your business entirely
- Eliminate the need to run your own warehouse
- No Monthly overhead, No Employees

**#4 Two Full Immersion Trade Show Events Per Year**
- 3 Days, where all of my "All In" students come to give and receive, network, and get to the next level
- CES Tradeshow in Las Vegas
- January & August, admission will be $4,995 <u>Annually</u>, today I will grandfather you in for Life as a Bonus
- Top Suppliers Trends & Upcoming Product Releases
- Ways Others & You Can Give Back
- Current Systems and Updates
- What you need in Your Business Now
- What you can give to others, give and take
- Obstacles and barriers to overcome and how

**#5 Unlimited Access to "The Network**
- Product Board:
  - Order Products Directly From our Warehouse, Easy Pay, Shipped to You
  - Access to Daily Deals
  - Access to Monthly Syndicate Deal, First Come First Serve
  - Leverage Network to Sell Your bulk deals to other students, or your product
  - The Network Always has Students looking to place Capital in good Product deals

**#6 Ungating in two main product categories**

Case 2:17-cv-00482-RSL Document 1 Filed 03/29/18 Page 74 of 237





Chris Bowser


Adam Bowser

# FBA STORES COACHING PROGRAM

Case 2:23-cv-00120-GPLD Document 49-1 Filed 01/05/21 Page 75 of 237

# Online Resource Center

The FBA Members Area education center is an online platform that delivers video training to help you launch and grow your online business. This information is broken out into several different categories.

## 1. FBA Coaching

The FBA Coaching page is filled with all types of modules, training videos & content to help educate you on the different areas of your online business. With step-by-step videos training you on how to run a successful online business you will have the availability to reference all the resources you need.

## 2. Wholesalers

Our wholesalers page is filled with top tier wholesale suppliers that you can contact and build relationships with more companies that can supply you products consistently for your online business.

## 3. Tools & Software's

Our Tools & Software page has every resource and company you may work with in order to help automate your business along the way. With listing, shipping, tax, & many other software's at your fingertips you will know exactly where to go to help systematize your business as you grow.

You will be given login access to www.fbamembersarea.com to access the site.



# Personal 1-on-1 Coaching with our Amazon Experts & Access to our entire mentoring fulfillment team.

———————

Personal coaching will help you acquire the skills necessary to run a 6 figure online business. Our Amazon expert coaches have years of experience and are actively running successful business online and throughout working with them you will develop the mindset of a successful business owner.

## 1. Your Amazon Expert Coach

We will be assigning our top level Amazon experts that fits your wants and needs to coach you along this journey. This coach will mentor and guide you on the path to being successful in this business.

## 2. Product Representative

You will be assigned a product representative that will be available Monday through Friday to assist you with any questions you have and help you with any product purchases you need.

## 3. Coaching Managers

Adam Bowser the co-founder of FBA Stores and Jason Brown the coaching manager are managing and assisting you along the way throughout your coaching journey. You will have their help and assistance at anytime you are stuck or need additional training on any area of your business.



# 2- Day On Site Office Visit
# (Live Training)



## It's All About You

In the weeks or months following your 3-Day Amazon Explosion Workshop, you'll have the chance to visit (1) of our office locations either in Boston or Las Vegas. Our travel coordinator will schedule a time for you to come visit and take care of your accommodations during these 2 days at our office. By design, the visit is highly personalized to YOUR business.

## 2nd Amazon Store Front

During your office visit we will supply you with a Brand New computer and wifi card and assist you on setting up a 2nd Amazon store for your business. This will be setup by your request and customized around what you want your 2nd store to be.

## Warehouse Tour

You will experience hands on exactly what FBA Stores does on a daily basis from sourcing to sorting to fulfilling thousands of products on a weekly basis. You will see exactly how a multi-million dollar wholesale company operates.

## Dinner With Adam & The Team

The night of your visit Adam & his team will find a restaurant of your choice to fine dine and map out your business plan and find out exactly what areas of the business you need help in along with determining the goals you want to achieve from this business.



# 3 Day FBA Stores "Full Immersion" Trade Show Event Las Vegas - (Live Training)



**Held in Las Vegas Nevada,** this incredible Jam- packed 3-day event is the type of signature event that can change your life. You will seldom have the opportunity to acquire knowledge directly from wholesale suppliers that can supply your business money-making products for many years to come. Learn exactly how Adam and his team interact, negotiate and acquires deals from the top suppliers in the world carrying some of the hottest selling products for Amazon.

## On Site Visit In Our Las Vegas Office
We spend 1 day educating you on what you want to accomplish at the ASD or CES trade show and how to best take advantage of your time at the largest trade show in the world. The other 2 days will be spent at the convention center walking around meeting new suppliers.

## Amazon Elite Seller Panel
You'll have the opportunity to meet other successful online sellers in our "Network" that are looking to increase their business.  At this live event you will find top suppliers, trends and upcoming product releases that is only going to increase the amount of sales you do online.

## Travel And Accommodations
We will help assist you with flights & hotel, we believe staying together as a team is essential in the trade show experience.  While the fun you have in Las Vegas will be world-class, make no mistake that the knowledge and experience you acquire from the event can pay for itself over and over again.



# Fulfillment By Adam

# Boston Warehouse & Las Vegas Warehouse

**The key component to running an online business and making money is finding products that sell and have a healthy profit margin for your storefront on a weekly basis.  Fulfillment by Adam is your exact answer on providing you with great selling products for many years to come.**

## Adam Bowser

Adam Bowser the co    -founder of FBA Stores is in complete control of Fulfillment by Adam and sourcing the hottest products in the market for you to buy and resell. Adam and his team have developed a competitive edge in the worldwide supply chain in order for you to buy products a quality prices and resell them online for great profits. Adam has over 12 years of experience in the online business and will be assisting you on your journey of becoming a successful online seller.

## The Fulfillment by Adam Team

Fulfillment by Adam consists of over 30 employees that are experts in market analysis, sourcing, packaging and shipping the right products for your business. With offices in Boston & Vegas we handle thousands of products and service them directly to hundreds of Amazon's fulfillment centers.  The hard work this team puts in on a daily basis is what will help grow your business for years to come.



# eBay Riches Online Course

# (On Demand in FBA Members Area)

**The 2nd largest online marketplace to offer products is eBay and therefore you need to learn how to sell products on eBay and have Amazon fulfill your orders.**

## eBay Riches Course

Adam Bowser the co - founder of FBA Stores is in complete control of Fulfillment by Adam and sourcing the hottest products in the market for you to buy and resell. Adam and his team have developed a competitive edge in the worldwide supply chain in order for you to buy products a quality prices and resell them online for great profits. Adam has over 12 years of experience in the online business and will be assisting you on your journey of becoming a successful online seller.



## The Fulfillment by Adam Team

Fulfillment by Adam consists of over 30 employees that are experts in market analysis, sourcing, packaging and shipping the right products for your business. With offices in Boston & Vegas we handle thousands of products and service them directly to hundreds of Amazon's fulfillment centers. The hard work this team puts in on a daily basis is what will help grow your business for years to come.



# EXHIBIT 2

Roberto Anguizola
Illinois Bar # 6270874
(Admitted in the D. Nev. pursuant to LR IA 11-3)
Tel. (202) 326-3284
Email: ranguizola@ftc.gov

Miry Kim
Washington Bar # 31456
(Seeking admission pursuant to LR IA 11-3)
Tel. (202) 326-3622
Email: mkim@ftc.gov

Gregory J. Evans
DC Bar # 1033184
(Seeking admission pursuant to LR IA 11-3)
Tel. (202) 326-3425
Email: gevans2@ftc.gov

Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Drop CC-8528
Washington, DC 20580

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION



### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

AWS, LLC, a Nevada limited liability company;
FBA DISTRIBUTORS, LLC, a Massachusetts
limited liability company; FBA STORES, LLC, a
Nevada limited liability company; INFO PROS,
LLC, a Nevada limited liability company;
ONLINE AUCTION LEARNING CENTER,
INC., a Massachusetts corporation; ONLINE
AUCTION LEARNING CENTER, INC., a
Nevada corporation; CHRISTOPHER F.
BOWSER; ADAM S. BOWSER; and JODY
MARSHALL,

      Defendants.

**Case No. 2:18-cv-00442-JCM-PAL**

**<u>FILED UNDER SEAL</u>**

**TEMPORARY RESTRAINING
ORDER**

1

Plaintiff, the Federal Trade Commission ("Commission"), has filed its Complaint for
Permanent Injunction and Other Equitable Relief pursuant to Sections 13(b) and 19 of the
Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Business
Opportunity Rule, 16 C.F.R. Part 437, and has moved, pursuant to Fed. R. Civ. P. 65(b), for a
temporary restraining order, asset freeze, other equitable relief, and an order to show cause why a
preliminary injunction should not issue.

## FINDINGS OF FACT

The Court, having considered the Complaint, the *ex parte* Motion for a Temporary
Restraining Order, declarations, exhibits, and the memorandum of points and authorities filed in
support thereof, and being otherwise advised, finds that:

A.      This Court has jurisdiction over the subject matter of this case, and there is good
cause to believe that it will have jurisdiction over all parties hereto and that venue in this District
is proper.

B.      There is good cause to believe that Defendants AWS, LLC, FBA Distributors,
LLC, FBA Stores, LLC, Info Pros, LLC, Online Auction Learning Center, Inc. (Mass. Corp.),
Online Auction Learning Center, Inc. (Nev. Corp.), Christopher F. Bowser, Adam S. Bowser,
and Jody Marshall have advertised, marketed, distributed, promoted, or sold business
opportunities to consumers in this District and throughout the United States.

C.      There is good cause to believe that Defendants have engaged in and are likely to
engage in acts or practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and
multiple sections of the Business Opportunity Rule, 16 C.F.R. Part 437, as amended, and that the
Commission is therefore likely to prevail on the merits of this action.

D.     As demonstrated by the Commission investigator declarations, the declaration of the Commission's expert Randy Hlavac, consumer declarations, Defendants' mail and Internet advertising, transcripts of undercover recordings, financial records, public records, and additional evidence contained in the volumes of exhibits filed by the Commission in support of its *ex parte* Motion for Temporary Restraining Order, the Commission has established a likelihood of success in showing that Defendants have: (1) made false or unsubstantiated earnings claims regarding the business opportunities they market and sell to consumer, and (2) failed to furnish prospective purchasers of Defendants' business opportunities with the disclosure documents and earnings claim statements required by the Business Opportunity Rule.

E.     There is good cause to believe that immediate and irreparable harm will result from Defendants' ongoing violations of the FTC Act and the Business Opportunity Rule unless Defendants are restrained and enjoined by order of this Court.

F.     There is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers – including monetary restitution, rescission, disgorgement, or refunds – will occur from the sale, transfer, destruction or other disposition or concealment by Defendants of their assets or records, unless Defendants are immediately restrained and enjoined by order of this Court; and that, in accordance with Fed. R. Civ. P. 65(b), the interests of justice require that this Order be granted without prior notice to Defendants. Thus, there is good cause for relieving the Commission of the duty to provide Defendants with prior notice of its Motion for a Temporary Restraining Order.

G.     Good cause exists for appointing a temporary receiver over the Corporate Defendants AWS, LLC, FBA Distributors, LLC, FBA Stores, LLC, Info Pros, LLC, Online Auction Learning Center, Inc. (Mass. Corp.), Online Auction Learning Center, Inc. (Nev. Corp.);

freezing Defendants' assets; permitting the Commission and the receiver immediate access to the Defendants' business premises; and permitting the Commission and the receiver to take expedited discovery.

    H.      Weighing the equities and considering the Commission's likelihood of ultimate success on the merits, a temporary restraining order with an asset freeze, the appointment of a temporary receiver, immediate access to business premises, expedited discovery, and other equitable relief is in the public interest.

    I.      This Court has authority to issue this Order pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and § 57b; Federal Rule of Civil Procedure 65; and the All Writs Act, 28 U.S.C. § 1651.

    J.      No security is required of any agency of the United States for issuance of a temporary restraining order. Fed. R. Civ. P. 65(c).

## DEFINITIONS

For the purpose of this Order, the following definitions shall apply:

    A.      "**Asset**" means property of all kinds, including any legal or equitable interest in, right to, or claim to, any tangible or intangible property, and any real or personal property, wherever located and by whomever held.

    B.      "**Corporate Defendants**" means AWS, LLC, FBA Distributors, LLC, FBA Stores, LLC, Info Pros, LLC, Online Auction Learning Center, Inc. (Mass. Corp.), Online Auction Learning Center, Inc. (Nev. Corp.) and each of their subsidiaries, affiliates, successors, and assigns.

    C.      "**Defendants**" means each Corporate Defendant, Christopher F. Bowser, Adam S. Bowser, and Jody Marshall, individually, collectively, or in any combination.

4

D.     **"Document"** is synonymous in meaning and equal in scope to the usage of "document" and "electronically stored information" in Federal Rule of Civil Procedure 34(a), Fed. R. Civ. P. 34(a), and includes writings, drawings, graphs, charts, photographs, sound and video recordings, images, internet sites, web pages, websites, electronic correspondence, including e-mail and instant messages, contracts, accounting data, advertisements (including advertisements placed on the World Wide Web), FTP Logs, Server Access Logs, USENET Newsgroup postings, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, computer records, customer or sales databases, and any other electronically stored information, including Documents located on remote servers or cloud computing systems, and other data or data compilations from which information can be obtained directly or, if necessary, after translation into a reasonably usable form.  A draft or non-identical copy is a separate document within the meaning of the term.

E.     **"Earnings Claim"** means any oral, written, or visual representation to a consumer, prospective purchaser or investor that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits.  Earnings claims include, but are not limited to any:  (1) chart, table, or mathematical calculation that demonstrates possible results based upon a combination of variable; and (2) statements from which a consumer, prospective purchaser or investor can reasonably infer that he or she will earn a minimum level of income (e.g., "earn enough to buy a Porsche," "earn a six-figure income," or "earn your investment back within one year").

F.     **"Electronic Data Host"** means any person or entity in the business of storing, hosting, or otherwise maintaining electronically stored information.  This includes, but is not

limited to, any entity hosting a website or server, and any entity providing "cloud based" electronic storage.

      G.    **"Individual Defendants"** means Christopher F. Bowser, Adam S. Bowser, and Jody Marshall, individually or collectively.

      H.    **"Person"** means a natural person, organization, or legal entity, including a corporation, partnership, proprietorship, association, cooperative, government or governmental subdivision or agency, or any other group or combination acting as an entity.

      I.    **"Receiver"** means the temporary receiver appointed in Section XI of this Order and any deputy receivers that shall be named by the temporary receiver.

      J.    **"Receivership Entities"** means the Corporate Defendants as well as any other entity that the Receiver determines is controlled or owned by any Defendant and (1) conducted any business related to Defendants' advertising, marketing, distributing, promoting, or selling of business opportunities, (2) commingled or pooled Assets with any Defendant, or (3) otherwise participated in the transfer of Assets stemming from the advertising, marketing, distributing, promoting, or selling of business opportunities. Upon determining that a nonparty entity is a Receivership Entity, the Receiver shall promptly notify the entity as well as the parties, and shall inform the entity that it can challenge the Receiver' determination by filing a motion with the Court. Provided, however, that the Receiver may delay providing such notice for up to 48 hours if the Receiver determines that notice to the entity or the parties before the Receiver establishes control over the entity may result in the destruction of records, dissipation of Assets, or any other obstruction of the Receiver's control of the entity.

6

## ORDER

### I.     PROHIBITED BUSINESS ACTIVITIES

**IT IS THEREFORE ORDERED** that Defendants, Defendants' officers, agents,

employees, and attorneys, and all other Persons in active concert or participation with them, who

receive actual notice of this Order, whether acting directly or indirectly, in connection with

promoting or offering for sale any good or service, are temporarily restrained and enjoined from:

     A.     making any earnings claim, unless the earnings claim is non-misleading, and, at

the time such claim is made, Defendants:  (1) have a reasonable basis for their claim; (2) have in

their possession written materials that substantiate the claim; and (3) make the written

substantiation available upon request to the consumer, potential purchaser or investor, the

Receiver, and to the Commission;

     B.     misrepresenting or assisting others in misrepresenting, expressly or by implication

any other fact material to consumers concerning any product or service, such as the total costs;

any material restrictions, limitations, or conditions; or any material aspect of its performance,

efficacy, nature, or central characteristics; or

     C.     from violating the Business Opportunity Rule, 16 C.F.R. Part 437, a copy of

which is attached as **Attachment A**.

### II.     PROHIBITION ON RELEASE OF CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees,

and attorneys, and all other Persons in active concert or participation with any of them, who

receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily

restrained and enjoined from:

     A.     Selling, renting, leasing, transferring, or otherwise disclosing, the name, address,

birth date, telephone number, email address, credit card number, bank account number, Social

Security number, or other financial or identifying information of any person that any Defendant obtained in connection with any activity that pertains to the subject matter of this Order; and

B. Benefitting from or using the name, address, birth date, telephone number, email address, credit card number, bank account number, Social Security number, or other financial or identifying information of any person that any Defendant obtained in connection with any activity that pertains to the subject matter of this Order.

Provided, however, that Defendants may disclose such identifying information to a law enforcement agency, as required by any law, regulation, or court order, or in any filings, pleadings or discovery in this action, provided the Defendants comply with any protective order in the case.

## III. ASSET FREEZE

**IT IS FURTHER ORDERED** that Defendants and their officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from:

A. Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, relinquishing, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any Assets, wherever located, including outside the United States, that are:

1. owned or controlled, directly or indirectly, by any Defendant;

2. held, in part or in whole, for the benefit of any Defendant;

3. in the actual or constructive possession of any Defendant; or

4. owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset

8

protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant, including any Assets held by, for, or subject to access by, any Defendant at any bank or savings and loan institution, or with any broker-dealer, escrow agent, title company, insurance company, commodity trading company, precious metal dealer, payment processor, credit card processor, acquiring bank, merchant bank, independent sales organization, third party processor, payment gateway, or other financial institution or depository of any kind.

B.    Opening or causing to be opened any safe deposit boxes, commercial mail boxes, or storage facilities titled in the name of any Defendant or subject to access by any Defendant, except as necessary to comply with written requests from the Receiver acting pursuant to its authority under this Order;

C.    Incurring liens or other encumbrances on real property, personal property, or other Assets held, controlled, or subject to access by, or held for the benefit of, any Defendant or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant;

D.    Incurring charges or cash advances on any credit or bank card issued in the name, individually or jointly, of any Corporate Defendant or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant or of which any Defendant is an officer, director, member, or manager.  This includes any corporate bankcard or corporate credit card account for which any Defendant is, or was on the date that this Order was signed, an authorized signor; or

E.     Cashing any checks or depositing any money orders or cash received from
consumers, clients, or customers of any Defendant.

Provided that the Assets affected by this Section shall include: (1) all Assets of
Defendants as of the time this Order is entered; and (2) Assets obtained by Defendants after this
Order is entered if those Assets are derived from any activity that is the subject of the Complaint
in this matter or that is prohibited by this Order.

This Section does not prohibit transfers to the Receiver, as specifically required in
Section XIII (Transfer of Receivership Property to Receiver) of this Order, nor does it prohibit
the repatriation of foreign Assets, as specifically required in Section VI (Foreign Asset
Repatriation) of this Order.

## IV.     DUTIES OF HOLDERS OF DEFENDANTS' ASSETS

**IT IS FURTHER ORDERED** that any financial or brokerage institution, Electronic
Data Host, credit card processor, payment processor, merchant bank, acquiring bank,
independent sales organization, third party processor, payment gateway, insurance company,
business entity, or Person who receives actual notice of this Order (by service or otherwise) that
(a) holds, controls, or maintains custody of any electronically stored information or Document on
behalf of any Defendant, any Asset subject to Section III or any account holding any Asset
subject to Section III; (b) holds, controls, or maintains custody of any Document or any Asset
associated with credits, debits or charges made on behalf of any Defendant, including reserve
funds held by payment processors, credit card processors, merchant banks, acquiring banks,
independent sales organizations, third party processors, payment gateways, insurance companies,
or other entities; or (c) has held, controlled, or maintained custody of any such Document, Asset,
or account at any time since the date of entry of this Order shall:

10

 A. Hold, preserve, and retain within its control and prohibit the withdrawal, removal, alteration, assignment, transfer, pledge, encumbrance, disbursement, dissipation, relinquishment, conversion, sale, or other disposal of any such Document or Asset, as well as all Documents or other property related to such Assets, except by further order of this Court;

 B. Deny any Person, except the Receiver, access to any safe deposit box, commercial mail box, or storage facility that is titled in the name of any Defendant, either individually or jointly, or otherwise subject to access by any Defendant;

 C. Provide Commission counsel and the Receiver, **within five (5) days** of receiving a copy of this Order, a sworn statement setting forth:

  1. The identification number of each such account or Asset;

  2. The balance of each such account, or a description of the nature and value of each such Asset as of the close of business on the day on which this Order is served, and, if the account or other Asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the Person to whom such account or other Asset was remitted; and

  3. The identification of any safe deposit box, commercial mail box, or storage facility that is either titled in the name, individually or jointly, of any Defendant, or is otherwise subject to access by any Defendant; and

 D. Upon the request of Commission counsel or the Receiver, promptly provide Commission counsel and the Receiver with copies of all records or other Documents pertaining to such account or Asset, including originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts,

including wire transfers and wire transfer instructions, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and all logs and records pertaining to safe deposit boxes, commercial mail boxes, and storage facilities.

## V. FINANCIAL DISCLOSURES

**IT IS FURTHER ORDERED** that each Defendant, within **five (5) days** of service of this Order upon them, shall prepare and deliver to Commission counsel and the Receiver completed financial statements on the forms attached to this Order as **Attachment B** (Financial Statement of Individual Defendant) for each Individual Defendant, and **Attachment C** (Financial Statement of Corporate Defendant) for each Corporate Defendant.

## VI. FOREIGN ASSET REPATRIATION

**IT IS FURTHER ORDERED** that within **five (5) days** following the service of this Order, each Defendant shall:

A.       Provide Commission counsel and the Receiver with a full accounting, verified under oath and accurate as of the date of this Order, of all Assets, Documents, and accounts outside of the United States which are: (1) titled in the name, individually or jointly, of any Defendant; (2) held by any Person for the benefit of any Defendant or for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant; or (3) under the direct or indirect control, whether jointly or individually, of any Defendant;

B.       Take all steps necessary to provide Commission counsel and the Receiver access to all Documents and records of the accounts or Assets described above in subsection A, including signing the Consent to Release of Financial Records appended to this Order as **Attachment D** and serving this Order on any financial institution or other entity holding the assets;

C.      Transfer to the territory of the United States and deliver to the Receiver all Documents and Assets located in foreign countries which are: (1) titled in the name, jointly or individually, of any Defendant; (2) held by any Person for the benefit of any Defendant or for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant; or (3) under the direct or indirect control, whether jointly or individually, of any Defendant; and

D.      The **same business day as any repatriation**, (1) notify the Receiver and counsel for the Commission of the name and location of the financial institution or other entity that is the recipient of such Documents or Assets; and (2) serve this Order on any such financial institution or other entity.

## VII.    NON-INTERFERENCE WITH REPATRIATION

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from taking any action, directly or indirectly, which may result in the encumbrance or dissipation of foreign Assets, or in the hindrance of the repatriation required by this Order, including, but not limited to:

A.      Sending any communication or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all Defendants' Assets have been fully repatriated pursuant to this Order; or

B.      Notifying any trustee, protector or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to

a court order, until such time that all Defendants' Assets have been fully repatriated pursuant to this Order.

## VIII. CONSUMER CREDIT REPORTS

**IT IS FURTHER ORDERED** that any consumer reporting agency served with this Order shall:

A.     Promptly furnish consumer reports as requested concerning any Defendant to the Commission, pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1); and

B.     Promptly furnish any Documents related to any dispute of the accuracy of information contained in a credit report initiated by any Defendant, including, but not limited to, correspondence and other Documents submitted by any Defendant to the consumer reporting agency and any response from the consumer reporting agency to any Defendant.

## IX.     PRESERVATION OF RECORDS

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from:

A.     Destroying, erasing, falsifying, writing over, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, Documents that relate to:  (1) the business, business practices, Assets, or business or personal finances of any Defendant; (2) the business practices or finances of entities directly or indirectly under the control of any Defendant; or (3) the business practices or finances of entities directly or indirectly under common control with any other Defendant; and

B.     Failing to create and maintain Documents that, in reasonable detail, accurately, fairly, and completely reflect Defendants' incomes, disbursements, transactions, and use of Defendants' Assets.

## X.     REPORT OF NEW BUSINESS ACTIVITY

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from creating, operating, or exercising any control over any business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship, or corporation, without first providing Commission counsel and the Receiver with a written statement disclosing: (1) the name of the business entity; (2) the address and telephone number of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities.

## XI.     TEMPORARY RECEIVER

**IT IS FURTHER ORDERED** that **Robb Evans and Associates LLC** is appointed as temporary receiver of the Receivership Entities with full powers of an equity receiver. The Receiver shall be solely the agent of this Court in acting as Receiver under this Order.

## XII.     DUTIES AND AUTHORITY OF RECEIVER

**IT IS FURTHER ORDERED** that the Receiver is directed and authorized to accomplish the following:

A.     Assume full control of Receivership Entities by removing, as the Receiver deems necessary or advisable, any director, officer, independent contractor, employee, attorney, or

15

agent of any Receivership Entity from control of, management of, or participation in, the affairs of the Receivership Entity;

      B.     Take exclusive custody, control, and possession of all Assets and Documents of, or in the possession, custody, or under the control of, any Receivership Entity, wherever situated;

      C.     Conserve, hold, manage, and prevent the loss of all Assets of the Receivership Entities, and perform all acts necessary or advisable to preserve the value of those Assets. The Receiver shall assume control over the income and profits therefrom and all sums of money now or hereafter due or owing to the Receivership Entities. The Receiver shall have full power to sue for, collect, and receive, all Assets of the Receivership Entities and of other Persons whose interests are now under the direction, possession, custody, or control of, the Receivership Entities. Provided, however, that the Receiver shall not attempt to collect any amount from a consumer if the Receiver believes the consumer's debt to the Receivership Entities has resulted from the deceptive acts or practices or other violations of law alleged in the Complaint in this matter, without prior Court approval;

      D.     Obtain, conserve, hold, manage, and prevent the loss of all Documents of the Receivership Entities, and perform all acts necessary or advisable to preserve such Documents. The Receiver shall: divert mail; preserve all Documents of the Receivership Entities that are accessible via electronic means (such as online access to financial accounts and access to electronic documents held onsite or by internet service providers (cloud service, email service and web hosts)), by changing usernames, passwords, or other log-in credentials; and take possession of all electronic Documents of the Receivership Entities stored onsite or remotely;

E.     Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

F.     Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his or her duties as Receiver. The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Entities prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure Assets of the Receivership Entities, such as rental payments;

G.     Suspend business operations of the Receivership Entities if in the judgment of the Receiver such operations cannot be continued legally and profitably;

H.     Take all steps necessary to secure and take exclusive custody of each location from which the Receivership Entities operate their businesses. Such steps may include, but are not limited to, any of the following, as the Receiver deems necessary or advisable: (1) securing the location by changing the locks and alarm codes and disconnecting any internet access or other means of access to the computers, internet, or any records maintained at that location; and (2) requiring any persons present at the location to leave the premises, to provide the Receiver with proof of identification, and/or to demonstrate to the satisfaction of the Receiver that such persons are not removing from the premises Documents or Assets of the Receivership Entities. Law enforcement personnel, including, but not limited to, police or sheriffs, may assist the Receiver in implementing these provisions in order to keep the peace and maintain security. If requested by the Receiver, the United States Marshal will provide appropriate and necessary

17

assistance to the Receiver to implement this Order and is authorized to use any necessary and reasonable force to do so;

I. Take all steps necessary to prevent the modification, destruction, or erasure of any web page or website registered to and operated, in whole or in part, by any of the Defendants, and to provide access to all such web page or websites to the Commission's representatives,

J . Enter into and cancel contracts and purchase insurance as advisable or necessary;

K. Prevent the inequitable distribution of Assets and determine, adjust, and protect the interests of consumers who have transacted business with the Receivership Entities;

L. Make an accounting, as soon as practicable, of the Assets and financial condition of the receivership and file the accounting with the Court and deliver copies thereof to all parties;

M. Institute, compromise, adjust, appear in, intervene in, defend, dispose of, or otherwise become party to any legal action in state, federal, or foreign courts, or arbitration proceedings as the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Defendants, or to carry out the Receiver's mandate under this Order, including but not limited to, actions challenging fraudulent or voidable transfers;

N. Issue subpoenas to obtain Documents and records pertaining to the Receivership, and conduct discovery in this action on behalf of the receivership estate;

O. Open one or more bank accounts at designated depositories for funds of the Receivership Defendants. The Receiver shall deposit all funds of the Receivership Defendants in such a designated account and shall make all payments and disbursements from the receivership estate from such an account. The Receiver shall serve copies of monthly account statements on all parties;

P. Maintain accurate records of all receipts and expenditures incurred as Receiver;

18

Q. Allow the Commission's representatives, agents, and assistants, as well as Defendants' representatives and Defendants themselves, reasonable access to the premises of the Receivership Entities, or any other premises where the Receivership Entities conduct business. The purpose of this access shall be to inspect and copy any books, records, Documents, accounts, and other property owned by, or in the possession of, the Receivership Entities or their agents. The Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access;

R. Allow the Commission's representatives, agents, and assistants, as well as Defendants and their representatives reasonable access to all Documents in the possession, custody, or control of the Receivership Entities, including, but not limited to electronic Documents; and

S. Cooperate with reasonable requests for information or assistance from any state or federal civil or criminal law enforcement agency.

### XIII.  TRANSFER OF RECEIVERSHIP PROPERTY TO RECEIVER

**IT IS FURTHER ORDERED** that the Defendants, their Representatives, and any other Person with possession, custody, or control of property of, or records relating to, the Receivership Entities shall, upon notice of this Order by personal service or otherwise, fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the Assets and Documents of the Receivership Entities and immediately transfer or deliver to the Receiver possession, custody, and control of, the following:

A. All Assets held by or for the benefit of the Receivership Entities;

B. All Documents of the Receivership Entities;

C.     All computers, electronic devices, mobile devices, and machines used to conduct the business of the Receivership Entities;

D.     All Assets and Documents belonging to other Persons whose interests are under the direction, possession, custody, or control of the Receivership Entities; and

E.     All keys, codes, user names and passwords necessary to gain or to secure access to any Assets or Documents of the Receivership Entities, including access to their business premises, means of communication, accounts, computer systems (onsite and remote), remote computing service, or other property.

In the event that any Person fails to deliver or transfer any Asset or Document, or otherwise fails to comply with any provision of this Section, the Receiver may file an Affidavit of Non-Compliance regarding the failure and a motion seeking compliance or a contempt citation.

## XIV.   PROVISION OF INFORMATION TO RECEIVER

**IT IS FURTHER ORDERED** that Defendants shall immediately provide to the Receiver:

A.     A list of all Assets and property, including accounts, of the Receivership Entities that are held in any name other than the name of a Receivership Entity, or by any Person other than a Receivership Entity;

B.     A list of all agents, employees, officers, attorneys, servants and those Persons in active concert and participation with the Receivership Entities, or who have been associated or done business with the Receivership Entities; and

C.    A description of any documents covered by attorney-client privilege or attorney

work product, including files where such documents are likely to be located, authors or recipients

of such documents, and search terms likely to identify such electronic documents.

## XV.    COOPERATION WITH THE RECEIVER

**IT IS FURTHER ORDERED** that Defendants, Receivership Entities, Defendants' or

Receivership Entities' officers, agents, employees, and attorneys, and all other Persons in active

concert or participation with any of them, who receive actual notice of this Order; and any other

Person served with a copy of this Order shall fully cooperate with and assist the Receiver. This

cooperation and assistance shall include, but is not limited to, providing information to the

Receiver that the Receiver deems necessary to exercise the authority and discharge the

responsibilities of the Receiver under this Order; providing any username and password required

to access any computer (onsite or remotely) and any cloud account (including specific method to

access account), electronic file, or telephonic data in any medium; advising all Persons who owe

money to any Corporate Defendant that all debts should be paid directly to the Receiver; and

transferring funds at the Receiver's direction and producing records related to the Assets and

sales of the Receivership Entities.

## XVI.    INTERFERENCE WITH THE RECEIVER

**IT IS FURTHER ORDERED** that Defendants, Receivership Entities, Defendants' or

Receivership Entities' officers, agents, employees, attorneys, and all other Persons in active

concert or participation with any of them, who receive actual notice of this Order, and any other

Person served with a copy of this Order, are hereby restrained and enjoined from directly or

indirectly:

A.    Interfering with the Receiver's efforts to manage, or take custody, control, or

possession of, the Assets or Documents subject to the receivership;

B.    Transacting any of the business of the Receivership Entities;

C.    Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any Assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, the Receivership Entities; or

D.    Refusing to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any order of this Court.

## XVII.  STAY OF ACTIONS

**IT IS FURTHER ORDERED** that, except by leave of this Court, during the pendency of the receivership, Defendants, Defendants' officers, agents, employees, attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, and their corporations, subsidiaries, divisions, or affiliates, and all investors, creditors, stockholders, lessors, customers and other Persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such Persons, are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the Assets or Documents of Receivership Entities, including, but not limited to:

A.    Filing or assisting in the filing of a petition for relief under the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, or of any similar insolvency proceeding on behalf of Corporate Defendants;

B.    Commencing, prosecuting, or continuing a judicial, administrative, or other action or proceeding against the Receivership Entities, including the issuance or employment of process against the Receivership Entities, except that such actions may be commenced if necessary to toll any applicable statute of limitations; or

C.    Filing or enforcing any lien on any asset of the Receivership Entities, taking or

22

attempting to take possession, custody, or control of any Asset of the Receivership Entities; or attempting to foreclose, forfeit, alter, or terminate any interest in any Asset of the Receivership Entities, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise.

Provided, however, that this Order does not stay: (1) the commencement or continuation of a criminal action or proceeding; (2) the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; or (3) the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

## XVIII. COMPENSATION OF RECEIVER

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by, in the possession or control of, or which may be received by, the Receivership Entities. The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than **sixty (60) days** after the date of entry of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

## XIX. RECEIVER'S BOND

**IT IS FURTHER ORDERED** that the Receiver shall file with the Clerk of this Court a bond in the sum of **$20,000.00** with sureties to be approved by the Court, conditioned that the Receiver will well and truly perform the duties of the office and abide by and perform all acts the Court directs. 28 U.S.C. § 754.

## XX.     IMMEDIATE ACCESS TO BUSINESS PREMISES AND RECORDS

**IT IS FURTHER ORDERED** that:

A.     In order to allow the Commission and the Receiver to preserve Assets and evidence relevant to this action and to expedite discovery, the Commission and the Receiver, and their representatives, agents, contractors, and assistants, shall have immediate access to the business premises and storage facilities, owned, controlled, or used by the Corporate Defendants. Such locations include, but are not limited to, 293 Libbey Industrial Parkway, Suites 150 & 250, Weymouth, Massachusetts 02189; 197 East California Avenue, #260, Las Vegas, Nevada 89104; 350 South 400 West, Lindon, Utah 84042; 114 New South Road, Hicksville, New York 11801; 110 New South Road, Hicksville, New York 11801; and any offsite location, storage unit, or commercial mailbox used by any Corporate Defendant.  The Receiver may exclude Defendants, Receivership Entities, and their employees from the business premises during the immediate access;

B.     The Commission and the Receiver, and their representatives, agents, contractors, and assistants are authorized to remove Documents from the Corporate Defendant's premises in order that they may be inspected, inventoried, and copied.  The Commission shall return any removed materials to the Receiver within **seven (7) days** of completing inventorying and copying, or such time as is agreed upon by the Commission and the Receiver;

C.     The Commission's access to the Receivership Entities' documents pursuant to this Section shall not provide grounds for any Defendant to object to any subsequent request for documents served by the Commission;

D.     If any Documents, computers, or electronic storage devices containing information related to the business practices or finances of the Receivership Entities are at a location other than those listed herein, including personal residence(s) of any Defendant, then,

24

immediately upon receiving notice of this order, Defendants and Receivership Entities shall

produce to the Receiver all such Documents, computers, and electronic storage devices, along

with any codes or passwords needed for access. In order to prevent the destruction of computer

data, upon service of this Order, any such computers or electronic storage devices shall be

powered down in the normal course of the operating system used on such devices and shall not

be powered up or used until produced for copying and inspection; and

      E.     If any communications or records of a Corporate Defendant are stored with a

remote computing service, such Defendant shall, immediately upon receiving notice of this

order, provide the Receiver with the username, passwords, and any other login credential needed

to access the communications and records, and shall not attempt to access the communications or

records.

## XXI.  DISTRIBUTION OF ORDER BY DEFENDANTS

    **IT IS FURTHER ORDERED** that Defendants shall immediately provide a copy of this

Order to each affiliate, telemarketer, marketer, sales entity, successor, assign, member, officer,

director, employee, agent, independent contractor, client, attorney, spouse, subsidiary, division,

and representative of any Defendant, and shall, within **fourteen (14) days** from the date of entry

of this Order, and provide the Commission and the Receiver with a sworn statement that this

provision of the Order has been satisfied, which statement shall include the names, physical

addresses, phone number, and email addresses of each such Person who received a copy of the

Order. Furthermore, Defendants shall not take any action that would encourage officers, agents,

members, directors, employees, salespersons, independent contractors, attorneys, subsidiaries,

affiliates, successors, assigns or other Persons in active concert or participation with them to

disregard this Order or believe that they are not bound by its provisions.

## XXII.   EXPEDITED DISCOVERY

**IT IS FURTHER ORDERED** that, notwithstanding the provisions of the Fed. R. Civ. P.

26(d) and (f) and 30(a)(2)(c), and pursuant to Fed. R. Civ. P. 30(a), 34, and 45, discovery in this

case shall commence upon entry of this Order.  The Commission is also granted leave, at any

time after service of this Order, to conduct limited expedited discovery for the purpose of

discovering:  (1) the nature, location, status, and extent of Defendants' Assets; (2) the nature,

location, and extent of Defendants' businesses transactions and operations; (3) Documents

reflecting Defendants' business transactions and operations; (4) the existence and identity of

other Persons who were or are engaged in the conduct alleged in the Complaint in active concert

or participation with the Defendants; or (5) compliance with this Order.  The expedited discovery

set forth in this Section shall be designated as such by marking any notices or written discovery

requests as "Expedited" and proceed as follows:

A.     The Commission and the Receiver may take the expedited deposition of parties

and non-parties.  Notice of **forty-eight (48) hours** shall be sufficient notice for such depositions.

The limitations and conditions set forth in Rules 30(a)(2)(B) and 31(a)(2)(B) of the Federal

Rules of Civil Procedure regarding subsequent depositions of an individual shall not apply to

depositions taken pursuant to this Section.  Any such deposition taken pursuant to this sub-

section shall not be counted towards the deposition limit set forth in Rules 30(a)(2)(A) and

31(a)(2)(A) and depositions may be taken by telephone or other remote electronic means;

B.     The Commission and the Receiver may serve upon parties expedited requests for

production of Documents or inspection that require production or inspection within **seven (7)**

**days** of service, provided that **three (3) days** of notice shall be deemed sufficient for the

production of any such Documents that are maintained or stored only in an electronic format;

C.    The Commission and the Receiver may serve upon parties expedited

interrogatories that require response within seven **(7) calendar days** after the Commission serves

such interrogatories;

D.    The Commission and the Receiver may serve expedited subpoenas upon non-

parties that direct production or inspection within **seven (7) days** of service;

E.    Service of expedited discovery upon a party to this action, taken pursuant to this

Section, shall be sufficient if made by facsimile, email, or by overnight delivery;

F.    Any expedited discovery taken pursuant to this Section is in addition to, and is not

subject to, the limits on discovery set forth in the Federal Rules of Civil Procedure and the Local

Rules of this Court.  The expedited discovery permitted by this Section does not require a

meeting or conference of the parties, pursuant to Rules 26(d) & (f) of the Federal Rules of Civil

Procedure; and

G.    The Parties are exempted from conferring under Fed. R. Civ. P. 26(f) and making

initial disclosures under Fed. R. Civ. P. 26(a)(1) until further order of this Court.

## XXIII.  SERVICE OF THIS ORDER

**IT IS FURTHER ORDERED** that copies of this Order as well as the Motion for

Temporary Restraining Order and all other pleadings, Documents, and exhibits filed

contemporaneously with that Motion (other than the complaint and summons), may be served by

any means, including facsimile transmission, electronic mail or other electronic messaging,

personal or overnight delivery, U.S. Mail or FedEx, by agents and employees of Commission, by

any law enforcement agency, or by private process server, upon any Defendant or any Person

(including any financial institution) that may have possession, custody, or control of any

property, property right, Document, or Asset of any Defendant, or that may be subject to any

provision of this Order pursuant to Rule 65(d)(2) of the Federal Rules of Civil Procedure.  For

27

purposes of this Section, service upon any branch, subsidiary, affiliate or office of any entity

shall effect service upon the entire entity. This Order shall bind Persons that may be subject to

any provision of this Order pursuant to Rule 65(d)(2) of the Federal Rules of Civil Procedure

upon such Person's receipt of actual notice, by personal service or otherwise, of this Order.

### XXIV.  CORRESPONDENCE AND SERVICE ON THE COMMISSION

**IT IS FURTHER ORDERED** that, for the purpose of this Order, all correspondence

and service of pleadings on the Commission shall be addressed to:

> Roberto Anguizola
> Miry Kim
> Gregory J. Evans
> Federal Trade Commission
> 600 Pennsylvania Avenue NW
> Mail Drop CC-8528
> Washington, D.C. 20580
> Fax: (202) 326-3395
> Email: ranguizola@ftc.gov; mkim@ftc.gov; gevans2@ftc.gov

### XXV.  PRELIMINARY INJUNCTION HEARING

**IT IS FURTHER ORDERED** that, pursuant to Fed. R. Civ. P. 65(b), Counsel for the

Commission and Defendants shall appear before this Court on **March 27, 2018**, at **10AM**

**(Pacific Standard Time)** at the **United States Courthouse, 333 S. Las Vegas Blvd, Las Vegas,**

**NV 89101** in **Courtroom 6A,** for an evidentiary hearing on the Commission's motion for a

preliminary injunction, pending final ruling on the Complaint against Defendants, enjoining the

violations of the law alleged in the Complaint, continuing the freeze of Defendants' Assets,

continuing the receivership, and imposing such additional relief as may be appropriate.

### XXVI.  BRIEFS AND AFFIDAVITS CONCERNING PRELIMINARY INJUNCTION

### IT IS FURTHER ORDERED that:

A.      The Defendants shall file with the Court, and serve on Commission counsel, any

pleadings concerning preliminary injunction, including responses or oppositions, affidavits,

28

motions, expert reports or declarations, or legal memoranda no later than **March 22, 2018**. The Commission shall file a proposed preliminary injunction order no later than **March 26, 2018**. The Commission may reply and file responsive or supplemental pleadings, materials, affidavits, or memoranda with the Court and serve the same on Defendants no later than **March 26, 2018**; and

B.     The parties must serve any filings or pleading concerning preliminary injunction by personal or overnight delivery, or by email, to be received by the other party or parties no later than **5:00 PM (Pacific Standard Time)** on the applicable dates set forth in subsection A, above.

## XXVII.     DURATION OF THE ORDER

**IT IS FURTHER ORDERED** that this Order shall expire on **March 27, 2018**, unless the Order is extended for an additional period pursuant to Fed. R. Civ. P. 65(b)(2). The Commission shall file any request to extend the duration of this Order no later than **March 26, 2018**.

## XXVIII.     RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes.

IT IS SO ORDERED:

_____
UNITED STATES DISTRICT JUDGE

DATED: March 14, 2018
_____

TIME: 1:30 p.m.
_____

29

# ATTACHMENT A

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO



# FEDERAL REGISTER

Vol. 76                Thursday,

No. 236            December 8, 2011

Part II

## Federal Trade Commission

16 CFR Part 437
Business Opportunity Rule; Final Rule

---

**FEDERAL TRADE COMMISSION**

**16 CFR Part 437**

**RIN 3084–AB04**

**Business Opportunity Rule**

**AGENCY:** Federal Trade Commission (FTC or Commission).

**ACTION:** Final rule.

**SUMMARY:** The Commission is adopting final amendments to its Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities" ("Business Opportunity Rule" or "Rule"). Among other things, the Business Opportunity Rule has been amended to broaden its scope to cover business opportunity sellers not covered by the interim Business Opportunity Rule, such as sellers of work-at-home opportunities, and to streamline and simplify the disclosures that sellers must provide to prospective purchasers. The final Rule is based upon the comments received in response to an Advance Notice of Proposed Rulemaking ("ANPR"), an Initial Notice of Proposed Rulemaking ("INPR"), a Revised Notice of Proposed Rulemaking ("RNPR"), a public workshop, a Staff Report, and other information discussed herein. This document also contains the text of the final Rule and the Rule's Statement of Basis and Purpose ("SBP"), including a Regulatory Analysis.

**DATES:** The provisions of the final Rule will become effective on March 1, 2012.

**ADDRESSES:** Requests for copies of the final Rule and the SBP should be sent to Public Reference Branch, Room 130, Federal Trade Commission, 600 Pennsylvania Avenue NW., Washington, DC 20580. The complete record of this proceeding is also available at that address. Relevant portions of the proceeding, including the final Rule and SBP, are available at *http://www.ftc.gov.*

**FOR FURTHER INFORMATION CONTACT:** Christine M. Todaro, (202) 326–3711, Division of Marketing Practices, Room H–286, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW., Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:** The final Rule modifies the interim Business Opportunity Rule in two significant ways. First, the final Rule contains an expanded definition of "business opportunity" aimed at extending the scope of the Rule to business opportunities previously not covered, such as work-at-home programs. Second, although the final Rule's scope is broader than the interim Business

Opportunity Rule, the compliance burden is reduced. Specifically, in contrast to the extensive disclosures previously required, the final Rule now requires that business opportunity sellers provide prospective customers with a substantially simplified and streamlined one-page disclosure document. The final Rule also adds affirmative prohibitions on misrepresentations and omissions, as well as disclosure requirements for sales conducted in Spanish and other languages besides English.

**Statement of Basis and Purpose**

**Key Terms and Abbreviations Used Throughout This Statement of Basis and Purpose**

"Amended Franchise Rule" refers to the amended Franchise Rule published at 72 FR 15444 (Mar. 30, 2007) and codified at 16 CFR 436.

"ANPR" refers to the Trade Regulation Rule on Franchising and Business Opportunity Ventures: Advanced Notice of Proposed Rulemaking, 62 FR 9115 (Feb. 28, 1997).

"Initial Proposed Disclosure Document" refers to the original version of the Disclosure Document that was proposed in the INPR in 2006.

"INPR" refers to the Initial Notice of Proposed Rulemaking for the Business Opportunity Rule, 71 FR 9054 (Apr. 12, 2006).

"Interim Business Opportunity Rule" refers to the Business Opportunity Rule, codified at 16 CFR 437 that is currently in effect and is the subject of this amendment proceedings.

"IPBOR" refers to the Initial Proposed Business Opportunity Rule, which was proposed in the INPR in 2006.

"Macro Report" refers to Macro International, Inc.'s report to the FTC on the Disclosure Form, available at *http://www.ftc.gov/bcp/workshops/bizopps/disclosure-form-report.pdf.*

"Original Franchise Rule" refers to the original Franchise Rule published at 43 FR 59614 (Dec. 21, 1978).

"RNPR" refers to the Revised Notice of Proposed Rulemaking for the Business Opportunity Rule, 73 FR 16110 (Mar. 26, 2008).

"RPBOR" refers to the Revised Proposed Business Opportunity Rule, which was proposed in the RNPR in 2008.

"Staff Report" refers to FTC staff's *Staff Report to the Federal Trade Commission and Proposed Revised Trade Regulation Rule* (16 CFR Part 437). The Staff Report is available at *http://www.ftc.gov/os/fedreg/2010/october/101028business opportunitiesstaffreport.pdf.*

"Workshop" refers to the June 1, 2009, public workshop held in Washington, DC, to discuss the proposed Disclosure Document and other aspects of the Business Opportunity Rule.

"Workshop Notice" refers to the **Federal Register** Notice announcing the Workshop, 74 FR 18712 (Apr. 24, 2009).

**I. Introduction**

*A. Overview of the Franchise Rule and the Evolution of the Interim Business Opportunity Rule*

1. The Franchise Rule

On December 21, 1978, the Commission promulgated a Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" (the "Original Franchise Rule"), to address deceptive and unfair practices in the sale of franchises and business opportunity ventures.[1] The Original Franchise Rule covered, in a single Code of Federal Regulations part, both franchises and certain business opportunity ventures. With franchises, the franchisee sells goods or services that are associated with the franchisor's trademark, and the franchisee is subject to significant control by, or receives significant assistance from, the franchisor. The franchisee typically distributes goods or services supplied by the seller or an affiliate and receives accounts or locations in which to conduct the business. By contrast, business opportunities often do not involve a trademark. Vending machines or rack display routes are typical examples of business opportunities. Based upon the original rulemaking record, the Commission found that unfair and deceptive practices were widespread in the sale of franchises and business opportunities, causing serious economic harm to consumers.

The Commission adopted the Original Franchise Rule to prevent unfair and deceptive practices in the sale of franchises and business opportunities through pre-sale disclosure of specified items of material information. The purpose of the Original Franchise Rule was neither to regulate the substantive terms of a franchise or business opportunity agreement nor to regulate the relationship between the seller and the buyer. Rather, it was to ensure that sellers disclose material information to prospective buyers. The Original Franchise Rule was posited on the notion that a fully informed prospective buyer can determine whether a particular offering is in his or her best interest.

The Original Franchise Rule required extensive disclosures on a score of specified topics, such as, information about the seller; the business background of the seller's principals and their litigation and bankruptcy histories; the terms and conditions of

---

[1] 43 FR 59614 (Dec. 21, 1978).

the offer; statistical analyses of existing franchised and company-owned outlets; information about prior purchases, including the names and addresses of at least 10 purchasers nearest the prospective buyer; and audited financial statements.

The Commission recognized that requiring these extensive disclosures would likely impose significant compliance costs on businesses covered by the Original Franchise Rule. It therefore sought to strike the proper balance between prospective purchasers' need for pre-sale disclosure and the burden imposed on those selling business ventures covered by the Rule. To achieve this balance, the Commission limited the scope of the Original Franchise Rule's coverage in three significant ways.

First, the Original Franchise Rule covered only those opportunities that required a purchaser to make a payment of at least $500 within the first six months of operation. In transactions where a purchaser may incur high financial losses if the seller withholds material information, the benefit for prospective purchasers of the Original Franchise Rule's pre-sale disclosure requirements outweighs the sellers' cost to make those disclosures. By contrast, when the investment required to purchase a business opportunity is comparatively small, prospective purchasers face a relatively small financial risk. In such circumstances, compliance costs may outweigh the benefits of pre-sale disclosure. Therefore, the Original Franchise Rule did not reach opportunities that charged lower fees.

Second, the "inventory exemption" excluded certain types of payments from the Original Franchise Rule's $500 minimum cost threshold. The "inventory exemption" is the franchise industry's shorthand term for the Commission's determination that, as a matter of policy, voluntary purchases of reasonable amounts of inventory at bona fide wholesale prices for resale do not count toward the required threshold payment. An important consequence of this policy determination was to eliminate from Original Franchise Rule coverage many pyramid marketing plans because purchasers of such plans typically do not make a required payment of or exceeding $500, but instead make voluntary purchases of inventory in reasonable amounts and at bona fide wholesale prices for resale.

Third, in addition to franchise opportunities, the Commission focused the Original Franchise Rule on the types of business opportunities that the record showed were likely to result in

significant consumer injury, such as vending machines, rack displays, and similar opportunities, which frequently were sold through deceptive conduct. A feature common to these types of opportunities was the promise of assistance in securing locations or accounts. Thus, the Commission incorporated this characteristic into the Original Franchise Rule's definitional elements to ensure coverage of demonstrably injurious schemes. Other forms of assistance that business opportunity sellers frequently offer—such as training and the buy-back and resale of goods assembled by the purchaser (an element of many craft assembly opportunities) did not bring a business opportunity within the scope of the Original Franchise Rule's coverage.

In addition to these limits on the scope of the Original Franchise Rule's coverage—driven by balancing prospective purchasers' need for pre-sale disclosure against the burden imposed on business opportunity sellers—another aspect of the Original Franchise Rule's language further limited the scope of coverage. Specifically, the Original Franchise Rule provided that a business opportunity was covered only if the purchaser of the opportunity sells goods or services directly to end-users other than the business opportunity seller. The effect of this limitation was to exclude many work-at-home opportunities—such as envelope stuffing and craft assembly ventures—from Original Franchise Rule coverage. In those opportunities, the purchaser typically performs work for the seller or produces various goods for the seller, who then purportedly distributes them to end-users.

In 1995, as part of its systematic review of FTC rules, the Commission published in the **Federal Register** a request for comment on the Original Franchise Rule to determine its continued effectiveness and impact.[2] Based upon the comments received during the rule review, the Commission tentatively determined to retain the Original Franchise Rule, but sought additional comment on possible amendments. To that end, in February 1997, the Commission published an ANPR, seeking comment on various issues, including whether the Commission should separate the disclosure requirements for business opportunities from those for franchises.[3]

Based upon comments responding to the ANPR, the Commission found that the Original Franchise Rule continued

to serve a vital purpose and that pre-sale disclosure was necessary to protect purchasers of franchises and business opportunities from fraudulent and deceptive sales practices. At the same time, however, the Commission agreed with the overwhelming view of the commenters who suggested that there are material differences between franchises and business opportunities and that these two types of distinct business arrangements require separate disclosure approaches. For example, many of the Original Franchise Rule's pre-sale disclosures, in particular those pertaining to the structure of the parties' relationship, do not apply to the sale of most business opportunities because those sales typically involve comparatively simple contracts. In addition, the Commission recognized that the Original Franchise Rule's detailed disclosure obligations may create barriers to entry for legitimate business opportunity sellers.[4] Accordingly, in 1999, the Commission announced its intention to conduct a separate rulemaking proceeding for business opportunity sales.[5]

**2. The Interim Business Opportunity Rule**

Much of the information revealed by the Commission's regulatory review of the Original Franchise Rule highlighted the differences between franchises and business opportunity ventures, and the distinct regulatory challenges presented by these two types of offerings—that franchises typically are expensive and involve complex contractual licensing relationships, while business opportunity sales are generally less costly and involve comparatively simple purchase agreements that pose less of a financial risk to purchasers. Based on the record amassed during the review proceeding, the Commission concluded that the Original Franchise Rule's extensive disclosure requirements imposed unnecessary compliance costs on both business opportunity sellers and buyers, and determined to bifurcate the Original Franchise Rule into two separate parts—one covering the sale of business format franchises[6] and one to govern the sale of business opportunities. Accordingly, in the ANPR, the Commission solicited

---

[2] 60 FR 17656 (Apr. 7, 1995).

[3] 62 FR 9115 (Feb. 28, 1997).

[4] 64 FR 57296 (Oct. 22, 1999).

[5] Id.

[6] The industry term "business format franchise" specifically refers to franchises in which franchisees operate under a common trademark or other commercial symbol and are required to adhere to the specific business format or method of doing business prescribed by the franchisor. Business format franchises are commonly called "franchises" by the general public, and the two terms are used interchangeably here.

comment on several proposed regulatory modifications, including the creation of a separate trade regulation rule governing the sale of business opportunities.[7]

Subsequently, the Commission completed all procedural steps prescribed by Section 18 of the FTC Act to finalize the Amended Franchise Rule, along with a Statement of Basis and Purpose, in March 2007.[8] At that time, the Amended Franchise Rule—no longer covering business opportunities—was codified at Part 436 in Title 16 of the CFR. The Original Franchise Rule with all definitional elements and references regarding business format franchising deleted, was retained and redesignated as Part 437. Part 437 was titled the "interim Business Opportunity Rule."[9] The interim Business Opportunity Rule contained no new substantive disclosure requirements or prohibitions, and in all material respects was substantially identical to the Original Franchise Rule. Until the final Rule becomes effective, Part 437 governs sales of non-franchise business opportunities.[10]

*B. Rule Amendment Proceedings*

1. Initial Notice of Proposed Rulemaking and Initial Proposed Business Opportunity Rule

In 2006, having determined that a separate business opportunity rule was necessary, the Commission published an Initial Notice of Proposed Rulemaking ("INPR"), announcing its intention to proceed with its proposal for a separate business opportunity Rule (the "initial proposed Business Opportunity Rule" or "IPBOR").[11] The INPR proposed to amend the interim Business Opportunity Rule by updating it, streamlining it, and expanding its scope of coverage.[12] The IPBOR

contained an expansive definition of "business opportunity" that encompassed business opportunities previously covered by the Original Franchise Rule as well as work-at-home, medical billing, and multi-level marketing (MLM)[13] operations. It also eliminated the $500 threshold for Rule coverage.[14]

Streamlining the interim Business Opportunity Rule and tailoring it to fit business opportunities (as opposed to business format franchises) has been a primary focus of this proceeding. Both the Original Franchise Rule and the interim Business Opportunity Rule require extensive disclosures covering over twenty specified topics. In the INPR, the Commission recognized that these extensive disclosure requirements entail disproportionate compliance costs for sellers of comparatively low-cost business opportunity ventures.[15] Therefore, the Commission proposed to mitigate the compliance burden by simplifying and streamlining the disclosure requirements.[16]

Specifically, the INPR proposed a one-page business opportunity pre-sale disclosure document (the "initial proposed disclosure document") with only six required material disclosures.[17] The initial proposed disclosure document was intended to provide prospective purchasers with essential material information they could use in making a purchase decision. The INPR proposed to require sellers to use the

exact form and language set forth by the Commission and to include information regarding (1) the seller; (2) earnings claims; (3) legal actions involving the offered business and its key personnel; (4) the existence of cancellation or refund policies; (5) the number of cancellation or refund requests; and (6) references.[18]

In response to the INPR, the Commission received more than 17,000 comments, the overwhelming majority of which came from individuals active in the MLM industry.[19] MLM companies, their representatives and trade associations, as well as individual participants in various MLM plans, expressed grave concern about the burdens the IPBOR would impose on them and urged the Commission to exclude them from the scope of the IPBOR, to implement various safe harbor provisions, and to reduce the required disclosures.[20] The Commission also received approximately 187 comments, primarily from individual consumers or consumer groups, in favor of the IPBOR.[21] Only a handful of comments came from non-MLM companies and industry groups, expressing various concerns about obligations that the IPBOR would impose upon them.[22] None of the comments addressed the form of the initial proposed disclosure document.

2. The Revised Notice of Proposed Rulemaking and Revised Proposed Business Opportunity Rule

Based on an extensive review of the comments received in response to the INPR and the Commission's law enforcement history, the Commission issued a revised Notice of Proposed Rulemaking ("RNPR") on March 28, 2008, that set forth a revised proposed Rule (the "Revised Proposed Business Opportunity Rule" or "RPBOR") that was more narrowly tailored than the IPBOR.[23]

In the RNPR, the Commission recognized that there were two main problems with the IPBOR's breadth of coverage. First, the IPBOR would have unintentionally swept in numerous commercial arrangements, including

---

[7] 62 FR at 9115. In response to the ANPR, the Commission received 166 written comments. The staff also held six public workshops on the issues raised in the comments, three of which specifically addressed business opportunities.

[8] 72 FR 15444 (Mar. 30, 2007).

[9] For example, references to "franchisor" and "franchisee" used in the Original Franchise Rule were changed in the interim Business Opportunity Rule to "business opportunity seller" and "business opportunity purchaser," and the Original Franchise Rule's definition of "franchise" was changed to "business opportunity." *See id.*

[10] 73 FR 16111, 16112 (Mar. 26, 2008).

[11] 71 FR 19054 (Apr. 12, 2006).

[12] The INPR also specified the process the Commission would follow in amending the Business Opportunity Rule. Pursuant to the Commission's Rules of Practice, 16 CFR 1.20, the Commission determined to use a modified version of the rulemaking process set forth in section 1.13 of those Rules. Specifically, the Commission announced that it would publish a Notice of

Proposed Rulemaking, with a 60-day comment period, followed by a 40-day rebuttal period. In addition, pursuant to Section 18(c) of the FTC Act, the Commission announced that it would hold hearings with cross-examination and rebuttal submissions only if an interested party requested a hearing. The Commission also stated that, if requested to do so, it would contemplate holding one or more informal public workshops in lieu of hearings. Finally, pursuant to 16 CFR 1.13(f), the Commission announced that staff would issue a Report on the Business Opportunity Rule ("Staff Report"), which would be subject to additional public comment. 71 FR at 19079–80.

[13] Multi-level marketing is one form of direct selling, and refers to a business model in which a company distributes products through a network of distributors who earn income from their own retail sales of the product and from retail sales made by the distributors' direct and indirect recruits. Because they earn a commission from the sales their recruits make, each member in the MLM network has an incentive to continue recruiting additional sales representatives into their "down lines." *See* Peter J. Vander Nat & William W. Keep, *Marketing Fraud: An Approach to Differentiating Multilevel Marketing from Pyramid Schemes*, 21 J. Pub. Pol'y & Marketing 140 (Spring 2002).

[14] Promoters of business opportunities were able to evade coverage under the Original Franchise Rule and the interim Business Opportunity Rule by pricing their offerings opportunities below $500, the monetary threshold of coverage.

[15] 71 FR at 19057.

[16] *Id.*

[17] 71 FR at 19091.

[18] 71 FR at 19068.

[19] Comments responding to the INPR are available at *http://www.ftc.gov/os/comments/businessopprule/index.shtm*. References to INPR comments are cited herein as: Name of the commenter-INPR (*e.g.*, Avon-INPR).

[20] Thousands of comments were form letters submitted by participants in various MLM programs. 73 FR at 16113.

[21] Numerous letters came from individuals having negative experiences with various MLMs. 73 FR at 16113 n.37.

[22] 73 FR at 16113.

[23] *Id.* at 16110.

retail product distribution, training and/or educational organizations, where there was little or no evidence that fraud was occurring.[24] Recognizing this legitimate concern, the Commission, in the RNPR, proposed to narrow the definition of "business opportunity." Specifically, the RPBOR provided that the "required payment" prong of the business opportunity definition would not include payments for the purchase of reasonable amounts of inventory at bona fide wholesale prices;[25] eliminated as an element of the business opportunity definition the making of an earnings claim;[26] and narrowed the types of "business assistance" that would trigger the business opportunity definition to just those types of assistance that are the hallmark of business opportunity fraud: Location, account, and "buy-back" assistance.[27]

Second, the Commission determined that the IPBOR was unworkable with respect to MLMs and would have imposed greater burdens on the MLM industry than other types of business opportunity sellers without sufficient countervailing benefits to consumers. After careful consideration of the record, the Commission decided to narrow the scope of the RPBOR to avoid broadly sweeping in all sellers of MLM opportunities. This decision was based on the overwhelming majority of the approximately 17,000 comments that argued that the IPBOR failed to differentiate between unlawful pyramid schemes—which the Commission intended to cover—and legitimate companies using an MLM model.

Finally, the RPBOR eliminated two disclosures that would have been required by the IPBOR—information about legal actions pertaining to a business opportunity seller's sales personnel, and the number of cancellation or refund requests the seller received.[28] Eliminating the disclosure of legal actions involving sales employees was based on the Commission's recognition that the burden of collecting litigation histories for every sales person was not outweighed by the corresponding benefit to prospective purchasers.[29] With respect to the disclosure of the number of cancellation or refund requests received, the Commission determined that such disclosure was not useful, and further, may have had the perverse effect of discouraging legitimate businesses from offering refunds.[30]

The RNPR sought public comment on issues relevant to the Commission's consideration of the RPBOR, including whether the RPBOR would adequately accomplish the Commission's stated purpose of protecting consumers against fraud and, if it did not, what alternatives the Commission could consider.[31] In contrast to the INPR, which generated more than 17,000 comments, the Commission received fewer than 125 comments and rebuttal comments in response to the RNPR.[32] Again, however, the vast majority of commenters were from the MLM industry, but this time they supported the Commission's proposal to narrow the scope of the Business Opportunity Rule, albeit with suggestions for fine-tuning.[33] It is noteworthy that only one comment came from a business opportunity seller.[34] The Commission also received comments from two consumer groups[35] and approximately twelve individuals[36] who expressed their disappointment that the FTC's proposed rule would exclude MLMs from coverage.

3. Consumer Testing of Disclosure Document and Public Workshop

In the RNPR, the Commission announced that it had retained a consultant to assess the proposed disclosure document, with the objective of achieving the proper format and content for communicating material information to consumers. Following publication of the RNPR, Macro International, Inc. ("Macro"), the FTC's consultant, conducted extensive consumer testing of the initial proposed disclosure document that resulted in substantial improvement to both the layout and the wording of the form.[37] The Commission made Macro's report as well as the revised proposed Business Opportunity Disclosure Document ("revised proposed disclosure document")[38] public in a **Federal Register** Notice ("Workshop Notice") that also announced a one-day public workshop in Washington, DC.[39] The Workshop Notice focused on whether the revised proposed disclosure document was an effective means of conveying material information to prospective purchasers of business opportunities. The Workshop Notice also sought comment to further develop the public record on issues that had been raised in the comments received in response to the RNPR. Five individuals who represented a range of interests in the proposed Rule were chosen to participate as panelists, including a federal law enforcer, a state law enforcer, a consumer advocate, the general counsel of a national multi-level marketing company, and a former director of the FTC's Bureau of Consumer Protection.[40] Staff convened the public workshop with these five panelists in Washington, DC, on June 1, 2009. At the conclusion of the workshop discussion of the revised proposed disclosure document, panelists and audience members were invited to express their views about other issues related to the RPBOR.[41] Following

---

[24] *Id.* As one commenter described it, the IPBOR would have swept in traditional arrangements for distribution of "food and beverages, construction equipment, manufactured homes, electronic components, computer systems, medical supplies and equipment, automotive parts, automotive tools and other tools, petroleum products, industrial chemicals, office supplies and equipment, and magazines." IBA–INPR at 5; *see also* Timberland-INPR (noting that numerous manufacturers structure their retail distribution in this manner).

[25] This amendment was based on concerns raised by some commenters that if a "required payment" did not exclude the purchase of inventory, many traditional product distribution arrangements could be brought within the scope of the Rule. 73 FR at 16113.

[26] This amendment was based on concerns raised by some commenters that a broad range of commercial arrangements easily would fall under the business opportunity definition if the company made some representation about sales or profits sufficient to constitute an earnings claim. *Id.* at 16114; *see also infra* Section III.A.3.

[27] *Id.* at 16113. The Commission eliminated two additional types of assistance that would have triggered the Rule's strictures and disclosure obligations—tracking payments and providing training.

[28] *Id.* at 16125.

[29] *Id.*

[30] *Id.*

[31] *Id.* at 16133.

[32] Comments responding to the RNPR are available at *http://www.ftc.gov/os/comments/bizoprevised/index.shtm.* References to RNPR comments are cited herein as: Name of commenter-RNPR.

[33] Some commenters suggested changes to the language of certain definitions proposed in the RNPR to ensure that the multi-level marketing industry was not inadvertently swept into the ambit of the rule. *See, e.g.,* DSA–RNPR; Babener-RNPR; IBA–RNPR.

[34] Planet Antares-RNPR.

[35] The two consumer groups are the Consumer Awareness Institute ("CAI") and Pyramid Scheme Alert ("PSA").

[36] Some letters came from individuals having negative experiences with MLMs.

[37] A copy of the expert's report to the FTC, "Design and Testing of Business Opportunity Disclosures," ("Macro Report") is available at *http://www.ftc.gov/bcp/workshops/bizopps/disclosure-form-report.pdf.*

[38] The version of the revised proposed disclosure document that was tested by Macro inadvertently omitted the phrase "or pay any money" from the conclusion of the penultimate sentence of the revised proposed disclosure document. Macro determined that this omission had no effect on the results of its testing. *See* Macro Report at 2.

[39] *See* 74 FR 18712 (Apr. 24, 2009).

[40] Commission staff selected individuals as panelists based upon their comments, backgrounds, and interest in the subject matter.

[41] A copy of the transcript of the June 1, 2009 workshop is available at *http://www.ftc.gov/bcp/workshops/bizopps/index.shtml.* References to the

Continued

robust discussion on various topics, the Commission received follow-up written comment from six individuals and entities.[42]

### 4. Staff Report

Pursuant to the Rule amendment process announced in the INPR, the Commission's Bureau of Consumer Protection issued a Staff Report on the Business Opportunity Rule in November 2010.[43] The Staff Report explained in detail the history of the Rule amendment proceeding and summarized the issues raised during the various notice and comment periods, particularly those raised in response to the RNPR. It also addressed the public workshop discussion and subsequent comments, as well as additional issues that the staff raised on its own initiative, based on the Commission's law enforcement experience.

Twenty-seven comments were submitted in response to the Staff Report,[44] including eleven comments submitted by consumer group Consumer Awareness Institute ("CAI"). The Commission also received comments from the Department of Justice ("DOJ"), the Direct Selling Association ("DSA"), MLM companies,[45] one franchise lead generator, a consumer group named Pyramid Scheme Alert ("PSA"), and ten individuals. A few commenters suggested changes to some of the Rule's definitions and the scope of coverage,[46] while others encouraged the Commission to adopt the Rule as recommended in the Staff Report.[47] The majority of comments submitted by individuals, and the comments

submitted by CAI and PSA, opposed the Commission's decision to narrow the scope of the Rule to avoid broadly sweeping in MLMs.[48] In crafting the final Rule, the Commission has carefully considered the comments received in response to the Staff Report and throughout the Rule amendment proceeding.[49]

### C. Overview of the Final Rule

The final Rule significantly modifies the scope, disclosure requirements, and prohibitions of the interim Business Opportunity Rule. This proceeding was, in major part, prompted by the recognition that the interim Business Opportunity Rule's extensive disclosure requirements are ill-suited to many business opportunities and place unnecessary compliance costs on both business opportunity sellers and buyers. Similarly, commenters have observed that business opportunities and business format franchises are distinct business arrangements that pose very different regulatory challenges. To account for these differences, to avoid unnecessary compliance burdens, and to ensure that consumers are best protected against deceptive practices in the sale of business opportunities, the Commission has amended the interim Rule to:

(1) Expand its scope to cover many business opportunities that were not covered under the interim Business Opportunity Rule;

(2) Streamline pre-sale disclosures;

(3) Prohibit various specific misrepresentations and other misleading practices often engaged in by fraudulent business opportunity sellers; and

(4) Require that for offers conducted in Spanish or other languages besides English, that the disclosures be provided in the same language as the offer is made. The sections that follow describe these four aspects of the final Rule.

### 1. Scope of the Final Rule

The definition of "business opportunity" dictates the scope of coverage under the final Rule. To ensure appropriate coverage, this definition has been crafted to capture the sale of business opportunities that historically have been associated with deceptive

practices. As discussed below, the final Rule (1) extends coverage to those types of opportunities that previously were not covered under the Original Franchise Rule and the interim Business Opportunity Rule; (2) continues to cover business opportunities that previously were covered under the Original Franchise Rule and interim Business Opportunity Rule; and (3) avoids broadly sweeping in MLMs and certain other types of arrangements that are not characterized by the deceptive and unfair practices the final Rule aims to prevent.

a. The Final Rule Covers Many Business Opportunities That Previously Escaped Coverage

The final Rule includes an expansive definition of "business opportunity" aimed at extending the scope of the Rule to certain business opportunities— namely work-at-home opportunities such as envelope-stuffing, product assembly, and medical billing—that often were not covered by the interim Business Opportunity Rule. The Commission's law enforcement experience and complaint data show that these types of business opportunities are sources of prevalent and persistent problems. These opportunities, however, often escaped coverage of the Original Franchise Rule and the interim Business Opportunity Rule due to the following two limitations: (1) A minimum payment threshold set at $500; and (2) coverage was limited to business opportunities in which products were sold directly to third party end-users, rather than back to the business opportunity seller.[50] Each limitation is discussed below.

First, the Original Franchise Rule and the interim Business Opportunity Rule covered only business opportunity ventures costing $500 or more. Ventures such as product assembly, medical billing, and envelope stuffing, however, often require payments of less than $500 and thus were not covered by the interim Business Opportunity Rule.[51]

---

transcript from the June 2009 Business Opportunity Rule public workshop are cited herein as: Name of commenter, June 09 Tr at page no. (e.g., Jost, June 09 Tr at 12).

[42] Comments received in response to the Workshop Notice are available at *http://www.ftc.gov/os/comments/bizoprulerevwrkshp/index.shtm*. References to workshop comments are cited herein as: Name of commenter-Workshop.

[43] See Bureau of Consumer Protection, *Staff Report to the Federal Trade Commission and Proposed Revised Trade Regulation Rule (16 CFR Part 437)* (Nov. 2010) ("Staff Report"). The Staff Report is available at *http://www.ftc.gov/os/fedreg/2010/october/101028businessopportunitiesstaffreport.pdf*. In November, the Commission published a notice in the **Federal Register** announcing the availability of, and seeking comment on, the Staff Report. *See* 75 FR 68559 (Nov. 8, 2010).

[44] Comments received in response to the Staff Report are available at *http://www.ftc.gov/os/comments/bizoppstaffreport/index.shtm*. References to Staff Report comments are cited herein as: Name of commenter—Staff Report.

[45] Comments on behalf of the MLM industry were submitted by Tupperware and Primerica.

[46] E.g., Dub-Staff Report; Tupperware-Staff Report.

[47] DOJ-Staff Report; Primerica-Staff Report; DSA-Staff Report.

[48] E.g., CAI-Staff Report; PSA-Staff Report; O'Handley-Staff Report; Brooks-Staff Report; Johnson-Staff Report.

[49] The Staff Report comments addressing specific provisions of the Rule are discussed within the substantive discussions on the relevant provisions. The comments regarding MLMs are discussed in Subsection C.1.c below, addressing the Commission's decision to exclude MLMs from coverage.

[50] 73 FR at 16112.

[51] See, e.g., FTC v. Med. Billers Network, Inc., No. 05 CIV 2014 (RJH) (S.D.N.Y. 2005) ($200–$295 fee); FTC v. Sun Ray Trading, No. Civ. 05–20402–CIV–Seitz/Bandstra (S.D. Fla. 2005) ($160 fee); FTC v. Wholesale Mktg. Group, LLC, No. 05 CV 6485 (N.D. Ill. 2005) ($65 to $175 registration fees); FTC v. Vinyard Enters., Inc., No. 03–23291–CIV–ALTONAGA (S.D. Fla. 2003) ($139 fee); FTC v. Leading Edge Processing, Inc., 6:02–CV–681–ORL–19 DAB (M.D. Fla. 2002) ($150 fee); FTC v. Healthcare Claims Network, Inc., No. 2:02–CV–4569 MMM (AMWx) (C.D. Cal. 2002) ($485 fee); FTC v. Stuffingforcash.com, Corp., No. 92 C 5022 (N.D. Ill. 2002) ($45 fee); FTC v. Kamaco Int'l, No. CV 02–04566 LGB (RNBx) (C.D. Cal. 2002) ($42 fee); FTC v. Medicor LLC, No. CV01–1896 (CBM) (C.D. Cal. 2001) ($375 fee); FTC v. SkyBiz.com, No. 01–

Some commenters asserted that setting the threshold for coverage at a specific dollar amount simply provides scam operators a means to circumvent the Rule, noting that sellers of business opportunities may charge less than $500 to skirt the interim Business Opportunity Rule's disclosure requirements.[52] The Commission has concluded that the scope of the final Rule should be broad enough to reach business opportunities that the Commission's law enforcement history and consumer complaints show are a widespread and persistent problem, regardless of the price at which they are offered. Accordingly, the final Rule eliminates the monetary threshold.

A second limitation to the Original Franchise Rule and the interim Business Opportunity Rule's scope of coverage was the requirement that the purchaser of the opportunity had to sell goods or services directly to third party end-users—someone other than the business opportunity seller. The effect of this limitation was to exclude most work-at-home opportunities—such as envelope stuffing and craft assembly ventures— from coverage. Promoters of these types of opportunities often tell prospective purchasers that they (1) will work directly for the seller or a third party the seller identifies or (2) will produce various goods for the seller, who will then purportedly distribute the goods to end-users or retail markets.[53] In order to reach these types of business opportunities, coverage of the final Rule is not limited to transactions where the purchaser of the opportunity sells goods or services directly to individuals other than the business opportunity seller.

b. The Final Rule Continues To Cover Those Types of Opportunities Covered Under the Original Franchise Rule and the Interim Business Opportunity Rule

In addition to those types of business opportunities that often evaded coverage under the Original Franchise Rule and Interim Business Opportunity Rule, the final Rule continues to cover the types of business opportunities that

previously had been covered, such as vending machine opportunities, rack display opportunities, and similar arrangements. The Commission's law enforcement experience demonstrates that sales of these types of opportunities are fraught with unfair and deceptive practices, in particular, false or unsubstantiated earnings claims. Indeed, such practices are widespread in promotion and sale of such business opportunities. Since 1995, the Commission has brought over 80 law enforcement actions [54] in connection with more than ten law enforcement sweeps [55] that targeted business opportunity scams involving the sale of

[54] In bringing these FTC law enforcement actions, the FTC partnered with sister federal agencies— such as the DOJ and the United States Postal Inspection Service—and with the various state attorneys general, including the District of Columbia. Thus, these "sweeps" entailed many more actions besides those brought by the FTC.

[55] E.g., Project Fal$e Hope$, see FTC News Release: Federal, State Law Enforcers Complete Bogus Business Opportunity Sweep (Dec. 12, 2006), available at http://www.ftc.gov/os/caselist/projectfalsehopes.shtm; Project Biz Opp Flop, see FTC News Release: Criminal and Civil Enforcement Agencies Launch Major Assault Against Promoters of Business Opportunity and Work-at-Home Schemes (Feb. 22, 2005), available at http://www.ftc.gov/opa/2005/02/bizoppflop.htm; Project Busted Opportunity, see FTC News Release: State, Federal Law Enforcers Launch Sting on Business Opportunity, Work-at-Home Scams (June 20, 2002), available at http://www.ftc.gov/opa/2002/06/bizopswe.shtm; Project Biz-illion$, see FTC News Release: State-Federal Crackdown on Phony Business Opportunities Intensifies (March 6, 2000), available at http://www.ftc.gov/opa/2000/03/biz.shtm; Operation Money Pit, see FTC News Release: "Operation Money Pit" Targets Fraudulent Business Opportunity Schemes (Feb. 20, 1998), available at http://www.ftc.gov/opa/1998/02/moneypit.shtm; Project Vend Up Broke, see FTC News Release: FTC Announces "Operation Vend Up Broke" (Sept. 3, 1998), available at http://www.ftc.gov/opa/1998/09/vendup2.shtm; Project Trade Name Games, see FTC News Release: Display Racks for Trade-Named Toys and Trinkets are Lastest in Business Opportunity Fraud Schemes (Aug. 5, 1997), available at http://www.ftc.gov/opa/1997/08/tradenam.shtm; Operation Missed Fortune FTC News Release: Operation Missed Fortune (Nov. 13, 1996), available at http://www.ftc.gov/opa/1996/11/misdfort.shtm; Project Telesweep, see FTC News Release: Major State-Fed Crackdown Targets Business Opportunity Scam "Epidemic" (July 18, 1995), available at http://www.ftc.gov/opa/1995/07/scam.shtm. Recent law enforcement sweeps "Operation Bottom Dollar" and "Operation Short Change," challenged, among other things, "work-at-home" opportunities. See FTC News Release: FTC Cracks Down on Scammers Trying to Take Advantage of the Economic Downturn (Feb. 17, 2010), available at http://www.ftc.gov/opa/2010/02/bottomdollar.shtm; FTC News Release: FTC Targets Scams Spawned by Economic Downturn (July 1, 2009), available at http://www.ftc.gov/opa/2009/07/shortchange.shtm.

vending machines,[56] rack displays,[57] public telephones,[58] Internet kiosks,[59] and 900-number ventures,[60] among others. These persistent scams will continue to be covered under the final Rule.

c. The Final Rule Avoids Broadly Sweeping in MLMs

The final Rule's definition of business opportunity avoids broadly sweeping in all sellers of MLM opportunities.[61] The decision in the RPBOR to exclude MLMs from the scope of the Rule's coverage was based on the overwhelming majority of the approximately 17,000 comments that argued that the IPBOR failed to differentiate between unlawful pyramid

[56] See, e.g., United States v. Lifestyle Vending, Inc., No. CV–06–6421 (E.D.N.Y. 2006); FTC v. Am. Entm't Distribs., Inc., No. 04–22431–CIV–Huck (2004); FTC v. Inspired Ventures, Inc., No. 02–21760–CIV–Jordan (S.D. Fla. 2002); FTC v. Essex Mktg. Group, Inc., No. 2:02–cv–03415–TCP–AKT (E.D.N.Y 2002); United States v. Univend, LLC, No. 02–0433–P–L (S.D. Ala. 2002); FTC v. Pathway Merch., Inc., No. 01–CIV–8987 (S.D.N.Y. 2001); United States v. Photo Vend Int'l, Inc., No. 98–6935–CIV–Ferguson (S.D. Fla. 1998); FTC v. Hi Tech Mint Sys., Inc., No. 98 CIV 5881 (JES) (S.D.N.Y. 1998); FTC v. Claude A. Blanc, Jr., No. 2:92–CV–129–WCO (N.D. Ga. 1992); see also FTC News Release: FTC Announces "Operation Vend Up Broke" (Sept. 3, 1998), available at http://www.ftc.gov/opa/1998/09/vendup2.shtm (FTC and 10 states announce 40 enforcement actions against fraudulent vending business opportunities).

[57] See, e.g., United States v. Elite Designs, Inc., No. CA 05 058 (D.R.I. 2005); United States. v. QX Int'l, No. 398–CV–0453–D (N.D. Tex. 1998); FTC v. Carousel of Toys, No. 97–8587–CIV–Ungaro-Benages (S.D. Fla. 1997); FTC v. Raymond Urso, No. 97–2680–CIV–Ungaro-Benages (S.D. Fla. 1997); FTC v. Infinity Multimedia, Inc., No. 96–6671–CIV–Gonzalez (S.D. Fla. 1996); FTC v. O'Rourke, No. 93–6511–CIV–Ferguson (S.D. Fla. 1993); see also FTC News Release: Display Racks for Trade-Named Toys and Trinkets are the Latest in Business Opportunity Fraud Schemes (Aug. 5, 1997), available at http://www.ftc.gov/opa/1997/08/tradenam.htm (FTC and 8 states filed 18 enforcement actions against sellers of bogus display opportunities that use trademarks of well-known companies).

[58] See, e.g., FTC v. Advanced Pub. Commc'ns Corp., No. 00–00515–CIV–Ungaro-Benages (S.D. Fla. 2000); FTC v. Ameritel Payphone Distribs., Inc., No. 00–0514–CIV–Gold (S.D. Fla. 2000); FTC v. ComTel Commc'ns Global Network, Inc., No. 96–3134–CIV–Highsmith (S.D. Fla. 1996); FTC v. Intellipay, Inc., No. H92 2325 (S.D. Tex. 1992).

[59] See, e.g., FTC v. Bikini Vending Corp., No. CV–S–05–0439–LDG–RJJ (D. Nev. 2005); FTC v. Network Serv. Depot, Inc., No. CV–S0–05–0440–LDG–LRL (D. Nev. 2005); United States v. Am. Merch. Tech., No. 05–20443–CIV–Huck (S.D. Fla. 2005); FTC v. Hart Mktg. Enter. Ltd., Inc., No. 98–222–CIV–T–23 E (M.D. Fla. 1998); see also FTC v. FutureNet, Inc., No. CV–98–1113 GHK (BQRx) (C.D. Cal. 1998); FTC v. TouchNet, Inc., No. C98–0176 (W.D. Wash. 1998).

[60] See, e.g., FTC v. Bureau 2000 Int'l, Inc., No. 2:96–cv–01473–WMB–RC (C.D. Cal. 1996); FTC v. Genesis One Corp., No. CV–96–1516–MRP (MCX) (C.D. Cal. 1996); FTC v. Innovative Telemedia, Inc., No. 96–8140–CIV–Ferguson (S.D. Fla. 1996); FTC v. Ad-Con Int'l, No. 96–1472 LGB (VAP) (C.D. Cal. 1996).

[61] See 73 FR at 16120.

CV–0396–EA (X) (N.D. Okla. 2001) ($125 fee); FTC v. Para-Link Int'l, No. 8:00–CV–2114–T–27E (M.D. Fla. 2000) ($395 to $495 fee); see also Consumer Fraud in the United States: The Second FTC Survey (October 2007) at 48, available at http://www.ftc.gov/opa/2007/10/fraud.pdf (indicating a median payment for work-at-home schemes of $200).

[52] See 71 FR at 19079 (citing comments submitted in earlier proceedings by NCL, SBA Advocacy, Finnigan, and Purvin).

[53] E.g., FTC v. Darling Angel Pin Creations, Inc., No. 8:10–cv–00335–JSM–TGW (M.D. Fla. Feb. 2010); FTC v. Indep. Mktg. Exch. Inc., No. 1:10–Cv–00568–NLH–KMW (D.N.J. Feb. 2010); FTC v. Preferred Platinum Svcs. Network LLC, No. 3:10–cv–00538–MLC–LHG (D.N.J. Feb. 2010).

schemes—which the Commission intended to cover—and legitimate companies using an MLM model.

As detailed more fully in the RNPR, several common themes emerged from the numerous comments submitted by the MLM industry. Many commenters suggested that the low economic risks of participating in a typical MLM do not justify imposing burdensome regulations that would threaten to strangle the MLM industry.[62] These commenters focused on the low fees— often less than $100—that top MLM companies charge prospective distributors for the right to sell their products, and on the relatively low risk that consumers would lose money on large purchases of inventory.[63] In addition, industry commenters contended that the various disclosure requirements were ill-suited for the MLM business model and that many of the disclosure obligations would show direct selling companies in a distorting negative light.[64] For example, according to one commenter, the requirement to disclose prior legal actions would cast successful and long-established companies in a worse light than fly-by-night frauds simply because larger companies with more sales representatives and more years of operation are likely to get involved in a larger number of lawsuits.[65] Moreover, industry commenters uniformly asserted that the cost of compliance with the IPBOR would be extremely high for them—first, from the burden of developing, providing and keeping records of proposed disclosures, and second, from the impaired ability to recruit prospective distributors.[66] Finally, industry commenters argued that unlike traditional business opportunities, the MLM industry is not permeated with fraud.[67]

In contrast to the overwhelming majority of comments that opposed regulating MLMs through the Business Opportunity Rule, only a small minority of commenters were in favor of a rule that would cover MLMs. These commenters included two consumer groups, CAI and PSA, a few consumer advocates, individuals who regretted becoming involved in MLMs, and other MLM participants.[68] Many of the consumer advocates contended that the MLM industry is comprised primarily of pyramid schemes masquerading as

legitimate companies.[69] The commenters also asserted that MLMs deceptively market their distributorships as a low-risk opportunity with high earnings potential, when in fact, the costs of participating in an MLM can be high and the earnings comparatively small.[70]

In the RNPR, the Commission concluded that although there is significant concern that some pyramid schemes may masquerade as legitimate MLMs, assessing the incidence of such practices is difficult and indeed, determining whether an MLM is a pyramid scheme requires a fact-intensive, case-by-case analysis. Further, the record developed was insufficient as a basis for crafting MLM disclosures that would effectively help consumers make an informed decision about the risks of joining a particular MLM.

Based on the record and the Commission's law enforcement experience, the RNPR announced the Commission's determination that it would not be practicable to apply the requirements of the proposed Rule to MLM companies. Drawing on its law enforcement experience, the Commission acknowledged that some MLMs do engage in unfair or deceptive acts or practices, including operating pyramid schemes or making unsubstantiated earnings claims that cause consumer harm. The Commission, however, was not persuaded that workable, meaningful disclosures could be devised that would help consumers identify a fraudulent pyramid scheme. This being the case, the Commission decided that the proposed Rule was too blunt an instrument to alleviate fraud in the sale of MLMs. The Commission therefore determined to continue to challenge unfair or deceptive practices in the MLM industry through law enforcement actions alleging violations of Section 5 of the FTC Act and not through the Business Opportunity Rule. The Staff Report's recommendations were consistent with this decision.[71]

In response to the Staff Report, the Commission received 24 comments addressing the Commission's decision to narrow the scope of the Rule to avoid broadly sweeping in MLMs.

Specifically, 19 comments opposed the Commission's decision,[72] one commenter agreed with the decision to narrow the scope of the Rule, but suggested modifying the Rule to contain bright line exemptions and to clarify the definition of "required payment,"[73] and two commenters advocated that the Commission adopt the Rule as recommended.[74]

Commenters opposing the decision to avoid sweeping MLMs within the scope of the Rule's coverage set forth the same basic premise—that MLMs frequently misrepresent the level of earnings achieved by their distributors and therefore, should be subject to regulation.[75] More specifically, many of the commenters advocated that the MLM industry should be required to disclose the average income of their participants.[76] The Commission has carefully considered the comments submitted in response to the Staff Report on the issue of MLMs. While some of the commenters provided an analysis of the MLM industry with concrete examples of the types of problems that exist within that industry,[77] many did not. Instead, many commenters expressed in general terms their low opinion of MLMs and their general opinion that MLMs should be regulated.[78] More to the point, none of the commenters provided persuasive arguments for why the Business Opportunity Rule is the proper vehicle to address the problems they identified within the MLM industry.

Before discussing the comments in further detail, however, one point in the rulemaking record requires clarification. Several comments focused on the

---

[62] *Id.* at 16114.

[63] *Id.*

[64] *Id.* at 16115.

[65] *Id.*

[66] *Id.* at 16116.

[67] *Id.* at 16114.

[68] *Id.* at 16116.

[69] CAI–INPR at 2 ("I can certify that *MLM (sic) are not direct selling programs, but chain selling programs*"); CAI–INPR Rebuttal of DSA Comments at 3 ("The Direct Selling Association (DSA), recently taken over by chain sellers now promotes chain selling (pyramid marketing)—even more than legitimate direct selling"); *see also* Brooks–INPR at 2 ("In my opinion, most MLM firms operate in a deceptive or fraudulent manner").

[70] PSA–INPR at 3–4; Brooks–INPR at 4; Johnson–INPR at 1.

[71] Staff Report at 20.

[72] These included eleven comments submitted by consumer group CAI, as well as comments submitted by PSA and seven individuals. In addition, two individuals submitted comments supporting the statistical analysis provided by CAI President, Jon Taylor. *See* McKee-Staff Report; Ashby-Staff Report.

[73] Tupperware-Staff Report.

[74] DSA–Staff Report; Primerica-Staff Report.

[75] *See, e.g.,* O'Handley-Staff Report ("I personally believe that this industry is a borderline scam at best and needs MORE oversight than everyone else-NOT LESS."); Welling-Staff Report ("I find it amazing that * * * the MLM industry has little or no regulations.").

[76] *See, e.g.,* Barrett-Staff Report (FTC should "demand truthful disclosure of income potentials for MLM"); Brooks-Staff Report (MLMs should produce "actual, verifiable data concerning the earnings and losses of their distributors"); CAI–Staff Report at 7–3 (advocating for the disclosure of "information supporting earnings claims").

[77] *See, e.g.,* CAI-Staff Report (reporting research on the MLM industry and quoting representations made by various MLMs).

[78] *See, e.g.,* Craig-Staff Report (there is "ample evidence of problems with MLM to warrant inclusion in the rule"); Afoa-Staff Report (commenting on personal experience with one MLM).

following language contained in the Staff Report: "Two key problems emerged with the IPBOR's breadth of coverage. First, the IPBOR would have unintentionally swept in numerous commercial arrangements where there is little or no evidence that fraud is occurring." [79] The commenters suggest, incorrectly, that the quoted language reveals a finding by the Commission that there is little or no evidence of fraud occurring within the MLM industry.[80] This language, however, referred to a passage from the RNPR that addressed traditional product distribution arrangements, not MLMs.[81] The Commission has not made a finding that there is little or no evidence of fraud within the MLM industry; to the contrary, it has specifically recognized, through its own law enforcement experience, that some MLMs may be pyramid schemes in masquerade and may make false and unsubstantiated earnings claims.[82]

In any event, the comments submitted in response to the Staff Report do not persuade the Commission that the Business Opportunity Rule is the proper tool to address these problems.[83] Two of the affirmative disclosure requirements illustrate the difficulty in applying the Rule to MLMs: (1) The disclosure of substantiation for earnings claims; and (2) the disclosure of references.

First, as the Commission has acknowledged, the varied and complex structure of MLMs makes it exceedingly difficult to make an accurate earnings disclosure and likely would require different disclosures for different levels of participation in the company. For instance, it would be difficult to craft an accurate earnings disclosure that would account for "inactive" participants that use their distributorship as a "buyers club" and are interested only in purchasing goods at a wholesale price for their own use.[84] This problem appears to be unique to MLMs and, so

far as the Commission is aware, does not arise in other forms of business opportunities.

Furthermore, it may be difficult to determine retail income if the MLM is not in a position to verify the extent to which a distributor has resold the product at retail, is warehousing the product, or bought the product for his or her own personal consumption. Even where the MLM has policies in place purportedly to ensure that a portion of its distributors' income is derived from retail sales, these policies could go unenforced, or even where ostensibly enforced, could be circumvented by distributors who may have an incentive to "inflate" their retail sales by "certifying" that such sales occurred in order to qualify for higher levels of commissions. In light of these difficulties, and because the comments submitted in response to the Staff Report did not refute these findings, the Commission continues to believe that developing a standard, useful, and understandable earnings disclosure that would apply to both the MLM industry and the other business opportunities covered by the Rule remains elusive.[85]

Second, the reference disclosure required under the final Rule would make little sense in the MLM context. As the Commission has previously recognized, those prior purchasers appearing on the reference list likely would stand to receive a financial benefit if they could convince a prospect to enroll into their downline.[86] Under these circumstances, information provided by such a reference might not be a reliable indicator of the potential risk and rewards of enrollment in the MLM.

In response to the Staff Report, the Commission received one comment attempting to refute this reasoning. The commenter argued that, contrary to the Commission's view, prior purchasers would have little incentive to misrepresent the success of the MLM because that incentive would exist only if the prospective purchaser would become part of the prior purchaser's downline, which the commenter implies would not always be the case.[87] The commenter further argued that the fact that the prospective purchaser had received the disclosure document would indicate that the prospective purchaser had already been recruited,

and therefore would be unlikely to face further recruitment by the prior purchaser.[88]

The Commission finds these arguments unpersuasive. To the extent there is any financial incentive for a reference to puff or exaggerate the benefits of buying into a business, that reference obviously cannot provide a disinterested opinion to the prospect. The MLM model is inherently structured to create financial incentives for distributors to recruit prospects into their downlines.[89] Thus, those financial incentives are present whenever a potential recruit enquires into the business. To illustrate the point, even dissatisfied distributors have an incentive to refrain from disparaging the MLM because any losses they have suffered could potentially be recouped by the recruitment of the prospect into their downline. Whether they are ultimately successful in their attempt to woo a recruit from another distributor is immaterial; they have every incentive to try.[90]

Thus, the Commission continues to believe that the final Rule's reference disclosure would not provide prospective MLM participants with an accurate account of the MLM experience or with information necessary to make an informed purchasing decision. Moreover, these challenges appear to be unique to MLMs, and as far as the Commission is aware, are not inherent in the other types of business opportunities addressed by the final Rule.

Accordingly, while the Commission recognizes that problems may exist within the MLM industry, it continues to find that the Business Opportunity Rule is not the appropriate vehicle through which to address them. Rather, the Commission will continue to challenge unfair or deceptive practices in the MLM industry through Section 5 of the FTC Act. Thus, the final Rule has

---

[79] *See, e.g.,* CAI–Staff Report at 1, 10–41; PSA–Staff Report.

[80] CAI–Staff Report at 10–41; PSA–Staff Report ("The basis of the exclusion appears to be the extraordinary claim that there is insufficient evidence of widespread fraud in the multi-level marketing field.").

[81] Indeed, the language quoted by CAI and PSA contains a footnote referencing the section of the RNPR that discussed traditional product distribution arrangements. *See* Staff Report at 30 (citing 73 FR at 16113).

[82] *See* 73 FR at 16119; *see also* Staff Report at 20.

[83] Indeed, one commenter recommended a completely separate set of disclosures for MLM opportunities, further suggesting that the Business Opportunity Rule is a poor fit for the MLM industry. *See* Johnson-Staff Report (recommending that the FTC convert its consumer education on investing with an MLM into a series of disclosures that would be MLM-specific).

[84] *See* 73 FR at 16120.

[85] While CAI presented its proposal for an earnings disclosure, it is clear that the disclosure would be specific to MLMs and would have no application to the other types of business opportunities addressed by the Rule. *See* CAI–Staff Report at 7–33.

[86] *See* 73 FR at 16121.

[87] Brooks-Staff Report at 8.

[88] *Id.*

[89] Multi-level marketing is a business model in which a company distributes products through a network of distributors who earn income from their own retail sales of the product and from retail sales made by the distributors' direct and indirect recruits. Because they earn a commission from the sales their recruits make, each member in the MLM network has an incentive to continue recruiting additional sales representatives into their "down lines." *See* Vander Nat & Keep, supra note 13.

[90] Comments submitted in response to the Staff Report did not refute these arguments, but actually bolstered them. For instance, one commenter noted that MLM recruiters will often pretend they are wealthy when they are not, simply to entice others to join the MLM. *See* O'Handley-Staff Report at 2; *see also* CAI–Staff Report at 5 (noting that in MLMs, "every major victim is of necessity a perpetrator (recruiter) because to have any hope of recouping their ongoing investments * * * they must recruit others to do what they have done").

been crafted to avoid broadly sweeping in MLMs.[91]

### 2. Streamlined Disclosure Requirements

Although the scope of coverage is broader, the compliance burden is lighter under the final Rule than under the interim Business Opportunity Rule. In contrast to the voluminous disclosures that business opportunity sellers are required to make under the interim Business Opportunity Rule, the final Rule has significantly streamlined the disclosures to focus on the types of information most material to business opportunity purchasers: (1) The seller's identifying information; (2) whether the seller makes an earnings claim;[92] (3) whether the seller, its affiliates, or key personnel, have been involved in any legal actions;[93] (4) whether the seller has a cancellation or refund policy; and (5) a list of purchasers who have bought the business opportunity within the previous three years. The final Rule also requires the disclosure of supplementary information that substantiates earnings claims, identifies legal actions, and states the material terms of the seller's cancellation or refund policy. These disclosures are consistent with the Commission's experience concerning common practices in the sale of business opportunities, and the types of information most meaningful to prospective purchasers.[94] For example, the Commission's experience

demonstrates that earnings claims are highly relevant to consumers in making their investment decisions and are often the single most decisive factor in such decisions. Furthermore, the presence of a legal action against the seller or its key personnel may warn the purchaser of potential risk associated with the business opportunity. Information about the seller's cancellation or refund policy is relevant to consumers when weighing their investment risks. Finally, providing the contact information for prior purchasers will allow prospective purchasers to discuss the business opportunity with other purchasers prior to committing themselves to the business opportunity venture.

These streamlined disclosure requirements strike the appropriate balance by providing consumers with material information in a straightforward and focused document that will allow them to make informed purchasing decisions. At the same time, the streamlined form eases the compliance burden currently imposed on business opportunity sellers. Like the Original Franchise Rule and the interim Business Opportunity Rule, the final Rule is posited on the notion that a fully informed consumer is in a better position to determine whether a particular offering is in his or her best interest when sellers are required to disclose to them material information. Consumers should be protected against receiving inaccurate information and self-serving unsubstantiated statements from business opportunity sellers. Accordingly, the final Rule requires that business opportunity sellers disclose just the types of information that the Commission has determined are most material to potential purchasers in making a purchasing decision: The seller's identifying information; whether the seller makes an earnings claim, and if so, the substantiation for that claim; whether the seller offers a refund or cancellation policy, and if so, the material terms of that policy; whether the seller or its affiliates and key personnel have been the subject of prior legal actions; and the names and business telephone numbers of prior purchasers to contact. The Commission has determined that these streamlined disclosure requirements will provide potential purchasers with the tools they need to protect themselves from false claims, while at the same time minimizing compliance costs for legitimate business opportunity sellers.

### 3. Express Prohibitions

In addition to mandating disclosures to prospective purchasers, the final Rule includes prohibitions on sellers from

engaging in a number of deceptive practices, which were absent from the interim Business Opportunity Rule. In drafting the final Rule, the Commission relied heavily on its experience in addressing a wide array of deceptive and unfair business opportunity practices through law enforcement actions under the Original Franchise Rule, the interim Business Opportunity Rule, and Section 5 of the FTC Act. The Commission also relied on the staff's analysis of consumer complaints submitted to the FTC. By far, the most frequent allegations in Commission business opportunity cases pertain to false or unsubstantiated earnings claims.[95] False testimonials or fictitious references and misrepresentations concerning the profitability of locations, availability of support and assistance, nature of the products or services sold, prior success of the seller or locator, full extent of investment costs, and refund policies are also prevalent in Commission business opportunity cases.[96] These alleged material misrepresentations or omissions also were frequently mentioned in complaints to the Commission submitted by business opportunity purchasers.[97]

---

[91] The final Rule, however, does not explicitly exempt MLMs from coverage, but instead contains a narrow definition of "business opportunity." As discussed in Section III.A.3 *infra*, the final Rule's definition of "business opportunity" eliminates two types of business assistance that previously would have triggered the Rule's coverage of MLMs: (1) Tracking or paying commissions or other compensation for recruitment or sales; and (2) providing generalized training or advice for the business. The final Rule is thus more narrowly tailored to those types of deceptive business assistance representations that are the hallmark of fraudulent business opportunity schemes: location, account, and "buy back" assistance. 73 FR at 16123.

[92] If the business opportunity seller indicates that it does make earnings claims, then it must complete a separate earnings claim statement setting forth the earnings claim, the number and percentage of purchasers who achieved the represented level of earnings, the date range during which the represented earnings were achieved, and additional information.

[93] If the business opportunity seller indicates that it or its affiliates or key personnel have been subject to legal actions, then it must complete a separate attachment setting forth the full caption of each action, and may choose to include a brief 100-word description of the action.

[94] To fully develop the rulemaking record on business opportunities, in the ANPR, the Commission solicited comment about what pre-sale disclosures would ensure that business opportunity purchasers receive material information necessary to make an investment decision and prevent fraud in the sale of business opportunities. 62 FR at 9121, Questions 15 & 16.

[95] *See, e.g., FTC* v. *Darling Angel Pin Creations, Inc.,* No. 8:10–cv–00335–JSM–TGW (M.D. Fla. Feb. 2010) (representing likely earnings of $500 per week); *FTC* v. *Route Wizard, Inc.,* No. 1:06–cv–00815–KD–B (S.D. Ala. 2006) (representing that purchasers could earn $3,000 a month); *FTC* v. *Bus. Card Experts, Inc.,* No. 06–CV–4671 (PJS/RLE) (D. Minn. 2006) (claiming likely earnings of $150,000 in first year); *FTC* v. *Richardson d/b/a Mid-South Distribs.,* No. CV–06–S–4754–NW (N.D. Ala. 2006) (representing likely earnings of over $2,000 a month or $65,000 a year); *FTC* v. *Accent Mktg., Inc., et al.,* No. 02–405–CB–M (S.D. Ala. 2002) (representing likely earnings of $3,200 per month to $16,000 per month).

[96] *See, e.g., FTC* v. *Bus. Card Experts, Inc.,* No. 06–CV–4671 (PJS/RLE) (D. Minn. 2006) (used paid references); *FTC* v. *Route Wizard, Inc.,* No. 1:06–cv–00815–KD–B (S.D. Ala. 2006) (misrepresented location assistance); *FTC* v. *Richardson d/b/a Mid-South Distribs.,* No. CV–06–S–4754–NW (N.D. Ala. 2006) (promised high-traffic, high-profit locations); *FTC* v. *Am. Entm't Distribs., Inc.,* No. 04–22431–Civ–Martinez (S.D. Fla. 2004) (used fictitious references, misrepresented locations); *FTC* v. *Fidelity ATM, Inc.,* No. 06–81101–Civ–Hurley/Hopkins (S.D. Fla. 2004) (misrepresented level of support or assistance); *FTC* v. *Accent Mktg., Inc., et al.,* No. 02–405–CB–M (S.D. Ala. 2002) (misrepresented that references purchased the business venture or would provide reliable descriptions of their experience); *FTC* v. *Associated Record Distribs., Inc.,* No. 02–21754–CIV–Graham/Garber (S.D. Fla. 2002) (misrepresented business assistance and that references either purchased the business venture or would provide reliable descriptions of their experience).

[97] In 2010, the Commission logged over 12,000 complaints against franchises, business opportunities, and work-at-home schemes. *See* Consumer Sentinel Network Databook (March 2011) at 76, *available at http://ftc.gov/sentinel/reports/sentinel-annual-reports/sentinel-cy2010.pdf.*

**Federal Register** / Vol. 76, No. 236 / Thursday, December 8, 2011 / Rules and Regulations    76825

Therefore, among other things, under the final Rule, business opportunity sellers are prohibited from misrepresenting: (1) Earnings; (2) the cost, efficacy, nature, or central characteristics of the business opportunity or the goods or services sold to the purchaser as part of the business opportunity; (3) their cancellation or refund policies; (4) promised assistance; (5) the calculation and distribution of commissions, bonuses, incentives, premiums, or other payments from the seller; (6) the likelihood of finding locations for equipment or accounts for services; (7) that the business opportunity is an offer of employment; (8) territorial exclusivity or more limited territorial protections; (9) endorsements; and (10) references. The final Rule also prohibits business opportunity sellers from failing to make promised refunds, and from assigning to any purchaser a purported exclusive territory that has been sold to another purchaser.

The final Rule prohibits entities covered by the Rule from engaging in the specific acts or practices identified as deceptive or unfair through the Commission's law enforcement experience, as well as the rulemaking record. Engaging in any of those acts or practices is a violation of both the final Rule and Section 5 of the FTC Act.[98] Of course, the Commission, under Section 5, also may challenge any conduct that is not enumerated in the final Rule if the Commission determines that such conduct constitutes an unfair or deceptive act or practice.

### 4. Disclosures in Spanish or Other Languages Besides English

The Commission's law enforcement history demonstrates that some business opportunities are marketed primarily to Spanish speaking consumers.[99] Based on this experience, the Staff Report discussed the limited utility of English-language disclosures for business opportunities marketed for business in Spanish. Specifically, the staff questioned whether the disclosure document could be made more effective by translating it into Spanish and requiring that when a business opportunity is marketed in Spanish, the disclosure document and any disclosures required by the Rule be provided in Spanish. The Staff Report further suggested that when a business opportunity seller purposefully reaches out to a particular population by marketing in the foreign language spoken by members of that community, all of the disclosures required by the Rule should be accessible and comprehensible to each of those potential purchasers. The Staff Report recommended, therefore, that because the Commission has specific law enforcement experience with business opportunities marketed in Spanish, a Spanish translation of the disclosure document was necessary to attach as an appendix to the final Rule. It further recommended that where the business opportunity is marketed in a language other than Spanish, the business opportunity seller should be required to translate the disclosure document into the language of the sale and provide all the disclosures required by the Rule in that language.

It is the long-held policy of the Commission that disclosures required by Commission orders, rules, or guides should be made in the predominant language used in the related advertisement or sales material.[100] Upon consideration of this policy, the staff's recommendation, and the rationale for the staff's recommendation, the Commission agrees with the staff's recommendation. Accordingly, the final Rule contains a new provision, § 437.5, which specifies the disclosure requirements for sales conducted in Spanish or other languages besides English.

### II. The Legal Standard for Amending the Rule

The Commission is amending 16 CFR Part 437 pursuant to Section 18 of the FTC Act, 15 U.S.C. 57a *et seq.*, and Part 1, subpart B of the Commission's Rules of Practice.[101] This authority permits the Commission to promulgate, modify, and repeal trade regulation rules that define with specificity acts or practices that are unfair or deceptive in or affecting commerce within the meaning of Section 5(a)(1) of the FTC Act, 15 U.S.C. 45(a)(1).

The Commission's Rules of Practice further provide that if the Commission determines to promulgate a rule, it shall adopt a Statement of Basis and Purpose ("SBP"), which must address four factors: (1) The prevalence of the acts or practices addressed by the rule; (2) the manner and context in which the acts or practices are unfair or deceptive; (3) the economic effect of the rule, taking into account the effect on small businesses and consumers; and (4) the effect of the rule on state and local laws.[102] In this section, the Commission summarizes its findings regarding each of these factors.[103]

### A. Prevalence of Acts or Practices Addressed by the Rule

The Commission promulgated the Original Franchise Rule in 1978 based upon its finding of prevalent deception in the offer and sale of franchises and business opportunity ventures, leading to significant consumer injury. Since 1995, when the Commission commenced a regulatory review of the Original Franchise Rule to ensure that the Original Franchise Rule continued to serve a useful purpose, the Commission has sought comment several times to ascertain the need for a separate trade regulation rule to address widespread fraud in the sale of business opportunities.[104]

Throughout the Rule amendment proceedings, the Commission has described its experience in combating a wide array of business opportunity fraud through law enforcement actions. Indeed, the Commission's law enforcement experience in conducting numerous sweeps of the business opportunity industry demonstrates that deceptive and unfair practices in the sale of business opportunities are not only prevalent but persistent.[105]

---

[98] 15 U.S.C. 57a(d)(3).

[99] *E.g.*, *FTC* v. *Zoilo Cruz*, No. 3:08–cv–01877–JP (D. P.R. 2008) (envelope stuffing scheme marketed in Spanish-language newspapers and on a Web site available in Spanish and English); *FTC* v. *Integrity Mktg. Team, Inc.*, No. 07–cv–61152 (S.D. Fla. 2007) (envelope stuffing scheme marketed in Spanish-language classified advertisements); *FTC* v. *Hispanexo, Inc.*, No. 1:06–cv–00424–JCC–TRJ (E.D. Va. 2006) (assistance in starting a construction, gardening, or cleaning business marketed through Spanish-language television and radio stations); *FTC* v. *Juan Matos*, No. 06–61429–CIV–Altonaga (S.D. Fla. 2006) (craft assembly business marketed through Spanish-language advertisements); *FTC* v. *Nat'l Vending Consultants, Inc.*, CV–S–05–0160–RCJ (PAL) (D. Nev. 2005) (deceptively marketed vending machine business opportunities—with many marketing efforts specifically targeting Spanish-speaking consumers); *FTC* v. *Amanda Guerra*, No. 8:04–CV–1395 (M.D. Fla. 2004) (product assembly scheme telemarketed to Spanish-speaking consumers); *FTC* v. *USS Elder Enter., Inc.*, No. SACV–04–1039 AHS (Anx) (C.D. Cal. 2004)

(work at home assembly scheme offered through Spanish-language newspapers and magazines); *FTC* v. *Esteban Barrios Vega*, No. H–04–1478 (S.D. Tex. 2004) (deceptive product assembly opportunity marketed through Spanish-language newspaper and magazine advertisements).

[100] FTC Enforcement Policy Statement Concerning Clear and Conspicuous Disclosures in Foreign Language Advertising and Sales Materials, 16 CFR 14.9.

[101] 16 CFR 1.7, 5 U.S.C. 551 *et seq.*

[102] Rules of Practice, 16 CFR 1.14(a)(1)(i)–(iv). In addition, in accordance with 16 CFR 1.14(a)(1)(v), the regulatory analysis is provided at Section V of this Statement of Basis and Purpose.

[103] Support in the record for each factor is set forth in the substantive discussion of each provision of the final Rule.

[104] *See* 60 FR at 17657; 62 FR at 9117; 71 FR at 19064; 73 FR at 16133; 74 FR at 18172; 75 FR at 68559.

[105] Since 1995, the Commission has conducted more than 18 law enforcement sweeps to combat deceptive business opportunity programs, many
Continued

The Commission has amended the interim Rule to address the sale of deceptive work-at-home schemes, where unfair and deceptive practices have been both prevalent and persistent. These schemes prey upon stay-at-home parents, the physically disabled, those who do not speak English, and others who cannot obtain employment outside of the home. Sellers of fraudulent work-at-home opportunities deceive their victims with promises of an ongoing relationship in which the seller will buy the output that business opportunity purchasers produce, often misrepresenting to purchasers that there is a market for the purchasers' goods and services. In addition, the Commission's law enforcement experience demonstrates that fraudulent work-at-home opportunity sellers frequently invent undisclosed conditions and limitations for rejecting the work performed by purchasers and refusing to buy back the goods the purchasers produce. Similarly, these sellers' promises of continuing support and assistance frequently prove empty, leaving work-at-home opportunity purchasers with no help in figuring out how to assemble misshapen components into finished products. Finally, as the Commission's cases and complaint data demonstrate, con artists who promote fraudulent work-at-home schemes frequently dupe consumers with false earnings claims.

Since 1990 the Commission has brought over 75 work-at-home cases.[106] These actions have targeted a variety of schemes, ranging from envelope stuffing and craft assembly programs, to technology-driven opportunities and medical billing plans.[107]

Data compiled by the Commission demonstrate the prevalence of work-at-home opportunities that do not deliver the represented level of earnings. Indeed, the Commission's 2005 consumer fraud survey revealed that work-at-home plans from which the respondents who had purchased them did not earn at least half the level of promised earnings ranked fifth in terms of the estimated number of victims and third in terms of estimated number of incidents reported during the year.[108] According to the survey, an estimated 2.4 million individuals experienced work-at-home fraud, and there were an estimated 3.8 million incidents during the one year period surveyed.[109]

Consumer complaints, survey data, and the Commission's law enforcement experience convince the Commission that deception is prevalent in work-at-home offers. The final Rule's disclosure requirements and prohibitions provide potential work-at-home purchasers with the tools they need to protect themselves from false claims.

In addition to work-at-home opportunities, the final Rule also covers the same types of business opportunities that previously were covered under the Original Franchise Rule and the interim Business Opportunity Rule, such as opportunities involving vending machines, rack displays, Internet kiosks,

and the like, which, as the Commission's experience demonstrates, have been a persistently fertile ground for fraud and deception.[110] The Commission has conducted numerous law enforcement sweeps that targeted a wide variety of business opportunity scams involving the sale of vending machines, rack displays, and other opportunities covered by the Original Franchise Rule and the interim Business Opportunity Rule.[111] Consumer complaint data indicates that these types of business opportunities continue to be a significant source of consumer injury.[112]

*B. Manner and Context in Which the Acts or Practices Are Deceptive or Unfair*

The final Rule has been carefully crafted to address common deceptive or unfair practices engaged in by fraudulent business opportunity sellers.[113] By far, the most frequent allegations in the Commission's business opportunity cases pertain to inducing consumers to pay significant amounts of money by means of false or unsubstantiated earnings claims.[114] This is followed by inducement through false testimonials or fictitious references and by misrepresentations concerning: The profitability of locations; the availability of assistance; the nature of the products or services being sold; the prior success of third-party entities in finding successful locations; the full extent of

---

with other law enforcement partners. *E.g.,* Operation Bottom Dollar (2010); Operation Short Change (2009); Project Fal$e Hope$ (2006); Project Biz Opp Flop (2005); Project Busted Opportunity (2002); Project Telesweep (1995); Project Biz-illion$ (1999); Operation Money Pit (1998); Project Vend Up Broke (1998); Project Trade Name Games (1997); and Operation Missed Fortune (1996). In addition to joint law enforcement sweeps, the Commission also targeted specific business opportunity ventures such as envelope stuffing (Operation Pushing the Envelope, *see* FTC News Release: Agencies "Pushing the Envelope" to Protect Consumers (Dec. 16, 2003), *available at http://www.ftc.gov/opa/ 2003/12/pushenvelope.shtm*); medical billing (Operation Dialing for Deception, *see* FTC News Release: FTC Sweep Protects Consumers from "Dialing for Deception" (Apr. 15, 2002), *available at http://www.ftc.gov/opa/2002/04/dialing.shtm* and Project Housecall, *see* FTC News Release: Bogus Business Opportunity Scams Targeted by FTC (Jan. 28, 1998), *available at http://www.ftc.gov/ opa/1998/01/housecall.shtm*); seminars (Operation Showtime, *see* Operation "Show Time" Targets Seminars Selling Fraudulent Business Opportunities and Investments (May 5, 1998), *available at http://www.ftc.gov/opa/1998/05/ showtime.shtm*); Internet-related services (Net Opportunities 1998); vending machines (Operation Yankee Trader, *see* FTC News Release: Operation "Yankee Trader" Targets Bogus Vending Machine Business Opportunities (Sept. 11, 1997), *available at http://www.ftc.gov/opa/1997/09/still.shtm*); and 900 numbers (Project Buylines, *see* FTC News Release: Newest Business Opportunity Fraud Is For 900-Number Lines, Warns Federal Trade Commission (March 7, 1996), *available at http:// www.ftc.gov/opa/1996/03/buyline.shtm*).

[106] Many of these cases were brought in connection with law enforcement sweeps of fraudulent work-at-home and related employment opportunities, including Operation Bottom Dollar (2010); Operation Short Change (2009); Project Fal$e Hope$ (2006); Project Biz Opp Flop (2005); Project Homework (2001); Operation Top Ten Dot Con, *see* FTC News Release: Law Enforcers Target "Top 10" Online Scams (Oct. 31, 2000), *available at http://www.ftc.gov/opa/2000/10/topten.shtm*; and Operation Missed Fortune, *see* FTC News Release: FTC, State Enforcers Target Get-Rich-Quick Self-Employment Schemes (Nov. 13, 1996), *available at http://www.ftc.gov/opa/1996/11/ misdfort.shtm*.

[107] *See, e.g., FTC v. Real Wealth, Inc.,* 10–CV–0060–W–FJG (W.D. Mo. 2010) (envelope stuffing); *FTC v. Darling Angel Pin Creations, Inc.,* No. 8:10–cv–00335–JSM–TGW (M.D. Fla. 2010) (craft assembly); *FTC v. The Results Group L.L.C,* No. CV 06 2843 PHX JAT (D. Ariz. 2006) (work-at-home involving becoming a Web-based affiliate); *FTC v. Mazzoni & Sons, Inc.,* No.1:06CV2385 (N.D. Ohio 2006) (medical billing).

[108] *See* Consumer Fraud in the United States: The Second FTC Survey (October 2007) at 22, *available at http://www.ftc.gov/opa/2007/10/fraud.pdf* (studying consumer experience with a variety of products and services, including weight-loss products, foreign lotteries, and prize promotions, among others).

[109] *Id.*

[110] *See id.* at 16 (reporting that an estimated 800,000 individuals were victims of business opportunity fraud during the year surveyed).

[111] *E.g.,* Project Fal$e Hope$ (2006) (vending machine and rack display opportunities); Project Biz Opp Flop (2005) (vending machine opportunities); Project Busted Opportunity (2002) (vending machine and rack display opportunities); Project Biz-illion$ (1999); Operation Money Pit (1998) (rack display opportunities); Project Vend Up Broke (1998) (vending machine opportunities); Project Trade Name Games (1997) (rack display opportunities); Operation Missed Fortune (1996); Project Telesweep (1995) (vending machine and rack display opportunities); *see also supra* note 55.

[112] *See* FTC Consumer Sentinel Network Databook (March 2011) at 76, *available at http://ftc.gov/ sentinel/reports/sentinel-annual-reports/sentinel-cy2010.pdf* (reporting that in 2010, over 12,000 complaints were filed against franchises, business opportunities, and work-at-home schemes).

[113] An act or practice is deceptive under Section 5(a) if it involves a material representation or omission that is likely to mislead consumers, acting reasonably under the circumstances, to their detriment. *See* FTC Policy Statement on Deception, *appended to Cliffdale Associates, Inc.,* 103 F.T.C. 110, 174 (1984). An act or practice is unfair under Section 5 if: (1) It causes or is likely to cause substantial injury to consumers; (2) the harm to consumers is not outweighed by any countervailing benefits; and (3) the harm is not reasonably avoidable by consumers. *See* FTC Policy Statement on Unfairness, *appended to In re International Harvester,* 104 F.T.C. 949, 1062 (1984). *See* 15 U.S.C. 45(n).

[114] *See supra* note 95.

the investment costs; and refund policies.[115] The numerous business opportunity complaints that consumers submit to the Commission each year consistently reference these same concerns. The disclosure requirements under the final Rule address each of these deceptive or unfair practices.

## 1. Earnings Claims

In the Commission's experience, earnings claims are highly material to consumers in making their investment decisions and typically are the single most decisive factor in such decisions. Earnings claims lie at the heart of business opportunity fraud, and are typically the enticement that persuades consumers to invest their money. In the overwhelming majority of the Commission's more than 245 cases against business opportunity sellers, the business opportunity seller has lured unsuspecting consumers through false or deceptive earnings representations. These claims have taken the form of purported historical earnings statistics (*e.g.,* "Our operators have earned $100,000 a year"), as well as wild and unsupported earnings projections (*e.g.,* "You will earn $100,000 in your first year"). Promoters of work-at-home opportunities frequently dupe consumers with false earnings claims. For example, in one recent envelope-stuffing case brought under Section 5 of the FTC Act, the defendants promised purchasers weekly earnings ranging from $1,200 to $4,400.[116] In another case targeting Spanish-speaking consumers, the defendants promised that purchasers could earn $1,400 per week stuffing envelopes from home.[117] Often earnings claims are express, but may be implied. Sellers often convey these false and unsubstantiated earnings claims orally, although it is not unusual for such claims to be in writing. Nor is it unusual for these false earnings claims to contradict inconspicuous disclaimers the seller has hidden in contracts or other printed materials. At any rate, false or unsubstantiated earnings claims are inherently likely to mislead consumers. Certainly, no aspect of the sales transaction is more material than the level of earnings a purchaser can reasonably expect. Moreover, prospective purchasers reasonably interpret earnings claims at face value. Thus, false or unsubstantiated earnings

claims are deceptive and unlawful under Section 5 of the FTC Act.[118]

Under the Original Franchise Rule and the interim Business Opportunity Rule, the Commission sought to ensure the accuracy and reliability of earnings claims, both written and oral, express or implied, by prohibiting sellers from making an earnings claim, unless the seller possessed a reasonable basis for the claim, along with written substantiation for the claim, at the time the claim was made. Sellers were also required to provide prospective purchasers with a separate earnings claims statement that set forth the claim and the substantiation for that claim. The final Rule continues to address false and deceptive earnings claims by requiring business opportunity sellers to disclose whether they make an earnings claim. Sellers who make earnings claims must attach to the required disclosure document an earnings claim statement setting forth the earnings claim, the number and percentage of purchasers who achieved the represented level of earnings, the date range during which the represented earnings were achieved, and other information. These disclosure requirements are designed to help consumers identify and evaluate an earnings claim, if one is made, or to arouse suspicion if an earnings claim is made orally but is disclaimed in writing. The final Rule, in § 437.6(d), also prohibits misrepresenting "the amount of sales, or gross or net income or profits a prospective purchaser may earn, or that prior purchasers have earned."

## 2. References

The use of paid references or "shills" is a common practice in the sale of fraudulent business opportunities. In many of the Commission's cases against fraudulent business opportunity sellers, the defendants had offered to provide prospective purchasers with purportedly independent references, who in reality were nothing more than paid shills—individuals who were compensated by the defendants to claim that they were successful operators of defendants' business ventures.[119] The business opportunity sellers, however, had not disclosed to prospective

purchasers that the references were paid or otherwise received a benefit for providing a favorable account of the opportunity. The use of fictitious references is an objectionable, but very effective means of misleading consumers about a highly material fact—whether other purchasers have actually achieved earnings as the seller represents, and whether those purchasers' overall experience of operating the business has been positive. When the information a reference provides on these questions is fictitious, a prospective purchaser has no way of knowing the information is false and unreliable. Thus, the use of fictitious references—shills—is a deceptive practice.[120]

The Original Franchise Rule and the interim Business Opportunity Rule sought to remedy this deceptive practice by requiring business opportunity sellers to provide prospective purchasers with the names and contact information for at least 10 current purchasers of the opportunity. The final Rule continues to remedy this deceptive practice by requiring a business opportunity seller to disclose a list of all prior purchasers of the business opportunity during the previous three years. The disclosure of prior purchasers is instrumental in preventing fraud because it enables prospective purchasers to independently verify the seller's claims. The final Rule also, in § 437.6(q), prohibits misrepresenting that any person has purchased a business opportunity, or that any person can provide an independent assessment of the offering, when such is not the case.

## 3. Refund Policies

Fraudulent business opportunity sellers often offer prospective purchasers the right to cancel or to seek a whole or partial refund, but when a purchaser seeks to cancel, he finds there are hidden limitations or conditions on the refund policy. More often, the seller simply ignores the purchaser's request. Thus, refund offers are frequently just illusory, and misleading. Cancellation or refund offers are material to prospective purchasers because they purport to reflect the potential risk of the proposed transaction, and may create the impression that the business opportunity offer is either risk free or a low financial risk. Purchasers reasonably interpret a refund policy to be, in fact, as stated. Thus, representing

---

[115] *See supra* note 96.

[116] *FTC* v. *Global U.S. Resources,* No. 10–CV–1457 (RNC) (D. Conn. 2010).

[117] *FTC* v. *Zoïlo Cruz,* No. 3:08–cv–01877–JP (D.P.R. 2008).

[118] *See* FTC Policy Statement on Deception, *appended to Cliffdale Associates, Inc.,* 103 F.T.C. 110, 174 (1984).

[119] *E.g., FTC* v. *Am. Entm't Distribs., Inc.,* No. 04–22431–CIV–Martinez (S.D. Fla. 2004); *U.S.* v. *Vaughn,* No. 01–20077–01–KHV (D. Kan. 2001); *FTC* v. *Hart Mktg. Enter. Ltd., Inc.,* No. 98–222–CIV–T–23 E (M.D. Fla. 1998); *FTC* v. *Inetintl.com,* No. 98–2140 (C.D. Cal. 1998); *FTC* v. *Infinity Multimedia, Inc.,* No. 96–6671–CIV–Gonzalez (S.D. Fla. 1996); *FTC* v. *Allstate Bus. Consultants Group, Inc.,* No. 95–6634–CIV–Ryskamp (S.D. Fla. 1995).

[120] *See* FTC Policy Statement on Deception, *appended to Cliffdale Associates, Inc.,* 103 F.T.C. 110, 174 (1984).

an illusory refund policy is deceptive under Section 5 of the FTC Act.

Moreover, the failure to honor refund promises is an unfair practice in violation of Section 5(n) of the FTC Act.[121] It often results in substantial injury to business opportunity purchasers that they cannot reasonably avoid.[122] Moreover, the record is devoid of any evidence suggesting that this harm is outweighed by any countervailing benefits.

To remedy this practice, under the Original Franchise Rule and the interim Business Opportunity Rule, it was a violation for a seller to fail to refund a purchaser's funds, in certain instances. The final Rule continues to address this practice. Under § 437.3(a)(4) of the final Rule, a seller is not required to have a refund or cancellation policy. The seller, however, is required to disclose whether it has either a refund or cancellation policy, and if so, the seller must disclose, in an attachment to the disclosure document, the material terms of the policy. Moreover, § 437.6(k) prohibits any misrepresentation of a seller's refund or cancellation policies, and § 437.6(l) prohibits failure to provide a refund or cancellation when the purchaser has satisfied the terms and conditions disclosed.

### 4. Legal Actions

The Commission's law enforcement experience amply demonstrates that fraudulent business opportunity sellers often operate through multiple related affiliates, or use, sequentially or simultaneously, a variety of corporate identities in order to obscure their negative reputation or to avoid alerting consumers of the potential for fraud. This subterfuge is designed to mislead, and actually does mislead prospective business opportunity purchasers about a crucially material fact: The reliability and trustworthiness of the seller with whom the consumer is transacting. It is not unreasonable for a consumer to believe that a seller is as represented; the consumer is not obliged to suspect an apparently legitimate seller has a history of fraud hidden behind multiple defunct or impossible to trace corporate entities. Thus, it is a deceptive practice and a violation of Section 5 for a seller to obfuscate past activities that would

alert a prospective purchaser of a likelihood of fraud.[123]

One of the key indicia of a seller's reliability and trustworthiness is whether there have been law enforcement actions or lawsuits for fraud and similar infractions targeting that seller. Accordingly, under the Original Franchise Rule and the interim Business Opportunity Rule, the Commission required sellers to disclose certain legal actions in which they or their principals have been involved. Similarly, the final Rule requires a business opportunity seller to disclose any legal actions that the seller, its affiliates, and certain key personnel have been involved in during the previous ten years involving misrepresentation, fraud, securities law violations, or unfair or deceptive practices, including violations of any FTC Rule. Knowledge of such legal actions against the seller and other key persons associated with the seller is material to a prospective purchaser's decision to go forward with the transaction.

These disclosure requirements are tailored to address common deceptive or unfair practices in the sale of business opportunities, as demonstrated by the Commission's extensive law enforcement experience with business opportunity fraud. In addition to these disclosures, the final Rule requires sellers to disclose certain identifying information about themselves and expressly prohibits a variety of material misrepresentations and omissions that the Commission's experience demonstrates to be most commonly associated with deceptive and unfair practices in the sale of business opportunities.

### C. The Economic Effect of the Rule

At every stage of the Rule amendment proceeding, the Commission solicited comment on the economic impact of the Rule, as well as the costs and benefits of each proposed Rule amendment. In issuing the final Rule, the Commission has carefully considered the comments received and the costs and benefits of each amendment. As discussed throughout this SBP, the final Rule's disclosure requirements and specific prohibitions will provide a substantial benefit to consumers weighing the risks of investing their money in specific business opportunity offers. In particular, the mandated disclosures will help consumers evaluate the earnings claims made by a seller,

investigate the litigation history of the seller, identify the seller's refund or cancellation policy, and check on the experiences of other purchasers. By providing consumers with access to this information before money changes hands, the final Rule will substantially reduce economic harm caused by misleading sales practices.

The Commission has attempted to reduce sellers' compliance costs wherever possible. In general, compliance with the final Rule's disclosure requirements is significantly less burdensome than with the Original Franchise Rule or the interim Business Opportunity Rule. Most notably, the final Rule streamlines the more than 20 separate categories of disclosures required by the interim Business Opportunity Rule to just five. The final Rule also employs specific prohibitions in place of affirmative disclosures wherever possible in an attempt to further reduce compliance costs.

A variety of other amendments have been made in an attempt to reduce compliance costs for business opportunity sellers. For example, in the RNPR, the Commission eliminated the requirement that sellers disclose the litigation histories of their sales personnel, recognizing that such disclosure would place a burden on business opportunity sellers that would not be outweighed by countervailing benefits to prospective purchasers.[124] The final Rule also does not require sellers with prior legal actions against them to detail the nature of the legal action, but rather, permits sellers to provide a brief 100-word description of the case if they so choose. Also, in an attempt to reduce compliance costs, the final Rule permits sellers to comply with the cancellation or refund disclosure requirement by attaching to the disclosure document a copy of a pre-existing document—such as a company brochure—that details the seller's cancellation or refund policy. The final Rule also provides sellers with a less burdensome means of complying with the reference disclosure requirement: In lieu of a list of the 10 prior purchasers nearest the prospect, a seller may provide a prospect with a national list of all purchasers. For example, a seller making disclosures online could simply maintain an electronic list of purchasers that it updates periodically. This would enable the seller to avoid having to tailor the disclosure to each prospective

---

[121] An act or practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. 5(n).

[122] See, e.g., In re Orkin Exterminating Co., 108 F.T.C. 263 (1986), aff'd, Orkin Exterminating Co. v. FTC, 849 F.2d 1354 (11 Cir. 1988).

[123] See FTC Policy Statement on Deception, appended to Cliffdale Associates, Inc., 103 F.T.C. 110, 174 (1984).

[124] 73 FR at 16126. The Commission's decision to narrow the Rule so that MLMs would not be burdened with unworkable disclosure requirements was similarly prompted by concern that any potential benefits would be outweighed by compliance costs. Id. at 16119–21.

purchaser, thereby further reducing compliance costs.

## D. The Effect of the Rule on State and Local Laws

Section 437.9(b) of the final Rule provides that the Commission does not intend to preempt state or local business opportunity laws, except to the extent that they conflict with the Rule. A law does not conflict with the Rule if it affords prospective purchasers equal or greater protection, such as a requirement for registration of disclosure documents or more extensive disclosures.

Although state laws offering equal or greater protections are not preempted, § 437.6(c) of the final Rule, which addresses extraneous materials, prohibits sellers from providing disclosures required under state law in the same document with the disclosures required under the final Rule. One of the main goals of revising and tailoring the disclosure requirements for business opportunity sellers is to simplify and streamline the disclosures into a single-page document. The Commission has determined, therefore, that allowing business opportunity sellers to mix federal and state disclosures into one document would be a means for sellers to present lengthy and confusing information to prospective purchasers, and would be contrary to the Commission's goal of requiring sellers to provide a simple, clear, and concise disclosure document.[125]

## III. Section-by-Section Analysis of Part 437

The final Rule is divided into ten sections. Section 437.1 defines 19 key terms employed in the Rule's text. Section 437.2 establishes the business opportunity seller's obligation to furnish prospective purchasers with material information in the form of a written basic disclosure document. Section 437.3 specifies the content and form of the disclosure document. Section 437.4 sets forth the requirements that business opportunity sellers must follow if they elect to make representations regarding earnings. Section 437.5 addresses sales conducted in Spanish or other languages besides English, and the disclosure requirements for those sales. Section 437.6 prohibits a number of specific deceptive claims and other deceptive practices in connection with business opportunity sales. Section 437.7 sets forth the Rule's recordkeeping provisions. Section 437.8 expressly exempts from the Rule those business arrangements that are covered by the

Amended Franchise Rule. Finally, two administrative sections—437.9 and 437.10—address other laws, rules, and orders, and severability. The sections that follow discuss each of these rule provisions in turn.

## A. Section 437.1: Definitions

The final Rule begins with a list of defined terms in alphabetical order. In several instances, the final Rule's definitions closely track those contained in the interim Business Opportunity Rule or the Commission's interpretations of the Original Franchise Rule.[126] These include the definitions for the terms "action," "affiliate," "disclose or state," "earnings claim," "person," and "written or in writing." In addition, the final Rule includes definitions for the terms "business opportunity," "designated person," "exclusive territory," "general media," "new business," "prior business," "providing locations, outlets, accounts, or customers," "purchaser," "quarterly," "required payment," and "seller," each of which was proposed in the IPBOR and, in certain circumstances, modified in the RPBOR and the proposed Final Rule attached to the Staff Report. Finally, the final Rule includes two new definitions that were recommended in the Staff Report: (1) "Material" and (2) "signature or signed."[127] Each definition, including the record support for the definition and the Commission's analysis, is addressed below.

## 1. Section 437.1(a): Action

The term "action" appears in § 437.3(a)(3), which requires business opportunity sellers to disclose material information about the business opportunity seller's litigation history.[128] Specifically, § 437.3(a)(3) of the final Rule requires the disclosure of material information about certain civil or criminal actions within the previous ten years involving the business opportunity seller, its directors, and certain key employees,[129] as well as its

[126] See 16 CFR 437.1; Final Interpretive Guides ("Interpretive Guides") accompanying the Original Franchise Rule. 44 FR 49966 (Aug. 24, 1978).

[127] At the same time, the final Rule eliminates nine of the interim Business Opportunity Rule's terms and their definitions, which are no longer necessary: "prospective business opportunity purchaser," "business day," "time for making of disclosures," "fractional business opportunity," "business opportunity broker," "sale of a business opportunity," "cooperative association," "fiscal year," and "personal meeting."

[128] Section 437.3(a)(3) requires disclosure of "any civil or criminal action for misrepresentation, fraud, securities law violations, or unfair or deceptive practices, including violations of any FTC Rule."

[129] The final Rule covers "any sales managers, or any individual who occupies a position or performs

affiliates or prior businesses. Information about litigation history based on allegations of misrepresentation, fraud, securities law violations, or unfair or deceptive practices is highly material to assessing investment risk. Discovering that a seller has a history of violating laws and regulations is perhaps the best indication that a particular business opportunity is a high-risk investment.

The definition of "action" is intended to make clear that disclosures involving prior litigation include not only civil actions brought before a court but also matters before arbitrators.[130] It is also intended to make clear that an "action" includes all government actions, including criminal matters and actions brought to enforce FTC Rules, as well as administrative law enforcement actions, such as cease and desist orders or assurances of voluntary compliance.[131]

During the Business Opportunity workshop, a panelist representing the DOJ suggested that bankruptcy is another type of legal action that should be disclosed to potential purchasers because a bankruptcy filing could be a red flag warning of potential risk associated with a business opportunity.[132] A panelist from the Maryland Attorney General's Office disagreed, arguing that this additional disclosure would not benefit potential business opportunity purchasers because, in his experience, fraudulent business opportunities do not typically file for bankruptcy protection.[133] Instead, in that panelist's experience, fraudulent business opportunity promoters shutter their premises and reopen as an entirely new fraudulent entity. Another panelist posited that disclosure of the existence of a bankruptcy by the business opportunity or its key personnel was not likely to identify fraudulent or problematic business opportunities that would not already be identified through the existing proposed categories of legal actions.[134]

The Commission has determined not to include bankruptcy as a type of legal action that a business opportunity seller must disclose. The Commission's law enforcement experience indicates that when targeted by law enforcement,

a function similar to an officer, director, or sales manager of the seller." See § 437.3(a)(3)(i)(c).

[130] 71 FR at 19061.

[131] Id.

[132] Jost, June 09 Tr at 32. A second panelist (Taylor, June 09 Tr at 35), and a commenter (Brooks-Workshop comment) agreed that existence of a bankruptcy might be relevant to a potential purchaser.

[133] Cantone, June 09 Tr at 37.

[134] MacLeod, June 09 Tr at 33.

[125] 73 FR at 16128.

rather than file for bankruptcy, fraudulent business opportunity sellers tend to vanish and then simply reopen under new company names.[135] Thus, there is little meaningful correlation between filing for bankruptcy and promoting a fraudulent business opportunity. Yet, many legitimate businesses have been forced by circumstances to seek the protection of bankruptcy courts. Therefore, bankruptcy filing would not seem to be a reliable marker for potential fraud, and would not likely help business opportunity purchasers avoid being defrauded. Therefore, the final Rule's definition of action does not contain reference to bankruptcy.[136]

Finally, the Staff Report noted that some state administrative proceedings result in parties entering into assurances of voluntary compliance, while other states refer to such orders as assurances of discontinuance. The staff recommended, therefore, adding "assurance of discontinuance" to the categories of legal actions enumerated in the proposed definition. The Commission agrees with the staff's recommendation and the final Rule's definition of "action" now includes that phrase. Accordingly, § 437.1(a) of the final Rule defines "action" as follows: "A criminal information, indictment, or proceeding; a civil complaint, cross claim, counterclaim, or third party complaint in a judicial action or proceeding; arbitration; or any governmental administrative proceeding, including, but not limited to, an action to obtain or issue a cease and desist order, an assurance of voluntary compliance, and an assurance of discontinuance."

The definition of "action," as recommended in the Staff Report, received no comment, and the final Rule adopts this definition of "action" as recommended.

### 2. Section 437.1(b): Affiliate

The term "affiliate" appears in several sections of the final Rule, most notably in § 437.3(a)(3), which requires a business opportunity seller to disclose not only litigation in which the seller was named as a party, but any litigation naming any of the seller's "affiliates" or prior businesses. Section 437.1(b) of the

final Rule defines the term "affiliate" to mean: "An entity controlled by, controlling, or under common control with a business opportunity seller." This definition also covers litigation involving a parent or subsidiary of the business opportunity seller.

The definition of "affiliate," as proposed in the INPR and RNPR, and recommended in the Staff Report, received no comment, and the final Rule adopts this definition of "affiliate" as recommended.

### 3. Section 437.1(c): Business Opportunity

The definition of "business opportunity" delineates the scope of the Rule's coverage. Under the final Rule, a "business opportunity" is a commercial arrangement that possesses three required elements. First, a seller must solicit a prospective purchaser to enter into a new business.[137] Second, the prospective purchaser of the business opportunity must make a "required payment."[138] And third, the seller must represent that the seller or one or more designated persons will provide any of three types of business assistance: (1) Providing locations for the purchaser's use or operation of equipment, displays, vending machines, or similar devices; (2) providing outlets, accounts, or customers to the prospective purchaser; or (3) buying back any or all of the goods or services that the purchaser makes, including providing payment for such services as, for example, stuffing envelopes from the purchaser's home.

Because this section triggers the strictures and requirements of the Rule, the definition of "business opportunity," and in particular, its specification of the types of "business assistance" that characterize a covered business, has generated substantial comment throughout this proceeding. After careful consideration of the amassed record, the Commission has crafted the final Rule's business opportunity definition to ensure that it is broad enough to encompass many business opportunities that historically were not covered under the Original Franchise Rule or the interim Business Opportunity Rule, but which have routinely been shown to be associated with unfair or deceptive practices.[139] As

the same time, the definition of "business opportunity" has been narrowly tailored to avoid inadvertently sweeping in other business arrangements, such as traditional product distribution. This has been accomplished primarily through narrowing the types of business assistance that will trigger the Rule's coverage from the five categories originally proposed in the IPBOR to the three categories described above.

Consistent with the approach proposed in the RPBOR, the final Rule's definition of business opportunity eliminates two types of business assistance that under the IPBOR would have triggered the Rule's strictures and disclosure obligations: (1) Tracking or paying, or purporting to track or pay, commissions or other compensation; and (2) providing other advice or training assistance. The sections below describe the evolution of the business opportunity definition, including the rationale for eliminating these types of assistance from the definition of business opportunity.

In the IPBOR, the proposed definition of "business opportunity" was designed to be broad enough to cover the sale of virtually any type of business opportunity, including two types in particular that historically had fallen outside the scope of the Original Franchise Rule—work-at-home and pyramid marketing opportunities.[140] As explained more fully in the INPR, the Commission's law enforcement experience and consumer complaints demonstrate that these two types of opportunities are sources of prevalent and persistent problems,[141] which the Commission has traditionally challenged under Section 5 of the FTC Act.[142]

In order to reach these two types of opportunities, the INPR proposed a broad definition of "business opportunity" comprised of three

[135] See, e.g., FTC v. Nat'l Vending Consultants, Inc., CV–S–05–0160–RCJ–PAL (D. Nev. 2005); FTC v. USA Beverages, Inc., CV–05–61682 (S.D. Fla. 2004); FTC v. Allstate Bus. Distribution Ctr., Inc., CV–00–10335AHM (C.D. Cal. 2001); FTC v. O'Rourke, No. 93–6511–Civ–Gonzalez (S.D. Fla. 1993); FTC v. Inv. Dev., Inc., 1989 U.S. Dist. LEXIS 6502 (E.D. La. June 7, 1989).

[136] Similarly, the scope of 437.3(c)(3)(i) has remained unchanged and does not require the disclosure of bankruptcy filings.

[137] Section 437.1(j) defines "new business" as "a business in which the prospective purchaser is not currently engaged, or a new line or type of business."

[138] See § 437.1(p) (defining "required payment").

[139] As discussed supra in Section I.C, the definition of business opportunity no longer excludes transactions falling below a minimum monetary payment threshold nor does it require that the purchaser of the opportunity sell goods or

services directly to end-users other than the business opportunity seller. These changes extend the scope of coverage to many business opportunities that previously escaped coverage.

[140] 71 FR at 19059.

[141] In 2010, pyramid schemes generated approximately 2,000 consumer complaints, while work-at-home schemes generated over 8,000 complaints. See Consumer Sentinel Network Databook (March 2011) at 76, 79, available at http://ftc.gov/sentinel/reports/sentinel-annual-reports/sentinel-cy2010.pdf.

[142] Many of these schemes fell outside the ambit of the Original Franchise Rule because: (1) The purchase price was less than $500, the minimum payment necessary to trigger coverage; (2) required payments were primarily for inventory, which did not count toward the $500 monetary threshold; (3) the scheme did not offer location or account assistance; or (4) the scheme involved the sale of products to the business opportunity seller rather than to end-users. See 71 FR at 19055, 19059.

elements: (1) A solicitation to enter into a new business; (2) payment of consideration, directly or indirectly through a third party; and (3) the making of either an "earnings claim" or an offer to provide "business assistance."[143] The IPBOR's definition of "business assistance" included assistance in the form of "tracking or paying, or purporting to track or pay, commissions or other compensation based upon the purchaser's sale of goods or services or recruitment of other persons to sell goods or services."[144] The Commission noted that many pyramid schemes offer this type of assistance, purporting to compensate participants not only for their own product sales but also for sales made by their participants' downline recruits.[145] Under the IPBOR, "business assistance" also included providing other advice or training assistance.[146]

In response to the INPR, many commenters argued that the IPBOR would have unintentionally swept in numerous commercial arrangements where there is little or no evidence that fraud is occurring.[147] Several commenters contended that the IPBOR would have regulated a wide range of legitimate and traditional product distribution arrangements that were not associated with the types of fraud that business opportunity laws are designed to remedy. For example, one commenter suggested that the IPBOR could be read to cover product distribution through retail stores simply because the retailer pays for inventory and the manufacturer provides sales training to its retail accounts.[148] The commenter suggested that its business operations would meet the IPBOR's definition of business opportunity because: (1) The "payment" prong of the definition did not exempt voluntary purchases of inventory; and (2) providing retail staff with sales training would have satisfied the "business assistance" prong of the definition.[149] Other commenters noted that even if a company provided no "business assistance," it easily could have fallen under the "business opportunity" definition if the company made some representation about sales or profits sufficient to constitute an earnings claim.[150]

Other commenters in response to the INPR argued that the IPBOR would have

been broad enough to cover other types of commercial arrangements, such as bona fide educational programs offered by colleges and universities, the sale of certain books by publishers or book stores, and even the relationship between newspapers and independent carriers who distribute the newspapers to homes and businesses.[151] Recognizing the unintended overbreadth of the Rule to sweep in these types of commercial arrangements as well as the unworkability of applying the Rule to MLMs, the Commission proposed the RPBOR with a narrower definition of "business opportunity." The RPBOR "business opportunity" definition narrowed the types of "business assistance" that would trigger Rule coverage by deleting from the Rule text: (1) Tracking payments or commissions and (2) providing other advice or training assistance.[152] The RPBOR definition also eliminated the "earnings claim" element from the definition.[153] But for this modification, any business or commercial arrangement that made an earnings claim could have been a "business opportunity," as defined by the Rule. To avoid transforming common commercial transactions into "business opportunities," some commenters suggested narrowing the definition of "earnings claim."[154] In the RNPR, however, the Commission determined that the better approach to address concerns about overbreadth was the substantive scope of the Rule, in part, by unlinking the definition of "business opportunity" from the making of an earnings claim.[155] The Staff Report recommended that the Commission adopt this modification in the final Rule. No comments received in response to the Staff Report addressed this change.

In the RNPR, the Commission solicited comment as to whether the narrowed Rule would adequately reach the field of business opportunity promoters who are likely to engage in unfair or deceptive practices, and conversely, queried whether the newly-proposed narrowing of the definition, and, hence, the scope of the RPBOR's coverage, was sufficient to exclude from the rule traditional distributor

relationships[156] that had been inadvertently swept into the IPBOR.[157]

The majority of comments in response to the RNPR focused on whether the revisions to the proposed Rule would capture MLMs.[158] The majority of commenters applauded the Commission's decision to narrow the scope of the rule, while others expressed concern that the MLM industry would continue to be subject to the RPBOR despite the more narrowed definition of "business opportunity."[159] For example, some commenters expressed concern that the buy-back provision, set forth in § 437.1(c)(3)(iii), would sweep in MLM companies that offer to buy back their distributors' unused inventory.[160] These commenters suggested amending this provision to strike the word "provides" from § 437.1(c)(3)(iii), so that the definition of "business opportunity" would clearly not encompass a return of unused materials or merchandise.[161]

The Commission is not persuaded that such a change is necessary. In the RNPR, the Commission made clear that § 437.1(c)(3)(iii) was intended to capture work-at-home business opportunities in which the seller provides the purchaser with some supplies and the purchaser converts those supplies into a product

---

143 *See* 71 FR at 19087.

144 *Id.*

145 *Id.* at 19063 & n.106.

146 *Id.* at 19087 (IPBOR § 437.1(c)(v)).

147 *See* 73 FR at 16113–14.

148 Timberland–INPR at 2.

149 *Id.*

150 IBA–INPR at 4; *see also* PMI–INPR at 3.

151 Venable–INPR at 2–3; NAA–INPR at 1–3.

152 In addition, the RPBOR clarified that a "required payment" does not include payments for the purchase of reasonable amounts of inventory at bona fide prices. The final Rule incorporates this clarification.

153 73 FR at 16124.

154 *Id.*

155 *Id.*

156 For example, commenters to the INPR noted that the IPBOR would cover "manufacturers, suppliers and other traditional distribution firms that have relied on the bona fide wholesale price exclusion to avoid coverage" under the Rule. Sonnenschein-INPR at 1–2. The Cosmetic, Toiletry and Fragrance Association posited that the IPBOR would cover the relationship between a manufacturer and an independent contractor who sells the product to beauty supply companies, salons, and others. CTFA–INPR: *see also* LHD&L–INPR at 2 (noting that the IPBOR could cover the relationship between a manufacturer and a regional distributor of products).

157 73 FR at 16133.

158 DSA–RNPR. In addition, the Commission received more than 40 comments from various MLMs that expressed support and concurrence with DSA's comments. *See, e.g.,* Big Ear-RNPR; Jafra Cosmetics-RNPR; Lia Sophia-RNPR; Longaberger-RNPR; Princess House-RNPR; Shaklee-RNPR. Some commenters expressed disappointment that the Commission proposed to exclude MLMs from coverage by the Rule. *See, e.g.,* CAI–RNPR; Durand-RNPR; PSA–RNPR; Aird-RNPR (Rebuttal); Parrington-RNPR. As previously noted, the Commission decided to narrow the scope of the Rule to avoid broadly sweeping in MLMs.

159 *See, e.g.,* DSA–RNPR; Avon-RNPR; Bates-RNPR; IBA–RNPR; MMS–RNPR; Mary Kay-RNPR; Melaleuca-RNPR; Primerica-RNPR; Pre-Paid Legal-RNPR; IDS–RNPR; Tupperware-RNPR; Venable-RNPR.

160 DSA requires that its members offer to buy back, at 90% of the salesperson's cost, all resalable inventory and other sales materials. DSA–INPR at 35.

161 DSA–RNPR at 6 n.14 (noting that "the buy-back provision is the cornerstone of the DSA's self regulatory regime and a valuable protection for individual direct sellers"); Mary Kay-RNPR at 6; Babener-RNPR; Melaleuca-RNPR.

or other "good" for repurchase by the seller or other person.[162] As the Staff Report noted, it would require a labored reading of this section to suggest that the word "provides" means "to return unused inventory the purchaser bought from the seller but was not able to sell."[163] Moreover, the Commission has explicitly stated that this provision "would not include the offer to buy back inventory or equipment needed to start a business."[164]

In addition, some commenters argued that § 437.1(c)(3)(i) would inadvertently cover entities that offer, at no cost to purchasers, the use of office space and equipment for the operation of the purchasers' business.[165] These commenters were concerned that such offers could be construed under § 437.1(c)(3)(i) to be providing "locations for the use or operation of equipment * * * on premises neither owned nor leased by the purchaser." In the RNPR, the Commission stated that this provision was intended to capture fraudulent vending machine and rack display schemes,[166] as well as schemes where a purchaser is forced to lease office space, telephones and other equipment for operation of his or her business.[167] Noting that the Commission did not intend to capture the incidental use of office space and equipment that the purchaser does not own, lease, or control, and for which the purchaser makes no payment, the Staff Report recommended a slight modification to § 437.1(c)(3)(i), amending it to state: "provide locations for the use or operation of equipment, displays, vending machines, or similar devices, owned, leased, controlled, or paid for by the purchaser."[168]

No comments responding to the Staff Report addressed this proposal. The Commission adopts the change recommended in the Staff Report. This change clarifies that the third prong of the "business opportunity" definition is triggered only when the seller offers to provide the purchaser, directly or through an intermediary, with locations in which to place equipment, displays, vending machines, or similar devices that the purchaser controls. This change will not compromise the long-standing coverage of the Rule, and will allow legitimate sellers to offer beneficial assistance to purchasers, at no cost to those purchasers.[169]

### 4. Section 437.1(d): Designated Person

The term "designated person" appears in the definition of "business opportunity" to ensure coverage over those transactions in which a seller refers a purchaser to a third party for the provision of business locations, accounts, or assistance such as buy-back services, as specified in § 437.1(c)(3). That section makes clear that in order to fall within the scope of the business opportunity definition, the business assistance being offered need not be provided to the purchaser by the seller directly. Rather, a seller who represents that business assistance may or will be provided by a third party, such as a locator or a supplier, will still be covered by the Rule. Section 437.1(c)(3) uses the term "designated person" to refer to any third parties who would provide business assistance to a business opportunity purchaser and to close a potential loophole. For example, a fraudulent vending machine route seller would not be able to circumvent the final Rule by representing to a prospective purchaser that a specific locator will place machines for the purchaser.[170] The referral to a third party would be sufficient to bring the transaction within the ambit of the Rule.[171] Section 437.1(d) of the final

Rule defines the term "designated person" to mean "any person, other than the seller, whose goods or services the seller suggests, recommends, or requires that the purchaser use in establishing or operating a new business."[172]

One commenter argued that the proposed definition of "designated person" was overbroad and that its application would result in many multilevel marketing opportunities being swept into the Rule.[173] For instance, if an MLM company requires its managers to provide the use of office space, equipment and supplies, and general business advice to new agents (and presumably to describe these types of assistance to prospective purchasers as part of a sales pitch),[174] one could argue that the company would be covered by the Rule.[175] The commenter offered several suggested revisions to resolve this problem, one of which was to specify that "designated person" does not include entities that receive no payment from the purchaser in order to receive the services provided.[176] The Staff Report noted that alternate resolutions were more appropriate—namely the modification to the definitions of "business opportunity" and "providing locations, outlets, accounts, or customers," and recommended, therefore, that the definition of "designated person" be adopted in the form proposed in the RNPR. No comments in response to the Staff Report addressed this definition, and the final Rule adopts the definition as recommended.

### 5. Section 437.1(e): Disclose or State

Section 437.1(e) of the final Rule defines "disclose or state" to mean "to give information in writing that is clear and conspicuous, accurate, concise, and legible."[177] The purpose of this definition is to ensure that a prospective purchaser will receive complete information in a form that a prospective purchaser can easily read. For example, the furnishing of a disclosure document without punctuation or appropriate

---

[162] See 73 FR at 16123.

[163] Staff Report at 34.

[164] See 71 FR at 19062.

[165] For example, Primerica, an MLM that sells insurance products and services, requires that its regional managers provide at no cost to "downline" sales agents the use of office space, supplies, and equipment (such as computers and printers) for the operation of his or her business. Primerica noted that, as a practical matter, it must require this assistance, as the regulatory structure in which Primerica operates necessitates that regional managers exercise compliance oversight functions with respect to the agents in their downlines. Primerica-RNPR; see also Avon-RNPR; Tupperware-RNPR.

[166] 73 FR at 16123 (citing FTC v. Am. Entm't Distribs., No. 04–22431–CIV–Martinez (S.D. Fla. 2004); FTC v. Advanced Pub. Commc'ns Corp., No. 00–00515–CIV–Ungaro-Benages (S.D. Fla. 2000); FTC v. Ameritel Payphone Distribs., Inc., No. 00–0514–CIV–Gold (S.D. Fla. 2000); FTC v. Mktg. and Vending Concepts, No. 00–1131 (S.D.N.Y. 2000)).

[167] FTC v. Equinox, Int'l, No. CV–S–99–0969–JAR–RLH (D. Nev. 1999).

[168] The Staff Report recommended that the Commission strike the final clause of this provision of the RPBOR—"on premises neither owned or leased by the purchaser"—noting that the clause is

superfluous, as a buyer would never need a seller's assistance in identifying locations that the buyer already owns or leases. The Commission agrees, and the final Rule does not include this language.

[169] In the final Rule, a non-substantive change was made to the definition of "business opportunity" proposed in the Staff Report—the colon and number signaling the first element of the definition was moved. This change simply makes the sentence structure parallel.

[170] The Commission's law enforcement experience demonstrates that closing this potential loophole is necessary. For example, in FTC v. Greeting Cards of Am., Inc., No. 03–60746–CIV–Gold (S.D. Fla. 2003), the FTC alleged that the business opportunity seller represented that a third party locator would secure locations for the prospective purchaser, and the locator failed to do so.

[171] See 71 FR at 19064.

[172] This approach is consistent with the Amended Franchise Rule's analogous definitional elements, extending the scope of that rule's coverage to reach transactions in which the franchisor provides to the franchisee the services of a person able to secure the retail outlets, accounts, sites, or locations. See 16 CFR 436.1(j).

[173] Primerica-RNPR at 11.

[174] The MLM company compensates managers for this service; there is no cost to down-line agents. Primerica-RNPR at 11.

[175] Id.

[176] Id. at 13.

[177] See FTC Policy Statement on Deception, appended to Cliffdale Associates, Inc., 103 F.T.C. 110, 174 (1984) (discussing the standard for clear and conspicuous disclosures).

spacing between words would not be "clear." Similarly, required information such as the number and percentage of prior purchasers who obtained a represented level of earnings would not be "conspicuous" if set in small type, printed in a low-contrast ink, or buried amid extraneous information.

The proposed definition of "disclose or state" received no comment. The final definition, therefore, is adopted as proposed.

### 6. Section 437.1(f): Earnings Claim

The final Rule's key feature is the disclosure document, which provides a potential purchaser of a business opportunity with five items of material information, including written disclosure of all "earnings claims" made by the seller, before the purchaser pays any money or executes a contract. This will allow a potential purchaser to compare a seller's written representations with any oral representations made. The term "earnings claim" is defined in the final Rule as "any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits."[178] This intentionally broad definition will cover all variations of earnings representations that the Commission's law enforcement experience shows are associated with business opportunity fraud.[179]

For illustrative purposes, the definition includes two examples of communications that constitute earnings claims. The first of these examples describes common types of potentially fraudulent earnings claims: "A chart, table, or mathematical calculation that demonstrates possible results based upon a combination of variables." This example is intended to clarify that sales matrices that purport to show income from an array of "vends" per day from a vending machine, for example, would constitute an "earnings claim" under the final Rule.[180]

The second example incorporates the principle, as expressed in the Interpretive Guides to the Original Franchise Rule, that "any statements from which a prospective purchaser can reasonably infer that he or she will earn a minimum level of income" constitute an earnings claim.[181] Given the

prevalence of earnings claims in business opportunity sales, the Commission believes that a broad earnings disclosure requirement is necessary to prevent fraud. Therefore, the final Rule is not limited to express earnings claims, but also includes implied claims. Indeed, such implied claims are at least as likely to mislead prospective purchasers as express claims.[182] The final Rule's definition includes three specific examples illustrative of this type of earnings claim, as follows: "Earn enough to buy a Porsche," "earn a six-figure income," and "earn your investment back within one year." Each of these three illustrative examples implies a minimum value—the cost of the lowest priced Porsche in the first example; at least $100,000 in the second; and an amount equal to the purchaser's initial investment in the third. Accordingly, this language makes clear that these types of representations are indistinguishable from direct, express earnings claims.

Some commenters have argued that the definition of "earnings claim" is overly broad and that the Commission should narrow the definition.[183] Earnings claims, however, lie at the heart of business opportunity fraud and typically entice consumers into investing their money. The Commission has determined that narrowing the definition of "earnings claim" could allow business opportunity sellers to avoid disclosing critical information to prospective purchasers. Accordingly, the definition of "earnings claim," as proposed in the RPBOR and recommended in the Staff Report, is adopted without change.

### 7. Section 437.1(g): Exclusive Territory

This term is defined because it is referenced in § 437.6(n), which prohibits misrepresentations concerning territory exclusivity. Representations about exclusive territories are material because they purport to assure a potential purchaser that he or she will not face competition from other purchasers of the same business opportunity in his or her chosen location, or from the seller offering the same goods or services through alternative channels of distribution.[184] Exclusive territory promises go to the viability of the business opportunity and to the level of risk entailed in the purchase.[185] Indeed, misrepresentations about territories have commonly been

made by business opportunity sellers to lure consumers into believing that a purchase poses little financial risk.[186]

Section 437.1(g) of the final Rule defines the term "exclusive territory" as "a specified geographic or other actual or implied marketing area in which the seller promises not to locate additional purchasers or offer the same or similar goods or services as the purchaser through alternative channels of distribution." This definition reflects the common industry practice of establishing geographically delimited territories—such as a city, county, or state borders—as well as other marketing areas, such as those delineated by population.[187] The definition includes both representations that other business opportunity purchasers will not be allowed to compete with a new purchaser within the territory, as well as representations that the business opportunity seller itself or other purchasers will not compete with the new purchaser through alternative means of distribution, such as through Internet sales.

The definition also covers implied marketing areas, such as representations that the seller or other operators will not compete with the purchaser, without delineating a specific territory, or stating a vague or undefined territory, such as "in the metropolitan area" or "in this region." If untrue, any of these kinds of representations can mislead a prospect about the likelihood of his or her success.[188]

The definition of "exclusive territory" received no comment. Accordingly, the definition of "exclusive territory," as proposed in the RNPR and recommended in the Staff Report, is adopted without change.

### 8. Section 437.1(h): General Media

The term "general media" appears in § 437.4(b), which prohibits business opportunity sellers from making unsubstantiated earnings claims in the "general media."[189] Section 437.1(h) of

---

[178] This definition is substantially similar to the Amended Franchise Rule's definition of "financial performance representation," which is the Amended Franchise Rule's equivalent of an earnings claim. See 16 CFR 436.1(e).

[179] 71 FR at 19065.

[180] Id.

[181] 44 FR at 49982.

[182] Interpretive Guides, 44 FR 49966.

[183] 73 FR at 16124.

[184] See 71 FR at 19065.

[185] Id.

[186] E.g., FTC v. Vendors Fin. Serv., Inc., No. 98–1832 (D. Colo. 1998); FTC v. Int'l Computer Concepts, Inc., No. 1:94CV1678 (N.D. Ohio 1994); FTC v. O'Rourke, No. 93–6511–CIV–Ferguson (S.D. Fla. 1993); FTC v. Am. Safe Mktg., No. 1:89–CV–462–RLV (N.D. Ga. 1989).

[187] 71 FR at 19065.

[188] Id.

[189] This provision is based on an analogous provision in the Amended Franchise Rule, 16 CFR 436.1(e). The Commission has challenged allegedly unsubstantiated earnings claims made through the general media in numerous cases, e.g., FTC v. Wealth Sys., Inc., No. CV 05 0394 PHX JAT (D. Ariz. 2005); United States v. Am. Coin-Op Servs., Inc., No. 00–0125 (N.D.N.Y. 2000); United States v. Cigar Factory Outlet, Inc., No. 00–6209–CIV–Graham-

Continued

**76834** **Federal Register** / Vol. 76, No. 236 / Thursday, December 8, 2011 / Rules and Regulations

the final Rule defines "general media" to mean: "Any instrumentality through which a person may communicate with the public, including, but not limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and mobile communications." [190] Due to the explosive growth of advertising through mobile devices, the Staff Report recommended adding the phrase "mobile communications" to the list of instrumentalities enumerated in the definition. [191]

The definition of general media recommended in the Staff Report received no comment. The Commission has determined to adopt the staff's recommendation and has therefore modified the definition of general media to include mobile communications. Moreover, the definition of general media is not intended to contain an exhaustive list of instrumentalities, and other current (and future) types of mass communication could also fall within the general media definition.

### 9. Section 437.1(i): Material

The term "material" is used in several sections of the final Rule. [192] Section 437.3(a)(4) of the final Rule requires sellers that offer refunds and cancellations to "state all material terms and conditions of the refund or cancellation policy in an attachment to the disclosure document." The term "material" is also used in other provisions of the Rule. For example, under § 437.2 (the obligation to furnish written documents), it is a violation of the Rule for the seller to fail to disclose the "material" information specified in § 437.3. Section 437.3, in turn, specifies the items of "material" information that must be disclosed. The definition of "material" at § 437.1(i) was added to the final Rule because some workshop participants expressed concern that § 437.3(a)(4) as originally proposed would not provide sellers with sufficient guidance about the types of

information that should be disclosed. [193] In the Staff Report, the staff recommended that "material" be defined to mean as "likely to affect a person's choice of, or conduct regarding, goods or services." [194] This definition is consistent with the definition of "material" used in the Telemarketing Sales Rule ("TSR"). [195]

The definition of "material" recommended in the Staff Report received one comment. [196] The commenter expressed concern that the definition could be used by sellers as a potential loophole. The commenter suggested that the definition effectively would permit a seller to avoid disclosing the information required by the Rule by arguing that such information is not likely to affect a buyer's decision. [197] The commenter further stated that if the Commission retained the recommended definition, the Rule should contain the following language: "Even though this Rule imposes various requirements for specific disclosures, sellers are permitted to dispense with any disclosures which would not be likely to affect a buyer's choice of, or conduct regarding goods or services." [198]

The Commission disagrees with the commenter. The final Rule mandates the disclosure of certain types of information, which the Commission has determined are material to a purchaser's investment decision. [199] The language the commenter proposes does nothing to close any perceived loophole. The Commission is not persuaded that the commenter's suggested change will improve clarity. In fact, it may obscure the definition. The Commission is persuaded by the Staff Report that a definition of "material" is necessary and adopts the definition as recommended.

### 10. Section 437.1(j): New Business

The term "new business" appears in the first of three definitional elements of

the term "business opportunity." [200] Section 437.1(j) of the final Rule defines "new business" as a "business in which the prospective purchaser is not currently engaged, or a new line or type of business." Because it is reasonable to assume that a veteran businessperson may need the final Rule's protections as much as a novice, [201] the latter language of the definition covers the sale of business opportunities to persons who may already be involved in some type of business other than that which is being offered by the seller. [202]

The proposed definition of "new business" received no comment. Accordingly, the Commission adopts the definition of "new business," as proposed in the RNPR and recommended in the Staff Report.

### 11. Section 437.1(k): Person

Section 437.1(k) of the final Rule defines the term "person," a term used in many of the final Rule's definitional or substantive provisions. [203] The Staff Report recommended that the term be defined as "an individual, group, association, limited or general partnership, corporation, or any other entity." [204]

The Commission received no comments related to the proposed definition of "person." The Commission adopts the definition of "person" as recommended in the Staff Report, with one slight modification. To clarify that the term encompasses entities that are businesses, the Commission added the word "business" to the last clause of the definition. Accordingly, the final Rule defines the term as "an individual, group, association, limited or general partnership, corporation, or any other business entity." [205] The term "person" is to be read broadly to refer to natural persons, businesses, associations, and other business entities. Where the Rule refers to a natural person only, it uses the term "individual." [206]

---

Turnoff (S.D. Fla. 2000); *United States* v. *Emily Water & Beverage Co., Inc.,* No. 4–00–00131 (W.D. Mo. 2000); and *United States* v. *Greeting Card Depot, Inc.,* No. 00–6212–CIV–Gold (S.D. Fla. 2000).

[190] *See* Interpretive Guides, 44 FR at 49984–85 (earnings claims made "for general dissemination" include "claims made in advertising (radio, television, magazines, newspapers, billboards, *etc.*) as well as those contained in speeches or press releases"]. The Commission notes that the Interpretive Guides recognize several exemptions to the general media claim, such as claims made to the press in connection with bona fide news stories, as well as claims made directly to lending institutions. *Id.* The Commission has proposed that future Compliance Guides to the new Business Opportunity Rule retain these standard general media claims exemptions. *See* 71 FR at 19065.

[191] Staff Report at 42–43.

[192] *See* §§ 437.1, 437.2, 437.3, 437.4, 437.6, 437.7, and 437.8.

[193] Morrissey, June 09 Tr at 41; Taylor, June 09 Tr at 43; Cantone, June 09 Tr at 47.

[194] Under the TSR, the Commission requires sellers to disclose all material terms and conditions of the seller's refund policy if the seller makes a representation about the refund policy. *See* 16 CFR 310.3(a)(1)(iii).

[195] *See* 16 CFR 310.2(q) (defining "material" to mean "likely to affect a person's choice of, or conduct regarding, goods or services or a charitable contribution"); *see also* FTC Policy Statement on Deception, *appended to Cliffdale Associates, Inc.,* 103 F.T.C. 110, 174 (1984) (defining "material" misrepresentation or practice to mean "one which is likely to affect a consumer's choice of or conduct regarding a product").

[196] Dub-Staff Report.

[197] *Id.* at 2–3.

[198] *Id.* at 2.

[199] *See supra* Section I.C.2 discussing the five substantive disclosure items and why they are material to consumers.

[200] The first of the three definitional elements of a "business opportunity" is a "solicitation to enter into a "new business." Section 437.1(c)(1). This element distinguishes the sale of a business opportunity from the ordinary sale of products and services. 71 FR at 19066.

[201] 71 FR at 19066.

[202] For example, an existing tire business owner could purchase a vending machine route, or a beverage vending machine route owner could purchase an envelope stuffing opportunity.

[203] *E.g.,* §§ 437.1; 437.6(q).

[204] This definition is consistent with the definition of the term "person" in both the interim Business Opportunity Rule and the Amended Franchise Rule. *See* 16 CFR 436.1(n); interim Business Opportunity Rule 437.2(b).

[205] This definition is consistent with the definition of the term "person" in the TSR. *See* 16 CFR 310.2(v).

[206] 71 FR at 19066.

## 12. Section 437.1(l): Prior Business

The final Rule requires sellers to disclose certain civil and criminal actions against them, including actions against a "prior business of the seller." [207] Section 437.1(l) of the final Rule defines "prior business" to mean:

(1) A business from which the seller acquired, directly or indirectly, the major portion of the business' assets; or

(2) Any business previously owned or operated by the seller, in whole or in part.

This definition is intended to include not only an entity from which a seller acquired the major portion of the seller's assets, but also businesses that the seller previously owned or operated. [208] A broad definition of "prior business" is necessary to capture all of a seller's prior operations. [209] The Commission's law enforcement experience shows that sellers of fraudulent business opportunities frequently ply their trade through multiple companies simultaneously or sequentially, disappearing in order to avoid detection, and then reemerging in some new form or in a different part of the country under new names. [210] The definition thus requires a more complete disclosure of the seller's business history.

The final definition of "prior business" differs from the definition included in the RPBOR. [211] The Staff Report recommended that the definition eliminate a reference to the prior businesses of the seller's key personnel. Namely, the second prong of the original definition defined prior business to include businesses owned or operated by both the seller and the seller's key personnel. [212] The Commission agrees that this change is necessary for two reasons. First,

§ 437.3(a)(3)(i)(B) requires disclosure of legal actions pertaining to a prior business "of the seller," and so including the seller's key personnel in the definition of "prior business" is confusing. Second, § 437.3(a)(3)(i)(C) separately requires disclosure of legal actions pertaining to the seller's key personnel, namely, "the seller's officers, directors, sales managers, or by any other individual who occupies a position or performs a function similar to that of an officer, director, or sales manager of the seller." The change, therefore, does not affect the scope of the required disclosure of legal actions, but rather clarifies a term that is otherwise confusing and somewhat redundant. Accordingly, the Commission adopts the definition of "prior business" with the modification recommended by the staff.

## 13. Section 437.1(m): Providing Locations, Outlets, Accounts, or Customers

The definition of "providing locations, outlets, accounts, or customers" relates to the third prong of the "business opportunity" definition, which sets forth the types of assistance the seller represents it will provide to the purchasers of its business opportunity. [213] The Commission's law enforcement history shows that fraudulent business opportunity sellers often falsely promise to assist purchasers in obtaining key elements necessary for the success of the proposed business: A source of customers, locations, outlets, or accounts. For example, deceptive representations concerning location assistance are the hallmark of fraudulent vending machine and rack display opportunities, [214] while deceptive representations concerning the provision of accounts or customers are typical of medical billing schemes. [215] In such schemes, the seller itself may purport to secure locations, outlets, accounts, or customers, or may represent that third parties will do so. Therefore, the final Rule defines

"providing locations, outlets, accounts, or customers" as:

furnishing the prospective purchaser with existing or potential locations, outlets, accounts, or customers; requiring, recommending, or suggesting one or more locators or lead generating companies; providing a list of locator or lead generating companies; collecting a fee on behalf of one or more locators or lead generating companies; offering to furnish a list of locations; or otherwise assisting the prospective purchaser in obtaining his or her own locations, outlets, accounts, or customers, *provided, however, that advertising and general advice about business development and training shall not be considered as "providing locations, outlets, accounts, or customers."* [216]

The proviso, underscored above, has been added to the definition put forth in the RNPR. As originally proposed in the INPR, the definition ended immediately after the clause "otherwise assisting the prospective purchaser in obtaining his or her own locations, outlets, accounts, or customers." In the RNPR, however, the Commission stated that in interpreting this unqualified clause, it would "continue to apply its longstanding analysis, which considers the kinds of assistance the seller offers and the significance of that assistance to the prospective purchaser (*e.g.,* whether the assistance is likely to induce reliance on the part of the prospective purchaser)." [217] In the RNPR, the Commission solicited comment on three issues related to the "otherwise assisting" clause of the definition: (1) Whether the "otherwise assisting" clause adequately covered all of the business opportunity arrangements that should be within the scope of the rule; (2) whether inclusion of the "otherwise assisting" clause in the definition would cause traditional product distribution arrangements, educational institutions, or how-to books to be subject to the Rule; and (3) whether the clause would result in the inclusion of multi-level marketing relationships that otherwise would not be covered by the Rule. [218]

The majority of commenters who addressed this definition in response to the RNPR focused on when the "otherwise assisting" clause of the definition would be triggered. Commenters from the MLM industry

---

[207] § 437.3(a)(3).

[208] The definition of prior business is broader than the definition of "predecessor" found in the Amended Franchise Rule, which covers only an entity from which a seller acquired the major portion of the seller's assets. *See* 16 CFR 436.1(p).

[209] 71 FR at 19066.

[210] *E.g., FTC v. Nat'l Vending Consultants, Inc.,* No. 05–0160 (D. Nev. 2005); *FTC v. Joseph Hayes,* No. 4:96CV06126 SNL (E.D. Mo. 1996); *FTC v. O'Rourke,* No. 93–6511–CIV–Ferguson (S.D. Fla. 1993); *FTC v. Inv. Dev. Inc.,* No. 89–0642 (E.D. La. 1989).

[211] Proposed § 437.1(k) of the RPBOR would have defined "prior business" to mean:

(1) A business from which the seller acquired, directly or indirectly, the major portion of the business' assets, or

(2) Any business previously owned or operated by the seller, in whole or in part, by any of the seller's officers, directors, sales managers, or by any other individual who occupies a position or performs a function similar to that of an officer, director, or sales manager of the seller.

[212] *Id.*

[213] *See* § 437.1(c)(3).

[214] *E.g., FTC v. Am. Entm't Distribs.,* No. 04–22431–CIV–Martinez (S.D. Fla. 2004); *FTC v. Advanced Pub. Commc'ns Corp.,* No. 00–00515–CIV–Ungaro-Benages (S.D. Fla. 2000); *FTC v. Ameritel Payphone Distribs., Inc.,* No. 00–0514–CIV–Gold (S.D. Fla. 2000); *FTC v. Mktg. and Vending Concepts,* No. 00–1131 (S.D.N.Y. 2000).

[215] *E.g., FTC v. Mediworks, Inc.,* No. 00–01079 (C.D. Cal. 2000); *FTC v. Home Professions, Inc.,* No. 00–111 (C.D. Cal. 2000); *FTC v. Data Med. Capital, Inc.,* No. SACV–99–1266 (C.D. Cal. 1999); *see also FTC v. AMP Publ'ns, Inc.,* No. SACV–00–112–AHS–ANx (C.D. Cal. 2000).

[216] The proposed definition was intended to capture offers to provide locations that have already been found, as well as offers to furnish a list of potential locations; and includes not only directly furnishing locations, but also "recommending" to prospective purchaser specific locators; providing lists of locators who will furnish the locations, and training or otherwise assisting prospects in finding their own locations." 71 FR at 19066.

[217] 73 FR at 16124.

[218] *Id.* at 16133.

were concerned that various types of optional or no-cost assistance that MLM companies frequently offer their sales representatives could be considered to be "otherwise assisting."[219] These include such things as general advice and training about how to succeed in a new business venture,[220] general advertising for the purpose of promoting the MLM's products or services,[221] occasional ad hoc referrals from consumers who contact the company directly,[222] and optional business tools, such as web templates and links to corporate Web sites that some MLM companies offer for sale to its sales representatives. Additionally, one commenter expressed concern that because of this open-ended clause, sellers of general training services, such as training on how to start a new business and advice about how to obtain customers, would be covered by the Rule.[223]

Commenters made a number of suggestions to cure what they perceived to be the overbreadth of this provision. Some commenters suggested omitting the word "customers" from the "otherwise assisting" provision and the corresponding provisions of the "business opportunity" definition.[224] Other commenters recommended that the definition distinguish customers from "near customers" so as to exclude the provision of potential customers or businesses that the seller obtains from publicly available records.[225] Others suggested adding a statement that no-cost general business advice is not "providing customers."[226] Another commenter suggested adding a new clause to the definition of business opportunity that would create an exception when the assistance offered by the seller is limited to advice or

training.[227] Some commenters suggested eliminating the concept of "potential customers" from the scope of the "otherwise assisting" language.[228] Finally, one commenter suggested revising the definition of "business opportunity" to require that the seller's assistance in providing outlets, accounts or customers be a "material inducement" to the purchaser.[229]

The Staff Report noted a concern with narrowing the definition in the ways the commenters suggested, because it would allow promoters of fraudulent schemes to craft their sales pitches carefully to evade the Rule. The staff disagreed with commenters who recommended excising the word "customers" from the definition or diluting it in some fashion. Instead, the Staff Report recommended that the Commission continue its long-standing policy of analyzing the significance of assistance in the context of the of the specific business opportunity, focusing on whether the seller's offer is "reasonably likely to have the effect of inducing reliance on [the seller] to provide a prepackaged business."[230]

While urging that the word "customers" remain in the definition, the Staff Report did recommend new qualifying language to address the concern that the definition could be read more broadly than intended. Specifically, the Staff Report recommended adding a short proviso to the "otherwise assisting" clause as follows: "provided, however, that advertising and general advice about business development and training shall not be considered as 'providing locations, outlets, accounts, or customers.'"[231]

The language recommended in the Staff Report received two comments. DOJ strongly agreed that "customers" should remain in the definition, noting that the allure of a business opportunity is the purported ready cash flow to the purchaser, which can come either from locations or customers, depending on the nature of the opportunity being

offered.[232] DOJ also agreed with the staff's recommendation to include the proviso, but objected to further narrowing of coverage, arguing that any loophole would be vigorously exploited by fraudulent business opportunity sellers.[233] Tupperware similarly encouraged the Commission to adopt the proviso as recommended, stating that the proviso will allow businesses to continue to provide general business advice and training without the risk of inadvertently falling under the aegis of the Rule.[234]

The Commission is persuaded by the Staff Report's recommendation not to eliminate the word "customers" from the "otherwise assisting" clause of the definition, and to add qualifying language to the definition to tailor coverage more appropriately. Providing the prospective purchaser with assistance in obtaining customers is a feature common to many business opportunities and should be included in the definition. For instance, in the cases the Commission has brought against medical billing opportunities, it is typical for sellers to offer to provide assistance to the potential purchaser in finding customers for the medical billing service.[235] Although the RNPR made clear that the "otherwise assisting" provision of the definition was not intended to apply to advertising, no-cost offers of general business advice, and training described by the various commenters,[236] the qualifying language is necessary to prevent the definition from a broader reading than the Commission intends. The final Rule, therefore, contains the proviso recommended in the Staff Report.

### 14. Section 437.1(n): Purchaser

The final Rule defines the term "purchaser" to mean "a person who buys a business opportunity." By operation of the definition of "person,"[237] a natural person, as well as any other entity, would qualify as a business opportunity purchaser. The definition of "purchaser" received no

---

[219] E.g., DSA–RNPR at 5 (tools are intended to maintain brand uniformity and promote effective customer service).

[220] E.g., Primerica-RNPR at 5 (provides advice and training about how to identify potential customers and how to make effective sales presentations); Tupperware-RNPR at 4 (provides training about how new representatives can develop own customer bases); Venable-RNPR.

[221] DSA–RNPR at 4 (5/27/2008); Primerica-RNPR at 6.

[222] E.g., Avon-RNPR at 3 (noting that this practice is designed to help potential customers find a sales representative, not to help sales representatives find potential customers); Mary Kay-RNPR at 7 (suggesting that merely providing the ability to search for a sales associate on the company's Web site should not trigger the "providing locations" factor of the "business opportunity" definition); DSA–RNPR at 5; Melaleuca-RNPR at 2.

[223] Venable-RNPR at 2.

[224] DSA–RNPR at 5; Venable Rebuttal-RNPR at 3; Primerica-RNPR at 5.

[225] Venable-RNPR.

[226] Primerica-RNPR at 8; Tupperware-RNPR at 6; Avon-RNPR; Mary Kay-RNPR.

[227] Pre-Paid Legal-RNPR.

[228] Mary Kay-RNPR at 7 (as an alternative Mary Kay suggests that in the commentary to the Final Rule, the Commission make clear that passing on ad hoc referrals of customers who contact the company directly would not trigger this provision).

[229] Melaleuca-RNPR.

[230] Staff Advisory Opinion 95–10, Business Franchise Guide (CCH) ¶ 6475 (1995).

[231] For example, this new proviso was designed to make clear that giving advice about how to demonstrate products, complete product order forms and how to process returns (Tupperware-RNPR); or providing product advertising in the general media and training in customer and business development (Primerica-RNPR), would not be considered as "providing locations, outlets, accounts, and customers."

[232] DOJ-Staff Report at 1–2.

[233] Id. at 2.

[234] Tupperware-Staff Report at 2.

[235] See, e.g., FTC v. Med. Billers Network, Inc., No. 05–CV–2014 (S.D.N.Y. 2005); FTC v. Med.-Billing.com, Inc., No. 3–02CV0702CP (N.D. Tex. 2002); FTC v. Electronic Med. Billing, Inc., No. SACV02–368 AHS (C.D. Cal. 2002); see also FTC v. Star Publ'g Group, Inc., No. 00cv–023D (D. Wyo. 2000) (offering to everything necessary to earn money processing HUD refunds); FTC v. AMP Publ'ns, Inc., SACV–00–112–AHS–Anx (C.D. Cal. 2000) (offering to provide list of companies in need of consumer's home-based computer services).

[236] 73 FR at 16123.

[237] Section 437.1(k).

comment, and the final Rule includes the definition as proposed.

### 15. Section 437.1(o): Quarterly

To ensure accuracy and reliability of disclosures, § 437.3 (instructions for completing the disclosure document) requires sellers to revise their disclosures at least "quarterly."[238] The definition of "quarterly" sets forth a bright line rule that is easy to follow and that ensures uniformity of disclosures: "Quarterly" means "as of January 1, April 1, July 1, and October 1." Thus, the final Rule requires sellers to update their disclosure by those specific dates each year. The definition of "quarterly" received no comment, and the final Rule includes the definition as proposed.

### 16. Section 437.1(p): Required Payment

Under the final Rule's definition of "business opportunity," the Rule reaches only those opportunities where the prospective purchaser of a business opportunity makes a "required payment" to the seller. Section 437.1(p) of the final Rule defines a "required payment" to mean:

all consideration that the purchaser must pay to the seller or an affiliate, either by contract or by practical necessity, as a condition of obtaining or commencing operation of the business opportunity. Such payment may be made directly or indirectly through a third party. A required payment does not include payments for the purchase of reasonable amounts of inventory at bona fide wholesale prices for resale or lease.

The final definition of "required payment" is the same as proposed in the RNPR and is substantially similar to that employed in the Amended Franchise Rule. It differs in that it includes language that reaches situations where a payment is made directly to a seller or indirectly through a third party. The RPBOR included this definition because without such a modification, fraudulent business opportunity sellers could circumvent the Rule by requiring payment to a third party with which the seller has a formal or informal business relationship.[239]

The last sentence of the definition excludes payments for reasonable amounts of inventory at bona fide wholesale prices.[240] This effectuates the Commission's determination articulated

in the RNPR, that traditional product distribution arrangements should not be covered by the Business Opportunity Rule.[241] Manufacturers, suppliers, and other traditional distribution firms "have relied solely on the bona fide wholesale price exclusion to avoid coverage as a franchise."[242]

The IPBOR had eliminated this inventory exemption in an attempt to bring pyramid schemes that engaged in "inventory loading" within the ambit of the Rule.[243] Several commenters contended that the IPBOR would have regulated a wide range of legitimate and traditional product distribution arrangements that were not associated with the types of fraud that business opportunity laws are designed to remedy. For example, one commenter suggested that the IPBOR could be read to cover product distribution through retail stores simply because the retailer pays for inventory.[244] This commenter suggested that its business operations would meet the IPBOR's definition of business opportunity because, among other reasons, the "payment" prong of the definition did not exempt voluntary purchases of inventory.[245]

Because the application of the IPBOR to these types of arrangements was unintended, the RPBOR narrowed the definition of "business opportunity" by clarifying that a "required payment" does not include payments for the purchase of reasonable amounts of inventory at bona fide wholesale prices.[246] Moreover, in the RNPR, the Commission determined that challenging deceptive pyramid schemes in targeted law enforcement actions brought under Section 5 of the FTC Act is a more cost-effective approach than attempting to address pyramid schemes through the elimination of the inventory exemption as proposed in the IPBOR.[247]

In response to the RNPR, MLM industry commenters urged the Commission to expand the inventory exemption additionally to exempt sales of business materials, supplies, and equipment to purchasers on a not-for-profit basis.[248] Commenters stated that

the MLM business model often requires that new sales representatives purchase materials, supplies, or equipment to facilitate his or her sales to consumers.[249] At least one commenter also noted that individuals sometimes pay to become sales consultants solely to obtain the products that are part of the company's sales kit for personal use at less than retail cost.[250] These commenters argued that without expanding the exemption, MLMs would be swept within the scope of the Rule.[251]

The Staff Report noted these concerns, but opined that they were misplaced and that the suggested changes to the definition of "required payment" were unnecessary.[252] The staff recognized, however, that without making the changes suggested by the commenters, some MLM companies could indeed meet the "required payment" prong of the business opportunity definition.[253] But, as noted previously, in order to be covered by the Rule, an entity must meet each of the three definitional components of the term "business opportunity."[254] Meeting one prong is insufficient to come within the scope of the Rule.

[238] Section 437.3(b) requires that until a seller has at least 10 purchasers, the list of references must be updated monthly.

[239] 73 FR at 16122.

[240] The inventory exemption was originally set forth by the Commission in its 1979 Final Interpretative Guide to the Franchise Rule. 44 FR at 49967. The rationale for excluding payments for inventory was to exclude "[a]gency relationships in which independent agents, compensated by commission, sell goods or services" (*e.g.*, insurance salespersons). *Id* at 49967–68.

[241] 73 FR at 16122.

[242] *Id.*

[243] 71 FR at 19055. Inventory loading occurs when a company's incentive program forces recruits to buy more products than they ever will sell, often at inflated prices. If this occurs throughout the company's distribution system, the people at the top of the pyramid reap substantial profits, even though little or no product moves to market.

[244] 73 FR at 16113–14.

[245] *Id.*

[246] *Id.* at 16114.

[247] 73 FR at 16122.

[248] Commenters suggested various ways to expand the exemption. *See* DSA–RNPR at 4 (recommending that the exemption include

"business materials, supplies, and equipment sold on a not-for-profit basis"); Mary Kay-RNPR at 2 (same); Avon-RNPR at 2 (exemption should extend to "sales aid or kits at cost"); Tupperware-RNPR at 4 (required payment should not include payments for the purchase of reasonable amounts of inventory at bona fide wholesale prices, which may be used for resale, lease or display, or payments for products for personal use). Also, one commenter expressed concern that under the proposed definition, voluntary payments made to third parties unaffiliated with the seller for items or equipment to be used in a purchaser's business could be considered a "required payment." *See* IBA–RNPR at 4. The Commission disagrees. By its very words, the definition is not intended to capture payments of the type described by the commenter, as such payments are not made directly or indirectly to the seller.

[249] DSA–RNPR at 4; Tupperware-RNPR at 2 (explaining that it requires purchase of a starter Business Kit that contains a selection of Tupperware products sold below retail value for demonstration at parties); Mary Kay-RNPR at 4 (initial sales kit, sold to consultant at below cost, is used to demonstrate products to customers); Avon-RNPR at 2 (sales kits, which explain business fundamentals and provide necessary equipment such as sales brochures, sales receipts, a tote bag, and product samples, are sold to independent sales representatives without a profit).

[250] Tupperware-RNPR at 2 (products in starter Business Kit sold to sales consultants for $79 or $129 have retail value of $350 and $550 respectively).

[251] DSA–RNPR; Mary Kay-RNPR; Tupperware-RNPR; Pre-Paid Legal-RNPR.

[252] Staff Report at 58.

[253] *Id.* at 57.

[254] *Id.* Those components are: (1) A solicitation to enter into a new business; (2) a required payment made to the seller; and (3) a representation that the seller will provide assistance in the form of securing locations, securing accounts, or buying back goods produced by the business. *Id.* at n.186.

Furthermore, the other clarifications and changes to the definitions of "business opportunity" and "providing locations, outlets, accounts, or customers" under the final Rule tailor coverage appropriately, and make the additional suggested changes to the "required payment" definition unnecessary. Accordingly, the Staff Report recommended that the definition of "required payment" be adopted in the form proposed in the RNPR.[255]

Moreover, the Commission is concerned that expanding the exemption as the commenters suggested would create enforcement problems. For example, when a "required payment" includes both an inventory and non-inventory component, it would be difficult to determine whether non-inventory products—such as sales kits or display-related materials—were, in fact, being sold to purchasers at less than the seller's cost. Finally, the suggested changes could have the unintended effect of allowing some fraudulent business operators to be excluded from the Rule's coverage.[256]

In response to the Staff Report, the Commission received one comment addressing the "required payment" definition. The commenter set forth the same suggestion it had provided in response to the RNPR—that a "required payment" should not include situations where the seller agrees to buy back from the purchaser any unused inventory within 12 months of purchase for at least 90 percent of the purchaser's cost.[257] The commenter, a large MLM company, continued to argue that incorporating this change into the definition of "required payment" would assist in creating regulatory certainty that the Rule would not cover this situation. The commenter disagreed with one of the justifications given in the Staff Report for urging no modification of the definition—namely, that satisfying the "required payment" definition, by itself, is insufficient to bring an entity within the scope of the Rule. The commenter argued that legitimate companies that might satisfy the "required payment" prong have too much at stake to rely on one of the other two prongs of the "business

opportunity" definition to avoid coverage under the Rule.[258]

This argument is not persuasive. The definition of "required payment" already excludes payments for the purchase of inventory at bona fide wholesale prices. To the extent that the business opportunity seller offers inventory at prices above wholesale, such a payment would generate profit to the seller. If the Rule were modified to exempt payments for inventory not just at wholesale but also retail prices, such a change would give sellers an incentive to structure their payment schemes to require only payment for inventory, in order to avoid coverage by the Rule. Moreover, granting an exemption to sellers that offer to buy back some percentage of unused inventory within 12 months is problematic in light of the Commission's experience that fraudulent business opportunity sellers could go out of business, change names, or disappear during that time.[259] Accordingly, the final Rule incorporates the definition of "required payment" as recommended in the Staff Report.

### 17. Section 437.1(q): Seller

The final Rule defines the term "seller" to mean: "A person who offers for sale or sells a business opportunity." Like the "purchaser" definition, it contemplates that both natural persons and entities may be business opportunity sellers.[260] The definition of "seller" is unchanged from the INPR, received no comment, either in response to the RNPR or the Staff Report, and the final Rule adopts the definition as recommended in the Staff Report.

### 18. Section 437.1(r): Signature or Signed

Under § 437.1(a)(6) of the final Rule, business opportunity sellers are required to attach a duplicate copy of the disclosure document, which is to be signed and dated by the purchaser. A designation for the signature and date is included at the bottom of the disclosure document. The Staff Report recommended adding a definition of "signature" to the Rule to clarify that a signature may include any electronic or digital form of signature to the extent that such signatures are valid under applicable law.[261] The recommended definition of "signature" received no comment.

As recommended in the Staff Report, § 437.1(r) of the final Rule states: "Signature or signed" means "a person's

affirmative steps to authenticate his or her identity." It includes a person's handwritten signature, as well as an electronic or digital form of signature to the extent that such signature is recognized as a valid signature under applicable federal law or state contract law."[262] This definition effectively permits business opportunity sellers to comply with the Rule electronically, consistent with the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. 7001,[263] and is consistent with other rules enforced by the FTC.[264] For example, a seller could obtain the digital signature of a purchaser by providing the disclosure document to the purchaser as a word processing document and require the purchaser to type his or her name into the form in the space provided for the signature. Alternatively, the seller could direct the purchaser to a web page that contains an electronic version of the disclosure document and require the purchaser to input his or her name before submitting the web-based form electronically.

### 19. Section 437.1(s): Written or In Writing

The final Rule, like the version proposed in the INPR, defines the terms "written" or "in writing," which are used throughout the Rule[265] as "any document or information in printed form or in any form capable of being downloaded, printed, or otherwise preserved in tangible form and read. It includes: type-set, word processed, or handwritten documents; information on computer disk or CD–ROM; information sent via email; or information posted on the Internet. It does not include mere oral statements." This definition is designed to capture information stored on computer disks, CD–ROMs, or through new or emerging technologies, as well as information sent via email or posted on the Internet. Nevertheless, the definition seeks a balance, attempting to minimize compliance costs while at the same time preventing fraud. To that end, the definition would make clear that all electronic media must be in a form "capable of being downloaded, printed, or otherwise preserved in tangible form and read," thus ensuring that a prospective purchaser who receives disclosures electronically can

[255] *Id.*

[256] For example, in *United States* v. *Universal Adver., Inc.,* No. 1:06–cv–152–DAK (D. Utah 2006), the fraudulent business opportunity seller told purchasers they could earn significant money by signing up business owners to pay monthly fees to display their business cards in rack display "profit centers." In that case, the entire purchase cost went towards the rack display profit centers, which could be characterized as "display-related materials."

[257] Tupperware-Staff Report at 3.

[258] *Id.*

[259] *See* DOJ–Staff Report at 2 (noting that many business opportunities begin and end within a short period of time).

[260] 71 FR at 19067.

[261] Staff Report at 59.

[262] This definition is consistent with the definition of signature in the TSR. *See* 16 CFR 310.3(a)(3).

[263] *See* 71 FR at 19067 n.142.

[264] *See* TSR, 16 CFR 310.3(a)(3)(i); Amended Franchise Rule, 16 CFR 436.3(u) (containing similar definitions).

[265] *E.g.,* §§ 437.2, 437.3(a), 437.4(a).

read them, share them with an advisor, and retain them for future use.[266]

In response to the Staff Report, one commenter expressed concern that the Rule would be overly burdensome if electronic compliance were not permitted.[267] As discussed above, however, the definition of "written" or "in writing" and the definition of "signature" or "signed" each makes clear that sellers can comply with the Rule electronically.[268] Thus, the Commission adopts the definition as recommended in the Staff Report.

### B. Section 437.2: The Obligation To Furnish Written Documents

The next section of the Rule, § 437.2, imposes a core requirement of the Rule—the obligation of sellers to furnish prospective purchasers with a single-page disclosure document before purchasers execute a contract or pay any money. As noted previously, the disclosure document required under the Original Franchise Rule and interim Business Opportunity Rule was often extremely lengthy, cumbersome, and in some ways ill-suited to business opportunity transactions. Through the INPR and the RNPR, the Commission sought to simplify and streamline this document in order to make the disclosures more meaningful to consumers.

The disclosure document mandated by § 437.2 must be furnished at least seven calendar days before one of two events: Either (1) the execution of any contract in connection with the business opportunity sale; or (2) the payment of any consideration to the seller.[269] This provision is intended to ensure a uniform standard for determining when sellers must furnish disclosures before potential purchasers must put their money at risk. Section 437.2 clarifies that "payment to the seller" refers to payments made either directly to the seller, or indirectly through a third party, such as a broker, lead generator, or locator.

The seven calendar-day period was modeled on the Original Franchise Rule's requirement that sellers furnish prospective purchasers with a completed copy of the disclosure document at least ten business days

before a potential purchaser pays any fee or executes any agreement in connection with the sale.[270] In the INPR, the Commission proposed shortening the period of time business opportunity sellers would be required to provide the disclosures to potential purchasers.[271] The Commission determined that seven calendar days is sufficient time to enable a prospective purchaser to review the information contained on the simplified and streamlined basic disclosure document and any earnings claims statements, as well as to conduct a due diligence review of the offering, including contacting references.[272] The seven day time period was proposed in the RNPR.[273]

Only one comment received in response to the RNPR addressed this provision. The commenter argued, without providing any evidence, that imposing a "waiting period" of any length before a prospective purchaser signs a binding agreement or makes a payment to a seller would chill the sale of legitimate business opportunities.[274] The Commission is not persuaded by this assertion, as both the Original Franchise Rule and interim Business Opportunity Rule have waiting periods in excess of seven days.[275] Furthermore, a waiting period is particularly necessary in the sale of business opportunities, where consumers are often rushed into making investment decisions.[276] No Staff Report comments addressed this provision. The Commission concludes that seven calendar days is sufficient time for purchasers to review the disclosure information and to conduct due diligence, and adopts § 437.2 as recommended in the Staff Report.

### C. Section 437.3: Disclosure Document

Section 437.3(a) of the final Rule instructs business opportunity sellers how to prepare the basic disclosure document, identifies the categories of required disclosure, and specifies what information must be included in each of

these categories. Section 437.3(a) requires that sellers provide prospective purchasers with information about the seller, the seller's litigation history, any cancellation and refund policy, any earnings claims, and references "in the form and using the language set forth in Appendix A" to the Rule. In addition, the final Rule adds a clause to § 437.3(a) requiring that if the offer for sale, sale, or promotion of a business opportunity is conducted in Spanish, the seller must provide the Spanish version of the disclosure document (Appendix B to the Rule) and provide any required disclosures in Spanish. For sales conducted in a language other than English or Spanish, the seller must use the form and an accurate translation of the language set forth in Appendix A.

All disclosures, regardless of the language they are in, must be presented in a "single written document." The Commission concludes that the single written document requirement is necessary to ensure that disclosures are not furnished in piecemeal fashion that easily could be overlooked or lost.[277] In addition, requiring that the disclosure information be presented in the specified format will prevent sellers from circumventing the Rule by presenting damaging information in a format that is not sufficiently prominent to be noticed or understood, or that is not readily accessible.[278] Failure to follow the form and language of the appropriate disclosure document would constitute a violation of Section 5 of the FTC Act.[279]

Section 437.3(a)(6) requires that a seller provide the potential purchaser with two copies of the disclosure document, one of which is for the prospective purchaser to sign, date, and return to the seller to maintain in accordance with § 437.7. Section 437.3(b) specifies that it is an unfair or deceptive practice and a violation of Section 5 of the FTC Act for a seller to fail to update the required disclosures at least quarterly to reflect changes in the five required categories of information, provided, however, that the list of references must be updated monthly, until the seller has 10 purchasers, after which quarterly updates are required.

The sections that follow discuss the evolution of the disclosure document's format and substance, the commentary received about the disclosure document, further revisions to the document recommended in Staff Report, and the Commission's analysis of the comments and recommendations.

---

[266] 71 FR at 19067.

[267] NG Franchise-Staff Report.

[268] See also supra note 261.

[269] Section 437.1(s) allows the disclosure document to be provided to purchasers electronically, such as by posting in on the Internet, sending it via email, etc. Providing the disclosure document through one of these alternative methods does not, however, relieve the seller of the obligation to obtain and maintain copies of signed and dated disclosure documents provided to purchasers.

[270] See 71 FR at 19067. When the Original Franchise Rule was amended, the time period was extended to 14 calendar days. The interim Business Opportunity Rule maintained the 10 business-day period. See 72 FR at 15468, 15570.

[271] See 71 FR at 19067.

[272] Id.

[273] See 73 FR at 16134.

[274] Planet Antares-RNPR at 13–14.

[275] See 16 CFR 436.2(a) (fourteen calendar days); § 437.2(g) of the interim Business Opportunity Rule (ten business days).

[276] See, e.g., FTC v. Bus. Card Experts, Inc., No. 06–CV–4671 (PJS/RLE) (D. Minn. 2007) (representatives told consumers they must invest within one or two weeks in order to take advantage of special "promotional" rate).

[277] 71 FR at 19067.

[278] See id.

[279] See § 437.3(a).

### 1. The Format of the Disclosure Document

#### a. Background

As noted above, a major goal of this rulemaking has been to streamline the lengthy disclosure document that was appropriate in the sale of business format franchises, but ill-suited to the sale of traditional business opportunities. The interim Business Opportunity Rule, modeled on the Original Franchise Rule, required sellers to make more than 20 separate disclosures to potential purchasers.[280] Requiring sellers to make these extensive disclosures imposes significant compliance costs on covered businesses, and many of the disclosures, which are material in the context of franchise sales are not well-suited to business opportunity sales. The final Rule aims to strike the proper balance between prospective purchasers' need for pre-sale disclosure and the burden imposed on those selling business opportunities.[281]

Thus, the Commission proposed a single-page disclosure document both in the INPR and the RNPR. The Commission invited public comment about the form, including whether the overall presentation of information could be improved to make it more useful and understandable, and whether the substantive disclosure sections would capture the information that would most benefit potential purchasers.[282] The Commission received no comments in response to this request.

The Commission engaged a consultant with expertise in document design and comprehension to evaluate the proposed disclosure document to ensure that it adequately conveyed to consumers information material to the prospective business opportunity, and to determine whether the overall presentation of the information in the proposed document could be improved to make it more useful and understandable.[283] Following publication of the initial proposed disclosure document, the consultant conducted extensive

consumer testing that resulted in the revised proposed disclosure document that the Commission concluded substantially improved both the layout and the wording of the form.[284]

Some of the changes suggested by the consultant included: Changing the title of the form from "Business Opportunity Disclosures" to "Disclosure of Important Information about Business Opportunity"; revising the preamble of the disclosure to make it more readable; adding a description of the Federal Trade Commission for consumers who may not be familiar with the agency; clarifying that the information on the form relates specifically to the business opportunity the reader is being offered; reformatting the sections that address earnings, legal actions, and cancellation or refund policies, to make those sections easier to understand; and adding a note below the signature line stating that the FTC requires that the business opportunity seller give potential buyers at least seven calendar days before asking him or her to sign a purchase contract.[285] A copy of the revised proposed disclosure document, which incorporated the consultant's suggested revisions, was included in the Workshop Notice announcing that the FTC would hold a public workshop on June 1, 2009.[286]

#### b. Public Workshop

On June 1, 2009, the staff held a one-day public workshop in Washington, DC to get public input about the revised proposed disclosure document.[287] The Workshop Notice invited interested parties to submit a request to participate as a panelist.[288] Ultimately, the workshop featured five panelists who represented a range of interests in the proposed Rule, including a federal law enforcer,[289] a state law enforcer,[290] a consumer advocate,[291] the general counsel of a national multilevel-marketing company,[292] and a former

director of the FTC's Bureau of Consumer Protection.[293]

Workshop panelists uniformly approved the revised, proposed disclosure document, and applauded the Commission's goal of streamlining and simplifying the form.[294] All workshop panelists believed that the disclosure document generally accomplished the Commission's stated purposes of streamlining and simplifying the form to make it more useful to prospective business opportunity purchasers, although they did have some minor suggestions related both to the proposed disclosure document and some of the substantive disclosure requirements, which are discussed below.

### 2. Section 437.3(a): Disclosure Requirements

Section 437.3 requires that business opportunity sellers give prospective purchasers five items of material information, in a basic disclosure document.[295] Each required disclosure is intended to help prospective purchasers make informed investment decisions. First, sellers must state their name, business address, and telephone number, the name of the salesperson offering the opportunity, and the date when the disclosure document is furnished to the prospective purchaser. Second, sellers must disclose whether or not they make earnings claims and, if so, must state the claim or claims in a separate earnings claims statement attached to the basic disclosure

---

[280] These include but are not limited to information about the seller; the business background of its principals and their litigation and bankruptcy histories; the terms and conditions of the offer; statistical analyses of existing franchised and company-owned outlets; prior purchasers, including the names and addresses of at least 10 purchasers nearest the prospective buyer; and audited financial statements. Additional disclosure and substantiation provisions apply if the seller chooses to make any financial performance representations.

[281] 73 FR at 16130–32.

[282] Id. at 16132–33.

[283] See generally Macro Report.

[284] 74 FR at 18714–15.

[285] See generally Macro Report.

[286] 74 FR at 18714.

[287] Id. In response to the RNPR, three commenters (DRA, Planet Antares, and Johnson) had originally requested a hearing as permitted in the RNPR (see 73 FR at 16110), but later agreed that a public workshop would address their issues and concerns more efficiently.

[288] The staff received requests to serve as panelists from eight persons. It extended offers to serve as panelists to each of these individuals, three of whom declined.

[289] Kenneth Jost ("Jost"), DOJ, Office of Consumer Litigation.

[290] Dale Cantone ("Cantone"), Maryland Attorney General's Office.

[291] Jon Taylor ("Taylor"), Consumer Awareness Institute.

[292] Maureen Morrissey ("Morrissey"), Tupperware.

[293] William MacLeod ("MacLeod"). Although at the workshop Mr. MacLeod represented only his own views, he had previously filed comment to the INPR and RNPR on behalf of Planet Antares, which markets vending machine businesses.

[294] See, e.g., Jost, June 09 Tr at 12–15 (noting that the simplicity of the form is the key to it being successful. "Having a one page document that focuses on the key issues such as legal actions, earnings claims, and references will put the most important information in the hands of the prospective purchaser."); MacLeod, June 09 Tr at 18 (same, and commending the staff for engaging a consumer research expert to copy test the disclosure document); Cantone, June 09 Tr at 20 (stating that the disclosure document captures the major components of business opportunity fraud, including fraudulent earnings claims and false refund offers); Taylor, June 09 Tr at 23 (noting that the disclosure document is "easy to understand and short and accomplishes its purposes.").

[295] Like the Franchise Rule and the interim Business Opportunity Rule, the final Rule specifies that only sellers of business opportunities have an obligation to prepare and furnish a basic disclosure document. Other persons involved in the sale of a business opportunity—such as brokers, locators, or suppliers—have no obligation to prepare basic disclosure documents or to furnish such documents. The ultimate responsibility to ensure that disclosures are accurately prepared and disseminated rests with the seller. See 71 FR at 19067.

document.[296] Third, sellers must disclose prior civil or criminal litigation involving claims of misrepresentation, fraud, securities law violations, or unfair or deceptive business practices that involve the business opportunity or its key personnel.[297] Fourth, sellers must disclose any cancellation or refund policy.[298] Finally, sellers must provide contact information for at least 10 of their purchasers nearest to the prospective purchaser's location.[299] A discussion of the record pertaining to each of the required substantive disclosures follows, along with changes made in the final Rule and consistent amendments made to the disclosure document.[300] The final disclosure document is Appendix A to this Notice. The Spanish translation of the disclosure document is Appendix B to this Notice.

**a. Section 437.3(a)(1): Identifying Information**

The first required disclosure under the final Rule is the seller's identifying information. Specifically, § 437.3(a)(1) requires that the seller disclose the name, business address, and telephone number of the seller, the name of the salesperson offering the opportunity, and the date when the disclosure document is furnished to the prospective purchaser.[301] The Commission has long recognized the materiality of a business opportunity seller's identifying information. For example, when the Original Franchise Rule was promulgated, the Commission concluded that:

> The failure to disclose such material information * * * may mislead the [prospect] as to the business experience of the parties with whom he or she is dealing and * * * could easily result in economic injury to the [prospect] because of the * * * dependence upon the business experience and expertise of the [business opportunity seller].[302]

This identifying information is material because it enables a prospective purchaser to contact the seller and any salesperson for additional information. This information also enables a prospective purchaser to perform additional, independent research on the seller and salesperson. At the same time, for law enforcement purposes, this disclosure provides a written record of who provided the required disclosures and when they did so.[303]

**b. Section 437.3(a)(2): Earnings Claims**

The final Rule permits sellers to make an earnings claim, provided there is a reasonable basis for the claim and that the seller can substantiate the claim at the time it is made.[304] If the seller makes no earnings claim, § 437.3(a)(2) directs the seller simply to check the "no" box on the disclosure document.[305] Moreover, § 437.3(1)(4) specifies items of information necessary to substantiate an earnings claim. If the seller does make an earnings claim, the Rule requires the seller to check the "yes" box and attach to the basic disclosure document a second document, the earnings claim statement. The disclosure document advises the prospective purchaser of this requirement: "If the statement is yes, [the seller] must attach an Earnings Claim Statement to this form."[306]

At the June 1, 2009 workshop, the DOJ representative spoke approvingly of the form and language of this disclosure, noting that if a seller had checked the "no" box, but had, in fact, made an earnings claim, the misrepresentation would be in violation of Section 5 of the FTC Act, and the seller would be subject to civil penalties.[307] A couple of workshop panelists, however, found the language confusing and believed that a potential purchaser reading this disclosure might not know who should be completing this section of the form—the purchaser, or the seller.[308] Two of the panelists had some suggestions for improving the language of the disclosure.[309]

The Staff Report concluded that revisions to the language of the earnings disclosure were unnecessary. The Commission agrees. The initial proposed disclosure document, including the earnings disclosure, underwent substantial revision based upon consumer testing. Testing of the format and language of the earnings disclosure revealed that, contrary to the panelists' concerns, consumers did understand the meaning of the earnings disclosure, and realized that "a check in the 'No' box would contradict any previous earnings claim that a salesperson had made."[310] Indeed, the ultimate test for the effectiveness of the disclosure document is whether, in practice, the written form helps consumers detect a contradictory oral statement made by the seller. On that point, the revised proposed disclosure document proved effective—9 out of 10 participants in the FTC study who heard a hypothetical oral sales presentation understood that it had included an earnings claim, and when they subsequently reviewed the disclosure document, correctly identified a written contradiction of the oral presentation.[311] Based on the results of the consumer testing, the Commission is not persuaded that the workshop panelists' suggestions would improve the comprehension of the earnings claim disclosure, and therefore has not adopted any changes to it.

**c. Section 437.3(a)(3): Legal Actions**

Section 437.3(a)(3) addresses deceptive practices in the sale of business opportunities by requiring sellers to disclose material information about certain prior legal actions. Specifically, § 437.3(a)(3)(i) requires business opportunity sellers to provide prospective purchasers with

---

[296] Section 437.3(a)(2).

[297] Section 437.3(a)(3). Key personnel include any of the business opportunity seller's principals, officers, directors, and sales managers, as well as any individual who occupies "a position or performs a function similar to an officer, director, or sales manager of the seller."

[298] Section 437.3(a)(4). The IPBOR would have required disclosure of the business opportunity seller's cancellation or refund request history. Some commenters argued that requiring disclosure of the seller's refund history would have had the wayward effect of discouraging legitimate businesses from offering refunds. Because companies with liberal refund policies were more likely to have refund requests than those offering no refunds, disclosure of refund requests could mislead consumers into thinking that a company offering liberal refunds is less reputable than the company offering no refunds. The Commission was persuaded by these commenters and omitted this required disclosure from the RPBOR. *See* 73 FR at 16126.

[299] Section 437.3(a)(5).

[300] In response to the Staff Report, one commenter suggested a myriad of additional changes to the disclosure document such as fields for the buyer's contact information and additional fields for information related to the salesperson. NG Franchise-Staff Report at 4–5. The Commission finds the suggested changes unnecessary.

[301] Other Commission trade regulation rules similarly require disclosure of identifying information. E.g., Wool Products Labeling Rule, 16 CFR 300.14; Fur Products Labeling Rule, 16 CFR 301.43.

[302] 43 FR at 59642.

[303] The Workshop panelists did not discuss this required disclosure.

[304] This is consistent with analogous provisions in the Amended Franchise Rule, 16 CFR 436.9, and the interim Business Opportunity Rule, 437.1(c).

[305] One workshop panelist commented that an earnings claim is the most important selling feature of any business opportunity, and for that reason, sellers should not be permitted to state they make no earnings claim. Taylor, June 09 Tr at 68. The Commission agrees that the earnings claim is important to purchasers' investment decisions, but recognizes that there is an important distinction between forcing sellers to make an earnings claims and requiring them to substantiate any claims they choose to make.

[306] Business opportunity sellers must also make the following prescribed cautionary statement in close proximity to the "yes" or "no" check boxes: "Read this statement carefully. You may wish to show this information to an advisor or accountant."

[307] Jost, June 09 Tr at 56.

[308] Cantone, June 09 Tr at 55; Taylor, June 09 Tr at 56.

[309] E.g., Taylor, June 09 Tr at 57; Cantone, June 09 Tr at 57.

[310] Macro Report at 15.

[311] Id.

information about legal actions of or against the seller, the seller's affiliates or prior businesses, and certain key personnel that involve "misrepresentation, fraud, securities law violations, or unfair or deceptive practices, including violations of any FTC rule." Key personnel include "any of the seller's officers, directors, sales managers, or any individual who occupies a position or performs a function similar to an officer, director, or sales manager of the seller."[312] If the seller has such information to disclose, it must check the "yes" box on the disclosure document. If there are no actions to disclose, the seller must check the "no" box.

Comments on this section centered on two main issues.[313] First, some expressed concern that the legal action disclosure might unfairly tarnish the image of a seller who had meritless lawsuits filed against it. Second, the DOJ focused on enhancing the government's ability to prosecute violations of the Rule, and to that end, made recommendations to revise the form of the disclosure.[314] In addition, DOJ submitted a comment in response to the INPR advising the Commission to add to the title of the disclosure document a citation to the legal authority requiring the seller to provide the basic disclosure document.[315] The final Rule incorporates this suggestion.

(1) Legal Action Disclosure Permits a Brief Description

Section 437.3(a)(3)(ii) requires that if the seller has litigation to disclose pursuant to § 437.3(a)(3)(i), it must provide an attachment to the disclosure document with the full caption of each legal matter (names of the principal parties, case number, full name of court, and filing date). The RPBOR would have prohibited a seller from including any additional information about the legal

action including truthful statements about the nature of the litigation or its ultimate outcome.[316] One commenter stated that in some instances, litigation may be meritless and disposed of by means of short of formal adjudication—for example through dismissal or settlement of nuisance lawsuits—and sellers should have the opportunity to provide an explanation of any disclosed legal actions.[317] A panelist at the workshop agreed and also noted that the FTC's expert report on the consumer testing of the disclosure document revealed that consumers had very negative reactions to the existence of legal actions against the seller.[318] The DOJ panelist, on the other hand, expressed concern that, if allowed to provide a description of disclosed legal actions, sellers might craft misleading descriptions.[319] He stated that he has seen such abuse in the context of the Franchise Rule,[320] although he did acknowledge that it might be unfair to prohibit sellers from providing an explanation when they have been sued.[321]

The Commission's initial decision not to allow inclusions of details regarding the nature of each legal action, as is provided in the Amended Franchise Rule, was prompted by an attempt to minimize compliance costs to sellers.[322] Furthermore, the Commission reasoned that if "armed with the full caption, a prospective purchaser can seek additional information if he or she so chooses," as "the public's ability to review complaints in legal proceedings has become significantly easier since the

advent of the Internet * * * [because] [m]any legal documents are now routinely posted on court and related Web sites."[323] The Commission noted that since the disclosure document itself instructs potential purchasers that the legal actions disclosed pertain to misrepresentation, fraud, securities law violation, or unfair or deceptive practices, potential purchasers would have a basic understanding of the subject matter of the action.[324]

The existence of legal actions against the seller is not necessarily proof of fraud and that some legal actions may be without merit. The Commission concludes, however, that the existence of legal actions of the type enumerated—misrepresentation, fraud, securities law violations, or unfair or deceptive practices—against the business opportunity seller or its key personnel is critical to assessing the financial risk of the proposed investment.[325] This is highly material information. Indeed, discovering that a seller has a history of violating laws and regulations is perhaps the best indication that a particular business opportunity is a high-risk investment. In fact, in the Commission's law enforcement experience, business opportunity promoters routinely have hidden such material information from prospective purchasers, to the detriment of those purchasers.[326]

The Staff Report cautioned that if the Rule allowed sellers to provide a description of the legal action, it would provide an opportunity for dishonest sellers to misrepresent or mischaracterize such actions, including their ultimate outcomes.[327] Nevertheless, the Staff Report acknowledged that legitimate sellers potentially could be harmed if not afforded the opportunity to address in writing the legal action they are

---

[312] In the RNPR, the Commission solicited comment on whether this provision adequately captures the types of individuals whose litigation history should be disclosed. It received no comments responsive to that request. In addition, in the RNPR, the Commission determined that it would not be appropriate to require the disclosure of legal actions involving the seller's sales employees, which would have been required under the IPBOR. The Commission reasoned that the burden of collecting the litigation histories for every sales person was not outweighed by the corresponding benefit to prospective purchasers. 73 FR at 16126.

[313] In addition, discussion at the workshop focused on whether a seller's bankruptcy history should be considered a legal action and required to be disclosed. As noted in Section III.A.1, discussing the definition of "action," the Commission has determined not to require the disclosure of bankruptcy actions.

[314] See 73 FR at 16125.

[315] Id.

[316] 73 FR at 16125–26.

[317] Gary Hailey ("Hailey"), Venable LLP, June 09 Tr at 122.

[318] MacLeod, June 09 Tr at 124. The panelist also argued that lawsuits are often overpled and that there may be instances where some claims (such as constitutional claims) are not really of particular materiality to a prospective purchaser.

[319] Jost, June 09 Tr at 125.

[320] The Amended Franchise Rule requires that legal actions against franchise sellers be disclosed to potential purchasers. 16 CFR 436.5(c)(3) requires that franchisors summarize, "the legal and factual nature of each claim in the action, the relief sought or obtained, and any conclusion of law and fact," and provide information about damages or settlement terms, terms of injunctive orders, dates of any convictions or pleas, and the sentence or penalty imposed. The interim Business Opportunity Rule requires that sellers disclose only: the identity and location of the court or agency; the date of conviction, judgment, or decision; the penalty imposed; the damages assessed; the terms of the settlement or the terms of the order; and the date, nature, and issuer of each such ruling. A seller may also include a summary opinion of counsel as to any pending litigation, but only if counsel's consent to the use of such opinion is included in the disclosure statement. Interim Business Opportunity Rule § 437.1(a)(4)(ii).

[321] Jost, June 09 Tr at 125.

[322] 71 FR at 19069.

[323] Id. at n.165.

[324] Id. at 19068.

[325] See supra Section III.A.1.

[326] E.g., FTC v. Nat'l Vending Consultants, Inc., No. CV-S-05-0160-RCJ-PAL (D. Nev. 2005) (failure to disclose guilty plea for mail fraud of de facto corporate officer); FTC v. Netfran Dev. Corp., No. 1:05–cv–22223–UU (S.D. Fla. 2005) (failure to disclose FTC injunction against principal); FTC v. Am. Entm't Distribs., Inc., No. 04–22431–Civ–Martinez (S.D. Fla. 2004) (failure to disclose prior FTC injunction); United States v. We The People Forms and Serv. Ctrs. USA, Inc., No. CV 04 10075 GHK FMOx (C.D. Cal. 2004) (failure to disclose prior lawsuits); FTC v. Hayes, No. Civ. 4:96CV02162SNL (E.D. Mo 1996) (failure to disclose prior state fines and injunctive actions); FTC v. WhiteHead, Ltd. Bus. Franchise Guide (CCH) ¶ 10062 (D. Conn. 1992) (failure to disclose fraud action); FTC v. Inv. Dev. Inc., Bus. Franchise Guide (CCH) ¶ 9326 (E.D. La. 1989) (failure to disclose insurance fraud convictions).

[327] Staff Report at 75.

required to disclose.[328] The staff recommended, therefore, that § 437.3(a)(3)(ii) be revised to add the following sentence: "For each action, the seller may also provide a brief accurate statement not to exceed 100 words that describes the action." No comments to the Staff Report addressed this revision.

Upon consideration of the record, the staff's recommendation, and the rationale for that recommendation, the Commission adopts § 437.3(a)(3)(ii) as recommended in the Staff Report. Non-compliance with the restriction of this provision (i.e., statements that exceed the word limitation or that mischaracterize the action or its outcome) is a violation of the Rule.

(2) Amendment to the Disclosure Document

The DOJ panelist advocated for a small amendment to the "Legal Actions" section of the proposed disclosure document published prior to the Workshop. Specifically, the DOJ panelist recommended adding the phrase "including violation of an FTC Rule" after the phrase "or unfair or deceptive act or practice * * *," to make clear to business opportunity sellers that a violation of an FTC Rule is an unfair or deceptive practice.[329]

The Staff Report agreed that this recommended addition to the "Legal Actions" section of the disclosure document would assist enforcement efforts by eliminating any significant question as to whether the defendant had actual or implied knowledge that violation of an FTC rule is an unfair and deceptive practice, and recommended that the disclosure document include this language.[330] No comments to the Staff Report addressed this addition.

Upon consideration of the record and the rationale for the recommendation, the Commission adopts the staff's recommendation. Accordingly, § 437.3(a)(3)(i) of the final Rule requires disclosure of any civil or criminal action for misrepresentation, fraud, securities law violations, or unfair or deceptive practices, "including violations of any FTC Rule." The disclosure documents

provided as Appendix A and Appendix B have also been revised to include this language.

d. Section 437.3(a)(4): Cancellation or Refund Policy

Section 437.3(a)(4) pertains to a common practice among fraudulent business opportunity sellers: offering prospective purchasers an illusory right to cancel or to seek a whole or partial refund.[331] The Rule does not require any seller to offer cancellation or a refund; however, if the seller does offer a refund or the right to cancel the purchase, it must "state the material terms of the refund or cancellation policy in an attachment to the disclosure document." [332] The disclosure requirement is complemented by a prohibition, at § 437.6(l), against failing "to provide a refund or cancellation when the purchaser has satisfied the terms and conditions pursuant to § 437.3(a)(4)." The disclosure requirement is also complemented by prohibitions on other misrepresentations.[333]

As discussed below, the Commission adopts the staff's recommendation that sellers be required to state the "material" terms of the refund or cancellation policy, and the term "material" is now included in the final Rule provision. Under the final Rule, a seller that offers a cancellation or refund policy must check the "yes" box on the disclosure document and also must attach to the disclosure document a written description of its policy. To minimize compliance costs, the seller may comply with this requirement by attaching to the disclosure document a copy of a pre-existing document that details the seller's cancellation or refund policy. For example, a seller may detail its refund policy in a company brochure. If it does, the seller need only attach to the disclosure document the particular page setting forth the refund policy. As in the other examples, if no cancellation or refund is offered, then the seller need only check the "no" box.

Workshop panelists raised two issues related to the disclosure of refund and cancellation policies. First, panelists questioned whether information about the percentage of purchasers requesting and obtaining refunds should be part of the disclosure, and second, whether § 437.3(a)(4) should specify particular terms of a refund policy that must be disclosed to potential purchasers. The sections that follow address each of these concerns.

(1) Percentage of Purchasers Requesting and Obtaining Refunds

One panelist stated that information concerning the percentage of purchasers requesting and obtaining refunds would be relevant information to potential purchasers.[334] Another panelist disagreed, arguing that requiring disclosure of this information might have the unintended consequence of harming purchasers by discouraging sellers from offering refunds.[335] The Commission previously considered this issue. The IPBOR would have required a seller that had a cancellation or refund policy to disclose the number of purchasers who had asked to cancel or who had sought a refund in the two previous years.[336] In the INPR, the Commission specifically sought comment on the proposed disclosure of the seller's refund history, particularly on the likely effect this disclosure might have on the willingness of sellers to offer refunds.[337] Based upon arguments articulated in the comments to the INPR, the Commission concluded that this disclosure would not be useful to consumers, and that disclosure of refund history could be unduly prejudicial to business opportunities that offer and liberally provide refunds to prior purchasers.[338] Indeed, a prospective purchaser might compare the refund requests of a fraudulent seller with no refund policy against a legitimate seller with a liberal refund policy and inaccurately conclude that the legitimate seller offers a riskier business venture. The requirement, therefore, could create a perverse incentive to discontinue refund policies.[339] The Commission concluded that disclosure of refund history would not reliably remedy deception on this issue, and it was eliminated in the RPBOR.[340]

---

[328] As the Commission previously noted in the RNPR, however, nothing in the Rule would prevent the seller from speaking with the consumer to explain the nature or outcome of any legal action disclosed on the form. 73 FR at 16125.

[329] Jost, June 09 Tr at 36.

[330] The DOJ, upon request of the FTC, has the authority to seek civil penalties for violations of trade regulation rules issued pursuant to the FTC Act, but to obtain such penalties, the government must prove "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." See 15 U.S.C. 56(a)(1); 45(m)(1)(A).

[331] See, e.g., FTC v. AMP Publ'n., Inc., No. SACV–00–112–AHS–ANx (C.D. Cal. 2001); FTC v. Home Professions, Inc., No. SACV 00–111 AHS (Eex) (C.D. Cal. 2001); FTC v. Innovative Prods., No. 3:00–CV–0312–D (N.D. Tex. 2000); FTC v. Encore Networking Servs., No. 00–1083 WIR (AlJx) (C.D. Cal. 2000); FTC v. Mediworks, Inc., No. 00–01079 (C.D. Cal. 2000). Indeed, allegations that business opportunity sellers misrepresented their refund policies rank among the top 10 complaint allegations in Commission business opportunity cases brought under Section 5. See 71 FR 19069.

[332] The Commission adopted a similar approach in the TSR. 16 CFR 310.3(a)(1)(ii) (if a seller makes a representation about a refund policy, it must disclose "a statement of all material terms and conditions of such policy").

[333] See § 437.6.

[334] Taylor, June 09 Tr at 48. One commenter agreed. Brooks-Workshop comment.

[335] MacLeod, June 09 Tr at 50.

[336] 71 FR at 19088 (IPBOR § 437.3(a)(5)).

[337] Id. at 19070.

[338] 73 FR at 16126.

[339] Id. at 16115.

[340] Id. at 16126.

Panelists in favor of requiring the disclosure of seller's refund histories presented no arguments other than those previously considered by the Commission. Accordingly, the final Rule does not require this disclosure.

### (2) Information To Be Disclosed About Refund and Cancellation Policies

Although workshop participants agreed that information about a seller's cancellation and refund policies is an important component of a potential purchaser's evaluation of a business opportunity, they were universally concerned that § 437.3(a)(4) did not contain enough specificity about what information must be disclosed to potential purchasers and suggested that additional guidance from the Commission was necessary.[341] The panelist from the Maryland Attorney General's Office thought the Rule should specify that all material terms of a refund policy must be disclosed, because in the context of business opportunity sales, it has been his experience that the requirements to obtain a refund are often so onerous that as a practical matter, no one is ever eligible.[342] Some panelists felt the Rule should identify specific information to be disclosed. For example, one commenter noted that the period of time a seller has to exercise a right to cancellation or refund, or any conditions on return of unsold goods are material and should be required to be disclosed to potential purchasers.[343] One panelist suggested that the DSA Code of Ethics' refund requirements might serve as a model to identify types of information that should be disclosed to potential purchasers.[344]

After considering these comments, the Staff Report recommended modifying § 437.3(a)(4) to track closely a similar disclosure requirement in the TSR.[345]

The TSR requires that if the seller or telemarketer makes a representation about a refund, cancellation, exchange, or repurchase policy, it must provide the purchaser with a statement of all material terms and conditions of its policy.[346] Requiring the disclosure of all material terms of a refund or cancellation policy most effectively accomplishes the Commission's stated purpose of ensuring that potential purchasers are provided with information that would assist them in assessing the financial risk associated with the offer. Indeed, the commentary to the IPBOR indicates that the Commission, in fact, intended to require sellers to disclose all material terms of refund and repayment policies to prospective purchasers.[347]

Therefore, upon consideration of the record, the Commission adopts the staff's recommendation. Accordingly, the penultimate sentence of § 437.3(a)(4) of the final Rule has been clarified to read: "If so, state all material terms and conditions of the refund or cancellation policy in an attachment to the disclosure document." As discussed in Section III.A.9., the final Rule includes a definition of "material" similar to the definition used in the TSR. Specifically, § 437.1(i) defines, in relevant part, "material" to mean "likely to affect a person's choice of, or conduct regarding, goods or services." Examples of material terms and conditions may include, for example, the period of time the purchaser has to cancel a purchase or request a refund; the specific steps necessary to cancel a purchase or request a refund; any fees or penalties incurred for cancellation; and where unused inventory must be returned to and by what method. The Commission declines to enumerate in the final Rule what terms are material, as materiality may vary depending on the circumstances of the opportunity and the refund or cancellation policy.

### e. Section 437.3(a)(5): References

#### (1) Background

The interim Business Opportunity Rule required the disclosure of prior purchasers' name, street address, city, state, and telephone number.[348] In the INPR, the Commission concluded that prospects could readily contact a prior purchaser if provided with the prior purchaser's name, city, state, and

telephone number, and that this approach enables prospects to contact references while minimizing the intrusion into prior purchasers' privacy.[349] Accordingly, neither the IPBOR, nor the RPBOR would have required sellers of business opportunities to disclose prior purchasers' street address to potential purchasers.[350] As discussed below, the final Rule requires that sellers disclose only prior purchasers' name, state, and telephone number. Like the IPBOR and the RPBOR, the final Rule limits the disclosure of references to those who purchased the business opportunity within the three years prior to the date of the disclosure document. Moreover, the final Rule requires the seller to disclose this information by listing each prior purchaser (if fewer than 10), or listing at least the 10 prior purchasers nearest to the prospective purchaser's location. In order to minimize compliance costs, the final Rule also provides sellers with an alternative disclosure option—in lieu of a list of the 10 prior purchasers nearest the prospect, a seller may furnish a prospect with a national list of all purchasers.[351] In the INPR, the Commission noted that this option would allow the seller to maintain a master list of purchasers that could be updated periodically, which would allow the seller to avoid having to tailor the disclosure to each prospective purchaser.[352] A seller that chooses this option must insert into the reference section of the disclosure document the words "See Attached List," and attach a list of the references to the disclosure document.[353]

Notwithstanding the fact that most of the information required by the reference disclosure is often available in the public domain, in crafting this section of the Rule, as discussed infra, the Commission considered potential privacy concerns raised by the use of prior purchaser information.[354] To address these concerns, § 437.3(a)(5)(ii) requires that the disclosure document state the following language clearly and in immediate conjunction with the list of references: "If you buy a business opportunity from the seller, your

---

[341] *See* June 09 Tr at 39–53.

[342] Cantone, June 09 Tr at 47 (providing as an example a company offering a 100% buy-back for vending machines and noting the company's failure to disclose that the cost of sending back the vending machine would be borne by the purchaser, and would often exceed any refund due, thereby rendering any potential refund worthless).

[343] Taylor, June 09 Tr at 43.

[344] Morrissey, June 09 Tr at 45. The Commission has reviewed applicable provisions of the DSA Code of Ethics, but does not find them applicable. DSA dictates the specific terms of its members' refund policies. The RPBOR, by contrast, did not specify the requirements of a seller's refund or cancellation policy, or even whether the seller must have such policies. Instead, it attempted to ensure that if such policies existed, potential purchasers were aware of how they can exercise their rights under those policies.

[345] Specifically, in describing its approach regarding refund and cancellation policy disclosures, the Commission noted that it "adopted the same approach in the TSR." 71 FR at 19069

n.166 (citing 16 CFR 310.3(a)(1)(iii) (if a seller makes a representation about a refund policy, it must disclose "a statement of all material terms and conditions of such policy")).

[346] 16 CFR 310.3(a)(1)(iii).

[347] *See* 71 FR 19069–70.

[348] 72 FR 15565.

---

[349] 71 FR at 19071 n.180.

[350] 71 FR at 19088; 73 FR at 16135.

[351] *See* § 437.3(5)(i).

[352] 71 FR at 19071. In the RNPR, the Commission solicited comment on whether giving sellers the ability to provide prospective purchasers with a national list was a viable option. It received no comments responsive to that request.

[353] Sellers that provide the disclosure document electronically would be permitted to attach the national list of references in electronic form as well.

[354] 71 FR at 19071.

contact information can be disclosed in the future to other buyers."

(2) Privacy Concerns Raised in the Record

In response to the INPR, a number of commenters, primarily from the MLM industry, expressed concern that the reference disclosure requirement raised privacy and security concerns.[355] The Commission, however, was and is not persuaded that privacy concerns outweigh the benefits of this disclosure. The Commission finds that disclosure of prior purchasers is important to prevent fraud because it enables prospects to evaluate the seller's claims based on information from an independent source with relevant experience.[356] Furthermore, the required reference disclosures include no sensitive personal information whatsoever—no social security numbers, birth dates, financial account information, or even street addresses.[357]

Following publication of the RNPR, one commenter continued to argue that the disclosures enumerated in § 437.3(a)(5) would raise privacy and data security concerns.[358] The commenter articulated three main concerns: (1) That requiring the seller to "store purchasers' personal information in a single location or document creates a target ripe for theft and improper disclosure;" (2) that requiring disclosure of information of prior purchasers conflicts with the FTC's Privacy of Consumer Information Rule ("Privacy Rule" or "GLB Privacy Rule"),[359] promulgated under the Gramm-Leach-Bliley Act ("GLB")[360] because it does not allow those prior purchasers of the business opportunity the right to opt out of having their contact information disclosed to potential purchasers;[361] and (3) that the mandatory disclosure of references violates privacy obligations under the California Constitution.[362]

The Commission is not persuaded by any of these contentions.[363]

First, the Commission rejects the argument that the disclosure of references creates an unnecessary risk of theft or improper disclosure. As an initial matter, the Commission notes that a similar reference disclosure has been required for business opportunities and business format franchises covered by the Original Franchise Rule for more than 25 years, and it is required under the interim Business Opportunity Rule as well.[364] Moreover, the information to be collected and stored is not sensitive (e.g., no financial information, social security numbers, dates of birth, or street addresses). The commenter has not explained, nor does the Commission understand, why the information would be particularly attractive to thieves.

Second, the Commission is not persuaded that § 437.3(a)(5) creates potential conflicts with the GLB Privacy Rule, because the protections afforded by the Privacy Rule likely do not extend to the contact information of business opportunity purchasers. Congress enacted GLB to protect personal financial information of individual consumers, but excluded from the ambit of the law the protection of information pertaining to businesses. The Privacy Rule requires that a "financial institution" provide, under specified circumstances, notice to its consumers and customers of its privacy policies and practices,[365] including the consumers' right to opt out of having their personal information shared with third parties.[366] For purposes of the Privacy Rule, a consumer is an individual who obtains financial products or services for personal, family or household purposes.[367] The Commission need not consider the limited circumstances where a business opportunity seller might be considered a financial institution, because the Privacy Rule is aimed at protecting the non-public personal financial information of consumers, not businesses.[368]

The commenter argues that business opportunity operators should be considered consumers for purposes of the Privacy Rule, and thus should have the right to opt out of having their contact information disclosed to potential purchasers.[368] The commenter's interpretation is contrary to both prior Commission policy, and the plain meaning of the language of the Privacy Rule. As the Commission has previously stated, by investing in a business opportunity, purchasers are entering the world of commerce and embarking upon the establishment of a business.[370] Financing a business venture is not "primarily for personal, family, or household purposes." [371] This interpretation is consistent with previous Commission guidance in an analogous situation,[372] and with the Commission's interpretation of "consumer" in the context of other rules it enforces.[373]

Similarly, the reference disclosure is not in conflict with the California Constitution. A cause of action for invasion of privacy under the California Constitution exists only when a person has a reasonable expectation of privacy, which cannot exist if the person has been expressly informed that his or her contact information will be shared with prospective purchasers.[374]

---

[355] See 73 FR at 16126.

[356] See id.

[357] See id.

[358] Planet Antares-RNPR at 18–21.

[359] 16 CFR Part 313.

[360] 15 U.S.C. 6801 et seq.

[361] The Commission received a few comments in response to the INPR in favor of allowing individual business opportunity purchasers to opt out of having their contact information disclosed. The comment submitted by the DOJ however, urged the Commission to reject any opt-out believing it would be an easy matter for sellers to talk purchasers into opting out, describing to them what a hassle it becomes for those who do not opt out because of all the demand that arises for their time and attention. The Commission agreed with DOJ and after analyzing all of the commentary to § 437.3(a)(5), declined to make any changes to that section. See 73 FR at 16126–27.

[362] Planet Antares-RNPR at 20.

[363] This same commenter argues that the required reference information constitutes trade secrets that should be afforded special protections, but offers no support for this contention. Id. at 14.

[364] 16 CFR 437.1(a)(16)(iii).

[365] 73 FR at 16127.

[366] 16 CFR 313.1(a)(3).

[367] 16 CFR 313.3(e). Similarly, a customer is a consumer with a continuing relationship with the financial institution. See 16 CFR 313.3(h).

[368] See 16 CFR 313.1(b) (expressly stating that the Privacy Rule "does not apply to information about companies or about individuals who obtain financial products or services for business, commercial, or agricultural purposes"). Indeed, federal law often focuses on privacy concerns affecting individuals, not businesses. See, e.g., the

Fair Credit Reporting Act ("FCRA") 15 U.S.C. 1681(a)(4) (requiring various protections for consumer information, including provisions addressing identity theft). There is no comparable statute that protects business information.

[369] The commenter argues that the purchase of a business opportunity might be intended to "provide a revenue stream" to a purchaser and "not necessarily a source of employment." Planet Antares-RNPR at 18–21. The Commission finds this distinction immaterial to the analysis.

[370] 73 FR at 16127 & n.210.

[371] The Commission has not issued guidance about the meaning of "personal, family, or household purposes" because the plain meaning of the language seems abundantly clear. Courts' interpretations of this phrase when used in other consumer protection laws are instructive. See, e.g., In re Runski, 102 F.3d 744, 747 (4th Cir. 1996) (noting in the bankruptcy context that courts have uniformly concluded that debt incurred for a business venture or with a profit motive does not fall into the category of debt incurred for "personal, family, or household purposes").

[372] See "Frequently Asked Questions for the Privacy Regulation," Question B–2 (Dec. 2001), http://www.ftc.gov/privacy/glbact/glb-faq.htm (Privacy Rule does not apply when a financial institution makes a business loan to a sole proprietor; although an individual, a sole proprietor is not a "consumer" for purposes of the Privacy Rule where the financing is not for personal, family, or household purposes).

[373] See, e.g., Preservation of Consumer's Claims and Defenses, 16 CFR 433.1(b); Credit Practices, 16 CFR 444.1(d).

[374] When personal information has been released without consent, a cause of action for invasion of privacy exists under the California Constitution only if: (1) the individual had a reasonable

Continued

Privacy concerns relating to the reference disclosure were also articulated at the June 1, 2009 workshop. A panelist representing a large MLM company stated that at least some of its representatives expressed concern that under the proposed Rule, their addresses and home telephone numbers could be provided to persons they did not know. The panelist noted that representatives often use their home telephone number as their business number, and that the same telephone number is also used by other family members, including children. The panelist wondered if additional safeguards to protect purchasers' privacy could be taken and suggested requiring potential purchasers to contact a seller's references through a centralized telephone number to be administered by the seller.[375] The DOJ panelist opposed this suggestion, arguing that communications with prior purchasers could be subject to manipulation by the seller.[376]

The Commission does not believe that requiring sellers to provide and administer a centralized phone number to screen references is necessary or advisable. The Commission agrees with DOJ's comment that such a system may invite manipulation. It would also create an unjustified financial and administrative burden for sellers. As noted above, the Commission does not view the disclosure of a purchaser's name, state, and telephone number as creating privacy or security concerns, as this information is often available in the public domain. The required disclosure does not include street address information, and therefore, does not provide a "road map" to a purchaser's residence, as the commenter suggests. Moreover, potential purchasers are notified in writing, prior to the time of purchase that their reference information will be available to

subsequent purchasers. Purchasers who have privacy concerns, therefore, can take steps to minimize personal exposure, such as, for example, designating a separate phone number for business purposes.

Nonetheless, the Staff Report noted that the disclosure of information some may consider private must be weighed against the benefits of providing that information to potential purchasers. After considering the purpose of providing reference information, the Staff Report concluded that the disclosure of the city where the reference is located is not necessary. The staff recommended, therefore, that the city where previous purchasers reside be eliminated from § 437.3(a)(5)(i), and correspondingly, from the "References" section of the disclosure document.

No comments in response to the Staff Report addressed this recommended modification. The Commission agrees with the staff's recommendation. Accordingly, both § 437.3(a)(5)(i) of the final Rule and the related section of the disclosure document have been revised to eliminate references to the city where prior purchasers reside. The Commission reiterates, however, that this amendment is intended to alleviate privacy concerns, and it does not relieve a seller of its obligation to provide a list of the ten purchasers within the past three years that are nearest to the potential purchaser as an alternative to providing the full list of all prior purchasers.

### f. Section 437.3(a)(6): Receipt

Section 437.3(a)(6) sets forth a receipt requirement for the disclosure document. This requirement is designed to document proper disclosure by the seller. Specifically, the seller must attach a duplicate copy of the disclosure document, which is to be signed and dated by the purchaser. A designation for the signature and date is included at the bottom of the disclosure document.[377] The Commission believes that the receipt requirement is especially important to prove proper disclosure with respect to electronic

documents. A seller furnishing disclosures online, either through email or access to a Web site, has the burden of establishing that the prospect was actually able to access the electronic document.[378] Completion and submission of the receipt serves that purpose. The final Rule does not impose any particular method of transmitting the receipt. In order to minimize compliance costs, sellers should have flexibility to determine the best method to comply with this provision of the Rule.[379] Accordingly, § 437.3(a)(6) would permit the seller to inform the prospective purchaser how to return the signed receipts, for example, by sending the receipt to a street address, to an email address, or by facsimile.

As noted above, the Staff Report recommended adding a new definition of "signature" or "signed" to make clear that the term "signature" or "signed" includes not only a person's handwritten signature, but also an electronic or digital form of signature to the extent that such signature is recognized as a valid signature under applicable federal law or state contract law.[380] The receipt requirement received one comment. The commenter noted that the requirement that a purchaser be provided with a second copy of the disclosure document appears inconsistent with the Rule's recognition that the disclosure document can be provided to potential purchasers through electronic media.[381] The Commission disagrees with the commenter. Some sellers may post their disclosure document on their Web sites, and update it as needed. The requirement to provide a copy of the electronic disclosure ensures that the prospective purchaser will retain the document in a static format. This can be accomplished as easily through electronic means as it can through paper. In fact, allowing electronic distribution should greatly reduce sellers' compliance costs over the long run, especially costs associated with printing and distributing disclosure documents. Nevertheless, the final Rule enables sellers to determine for themselves whether it is most efficient and cost-effective to provide the disclosure document to prospective purchasers electronically or in printed form. Accordingly, the Commission adopts the receipt provision as recommended in the Staff Report, with one non-substantive modification: the reference to a "disclosure page" has

---

expectation that the information would be kept private, and (2) disclosure of the information is serious in nature, scope, and or potential impact to cause an "egregious breach of social norms." *See Pioneer Elecs., Inc. v. Olmstead*, 40 Cal. 4th 360, 370–71 (2007). Even when these criteria are met, the individual's privacy interest must be weighed against legitimate and important competing interests. *Id.* When measured against this standard, disclosure of purchaser information pursuant to proposed § 437.3(a)(5) would not give rise to a privacy action. First, the disclosure document plainly notifies potential purchasers that their reference information will be provided to subsequent purchasers, thus they have no reasonable expectation that their information will be kept private. Second, the reference disclosure includes no sensitive personal information whatsoever, and the value to potential purchasers of information about prior purchasers outweighs any potential detriment to those prior purchasers.

[375] Morrissey, June 09 Tr at 87.
[376] Jost, June 09 Tr at 88.

[377] As noted previously, the Commission engaged a consultant with expertise in document design and comprehension to evaluate the initial proposed disclosure document. One of the changes suggested by the consultant included adding a note below the signature line of the disclosure document stating that the FTC requires that all business opportunity sellers give the prospective purchaser at least seven calendar days before asking him or her to sign a purchase contract. A copy of the revised proposed disclosure document, which incorporated this change, was attached as Appendix A to the **Federal Register** Notice announcing the June 1, 2009 workshop. *See* 74 FR at 18715.

[378] 71 FR at 19072.
[379] *Id.*
[380] *See* § 437.1(r).
[381] Quixtar-INPR at 27.

been changed to "disclosure document" to conform it to the title of § 437.3.

### 3. Section 437.3(b): Updating the Disclosure Document

To ensure that a seller's disclosures are current, § 437.3(b) requires sellers to update their disclosures at least quarterly. Modeled on the Original Franchise Rule and interim Business Opportunity Rule,[382] the provision states that it would be a violation of the Rule and Section 5 of the FTC Act for a seller to fail to update the disclosures to reflect any material changes in the information presented in the basic disclosure document on at least a quarterly basis. The Commission has concluded that quarterly updating strikes the right balance between the need for accurate disclosure and the costs and burdens more frequent updating would entail.[383]

Section 437.3(b) includes a proviso that would require more frequent updating in one respect: the list of references. Specifically, a seller is required to update the list of references monthly until such time that it is able to include the full list of 10 references. This is particularly necessary for start-up opportunities that may have few or no prior references when they commence business opportunity sales. The Commission has concluded that prospective purchasers' ability to contact at least 10 references in their due diligence investigations of business opportunity offers outweighs any costs of more frequent updating until the list of 10 is compiled.[384]

No comments were directed to the requirement of updating the disclosures, and the final Rule contains § 437.3(b) as recommended in the Staff Report.

### D. Section 437.4: Earnings Claims

Section 437.4 of the final Rule addresses earnings claims, and is similar to the parallel sections of the Amended Franchise Rule and the interim Business Opportunity Rule.[385] Like both of those rules, the final Rule requires disclosure of earnings information only if a business opportunity seller chooses to make a claim about potential earnings to prospective purchasers.

Like the analogous provisions of the Amended Franchise Rule and the interim Business Opportunity Rule, § 437.4(a) requires a seller making an earnings claim to: (1) Have a reasonable

basis for the claim at the time the claim is made; (2) have in its possession written materials that substantiate the claim at the time the claim is made; (3) make the written material available to the prospect and the Commission upon request; and (4) furnish the prospect with an earnings claim statement. Section 437.4(b) sets forth disclosure and other requirements for sellers making earnings claims in the general media. In § 437.4(c), the final Rule addresses the use of industry financial statistics or data to suggest or imply a likely level of earnings. Finally, § 437.4(d) requires that sellers notify prospects in writing of any changes in earnings information before the prospect enters into a contract or provides any consideration to the seller, directly or indirectly through a third party.[386] Each of these requirements is discussed in the following sections.

### 1. Section 437.4(a)(1)–(3): Substantiation for Earnings Claims

As noted throughout this proceeding, the making of false or unsubstantiated earnings claims is the most prevalent problem in the offering of business opportunities. To address this problem, § 437.4(a)(1) of the final Rule permits sellers to make an earnings claim provided there is a reasonable basis for the claim at the time the claim is made.[387] Further, § 437.4(a)(2) requires sellers that make earnings claims to have in their possession written substantiation for their earnings claims, and § 437.4(a)(3) requires sellers to make that written substantiation available to the prospective purchaser, or to the Commission, upon request. Requiring that a prospective purchaser can obtain and review, or have his or her own advisor review, substantiation for earnings claims increases the likelihood that sellers will make claims only for which they have a reasonable basis.

### 2. Section 437.4(a)(4): Earnings Claim Statement

Section 437.4(a)(4) prescribes the content of the earnings claim statement, which must be provided to a prospect if a seller elects to make a representation about potential earnings. To ensure ease of review, each earnings claim statement

must be a single written document. The document must be titled "EARNINGS CLAIM STATEMENT REQUIRED BY LAW" in capital, bold type letters. This ensures that the prospective purchaser can readily determine from the face of the document the importance of its text. The title is followed by the name of the person making the claim, and the date of the claim. After the title and identifying information, the Rule requires the seller to state the specific earnings claim or claims. The final Rule does not specify any particular format or formula for an earnings claim. This is intended to allow flexibility in presenting earnings information in the manner that is appropriate for each opportunity, provided that any such claim has a reasonable basis and that there is written substantiation for the claim at the time it is made.[388]

The final Rule also requires a seller making an earnings claim to disclose the beginning and ending dates when the represented earnings were achieved.[389] This information is material because a prospective purchaser cannot begin to evaluate an earnings representation without knowing how recently the supporting data was collected. For example, a seller may have conducted a survey of purchasers of its business opportunity in 2009. The Rule would not necessarily prohibit the use of that survey information in 2010, but the prospect should be made aware of the applicable time period in order to assess the relevance of the claim to current market conditions. Similarly, a prospect may reasonably give greater weight to a survey of purchasers over an extended period of time (for example, over a three-year period), than a more limited survey (for example, over a three-month period).[390]

Further, this section of the Rule requires the disclosure of the number and percentage of all purchasers who purchased the business opportunity prior to the end of the represented time period who have achieved at least the claimed earnings during that period. This information is material because it enables the prospect to determine whether the claimed earnings of prior purchasers are typical.[391] For example, a seller may claim that purchasers have average earnings of $50,000 a year. Even if true, this statement may not reflect the experience of the typical purchaser because a few purchasers with unusually high earnings could skew the average. Thus, the number and

---

[382] 16 CFR 436.7(b) and interim Business Opportunity Rule § 437.1(a)(22).

[383] 71 FR at 19072.

[384] *Id.*

[385] *See* 16 CFR 436.9 and interim Business Opportunity Rule §§ 437.1(b), (c) and (e).

[386] The Amended Franchise Rule contains similar requirements. *See* 16 CFR 436.1(d)(2) and 436.1(e)(6) (each prospective franchisee to whom the representation is made shall be notified of any material change in the information contained in the earnings claims document).

[387] As discussed in the INPR, the Commission did not propose a "geographic relevance" requirement because that prerequisite is subsumed in the "reasonable basis" requirement. *See* 71 FR at 19072 n.185.

[388] 71 FR at 19072.

[389] Section 437.4(a)(4)(iv).

[390] 71 FR at 19072.

[391] *Id.*

percentage of purchasers earning $50,000 a year might actually be very low.[392]

In addition, this section of the final Rule requires a seller making an earnings claim to disclose any characteristics that distinguish purchasers who achieved at least the represented level of earnings from those characteristics of the prospective purchasers.[393] For example, a survey of ice cream vending route purchasers operating in the South may not be readily applicable to other regions, such as the North. Similarly, a survey limited to large urban areas may not be applicable to smaller, rural areas. Distinguishing characteristics of purchasers who achieved a represented level of earnings is material information because it enables a prospect to assess the relevance of an earnings claim to his or her particular market.[394]

Finally, the Rule requires a seller making an earnings claim to disclose to the prospective purchaser that written substantiation for the claim will be made available upon request.[395] As noted above, requiring that a prospective purchaser can obtain and review, or have his or her own advisor review, substantiation for earnings claims increases the likelihood that sellers will make claims only for which they have a reasonable basis.[396] This requirement balances the prospective purchaser's need for material information with the necessity of minimizing the seller's compliance costs. Thus, a seller need only provide such substantiation upon request.

In the RNPR, the Commission solicited comment on various aspects of the earnings claim statement including: (1) Whether the requirement that sellers disclose the number and percentage of prior purchasers that achieved at least the stated level of earnings would create difficulties for sellers, or whether there were alternative approaches that could limit any such difficulties; and (2) whether the requirement that sellers disclose any materially different characteristics of prior purchasers that attained at least the stated level of earnings adequately covered the relevant earnings information that should be disclosed.[397]

No comments were received in response to the Commission's specific questions, nor were any comments directed to this provision. The Staff

Report recommended that § 437.4(a) be adopted in the form proposed in the RPBOR, but sought additional comment on §§ 437.4(a)(4)(iv) and (v), which require any business opportunity seller that makes an earnings claim to identify the beginning and ending dates of the time period when those earnings were achieved (§ 437.4(a)(4)(iv)) and the number and percentage of all purchasers who purchased the opportunity before the ending date and who achieved those earnings in that time period (§ 437.4(a)(4)(v)).[398] Section 437.4(a)(4)(v) specifies that in calculating the number and percentage of purchasers who attained at least the represented level of earnings, the business opportunity seller must include all purchasers who purchased the opportunity prior to the ending date of the time period on which the representation is based. The Staff Report solicited comment on whether the results of such a calculation, which would include the experience of those who purchased the business opportunity toward the end of the stated time period, present consumers with a realistic picture of their likely earnings with the business opportunity. In addition, the Staff Report sought comment on whether this calculation would present prospective purchasers with information that would be useful in making an informed purchasing decision, and questioned whether there were alternative approaches that might be more useful.

Only one comment received in response to the Staff Report addressed these provisions. Specifically, DOJ agreed that any substantiation for earnings must be calculated using the number of all purchasers of the opportunity prior to the ending date of the time period for which the earnings representation is based, noting that:

In reality, many business opportunities begin and end in a short period of time, constantly reinventing themselves to avoid association with previous failures. Requiring inclusion of all purchasers who purchased before the ending date in any statistics in an earning claims document is necessary to force the seller to have the document be at all representative of the business as a whole. Any wiggle room in this regard will be exploited to create a document based on non-representative sellers.[399]

The Commission agrees and the final Rule includes § 437.4(a)(4) as recommended in the Staff Report.

### 3. Section 437.4(b): Earnings Claims in the General Media

Section 437.4(b) addresses the making of earnings claims in the general media, such as on television, radio, the Internet, in newspapers, *etc.* Specifically, a seller can make an earnings claim in the general media provided the seller: (1) Has a reasonable basis for the claim at the time the claim is made; (2) has written material that substantiates the claim at the time the claim is made; and (3) states in immediate conjunction with the claim the beginning and ending date when the represented earnings were achieved and the number and percentage of those who have achieved the represented earnings in the given time period. These requirements are necessary to prevent deceptive and misleading earnings representations in advertisements, as well as to enable a prospect to assess the typicality of any advertised earnings claim.[400]

The Commission received no comments about this provision. Based on the record as a whole and its enforcement experience, the Commission concludes that the requirements of § 437.4(b) are necessary to prevent misleading earnings representations, and the final Rule includes this provision as recommended in the Staff Report.

### 4. Section 437.4(c): Dissemination of Industry, Financial, Earnings, or Performance Information

Section 437.4(c) is intended to address a prevalent practice among business opportunity sellers—the use of real or purported industry statistics in the marketing of business opportunity ventures. The Commission's law enforcement experience reveals that it is common for vending machine business opportunity promoters, for example, to tout what are purported to be industry-wide vending sales statistics. A matrix of potential earnings based upon an industry-average sliding scale of "vends per day" is typical.[401] The use of such industry statistics in the promotion of a business opportunity creates the impression that the level of sales or earnings is typical in the industry, and

---

[392] *Id.*

[393] Section 437.4(a)(4)(vi).

[394] 71 FR at 17073.

[395] Section 437.4(a)(4)(vii).

[396] *See, e.g.,* 16 CFR 436.1(b)(2); 436.1(c)(2).

[397] 73 FR at 16133.

[398] Section 437.4(b)(3) requires similar disclosures, calculated in the same way, in conjunction with any earnings claim made in the general media.

[399] DOJ–Staff Report at 2.

[400] *E.g.,* FTC v. *Inspired Ventures, Inc.,* No. 02–21760–CIV–Jordan (S.D. Fla. 2002); FTC v. *MegaKing, Inc.,* No. 00–00513–CIV–Lenard (S.D. Fla. 2000).

[401] *E.g.,* FTC v. *Tashman,* 318 F.3d 1275 (11th Cir. 2003); FTC v. *Nat'l Vending Consultants, Inc.,* No. CV–S–05–0160–RCJ–PAL (D. Nev. 2005); FTC v. *Inspired Ventures, Inc.,* No. 02–21760–CIV–Jordan (S.D. Fla. 2002); FTC v. *Inv. Dev. Inc.,* No. 89–0642 (E.D. La. 1989).

implies that the prospective purchaser will achieve similar results.[402]

To prevent deceptive use of such earnings claims, § 437.4(c), as proposed in the RNPR, prohibited the use of industry financial, earnings, or performance information "unless the seller has written substantiation demonstrating that the information reflects the typical or ordinary financial, earnings, or performance experience of purchasers of the business opportunity being offered for sale."[403]

In response to the RNPR, one commenter noted that this provision would prohibit sellers from using industry statistics in ways that could assist potential purchasers in making informed decisions.[404] For example, hypothetically, the performance experience of prior purchasers of a business opportunity might contrast favorably against the industry average and, if so, that information might help a prospective purchaser assess the value of the investment against other proposed businesses.

The Staff Report noted that there may be a limited number of situations in which providing industry statistics may be beneficial to potential purchasers, but expressed concern that industry statistics can be, and have been, used to imply to potential purchasers that their likely earnings with the promoted business opportunity will match the industry averages.[405]

The Staff Report recommended a small change to Section 437.4(c) to state that it is an unfair or deceptive practice to "disseminate industry financial, earnings, or performance information unless the seller has written substantiation demonstrating that such information reflects, *or does not exceed,* the typical or ordinary financial, earnings, or performance experience of purchasers of the business opportunity being offered for sale." The Commission received no comments on this provision.

The Commission concludes that the recommended change is warranted. Section 437.4(c) of the final Rule thus includes the staff's recommended language. Accordingly, under the final Rule, a seller can use industry information only if it is able to measure the performance of existing purchasers of that seller's offered business opportunity and document that those existing purchasers' typical performance equals or exceeds the average performance of purchasers of other

business opportunities available in the industry. A start-up business opportunity with no or very limited prior sales, therefore, probably would not be able to use industry statistics because it would lack a sufficient basis to demonstrate that the industry statistics reflect the typical or ordinary experience of the start-up's prior purchasers.

**5. Section 437.4(d): Material Changes in Earnings Claim Statement**

Section 437.4(d) addresses post-disclosure changes in earnings information. It prohibits any seller making an earnings claim from failing to notify the prospective purchaser, before the prospect enters into a contract or pays any consideration, of any material change that has occurred and that calls into question the relevance or reliability of the information contained in its earnings claim statement. For example, "[s]uch material changes include the issuance of a new survey or other facts that would lead the seller to conclude that a prior survey is no longer valid."[406] In crafting § 437.4(d), the Commission was cognizant of the high degree of materiality of earnings information for prospective purchasers, but attempted to minimize compliance costs during the time before the prospective purchaser enters into a contract or pays any consideration.[407] In the RNPR, the Commission explained that "[t]he proposal would not require a seller, for example, to prepare a revised earnings claim statement immediately, but would simply require written notification of the change."[408] No comments in response to the RNPR or the Staff Report were directed at this provision. The Commission finds that § 437.4(d) strikes the right balance between accurate disclosure to prevent deception and the compliance costs that would result from a more frequent than quarterly updating requirement of the full earnings claim document. The final Rule includes this provision as recommended in the Staff Report.

**E. Section 437.5: Sales Conducted in Spanish or Other Languages Besides English**

On its own initiative, the staff recommended in the Staff Report adding a provision that would require sellers to provide the disclosure document and the disclosures required by the Rule to potential purchasers in the same language that the seller uses to market the business opportunity. This

recommendation was based, in part, on a long-standing Commission enforcement policy, which advises that where a Commission order, rule, or guide requires the clear and conspicuous disclosure of certain information in an advertisement or sales material appearing in a non-English language publication, the disclosures should be made in the predominant language of the publication in which the advertisement or sales material appears.[409] This policy is the result of the Commission's recognition that "with increasing intensity, advertisers are making special efforts to reach foreign language-speaking consumers."[410] Under the policy, failure to provide the required disclosures either in the predominant language of the publication or of the target audience could result in a civil penalty or other law enforcement proceeding for violating the terms of any applicable Commission order or rule.[411]

The staff's recommendation to address foreign-language sales also is based on its belief that when a business opportunity seller purposefully reaches out to a particular population by marketing in the foreign language spoken by members of that community, all of the disclosures required by the Rule should be accessible and comprehensible to each of those potential purchasers.[412] Accordingly, the Staff Report recommended that business opportunity sellers be required to provide the disclosure document to potential purchasers in the language the seller uses to conduct the offer for sale, sale, or promotion of the business opportunity.

The Staff Report sought public comment about whether this requirement adequately promotes the Commission's goal of ensuring that potential purchasers are provided with information necessary to make an informed purchasing decision. It also solicited comment on what alternatives, if any, the Commission should consider, and the costs and benefits of each alternative.

In response to the Staff Report, the Commission received one comment addressing the disclosure requirements for foreign-language sales. Specifically, DOJ agreed with the staff's

---

[402] 71 FR at 19073.
[403] 73 FR at 16135.
[404] Planet Antares-RNPR at 25.
[405] Staff Report at 99.

[406] *Id.* at 100.
[407] *Id.*
[408] 71 FR at 19073.

[409] FTC Enforcement Policy Statement Concerning Clear and Conspicuous Disclosures in Foreign Language Advertising and Sales Materials, 16 CFR 14.9(a). In the case of any other advertisement or sales material, the Commission policy states that the disclosures should appear in the language of the target audience.
[410] *Id.*
[411] *Id.*
[412] Staff Report at 101.

recommendation that the required disclosures should be made in the same language as the sale, noting that the disclosures should be "as comprehensible to would-be buyers as is the [seller's] sales pitch."[413]

After consideration of the record, the Commission's long-standing policy, and the rationale behind the staff's recommendation, the Commission agrees that an English disclosure document for business opportunities marketed in Spanish and other foreign languages may have little utility for the targeted prospects. Accordingly, the final Rule contains disclosure requirements for sales conducted in Spanish or other languages besides English.

Because the Commission's law enforcement history demonstrates that fraudulent business opportunities have specifically targeted Spanish-speaking communities,[414] the Staff Report recommended that the Rule contain a Spanish translation of the basic disclosure document as Appendix B. In the Staff Report, the staff solicited comment on whether the Spanish translation of the disclosure document was adequate to convey to Spanish-speaking potential purchasers the meaning of the required disclosures, or whether different word choices would make the disclosures more meaningful. No comments addressed these issues. Based on its law enforcement experience with business opportunity sellers specifically targeting Spanish-speaking consumers, the Commission agrees that a Spanish translation of the disclosure document is appropriate. Accordingly, a Spanish version of the disclosure document is included as Appendix B to the final Rule.

Although business opportunities may be marketed in dozens of languages besides English and Spanish, the Commission's law enforcement experience does not suggest that there are other particular languages in which business opportunity sales are conducted. Moreover, the record is silent as to whether translations into other languages are necessary. Therefore, the Commission has determined not to provide translations of the disclosure document into other languages. Under § 437.5(b), should a business opportunity seller use a language other than English or Spanish, the seller would be responsible for obtaining an accurate translation of the disclosure document.

The Commission adopts the language proposed in the Staff Report, with one slight modification. Namely, § 437.5 of the final Rule makes clear that all earnings disclosures required by § 437.4—rather than those identified only in § 437.4(a)—must be made in the language in which the business opportunity sales are conducted. Section 437.5 of the final Rule, entitled "Sales conducted in Spanish and other languages besides English" requires:

(a) If the seller conducts the offer for sale, sale, or promotion of a business opportunity in Spanish, the seller must provide the disclosure document required by § 437.3(a) in the form and language set forth in Appendix B to this part, and the disclosures required by §§ 437.3(a) and 437.4 must be made in Spanish; and

(b) If the seller conducts the offer for sale, sale, or promotion of a business opportunity in a language other than English or Spanish, the seller must provide the disclosure document required by § 437.3(a) using the form and an accurate translation of the language set forth in Appendix A to this part, and the disclosures required by §§ 437.3(a) and 437.4 must be made in that language.

Section 437.3(a) has been revised to conform with this requirement.[415]

*F. Section 437.6: Other Prohibited Practices*

Section 437.6 of the final Rule prohibits sellers from engaging in a number of deceptive practices, whether directly or through a third party, that are common in the sale of fraudulent business opportunity ventures. Violation of any provision of this section would be a violation of the Rule and an unfair or deceptive act or practice in violation of Section 5 of the FTC Act. Each of these prohibitions is discussed below.

1. Section 437.6(a): Disclaiming Any Required Disclosure

Section 437.6(a) prohibits a business opportunity seller from disclaiming, or requiring "a prospective purchaser to waive reliance on, any statement made in any document or attachment that is required or permitted to be disclosed under this Rule."[416] The purpose of this provision is to preserve the reliability and integrity of pre-sale disclosures. Otherwise, the Rule's very purpose would be undermined by signaling to prospects that they cannot trust or rely on the Rule's mandated disclosures.[417]

No comments received in response to the RNPR or the Staff Report were directed to this provision, and the final Rule includes § 437.6(a) as recommended in the Staff Report.

2. Section 437.6(b): Making Inconsistent or Contradictory Claims

Section 437.6(b) prohibits sellers from making any representation, whether orally, visually, or in writing, that is inconsistent with or that contradicts any statement made in the basic disclosure document or in any earnings claim disclosures required by the Rule.[418] Without this prohibition, a seller, for example, would be free to show a prospect a graph with earnings information, even though the seller's disclosure document states that it does not make an earnings claim.[419] The Commission's law enforcement experience shows that this is a prevalent problem.[420] This provision, like the anti-disclaimer provision, is necessary to preserve the reliability and integrity of the required disclosures.

No comments received in response to the RNPR or the Staff Report were directed to this provision, and the final Rule includes § 437.6(b) as recommended in the Staff Report.

3. Section 437.6(c): Including Extraneous Materials in Disclosure Document

Section 437.6(c) prohibits the inclusion of any additional information in the disclosure document that is not explicitly required or permitted by the Rule. This prohibition is intended to preserve the clarity, coherence, readability, and utility of the disclosures by ensuring that the seller does not

---

[413] DOJ-Staff Report at 2.

[414] See supra note 99 and accompanying text. DOJ also commented that in its experience, business opportunities have been pitched to the Spanish community. See DOJ-Staff Report at 2.

[415] Section 437.3 of the final Rule makes it an unfair or deceptive act or practice for any seller to fail to disclose to a prospective purchaser material information required by §§ 437.3 and 437.4 in a single written document in the form and using the language set forth in Appendix A to the Rule; or if the offer for sale, sale, or promotion of a business opportunity is conducted in Spanish, in the form and using the language set forth in Appendix B to the Rule; or if the offer for sale, sale, or promotion of a business opportunity is conducted in a language other than English or Spanish, using the form and an accurate translation of the language set forth in Appendix A to the Rule.

[416] This provision is parallel to the anti-disclaimer prohibition in the Amended Franchise Rule. See 16 CFR 436.9(h).

[417] 71 FR at 19073.

[418] This provision is similar to the Amended Franchise Rule's prohibition against making statements that contradict any required disclosure. See 16 CFR 436.9(a).

[419] 71 FR at 19074.

[420] E.g., FTC v. Am. Entm't Distribs., Inc., No. 04–22431–CIV–Martinez (S.D. Fla. 2004); FTC v. Inspired Ventures, Inc., No. 02–21760–CIV–Jordan (S.D. Fla. 2002); FTC v. Mortgage Serv. Assocs., Inc., No. 395–CV–1362 (AVC) (D. Conn. 1995); FTC v. Tower Cleaning Sys., Inc., No. 965844 (E.D. Pa. 1996).

clutter the disclosure document with extraneous materials that may overwhelm purchasers, distracting them from the required disclosures.[421] To facilitate a prospective purchaser's ability to maneuver through an electronic version of the disclosure document, this provision expressly permits the use of common navigational tools, such as scroll bars and internal links that facilitate review of an electronic document. The provision prohibits, however, other electronic features—such as audio, video, animation, or pop-up screens—that may distract attention from the core disclosures.[422]

The prohibition on including extraneous materials extends to information required or permitted by state law. One important goal of revising and tailoring the disclosure requirements for business opportunity sellers is to simplify and streamline the disclosures into a single-page document. Accordingly, the Commission has concluded that allowing business opportunity sellers to mix federal and state disclosures into one document would be an invitation to sellers to present lengthy and confusing information to prospective purchasers.[423] Such a result would be contrary to the Commission's goal of providing a simple, clear, and concise disclosure document. State laws offering equal or greater protections are not preempted by the final Rule. The final Rule only prohibits any sellers from providing any disclosures required under state law together with the disclosures required under the final Rule. No comments received in response to the RNPR or the Staff Report were directed to this provision, and the final Rule includes § 437.6(c) as recommended in the Staff Report.

4. Section 437.6(d): Making False Earnings Claims

As previously noted, the making of deceptive earnings claims is the most prevalent problem in the offer and sale of business opportunities. Accordingly, § 437.6(d) prohibits sellers from misrepresenting the amount of sales, or gross or net income or profits a prospective purchaser may earn or that

prior purchasers have earned. This prohibition complements the final Rule's earnings substantiation requirements in § 437.4. Thus, both unsubstantiated and false earnings claims are prohibited by the Rule.

No comments received in response to the RNPR or the Staff Report addressed this provision, and the final Rule includes § 437.6(d) as recommended in the Staff Report.

5. Section 437.6(e): Misrepresentations Regarding the Law as to Earnings Claims and the Identity of Other Business Opportunity Purchasers

Section 437.6(e) prohibits sellers from stating that any law or regulation prohibits seller from furnishing earnings information. This provision is intended to address a recurring problem identified in the rulemaking record— that sellers often misrepresent that federal law or the FTC prohibits the making of earnings claims.[424] In effect, prohibiting these types of misrepresentations ensures that prospective purchasers are not misled into believing that earnings information is unavailable to them as a matter of law.[425] In addition, the RPBOR added a second proposed prohibition to § 437.6(e) that would prevent sellers from misrepresenting that any law or regulation prohibits a seller from disclosing to prospective purchasers the identity of other purchasers of the business opportunity. The Commission proposed this change in response to a request from DOJ, which noted that in its experience, fraudulent business opportunity sellers frequently deflect potential purchasers' requests for the contact information of current distributors by falsely claiming that the law forbids disclosing those identities.[426] The Commission is convinced that the prohibition is appropriate because it will help

consumers understand that if the seller supplies no references, it is because none exist, or because the seller chooses not to make such information available in contravention of the Rule.[427]

No comments received in response to the RNPR or the Staff Report addressed this provision, and the final Rule contains § 437.6(e) as recommended in the Staff Report.

6. Section 437.6(f): Failing To Provide Written Substantiation for Earnings Claims

Section 437.6(f) prohibits a seller who makes an earnings claim from failing to provide written substantiation to prospective purchasers, and to the Commission, upon request.[428] Rather than mandating that business opportunity sellers routinely include documentation for earnings claims— which could be voluminous—in the earnings claim statement itself, the final Rule's requirement is intended to reduce compliance costs by requiring only that such materials be provided when requested. Purchasers could then review the documentation if they so choose. Therefore, although substantiation for earnings claims must exist, in writing, at the time any such claims are made, that substantiation need be provided to potential purchasers (or to the Commission) only upon request.

No comments received in response to the RNPR or the Staff Report addressed this provision, and the final Rule contains § 437.6(f) as recommended in the Staff Report.

7. Section 437.6(g): Misrepresenting Commissions or Other Payments From the Seller

Section 437.6(g) prohibits sellers from misrepresenting how or when commissions, bonuses, incentives, premiums, or other payments from the seller to the purchaser will be calculated or distributed. The Commission's law enforcement experience shows that these kinds of misrepresentations underlie deceptive work-at-home opportunities, where prospective purchasers rely on the seller as the source of income, or where the seller manages the system's cash flow.[429] The

---

[421] Indeed, in response to the INPR, DOJ urged the Commission to exclude state disclosures from the proposed form. In DOJ's experience, "[p]urveyors of fraudulent business opportunities will seek every opportunity to water down this document with extraneous information to hide any negative information it may contain." 73 FR at 16128. The Commission's experience supports DOJ's conclusions.

[422] This is the same approach used in the Amended Franchise Rule. *See* 16 CFR 436.6(d).

[423] *See* 73 FR at 16128.

[424] In the Amended Franchise Rule, the Commission addressed this problem in the context of sales of business format franchises through a new requirement that franchise sellers include a specific preamble in the financial performance section of their disclosures. Among other things, the preamble makes clear that franchisors can make financial performance information available, assuming they have a reasonable basis for their claims. *See* 16 CFR 436.5(s)(1). Although the same problem exists in the sale of business opportunities, the Commission, in an effort to streamline the business opportunity disclosure document and reduce compliance costs, proposed this different approach for the Business Opportunity Rule, believing it sufficient to address deceptive business opportunity sales. The Commission noted that "whereas the Franchise Rule seeks to encourage franchisors to make earnings claims, no such encouragement is needed in the business opportunity field, where such claims are all too common." 71 FR at 19075 n.211.

[425] 71 FR at 19075.

[426] 73 FR at 16127.

[427] *Id.*

[428] The Amended Franchise Rule and the interim Business Opportunity Rule have similar requirements. *See* 16 CFR 436.5(r)(3)(v); 437.1(b)(2); and 437.1(c)(2).

[429] *E.g., FTC v. Indep. Mktg. Exch., Inc.,* No. 10–CV–00569–NLH–KMW (D.N.J. 2010); *FTC v. Preferred Platinum Servs. Network, Inc.,* No.10–CV–00538–MLC–LHG (D.N.J. 2010); *FTC v. Sun Ray Traders, Inc.,* No. 05–20402–CIV-Seitz/Bandstra (S.D. Fla. 2005); *FTC v. Castle Publ'g, No.* A03CA
Continued

Commission concluded that absent this prohibition, the Rule would not address false promises about the compensation sellers will provide post-sale.[430]

No comments received in response to the RNPR or the Staff Report addressed this provision, and the final Rule contains § 437.6(g) as recommended in the Staff Report.

8. Section 437.6(h): Misrepresenting Costs, Performance, Efficacy or Material Characteristics of Business Opportunity

A common complaint of victims of business opportunity fraud arises from misrepresentations about the costs or the performance, efficacy, nature, or central characteristics of a business opportunity offered to a prospective purchaser, or the goods or services needed to operate the business opportunity. For example, a seller may misrepresent the total costs involved in purchasing or operating a business opportunity.[431] In other instances, a seller may misrepresent the quality of goods offered by the business opportunity seller, either for use in operating the business (*e.g.*, vending machines) or for ultimate resale to consumers (*e.g.*, novelty items).[432] Section 437.6(h) makes such deception actionable as a violation of the final Rule.

No comments received in response to the RNPR or the Staff Report addressed this provision, and the final Rule contains § 437.6(h) as recommended in the Staff Report.

9. Section 437.6(i): Misrepresenting Post-Sale Assistance

Section 437.6(i) prohibits business opportunity sellers from

misrepresenting any material aspect of assistance it represents it will provide to purchasers.[433] The Commission's enforcement experience shows that misrepresentation of post-sale assistance offered to a prospective purchaser is an element common to many business opportunity frauds targeted in Commission cases.[434] Also, consumer complaints about misrepresentations concerning the type and amount of assistance promised but not received are among the top categories of reported deceptive business opportunity practices.[435] The Commission has concluded that the best way to address this deceptive practice is through a direct prohibition.[436]

No comments received in response to the RNPR or the Staff Report addressed this provision, and the final Rule contains § 437.6(i) as recommended in the Staff Report.

10. Section 437.6(j): Misrepresenting Locations, Outlets, Accounts, or Customers

Section 437.6(j) prohibits sellers from misrepresenting "the likelihood that a seller, locator, or lead generator will find locations, outlets, accounts, or customers for the purchaser." Fraudulent business opportunity sellers often promise that the seller or some other third party will find locations or outlets for purchasers' equipment, or accounts or customers for the purchasers' services.[437] Such representations include claims that a particular locator is successful in

finding locations, as well as representations that the seller or other third party has already found and entered into contracts with location owners or customers.[438] The Commission has found that these types of representations are material to a prospective purchaser, because they foster the expectation that a profitable market exists for the goods or services the purchaser will sell.[439]

No comments received in response to the RNPR or the Staff Report addressed this provision, and the final Rule contains § 437.6(j) as recommended in the Staff Report.

11. Section 437.6(k): Misrepresenting Cancellation or Refund Policy

Section 437.6(k) prohibits a seller from misrepresenting, directly or through a third party, the terms and conditions of any cancellation or refund policy. This prohibition does not compel any seller to offer a cancellation or a refund, nor does it dictate the terms and conditions under which a seller may offer such relief. Rather, it simply ensures that any cancellation or refund offer a seller makes before the sale is truthful and accurate. The Commission's law enforcement experience demonstrates that, in many instances, business opportunity sellers falsely claim that they permit a purchaser to cancel the purchase, guarantee a 100% refund, or promise to buy back some or all of the products sold to a purchaser.[440] These representations have lured prospective purchasers into believing that the investment is either low-risk or even risk-free.[441]

No comments received in response to the RNPR or the Staff Report were directed to this provision, and the final Rule contains § 437.6(k) as recommended in the Staff Report.

12. Section 437.6(l): Failing To Provide a Refund or Cancellation

Section 437.6(l) prohibits a seller from failing to cancel a purchase or make a refund when the purchaser has qualified for such relief under the seller's

---

905 SS (W.D. Tex. 2003); *FTC v. Trek Alliance, Inc.*, No. 02–9270 SJL (AJWx) (C.D. Cal. 2002); *FTC v. Terrence Maurice Howard*, No. SA02CA0344 (W.D. Tex. 2002); *FTC v. Am.'s Shopping Network, Inc.*, No. 02–80540–CIV–Hurley (S.D. Fla. 2002).

[430] 71 FR at 19075.

[431] *E.g.*, *FTC v. World Traders Ass'n, Inc.*, No. CV05 0591 AHM (CTx) (C.D. Cal. 2005); *FTC v. Castle Publ'g*, No. A03CA 905 SS (W.D. Tex. 2003); *FTC v. End70 Corp.*, No. 3 03CV–0940N (N.D. Tex. 2003); *FTC v. Darrell Richmond*, No. 3:02–3972–22 (D.S.C. 2003); *FTC v. Carousel of Toys USA, Inc.*, No. 97–8587 CIV–Ungaro-Benages (S.D. Fla. 1997); *FTC v. Parade of Toys, Inc.*, No. 97–2367–GTV (D. Kan. 1997); *FTC v. Telecomm. of Am., Inc.*, No. 95–693–CIV–ORL–22 (M.D. Fla. 1995). Pre-sale disclosure of cost information is a remedial approach taken in many Commission trade regulation rules. *E.g.*, 900 Number Rule, 16 CFR 308.3(b); TSR, 16 CFR 310.3; Funeral Rule, 16 CFR 453.2.

[432] *E.g.*, *FTC v. Kitco of Nev.*, 612 F. Supp. 1282 (D. Minn. 1985); *FTC v. Associated Record Distribs., Inc.*, No. 02–21754–CIV–Graham/Garber (S.D. Fla. 2002); *FTC v. Home Professions, Inc.*, No. 00–111 (C.D. Cal. 2000); *FTC v. Worldwide Mktg. & Distrib. Co.*, No. 95–8422–CIV–Roettger (S.D. Fla. 1995); *see also FTC v. Med. Billers Network*, No. 05 CV 2014 (RJH) (S.D.N.Y. 2005).

[433] 71 FR at 19075 n.216.

[434] The Commission has recognized that promises of assistance made to induce prospects to purchase a franchise are material, especially to those prospects with "little or no experience at running a business." 43 FR at 59676–77; *see, e.g.*, *FTC v. Am. Entm't Distribs., Inc.*, No. 04–22431–CIV–Martinez (S.D. Fla. 2004); *FTC v. USS Elder Enter., Inc.*, No. SA CV–04–1039 AHS (ANx) (C.D. Cal. 2004); *FTC v. Kitco of Nev.*, 612 F. Supp. 1282 (D. Minn. 1985); *FTC v. Leading Edge Processing, Inc.*, No. 6:02–CV–681–ORL–19 DAB (M.D. Fla. 2003); *FTC v. Darrell Richmond*, No. 3:02–3972–22 (D.S.C. 2003); *FTC v. Elec. Med. Billing, Inc.*, No. SA02–368 AHS (ANX) (C.D. Cal. 2003); *FTC v. Transworld Enters., Inc.*, No. 00 8126–CIV–Graham (S.D. Fla. 2000); *FTC v. Advanced Pub. Commc'ns Corp.*, No. 00–00515–CIV–Ungaro-Benages (S.D. Fla. 2000); *FTC v. Hi Tech Mint Sys., Inc.*, No. 98 CIV 5881 (JES) (S.D.N.Y. 1998); *United States v. QX Int'l, Inc.*, No. 398–CV–0453–D (N.D. Tex. 1998).

[435] 71 FR at 19075 n.218.

[436] 71 FR at 19075.

[437] *E.g.*, *FTC v. Am. Entm't Distribs., Inc.*, No. 04–22431–CIV–Martinez (S.D. Fla. 2004); *FTC v. Int'l Trader*, No. CV–02–02701 AHM (JTLx) (C.D. Cal. 2002); *FTC v. Elec. Processing Servs., Inc.*, No. CV–S–02–0500–L.H.–R.S. (D. Nev. 2002); *FTC v. Home Professions, Inc.*, No. SACV 00–111 AHS (Eex) (C.D. Cal. 2001); *FTC v. Encore Networking Servs.*, No. 00–1083 WJR (AIJx) (C.D. Cal. 2000); *FTC v. AMP Publ'n, Inc.*, No. SACV–00–112–AHS–ANx (C.D. Cal. 2001); *FTC v. Infinity Multimedia, Inc.*, No. 96–6671–CIV–Gonzalez (S.D. Fla. 1996).

[438] *E.g.*, *FTC v. Hart Mktg. Enters. Ltd.*, No. 98–222–CIV–T–23 E (M.D. Fla. 1998); *FTC v. Vendors Fin. Servs., Inc.*, No. 98–1832 (D. Colo. 1998); *FTC v. Hi Tech Mint Sys., Inc.*, No. 98 CIV 5881 (S.D.N.Y. 1998); *FTC v. Infinity Multimedia, Inc.*, No. 96–6671–CIV–Gonzalez (S.D. Fla. 1996).

[439] 71 FR at 19076.

[440] *E.g.*, *FTC v. Med. Billers Network*, No. 05 CV 2014 (RJH) (S.D.N.Y. 2005); *FTC v. Castle Publ'g*, No. A03CA 905 SS (W.D. Tex. 2003); *FTC v. Am.'s Shopping Network, Inc.*, No. 02–80540–CIV–Hurley (S.D. Fla. 2002); *FTC v. Home Professions, Inc.*, No. SACV 00–111 AHS (Eex) (C.D. Cal. 2001); *FTC v. Encore Networking Servs.*, No. 00–1083 WJR (AIJx) (C.D. Cal. 2000).

[441] 71 FR at 19076.

cancellation or refund policy.[442] As noted above, § 437.6(k) prohibits a seller from misrepresenting, pre-sale, the seller's cancellation or refund policy. Section 437.6(l) complements that section and is intended to address sellers' post-sale conduct, prohibiting the seller from failing to honor cancellation or refund requests when purchasers have satisfied all the terms and conditions disclosed in the seller's disclosure document for obtaining such relief.[443] In the Commission's experience, the failure of business opportunity sellers to make promised refunds or to honor cancellation policies ranks high among issues raised by business opportunity purchasers.[444]

No comments received in response to the RNPR or the Staff Report were directed to this provision, and the final Rule contains § 437.6(l) as recommended in the Staff Report.

13. Section 437.6(m): Misrepresenting Business Opportunity as an Employment Opportunity

Section 437.6(m) prohibits business opportunity sellers from misrepresenting a business opportunity as an employment opportunity. The Commission's law enforcement experience demonstrates that some business opportunity sellers lure unsuspecting consumers by falsely representing that they are offering employment when, in fact, they are offering vending, work-at-home, or other business opportunities. For example, in some instances consumers have responded to advertisements seeking sales executives, only to discover that the "position" requires them to purchase equipment or products from the seller and, in turn, to sell those products.[445] The Commission concludes that this prohibition is necessary to protect consumers against false representations of employment opportunities.

No comments received in response to the RNPR or the Staff Report were directed to this provision, and the final Rule contains § 437.6(m) as recommended in the Staff Report.

14. Section 437.6(n): Misrepresenting the Exclusivity of Territories

Section 437.6(n) prohibits misrepresentations about the terms of any territorial exclusivity or limited territorial protection offered to a prospective purchaser.[446] In the Commission's experience, false or misleading promises about territories are a common deceptive practice reported by business opportunity purchasers.[447] The Commission has stated that representations about territorial exclusivity or more limited territorial protections are material because they often induce a prospective purchaser into believing that he or she will not be competing for customers with the seller or other purchasers, thereby increasing the purchaser's likelihood of success.[448]

No comments received in response to the RNPR or the Staff Report were directed to this provision, and the final Rule contains § 437.6(n) as recommended in the Staff Report.

15. Section 437.6(o): Assigning a Purported Exclusive Territory to Another Purchaser

Section 437.6(o) prohibits a seller from assigning a single "exclusive" territory to more than one purchaser. This prohibition complements § 437.6(n), which prohibit sellers from misrepresenting territories. It is intended to address sellers' post-sale conduct, and prohibits the seller from failing to honor its promises regarding exclusive or protected territories. Consumer complaints indicate, and the Commission's law enforcement experience confirms, that fraudulent business opportunity sellers often sell the same purportedly exclusive territory to several unsuspecting purchasers.[449] In these circumstances, purchasers who have been lured to invest in an opportunity on the basis of promises of

an exclusive territorial lock on their market find that their chances of success are materially reduced by competition from the other purchasers.

No comments received in response to the RNPR or the Staff Report were directed to this provision, and the final Rule contains § 437.6(o) as recommended in the Staff Report.

16. Section 437.6(p): Misrepresenting Third Party Endorsements or Other Affiliation

Section 437.6(p) prohibits business opportunity sellers from misrepresenting that "any person, trademark or service mark holder, or governmental entity, directly or indirectly benefits from, sponsors, participates in, endorses, approves, authorizes, or is otherwise associated with the sale of the business opportunity or the goods or services sold through the business opportunity."[450] The Commission's enforcement experience indicates that business opportunity frauds often lure consumers by misrepresenting that their opportunities have been approved or endorsed by a government agency or well-known third party.[451] In other instances, business opportunity sellers falsely claim that their opportunities are sponsored by or associated with a charity, or that a charity will benefit from a percentage of sales.[452] The Commission has concluded that such claims are material to a purchaser because an alleged endorsement or shared-profit arrangement may create the impression that the opportunity is legitimate or that the affiliation will enhance sales and profits.[453]

No comments received in response to the RNPR or the Staff Report were directed to this provision, and the final Rule contains § 437.6(p) as recommended in the Staff Report.

17. Section 437.6(q): Misrepresenting References (the Use of "Shills")

Section 437.6(q) addresses one of the most pernicious practices common in fraudulent business opportunity sales—

---

[442] This is consistent with the interim Business Opportunity Rule approach. *See* 16 CFR 437.1(h).

[443] *E.g., FTC* v. *AMP Publ'ns, Inc.,* No. SACV-00–112–AHS–ANx (C.D. Cal. 2001) (failure to honor 90-day money back guarantee); *FTC* v. *Star Publ'g Group, Inc.,* No. 00–023 (D. Wyo. 2000) (failure to honor 90-day refund policy).

[444] 73 FR at 19076.

[445] *See, e.g., FTC* v. *Trek Alliance, Inc.,* No. 02–9270 SJL (AJWx) (C.D. Cal. 2002) (defendants placed ads in "Help Wanted" sections of newspaper offering salaried position); *FTC* v. *Leading Edge Processing, Inc.,* No. 6:02–CV–681–ORL–19 DAB (M.D. Fla. 2003) (defendants sent emails to job seekers who posted their resumes on job Web sites, falsely representing the availability of jobs and guaranteeing a steady stream of work); *FTC* v. *David Martinelli, Jr.,* No. 3:99 CV 1272 (D. Conn. 2000) (defendants sent unsolicited emails falsely offering a $13.50 per hour position processing applications for credit, loans, or employment).

[446] 71 FR at 19076. In some instances, a business opportunity seller may offer a prospect an exclusive territory, in which no other person has the right to compete within the territory. In other instances, a seller may offer a more limited protection. For example, the seller may prohibit other purchasers from operating in the territory, but reserve to itself the ability to conduct telemarketing or Internet sales in the territory. Regardless of the scope of the territorial protection, § 437.6(n) prohibits business opportunity sellers from misrepresenting the nature of the territory.

[447] *Id.* at 19065.

[448] *Id.* at 19075.

[449] *E.g., FTC* v. *Am. Safe Mktg.,* No. 1:89–CV–462–RLV (N.D. Ga. 1989).

[450] *Cf.* TSR, 16 CFR 310.3(a)(vii) (prohibiting misrepresentations concerning "affiliation with, or endorsement or sponsorship by, any person or government entity").

[451] *E.g., FTC* v. *Streamline Int'l,* No. 01–6885–CIV–Ferguson (S.D. Fla. 2001) (misrepresented FDA approval); *FTC* v. *Star Publ'g Group, Inc.,* No. 00–023 (D. Wyo. 2000) (misrepresented HUD approval); *FTC* v. *Bus. Opportunity Ctr., Inc.,* No. 95 8429–CIV–Zloch (S.D. Fla. 1995) (misrepresented FDA approval); *see also FTC* v. *Hawthorne Commc'ns,* No. 93–7002 AAH (JGX) (C.D. Cal. 1993) (order restricting uses of testimonials and endorsements in the sale of business opportunities).

[452] *E.g., FTC* v. *Global Assistance Network for Charities,* No. 96–2494 PHX RCB (D. Ariz. 1996).

[453] 71 FR at 19077.

the use of "shill" references to lure unsuspecting consumers to invest in a business opportunity.[454] The Commission has brought many actions against business opportunity sellers who provided prospects with the names of individuals they falsely claimed were independent prior purchasers or independent third parties, but who, in fact, were paid by the seller to give favorable false reports confirming the seller's claims, especially their earnings claims.[455] The use of paid shills to give false reports induces prospective purchasers into believing that the opportunity is a safe and lucrative investment.

To address this deceptive practice, § 437.6(q) contains two related prohibitions. First, it prohibits any seller from misrepresenting that any person "has purchased a business opportunity from the seller." This prevents a seller, for example, from claiming that a company employee, locator, or other third party is a prior purchaser of the opportunity, when that is not the case. Second, the provision prohibits a seller from misrepresenting that any person—such as a locator, broker, or organization that purports to be an independent trade association—"can provide an independent or reliable report about the business opportunity or the experiences of any current or former purchaser." Providing a prospect with a list of brokers who are paid to give favorable reports, for example, would violate this provision because any statement a person on such a list makes would not be independent and reliable.[456]

No comments received in response to the RNPR or the Staff Report were directed to this provision, and the final Rule contains § 437.6(q) as recommended in the Staff Report.

**18. Section 437.6(r): Failing To Disclose Consideration Paid to or Prior Relationship With Prior Purchaser**

Section 437.6(r) is intended to complement the prohibition in § 437.6(q) regarding the use of "shills."

Section 437.6(r) prohibits a seller from failing to disclose payments to individuals identified as references, as well as any personal relationships the seller has with such individuals. Such prohibitions are necessary because an individual with a personal relationship with the seller, or who has been paid for his or her assessment of an opportunity, is likely to be biased, and any story of success or high earnings from any such person is suspect.[457] The final Rule clarifies that the term "consideration" is to be interpreted broadly to include not only direct cash payments, but indirect financial benefits, such as forgiveness of debt, as well as other tangible benefits such as equipment, services, and discounts.[458]

The RPBOR modified slightly the language of this provision to make clear that the information that must be disclosed to a potential purchaser is not only the payment of any consideration to the reference by the seller, but also the existence of any relationship between the seller and the reference.[459] Therefore, the RPBOR added clarifying language to the opening clause of § 437.6(r) so that it prohibits a failure to disclose any consideration paid, any personal relationship, or other past or current business relationship other than as the purchaser of the business opportunity being offered.

No comments, either in response to the RNPR or the Staff Report, addressed this provision. Because the Commission finds that the small clarification to § 437.6(r) more accurately identifies the information that must be disclosed to a potential purchaser, the Commission adopts § 437.6(r) in the final Rule in the form recommended in the Staff Report.

**G. Section 437.7: Record Retention**

Section 437.7 establishes the minimal record retention requirements necessary to document compliance and permit effective Rule enforcement. This section applies to both the business opportunity seller and its principals, to ensure that records required by the Rule are not destroyed if the seller goes out of business or otherwise ceases operations.[460] As detailed below, sellers and their principals must keep, and make available to the Commission, the

following five types of records for a period of three years:

(1) Section 437.7(a): Each materially different version of all documents required by the Rule;

(2) Section 437.7(b): Each purchaser's disclosure receipt;

(3) Section 437.7(c): Each executed written contract with a purchaser;

(4) Section 437.7(d): Each oral or written cancellation or refund request received from a purchaser; and

(5) Section 437.7(e): All substantiation upon which the seller relies from the time an earnings claim is made.

The Commission finds that these limited recordkeeping requirements strike the right balance, requiring no more than necessary for effective law enforcement, while minimizing compliance costs.[461] Moreover, records can be retained electronically, helping to further minimize compliance costs.

No comments received in response to the RNPR or the Staff Report were directed to this provision, and the final Rule contains § 437.7 as recommended in the Staff Report.

**H. Section 437.8: Franchise Exemption**

Section 437.8 is designed to eliminate potential overlap between the final Rule's scope of coverage and that of the Amended Franchise Rule, so that no business would face duplicative compliance burdens.[462] Accordingly, § 437.8 exempts from the final Rule's coverage those business opportunities that: (1) Satisfy the definitional elements of the term "franchise" under the Amended Franchise Rule; (2) entail a written contract between the seller and the business opportunity buyer; and (3) require the buyer to make a payment that meets the Amended Franchise Rule's minimum payment requirement. These criteria were designed to accomplish two ends: to ensure that certain categories of businesses "carved out" from the Amended Franchise Rule are not inappropriately subjected to coverage by the Business Opportunity Rule;[463] and, simultaneously, to obviate

---

[454] *See id.* at n.236 ("After earnings claims, false testimonials and shill references are the most common Section 5 allegations in Commission business opportunities cases.")

[455] *E.g., FTC v. Am. Entm't Distribs., Inc.,* No. 04–22431–CIV–Martinez (S.D. Fla. 2004); *United States v. Vaughn,* No. 01–20077–01–KHV (D. Kan. 2001); *FTC v. Hart Mktg. Enters. Ltd.,* No. 98–222–CIV–T–23 E (M.D. Fla. 1998); *FTC v. Inetintl.com,* No. 98–2140 (C.D. Cal. 1998); *FTC v. Infinity Multimedia, Inc.,* No. 96–6671–CIV–Gonzalez (S.D. Fla. 1996); *FTC v. Allstate Bus. Consultants Group, Inc.,* No. 95–6634–CIV–Ryskamp (S.D. Fla. 1995).

[456] *E.g., FTC v. Affiliated Vendors Ass'n, Inc.,* No. 02–CV–0679–D (N.D. Tex. 2002); *FTC v. Raymond Urso,* No. 97–2680–CIV–Ungaro-Benages (S.D. Fla. 1997); *see also* 71 FR at 19077 n. 238.

[457] Indeed, the Commission has long held that the failure to disclose compensation paid to an endorser is a deceptive practice in violation of Section 5. *See* 71 FR at 19077; *see also* Guides Concerning the Use of Endorsements and Testimonials in Advertising, 16 CFR 255 (Oct. 15, 2009).

[458] 71 FR at 19078.

[459] 73 FR at 16128, 16136.

[460] 71 FR at 19078.

[461] *Id.*

[462] *Id.; see also* 15 U.S.C. 57a(g) (authorizing the Commission to exempt persons or classes from all or part of rule coverage).

[463] For example, businesses exempt from Amended Franchise Rule coverage pursuant to the exemption for fractional franchises would not be subject to coverage by the Business Opportunity Rule because such businesses would meet the criteria of § 437.8. This is an appropriate result because the same rationale underlying exemption of these types of businesses from the Amended Franchise Rule would also dictate that they not be covered by the Business Opportunity Rule—*i.e.,* the franchisor is not likely to deceive the prospective franchisee or to subject the prospective franchisee to significant investment risk. Therefore, imposing the requirements of either the Amended Franchise

any loophole that could be exploited by certain other types of business opportunities that are exempt from the Amended Franchise Rule but that should be regulated by the Business Opportunity Rule.

On the other hand, certain businesses carved out of Amended Franchise Rule coverage should not escape regulation by the final Rule—specifically, those exempt from the Amended Franchise Rule's coverage due to the minimum payment exemption[464] or the oral agreement exemption.[465] The Commission has concluded that while these two exemptions are warranted in the franchise context to ensure that the significant disclosure costs imposed by the Amended Franchise Rule are cost-justified, they do not apply to the final Rule, with its significantly lighter disclosure burden.[466]

In the RNPR, the Commission solicited comment on whether the exemption was overly broad or overly narrow.[467] In response to the RNPR, some commenters, primarily from the MLM industry, suggested limitations on the Rule by granting a safe harbor to exempt firms that require very low registration fees;[468] firms that offer refunds on inventory purchases;[469] firms that are publicly-traded;[470] firms that have a high net worth;[471] or firms that are members of a self-regulatory body, such as the DSA.[472] These are not novel suggestions; each also was made in response to the INPR.[473] In the RNPR, the Commission concluded that none of these factors is determinative of whether a company is, in fact, a pyramid scheme or otherwise engaged in deceptive conduct. Furthermore, the Commission noted that the effort to craft a workable rule using these criteria could undermine law enforcement efforts, as it would, at least in the case of minimum payment thresholds, provide scam operators with a means to circumvent the Rule.[474] The Staff Report recommended that the Commission not

---

Rule or the Business Opportunity Rule would not be justified. *See* 71 FR at 19078.

[464] 16 CFR 436.2(a)(3)(iii).
[465] 16 CFR 436.2(a)(3)(iv).
[466] 71 FR at 19078.
[467] 73 FR at 16133.
[468] *See, e.g.,* Babener–RNPR; Pre-Paid Legal–RNPR.
[469] *See, e.g.,* Pre-Paid Legal–RNPR; Tupperware–RNPR; IBA–RNPR.
[470] *Id.*
[471] *See, e.g.,* IBA–RNPR.
[472] *See, e.g.,* DSA–RNPR.
[473] 73 FR at 16119–20. Moreover, none of the commenters offered any new rationale for expanding the proposed categories of exemption that had not previously been considered by the Commission.
[474] *Id.* at 16120.

expand the exemptions beyond those identified in the RPBOR. The Commission adopts § 437.8 as recommended in the Staff Report.

*I. Section 437.9: Outstanding Orders; Preemption*

1. Section 437.9(a): Effect on Prior Commission Orders

Section 437.9(a) addresses the effect the Rule may have on outstanding Commission orders. The Commission recognizes that the final Rule significantly changes the disclosure obligations for those sellers who are now under order in prior Commission actions. To enable business opportunity sellers to take advantage of the final Rule's reduced disclosure obligations, as well as to reduce any potential conflicts between existing orders and the final Rule, § 437.9(a) permits persons under order to petition the Commission for relief consistent with the provisions of the new Rule. Under the RPBOR, business opportunities required by FTC or court order to follow the Franchise Rule, 16 CFR Part 436, would have been permitted to petition the Commission to amend the order so that the business opportunity could follow the provisions of the Business Opportunity Rule instead.[475]

Although no comments received in response to the RNPR addressed this provision, the Staff Report noted that while the Commission could modify an FTC administrative order, it would not have the authority to modify any order entered by a court.[476] In the case of a court order, the Commission could, however, stipulate to an amendment of the order by the court to allow the business opportunity to follow the provisions of the Business Opportunity Rule. The Staff Report recommended, therefore, that § 437.9(a) be revised to add the phrase "or to stipulate to an amendment of the court order" as follows: "A business opportunity required by prior FTC or court order to follow the Franchise Rule, 16 CFR part 436, may petition the Commission to amend the order or to stipulate to an amendment of the court order so that the business opportunity may follow the provisions of this part."

In addition, the Staff Report noted that the first sentence of § 437.9(a) proposed in the RPBOR was superfluous, and recommended deleting it. No comments in response to the Staff Report were directed at this provision. Upon consideration of the staff's recommendation and the rationale for

---

[475] *Id.* at 16136 (RPBOR § 437.8(a)).
[476] Staff Report at 127.

that recommendation, the Commission has decided to modify the text of this provision in the manner recommended in the Staff Report. As the Commission has stated previously, all determinations under this provision regarding the amendment of orders will be made on a case-by-case basis.

2. Section 437.9(b): Preemption

Section 437.9(b) adopts a preemption policy similar to that embodied in the Amended Franchise Rule.[477] It provides that the Commission does not intend to preempt state or local business opportunity laws, except to the extent of any conflict with the Rule. Further, a law does not conflict if it affords prospective purchasers equal or greater protection, such as a requirement for registration of disclosure documents or more extensive disclosures.[478]

One commenter suggested that the FTC should preempt conflicting state business opportunity rules, noting its belief that "enforcement of a nationwide standard by the FTC is preferable to a patchwork series of laws and regulations."[479] The Staff Report noted that the commenter is suggesting that all state laws and regulations that do not mirror exactly the Business Opportunity Rule would be in conflict with the Rule, and should therefore be preempted. The Commission has long recognized that state laws and regulations that afford equal or greater protections than do FTC trade regulations are not subject to preemption,[480] and therefore declines to follow this commenter's recommendation.

*J. Section 437.10: Severability*

Finally, § 437.10 adopts the severability provision recommended by the Staff Report with one non-substantive change: The Commission removed the superfluous phrase, "it is the Commission's intention that" from the provision. This provision makes clear that, if any part of the Rule is held

---

[477] 16 CFR 436.10. This approach is consistent with other Commission trade regulation rules. *See, e.g.,* Appliance Labeling Rule, 16 CFR 305.17; Cooling-Off Rule, 16 CFR 429.2; Mail Order Rule, 16 CFR 435.3(b)(2).
[478] Although state laws offering equal or greater protections are not preempted, § 437.6(c) of the final Rule prohibits providing state and federal disclosures together in one document.
[479] Tupperware–RNPR (5/28/2008). No other comments were received. At the June 2009 Workshop, however, the panelist from the Maryland Attorney General's Office expressed appreciation that states were not preempted from requiring that business opportunity sellers provide information in addition to that required by the proposed Rule. Cantone, June 2009 Tr at 20.
[480] *See, e.g.,* Mail Order Rule, 16 CFR 435.3(b)(2) (rule does not preempt state or local laws that afford equal or greater protections).

invalid by a court, the remainder will still be in effect.[481] No comments received in response to the RNPR or the Staff Report were directed to this provision.

## IV. Paperwork Reduction Act

The Commission is submitting the final Rule and a Supplemental Supporting Statement to the Office of Management and Budget (OMB) for review under the Paperwork Reduction Act (PRA), 44 U.S.C. 3501–21. The final Rule amends a trade regulation rule governing business opportunity sales. The final Rule covers those business opportunities currently covered by the interim Business Opportunity Rule (and formerly covered by the Original Franchise Rule, as explained above), as well as certain others not covered by the interim Business Opportunity Rule, such as sellers of work-at-home programs. The final Rule requires business opportunity sellers to disclose specified information and to maintain certain records relating to business opportunity sales transactions. The currently approved estimate for the disclosure and recordkeeping burden under the interim Business Opportunity Rule is 16,750 hours for business opportunity sellers. That estimate was based on an estimated 2,500 business opportunity sellers. As discussed below, the final Rule reduces the existing burden on business opportunity sellers by streamlining disclosure requirements to minimize compliance costs.

In the RNPR, Commission staff estimated there were approximately 3,050 business opportunity sellers covered by the RPBOR. This figure consisted of an estimated 2,500 vending machine, rack display, and other opportunity sellers currently covered by the interim Business Opportunity Rule, and an estimated 550 work-at-home opportunity sellers, which would be newly covered entities under the final Rule. Because the final Rule is no different than the RPBOR regarding the types of entities to which it applies, and the Commission received no information suggesting the need to update these prior estimates, the Commission retains them for the final Rule. Additionally, Commission staff estimates that approximately 174 of those sellers market business opportunities in Spanish and that approximately 79 of the 3,050 business

opportunity sellers market in languages other than English or Spanish.[482]

### A. Disclosure Requirements

As discussed below, the final Rule is designed to streamline and substantially reduce the quantity of information business opportunity sellers are required to disclose under the interim Business Opportunity Rule. The final Rule impacts sellers differently, depending upon whether they are currently covered by the interim Business Opportunity Rule and what language they use to market the business opportunities.

### 1. Mandatory Disclosures

For the 2,500 vending machine, rack display, and other business opportunity sellers currently covered by the interim Business Opportunity Rule, the final Rule substantially reduces the disclosures from more than 20 categories of information to five—the seller's identifying information, earnings claims, lawsuits, refund and cancellation policies, and prior purchasers. This streamlining also will minimize compliance costs for the 550 business opportunity sellers that will be newly subject to the Rule. Business opportunity sellers must disclose whether or not they make earnings claims. The decision to make an earnings claim, however, is optional. While the disclosures of references and earnings claims retain, for the most part, the interim Business Opportunity Rule requirements, the required disclosure of lawsuits is reduced from the interim Business Opportunity Rule.[483]

The final Rule imposes one additional requirement that was not present in either the interim Business Opportunity Rule or the RPBOR, which was introduced in the Staff Report. For business opportunities marketed in Spanish, § 437.5 of the final Rule

requires that sellers provide potential purchasers with the Spanish version of the disclosure document (Appendix B to the Rule) and provide all other required disclosures in Spanish. For sales conducted in a language other than English or Spanish, the final Rule requires that sellers make the required disclosures in the same language as the sale, using the form and an accurate translation of the language set forth in Appendix A, as well as any additional required disclosures. As discussed in the Statement of Basis and Purpose, this translation requirement is supported by long-standing Commission policy, the Commission's law enforcement experience, the rulemaking record, and the rationale supporting staff's recommendation.

### 2. Incorporation of Existing Materials

The final Rule reduces collection and dissemination costs from those imposed by the interim Business Opportunity Rule, by permitting sellers to reference in their disclosure documents materials already in their possession. For example, a seller need not repeat its refund policy in the text of the disclosure document, but may incorporate its contract or brochures, or other materials that already provide the necessary details.

### 3. Use of Electronic Dissemination of Information

The final Rule defines the term "written" to include electronic media. Accordingly, all business opportunities covered by the final Rule are permitted to use the Internet and other electronic media to furnish disclosure documents. Allowing this distribution method should greatly reduce sellers' compliance costs over the long run, especially costs associated with printing and distributing disclosure documents. As a result of this proposal, the Commission expects sellers' compliance costs will decrease substantially over time.

### 4. Use of Computerized Data Collection Technology

Finally, because of advances in computerized data collection technology, the Commission anticipates that the costs of collecting information and recordkeeping requirements imposed by the final Rule will be minimal. For example, a seller can easily maintain a spreadsheet of its purchasers, which can be sorted by location. This would enable a seller to easily comply with the reference disclosure requirement (at least 10 prior purchasers in the last three years who are located nearest to the prospective

---

[481] This provision is comparable to the severability provision in the Amended Franchise Rule, 16 CFR 436.11, as well as the severability provisions in other Commission rules. *See, e.g.,* TSR, 16 CFR 310.9.

[482] To estimate how many of the 3,050 sellers market business opportunities in languages other than English, staff relied upon 2009 United States Census Bureau ("Census") data. Calculations based upon a recent Census survey reveal that approximately 5.7% of the U.S. population speaks Spanish or Spanish Creole at home and speak English less than "very well." Calculations based upon that same survey reveal that approximately 2.6% of the U.S. population speaks a language other than Spanish, Spanish Creole, or English at home and speak English less than "very well." Staff therefore projected that 5.7% of all entities selling business opportunities market in Spanish or Spanish Creole and 2.6% of all entities selling business opportunities market in languages other than English, Spanish and Spanish Creole. *http://factfinder.census.gov/servlet/STTable?_bm=y&-geo_id=01000US&-qr_name=ACS_2009_1YR_G00_S1601&-ds_name=ACS_2009_1YR_G00_&-_lang=en&-redoLog=false.*

[483] *See supra* Section III.C.2.

purchaser, or, if there are not 10 prior purchasers, then all prior purchasers. In the alternative, the final Rule permits a seller to maintain a national list of purchasers.

### B. Recordkeeping Requirements

Section 437.7 of the final Rule prescribes recordkeeping requirements necessary for effective enforcement of the Rule. Specifically, sellers of a covered business opportunity, and their principals, must retain for at least three years the following types of documents: (1) Each materially different version of all documents required by the Rule; (2) each purchaser's disclosure receipt; (3) each executed written contract with a purchaser; and (4) all substantiation upon which the seller relies for each earnings claim made. The final Rule requires that these records be made available for the Commission's inspection, but does not otherwise require their production. As previously noted, because of advances in computerized data collection technology, the Commission anticipates that the costs of collecting information and recordkeeping requirements imposed by the final Rule will be minimal.

### C. Estimated Hours Burden and Labor Cost

For the RNPR, the Commission submitted the RPBOR and associated documentation under the PRA for OMB review.[484] The Commission did not receive any public comments regarding staff's PRA burden estimates. The instant burden estimates differ from those previously submitted in the RNPR in two respects: (1) They account for the final Rule's requirement that sellers must provide the disclosure document and other required disclosures to potential purchasers in the same language the seller uses to market the business opportunity;[485] and (2) they incorporate the one hour recordkeeping burden estimate included in the currently approved interim Business Opportunity Rule's burden estimates under the PRA.

Through the Staff Report, the Commission sought comment on the new foreign language disclosure requirement, including the usefulness and sufficiency of the added foreign language disclosure requirement. The Staff Report, however, did not address

the associated PRA burden.[486] The Commission received just one comment on the new disclosure translation requirement.[487]

1. Estimated Hours Burden: 10,533

The estimated 2,500 vending machine, rack display, and related opportunity sellers currently covered by the interim Business Opportunity Rule (and, previously, the Original Franchise Rule) will have a disclosure document that needs merely streamlining and updating to comply with the final Rule. Thus, FTC staff estimates that these businesses likely will require no more than 3 hours to complete those tasks. Conversely, staff estimates that for existing businesses that were not covered by the interim Business Opportunity Rule but would be covered by the final Rule, e.g., work-at-home opportunities, approximately 5 hours will be required to prepare a new disclosure document. Staff further estimates that the total hours required in the first year to develop a disclosure document will be 10,250 [(2,500 entities × 3 hours per entity) + (550 entities × 5 hours per entity)]. In addition, all these businesses likely will require approximately one hour per year to file and store records, for a total of 3,050 hours [3,050 entities × 1 hour per entity]. Accordingly, the estimated total hours burden for the first year of implementation of these amendments would be 13,300 hours [10,250 hours + 3,050 hours]. Commission staff estimates that in subsequent years, the 3,050 existing businesses will require no more than approximately two hours to update the disclosure document [6,100 total hours] and approximately one hour to file and store records [3,050 total hours], for a total of 9,150 hours [6,100 hours + 3,050 hours] per year to meet the final Rule requirements.

Thus, cumulative average annual burden for affected sellers, based on a prospective three-year OMB clearance is 10,533 hours [((13,300 hours) + 18,300 hours (2 years × 9,150 hours per year)) + 3].

2. Estimated Labor Cost: $2,633,333

Labor costs are determined by applying applicable wage rates to associated burden hours. Commission staff assumes that an attorney likely would prepare or update the disclosure document at an estimated hourly rate of $250. As noted above, Commission staff estimates that 13,300 hours will be needed to prepare, file, and store the disclosure document and required records in the first year, for a total cost of $3,325,000 [13,300 hours × $250 per hour].

As noted above, Commission staff expects that there will be a reduction in the annual hours burden after the first year to approximately 9,150 hours. Accordingly, staff estimates that the labor cost burden for subsequent years will be reduced to $2,287,500 [9,150 hours × $250 per hour]. Thus, the average annual cost is approximately $2,633,333 [(($3,325,000) + ($2,287,500 × 2)) + 3], when averaged over a prospective three-year OMB clearance. Should disclosure or recordkeeping obligations be performed by clerical staff, the total labor costs would be significantly less.

3. Estimated Capital and Other Non-Labor Costs: $3,068,838

Business opportunity sellers must also incur costs to print and distribute the single-page disclosure document, plus any attachments. These costs vary based upon the length of the attachments and the number of copies produced to meet the expected demand. Commission staff estimates that 3,050 business opportunity sellers will print and mail approximately 1,000 disclosure documents per year at a cost of $1.00 per document, for a total cost of $3,050,000. This is a conservative estimate because Commission staff anticipates that these costs will be reduced by many business opportunity sellers electing to furnish disclosures electronically, e.g., via email or the Internet.

For sales conducted in a language other than English and Spanish, the final Rule requires that sellers use the form appearing in Appendix A and accurately translate it into the language used for sale. Thus, sellers marketing in languages other than English or Spanish will incur costs to translate the disclosure document, and these sellers may also need to translate the other required disclosures that may be attached to the disclosure document. Commission staff estimates that sellers marketing business opportunities in languages other than English and Spanish will incur a cost of

---

[484] 73 FR at 16129.

[485] As discussed within the Statement of Basis and Purpose, this requirement was not present in the RNPR. Rather, it was recommended in the Staff Report, and ultimately adopted in the final Rule.

[486] See Bureau of Consumer Protection. *Staff Report to the Federal Trade Commission and Proposed Revised Trade Regulation Rule (16 CFR Part 437)* (Nov. 2010) ("Staff Report"), *available at http://www.ftc.gov/os/fedreg/2010/october/ 101028businessopportunitiesstaffreport.pdf*. In November, the Commission published a notice in the **Federal Register** announcing the availability of, and seeking comment on, the Staff Report. *See* 75 FR 68559 (Nov. 8, 2010).

[487] DOJ Staff Report at 2. The comment, from the Office of Consumer Litigation, U.S. Department of Justice, registered strong support for the requirement.

approximately $6,705 to translate the disclosure document in the first year. This figure is based upon Commission staff's estimate that it will cost approximately 17.5 cents to translate each word into the language the sellers use to market the opportunities.[488] There are 485 words in Appendix A. Therefore, the total cost burden to translate the disclosure document is approximately $6,705 [79 sellers × (17.5 cents per word × 485 words)]. In subsequent years, the existing business opportunities sellers will not incur additional costs to translate the Appendix A as it will already have been translated during the first year. The 174 sellers marketing business opportunities in Spanish will not incur any additional costs to translate Appendix A, as a Spanish version of that document is provided for them, as Appendix B to the final Rule.

Commission staff estimates that in the first year, sellers marketing business opportunities in languages other than English will incur a total cost burden of approximately $27,672 [(79 sellers + 174 sellers) × (17.5 cents per word × 625 words)] to translate their responses to the five mandatory disclosures required in the disclosure document. This estimate is based upon assumptions that all sellers marketing business opportunities in languages other than English: (1) Are marketing in both English and another language; (2) are not incorporating any existing materials into their disclosure document; (3) have been the subject of civil or criminal legal actions; (4) are making earnings claims; (5) have a refund or cancellation policy; and (6) because of all of the above assumptions, require approximately 625 words (approximately 2.5 standard, double-spaced pages) to provide the required information. In reality, because it is unlikely that all such assumptions will apply to every seller marketing business opportunities in languages other than English, the cost burden will likely be much lower. In subsequent years, due to the final Rule's requirement that sellers must update their disclosures, Commission staff estimates that sellers may incur an additional cost burden of $11,069 [253 sellers × (17.5 cents per word × 250 words—approximately one standard, double-spaced page)] to translate the updates.

Therefore, cumulative average cost for affected sellers, based on a prospective three-year OMB clearance, to print and distribute the disclosure document and any attachments and to translate both

the disclosure document and the additional required disclosures would be $3,068,838 [(($3,050,000 × 3) + $6,705 + $27,672 + ($11,069 × 2)) ÷ 3].

## V. Regulatory Analysis and Regulatory Flexibility Act

Under Section 22 of the FTC Act, 15 U.S.C. 57b, the Commission must issue a regulatory analysis for a proceeding to amend a rule only when it: (1) Estimates that the amendment will have an annual effect on the national economy of $100,000,000 or more; (2) estimates that the amendment will cause a substantial change in the cost or price of certain categories of goods or services; or (3) otherwise determines that the amendment will have a significant effect upon covered entities or upon consumers. The Commission has determined that the final Rule will not have such an annual effect on the national economy, on the cost or prices of goods or services sold through business opportunities, or on covered businesses or consumers. As noted in the Paperwork Reduction Act discussion above, the Commission staff estimates each business affected by the Rule will likely incur only minimal compliance costs.

The Regulatory Flexibility Act ("RFA"), 5 U.S.C. 601–612, requires an agency to provide an Initial Regulatory Flexibility Analysis ("IRFA") with a proposed rule and a Final Regulatory Flexibility Analysis ("FRFA") with the final rule, if any, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.[489]

The FTC does not expect that the final Rule will have a significant economic impact on a substantial number of small entities and this document serves as notice to the Small Business Administration of the agency's certification of no significant impact. The abbreviated disclosure and recordkeeping requirements of the final Rule are the minimum necessary to give consumers the information they need to protect themselves and permit effective enforcement of the Rule. Companies previously covered by the interim Business Opportunity Rule will experience a reduction in their compliance burden, while companies not previously covered will have minimal new disclosure obligations. As such, the economic impact of the final Rule will be minimal. In any event, the burdens imposed on small entities are likely to be relatively small.

In the RNPR, the Commission provided notice to the Small Business

Administration of the agency's certification of no significant impact. Nonetheless, the Commission determined that it was appropriate to publish an IRFA in order to inquire into the impact of the proposed Rule on small entities. Based on the IRFA set forth in the Commission's earlier notice of proposed rulemaking, a review of the public comments submitted in response to that notice and additional information and analysis by Commission staff, the Commission submits this FRFA.

### A. Need for and Objectives of the Final Rule

The Commission's law enforcement experience provides ample evidence that fraud is pervasive in the sale of many business opportunities marketed to consumers. Yet, the Commission believes that the current requirements of the interim Business Opportunity Rule are more extensive than necessary to protect prospective purchasers of business opportunities from deception. The pre-sale disclosures provided by the final Rule will give consumers the information they need to protect themselves from fraudulent sales claims, while minimizing the compliance costs and burdens on sellers.

The objective of the final Rule is to provide consumers considering the purchase of a business opportunity with material information they need to investigate the offering thoroughly so they can protect themselves from fraudulent claims, while minimizing the compliance burdens on sellers. The legal basis for the final Rule is Section 18 of the FTC Act, 15 U.S.C. 57a, which authorizes the Commission to promulgate, modify, and repeal trade regulation rules that define with specificity acts or practices in or affecting commerce that are unfair or deceptive within the meaning of Section (5)(a)(1) of the FTC Act, 15 U.S.C. 45(a)(1).

### B. Significant Issues Raised by Public Comments, Summary of Agency's Assessment of These Issues, and Changes, if Any, Made in Response

In crafting the final Rule, the Commission has carefully considered the comments received throughout the Rule amendment proceeding. Section III of this document provides a more detailed discussion of the comments received by the Commission and the Commission's response to those comments.

In sum, in response to INRP, the Commission received more than 17,000 comments, the overwhelming majority

---

[488] 17.5 cents is staff's estimate of the current market translation rate per word.

[489] *See* 5 U.S.C. 603–605.

of which came from the MLM industry. The MLM industry urged the Commission to exclude MLM plans from the scope of IPBOR due to the burdens imposed on them through the IPBOR and the IPBOR's failure to differentiate between unlawful pyramid schemes and legitimate companies using an MLM model. In consideration of the comments received in response to the INPR, and a reassessment of the Commission's law enforcement history, the Commission subsequently issued a RNPR, in which the Commission decided to narrow the scope of the IPBOR to avoid broadly sweeping in all sellers of MLM plans. In addition, the Commission proposed a more narrowed definition of "business opportunity" and also eliminated two required disclosures—information about legal actions pertaining to a business opportunity seller's sales personnel, and the number of cancellation or refund requests the seller received. The Commission received fewer than 125 comments and rebuttal comments in response to RNPR addressing these changes. The Commission received written comment from six individuals and entities following the public workshop held by the Commission. Finally, the Commission received 27 comments in response to the Staff Report. Many of those comments opposed the Commission's decision to narrow the scope of the Rule to avoid broadly sweeping in the MLMs.

*C. Description and an Estimate of the Number of Small Entities to Which the Final Rule Will Apply, or Explanation Why No Estimate Is Available*

The final Rule primarily applies to "sellers" of business opportunities, including vending, rack display, medical billing, and work-at-home (*e.g.*, craft assembly, envelope stuffing) opportunities. The Commission believes that many of these sellers fall into the category of small entities. Determining the precise number of small entities affected by the final Rule, however, is difficult due to the wide range of businesses engaged in business opportunity sales. The staff estimates that there are approximately 3,050 business opportunity sellers, including some 2,500 vending machine, rack display, and related opportunity sellers and 550 work-at-home opportunity sellers. Most established and some start-up business opportunities would likely be considered small businesses according to the applicable Small Business Administration ("SBA") size

standards.[490] The FTC staff estimates that as many as 70% of business opportunities, as defined by the Rule, are small businesses.

*D. Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Final Rule, Including an Estimate of the Classes of Small Entities That Will Be Subject to the Requirements, and the Type of Professional Skills That Will Be Necessary To Comply*

As discussed in the Paperwork Reduction Act analysis of this notice (Section IV), the final Rule will impose compliance requirements (*e.g.*, disclosure) and minor recordkeeping requirements on those entities covered by the final Rule. Specifically, the final Rule imposes disclosure and recordkeeping requirements, within the meaning of the Paperwork Reduction Act, on the "sellers" of business opportunities and their principals.

The disclosure and recordkeeping requirements are fewer in number and lesser in extent than requirements currently applicable to such entities now covered by the interim Business Opportunity Rule and formerly covered by the Original Franchise Rule. Section 437.2 of the final Rule requires "sellers" of covered business opportunities to provide potential purchasers with a one-page disclosure document, as specified by § 437.3 and Appendix A and if applicable, Appendix B, at least seven calendar days before they sign a contract or pay any money toward a purchase. For business opportunities marketed in Spanish, § 437.5 of the final Rule requires that sellers provide potential purchasers with the Spanish version of the disclosure document (Appendix B to the Rule) and provide any required disclosures in Spanish. For sales conducted in a language other than English or Spanish, the final Rule requires that sellers use the form and an accurate translation of the language set forth in Appendix A.

Section 437.7 of the final Rule prescribes recordkeeping requirements necessary for effective enforcement of the Rule. Specifically, sellers of a covered business opportunity, and their principals, must retain for at least three years the following types of documents: (1) Each materially different version of

all documents required by the Rule; (2) each purchaser's disclosure receipt; (3) each executed written contract with a purchaser; and (4) all substantiation upon which the seller relies for each earnings claim made. The final Rule requires that these records be made available for inspection by the Commission, but does not otherwise require production of the records.

Commission staff assumes that sellers will hire an attorney to complete, update, file, and store the disclosure documents. If applicable, sellers may require translation services to comply with the disclosure requirements.

*E. Steps the Agency Has Taken in the Final Rule To Minimize Any Significant Economic Impact of the Final Rule on Small Entities, Consistent With Applicable Statutory Objectives, Including the Factual and Legal Basis for the Alternatives Adopted and Those Rejected*

As discussed throughout this document, the Commission has attempted to reduce compliance costs wherever possible. Compliance with the final Rule's disclosure requirements is significantly less burdensome than with the interim Business Opportunity Rule. The final Rule's disclosure and recordkeeping requirements are designed to impose the minimum burden on all affected business opportunity sellers, regardless of size. In formulating the final Rule, the Commission has taken a number of significant steps to minimize the burdens it would impose on large and small businesses. These include: (1) Limiting the required pre-sale disclosure to a one-page document, with check boxes provided to simplify disclosure responses; (2) allowing the disclosure to refer to information in other existing documents to avoid needless duplication; (3) permitting the disclosure document itself to be furnished in electronic form to minimize printing and distribution costs; and (4) employing specific prohibitions in place of affirmative disclosures whenever possible. Moreover, because the majority of sellers covered by the final Rule are already required to comply with the Commission's interim Business Opportunity Rule and the business opportunity laws in 22 states, FTC staff anticipates that the final Rule will drastically reduce their current compliance costs, while imposing exceedingly modest ongoing compliance costs on all covered sellers. Consequently, the Commission believes that the final Rule will not have a

---

[490] Since October 2000, SBA size standards have been based on the North American Industry Classification System ("NAICS"), in place of the Standard Industrial Classification ("SIC") system. In general, a company in a non-manufacturing industry is a small business if its average annual receipts are $7 million or less. *See http://www.sba.gov/content/summary-size-standards-industry.*

**76860** **Federal Register** / Vol. 76, No. 236 / Thursday, December 8, 2011 / Rules and Regulations

significant economic impact upon small businesses.

The final Rule requires business opportunity sellers to provide only five affirmative disclosures in a one-page disclosure document. This is a significant reduction from the more than 20 disclosures now required by the Commission's interim Business Opportunity Rule, with which many business opportunity sellers are now obligated to comply.

## VI. Final Rule Language

### List of Subjects in 16 CFR Part 437

Reporting and recordkeeping requirements, Trade practices.

By direction of the Commission.

**Donald S. Clark,**

*Secretary.*

For the reasons set forth in the preamble, the Federal Trade Commission amends title 16, Code of Federal Regulations, by revising part 437 to read as follows:

## PART 437—BUSINESS OPPORTUNITY RULE

Sec.
437.1    Definitions.
437.2    The obligation to furnish written documents.
437.3    The disclosure document.
437.4    Earnings claims.
437.5    Sales conducted in Spanish or other languages besides English.
437.6    Other prohibited practices.
437.7    Record retention.
437.8    Franchise exemption.
437.9    Outstanding orders; preemption.
437.10   Severability.
Appendix A to Part 437—Disclosure of Important Information About Business Opportunity
Appendix B to Part 437—Disclosure of Important Information About Business Opportunity (Spanish-Language Version)

**Authority:** 15 U.S.C. 41–58.

### § 437.1 Definitions.

The following definitions shall apply throughout this part:

(a) *Action* means a criminal information, indictment, or proceeding; a civil complaint, cross claim, counterclaim, or third party complaint in a judicial action or proceeding; arbitration; or any governmental administrative proceeding, including, but not limited to, an action to obtain or issue a cease and desist order, an assurance of voluntary compliance, and an assurance of discontinuance.

(b) *Affiliate* means an entity controlled by, controlling, or under common control with a business opportunity seller.

(c) *Business opportunity* means a commercial arrangement in which:

(1) A seller solicits a prospective purchaser to enter into a new business; and

(2) The prospective purchaser makes a required payment; and

(3) The seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will:

(i) Provide locations for the use or operation of equipment, displays, vending machines, or similar devices, owned, leased, controlled, or paid for by the purchaser; or

(ii) Provide outlets, accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services; or

(iii) Buy back any or all of the goods or services that the purchaser makes, produces, fabricates, grows, breeds, modifies, or provides, including but not limited to providing payment for such services as, for example, stuffing envelopes from the purchaser's home.

(d) *Designated person* means any person, other than the seller, whose goods or services the seller suggests, recommends, or requires that the purchaser use in establishing or operating a new business.

(e) *Disclose* or *state* means to give information in writing that is clear and conspicuous, accurate, concise, and legible.

(f) *Earnings claim* means any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits. Earnings claims include, but are not limited to:

(1) Any chart, table, or mathematical calculation that demonstrates possible results based upon a combination of variables; and

(2) Any statements from which a prospective purchaser can reasonably infer that he or she will earn a minimum level of income (*e.g.,* "earn enough to buy a Porsche," "earn a six-figure income," or "earn your investment back within one year").

(g) *Exclusive territory* means a specified geographic or other actual or implied marketing area in which the seller promises not to locate additional purchasers or offer the same or similar goods or services as the purchaser through alternative channels of distribution.

(h) *General media* means any instrumentality through which a person may communicate with the public, including, but not limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and mobile communications.

(i) *Material* means likely to affect a person's choice of, or conduct regarding, goods or services.

(j) *New business* means a business in which the prospective purchaser is not currently engaged, or a new line or type of business.

(k) *Person* means an individual, group, association, limited or general partnership, corporation, or any other business entity.

(l) *Prior business* means:

(1) A business from which the seller acquired, directly or indirectly, the major portion of the business' assets; or

(2) Any business previously owned or operated by the seller, in whole or in part.

(m) *Providing locations, outlets, accounts, or customers* means furnishing the prospective purchaser with existing or potential locations, outlets, accounts, or customers; requiring, recommending, or suggesting one or more locators or lead generating companies; providing a list of locator or lead generating companies; collecting a fee on behalf of one or more locators or lead generating companies; offering to furnish a list of locations; or otherwise assisting the prospective purchaser in obtaining his or her own locations, outlets, accounts, or customers, *provided, however,* that advertising and general advice about business development and training shall not be considered as "providing locations, outlets, accounts, or customers."

(n) *Purchaser* means a person who buys a business opportunity.

(o) *Quarterly* means as of January 1, April 1, July 1, and October 1.

(p) *Required payment* means all consideration that the purchaser must pay to the seller or an affiliate, either by contract or by practical necessity, as a condition of obtaining or commencing operation of the business opportunity. Such payment may be made directly or indirectly through a third party. A required payment does not include payments for the purchase of reasonable amounts of inventory at bona fide wholesale prices for resale or lease.

(q) *Seller* means a person who offers for sale or sells a business opportunity.

(r) *Signature* or *signed* means a person's affirmative steps to authenticate his or her identity. It includes a person's handwritten signature, as well as an electronic or digital form of signature to the extent that such signature is recognized as a valid signature under applicable federal law or state contract law.

(s) *Written* or *in writing* means any document or information in printed form or in any form capable of being downloaded, printed, or otherwise

preserved in tangible form and read. It includes: type-set, word processed, or handwritten documents; information on computer disk or CD–ROM; information sent via email; or information posted on the Internet. It does not include mere oral statements.

### § 437.2 The obligation to furnish written documents.

In connection with the offer for sale, sale, or promotion of a business opportunity, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act ("FTC Act") for any seller to fail to furnish a prospective purchaser with the material information required by §§ 437.3(a) and 437.4(a) of this part in writing at least seven calendar days before the earlier of the time that the prospective purchaser:

(a) Signs any contract in connection with the business opportunity sale; or

(b) Makes a payment or provides other consideration to the seller, directly or indirectly through a third party.

### § 437.3 The disclosure document.

In connection with the offer for sale, sale, or promotion of a business opportunity, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the FTC Act, for any seller to:

(a) Fail to disclose to a prospective purchaser the following material information in a single written document in the form and using the language set forth in appendix A to this part; or if the offer for sale, sale, or promotion of a business opportunity is conducted in Spanish, in the form and using the language set forth in appendix B to this part; or if the offer for sale, sale, or promotion of a business opportunity is conducted in a language other than English or Spanish, using the form and an accurate translation of the language set forth in appendix A to this part:

(1) *Identifying information.* State the name, business address, and telephone number of the seller, the name of the salesperson offering the opportunity, and the date when the disclosure document is furnished to the prospective purchaser.

(2) *Earnings claims.* If the seller makes an earnings claim, check the "yes" box and attach the earnings statement required by § 437.4. If not, check the "no" box.

(3) *Legal actions.* (i) If any of the following persons has been the subject of any civil or criminal action for misrepresentation, fraud, securities law violations, or unfair or deceptive practices, including violations of any FTC Rule, within the 10 years

immediately preceding the date that the business opportunity is offered, check the "yes" box:

(A) The seller;

(B) Any affiliate or prior business of the seller; or

(C) Any of the seller's officers, directors, sales managers, or any individual who occupies a position or performs a function similar to an officer, director, or sales manager of the seller.

(ii) If the "yes" box is checked, disclose all such actions in an attachment to the disclosure document. State the full caption of each action (names of the principal parties, case number, full name of court, and filing date). For each action, the seller may also provide a brief accurate statement not to exceed 100 words that describes the action.

(iii) If there are no actions to disclose, check the "no" box.

(4) *Cancellation or refund policy.* If the seller offers a refund or the right to cancel the purchase, check the "yes" box. If so, state all material terms and conditions of the refund or cancellation policy in an attachment to the disclosure document. If no refund or cancellation is offered, check the "no" box.

(5) *References.* (i) State the name, state, and telephone number of all purchasers who purchased the business opportunity within the last three years. If more than 10 purchasers purchased the business opportunity within the last three years, the seller may limit the disclosure by stating the name, state, and telephone number of at least the 10 purchasers within the past three years who are located nearest to the prospective purchaser's location. Alternatively, a seller may furnish a prospective buyer with a list disclosing all purchasers nationwide within the last three years. If choosing this option, insert the words "See Attached List" without removing the list headings or the numbers 1 through 10, and attach a list of the references to the disclosure document.

(ii) Clearly and conspicuously, and in immediate conjunction with the list of references, state the following: "If you buy a business opportunity from the seller, your contact information can be disclosed in the future to other buyers."

(6) *Receipt.* Attach a duplicate copy of the disclosure document to be signed and dated by the purchaser. The seller may inform the prospective purchaser how to return the signed receipt (for example, by sending to a street address, email address, or facsimile telephone number).

(b) Fail to update the disclosures required by paragraph (a) of this section

at least quarterly to reflect any changes in the required information, including, but not limited to, any changes in the seller's refund or cancellation policy, or the list of references; *provided, however,* that until a seller has 10 purchasers, the list of references must be updated monthly.

### § 437.4 Earnings claims.

In connection with the offer for sale, sale, or promotion of a business opportunity, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the FTC Act, for the seller to:

(a) Make any earnings claim to a prospective purchaser, unless the seller:

(1) Has a reasonable basis for its claim at the time the claim is made;

(2) Has in its possession written materials that substantiate its claim at the time the claim is made;

(3) Makes the written substantiation available upon request to the prospective purchaser and to the Commission; and

(4) Furnishes to the prospective purchaser an earnings claim statement. The earnings claim statement shall be a single written document and shall state the following information:

(i) The title "EARNINGS CLAIM STATEMENT REQUIRED BY LAW" in capital, bold type letters;

(ii) The name of the person making the earnings claim and the date of the earnings claim;

(iii) The earnings claim;

(iv) The beginning and ending dates when the represented earnings were achieved;

(v) The number and percentage of all persons who purchased the business opportunity prior to the ending date in paragraph (a)(4)(iv) of this section who achieved at least the stated level of earnings;

(vi) Any characteristics of the purchasers who achieved at least the represented level of earnings, such as their location, that may differ materially from the characteristics of the prospective purchasers being offered the business opportunity; and

(vii) A statement that written substantiation for the earnings claim will be made available to the prospective purchaser upon request.

(b) Make any earnings claim in the general media, unless the seller:

(1) Has a reasonable basis for its claim at the time the claim is made;

(2) Has in its possession written material that substantiates its claim at the time the claim is made;

(3) States in immediate conjunction with the claim:

(i) The beginning and ending dates when the represented earnings were achieved; and

(ii) The number and percentage of all persons who purchased the business opportunity prior to the ending date in paragraph (b)(3)(i) of this section who achieved at least the stated level of earnings.

(c) Disseminate industry financial, earnings, or performance information unless the seller has written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial, earnings, or performance experience of purchasers of the business opportunity being offered for sale.

(d) Fail to notify any prospective purchaser in writing of any material changes affecting the relevance or reliability of the information contained in an earnings claim statement before the prospective purchaser signs any contract or makes a payment or provides other consideration to the seller, directly or indirectly, through a third party.

### § 437.5 Sales conducted in Spanish or other languages besides English.

(a) If the seller conducts the offer for sale, sale, or promotion of a business opportunity in Spanish, the seller must provide the disclosure document required by § 437.3(a) in the form and language set forth in appendix B to this part, and the disclosures required by §§ 437.3(a) and 437.4 must be made in Spanish.

(b) If the seller conducts the offer for sale, sale, or promotion of a business opportunity in a language other than English or Spanish, the seller must provide the disclosure document required by § 437.3(a) using the form and an accurate translation of the language set forth in appendix A to this part, and the disclosures required by §§ 437.3(a) and 437.4 must be made in that language.

### § 437.6 Other prohibited practices.

In connection with the offer for sale, sale, or promotion of a business opportunity, it is a violation of this part and an unfair or deceptive act or practice in violation of Section 5 of the FTC Act for any seller, directly or indirectly through a third party, to:

(a) Disclaim, or require a prospective purchaser to waive reliance on, any statement made in any document or attachment that is required or permitted to be disclosed under this Rule;

(b) Make any claim or representation, orally, visually, or in writing, that is inconsistent with or contradicts the information required to be disclosed by

§§ 437.3 (basic disclosure document) and 437.4 (earnings claims document) of this Rule;

(c) Include in any disclosure document or earnings claim statement any materials or information other than what is explicitly required or permitted by this Rule. For the sole purpose of enhancing the prospective purchaser's ability to maneuver through an electronic version of a disclosure document or earnings statement, the seller may include scroll bars and internal links. All other features (*e.g.*, multimedia tools such as audio, video, animation, or pop-up screens) are prohibited;

(d) Misrepresent the amount of sales, or gross or net income or profits a prospective purchaser may earn or that prior purchasers have earned;

(e) Misrepresent that any governmental entity, law, or regulation prohibits a seller from:

(1) Furnishing earnings information to a prospective purchaser; or

(2) Disclosing to prospective purchasers the identity of other purchasers of the business opportunity;

(f) Fail to make available to prospective purchasers, and to the Commission upon request, written substantiation for the seller's earnings claims;

(g) Misrepresent how or when commissions, bonuses, incentives, premiums, or other payments from the seller to the purchaser will be calculated or distributed;

(h) Misrepresent the cost, or the performance, efficacy, nature, or central characteristics of the business opportunity or the goods or services offered to a prospective purchaser;

(i) Misrepresent any material aspect of any assistance offered to a prospective purchaser;

(j) Misrepresent the likelihood that a seller, locator, or lead generator will find locations, outlets, accounts, or customers for the purchaser;

(k) Misrepresent any term or condition of the seller's refund or cancellation policies;

(l) Fail to provide a refund or cancellation when the purchaser has satisfied the terms and conditions disclosed pursuant to § 437.3(a)(4);

(m) Misrepresent a business opportunity as an employment opportunity;

(n) Misrepresent the terms of any territorial exclusivity or territorial protection offered to a prospective purchaser;

(o) Assign to any purchaser a purported exclusive territory that, in fact, encompasses the same or

overlapping areas already assigned to another purchaser;

(p) Misrepresent that any person, trademark or service mark holder, or governmental entity, directly or indirectly benefits from, sponsors, participates in, endorses, approves, authorizes, or is otherwise associated with the sale of the business opportunity or the goods or services sold through the business opportunity;

(q) Misrepresent that any person:

(1) Has purchased a business opportunity from the seller or has operated a business opportunity of the type offered by the seller; or

(2) Can provide an independent or reliable report about the business opportunity or the experiences of any current or former purchaser.

(r) Fail to disclose, with respect to any person identified as a purchaser or operator of a business opportunity offered by the seller:

(1) Any consideration promised or paid to such person. Consideration includes, but is not limited to, any payment, forgiveness of debt, or provision of equipment, services, or discounts to the person or to a third party on the person's behalf; or

(2) Any personal relationship or any past or present business relationship other than as the purchaser or operator of the business opportunity being offered by the seller.

### § 437.7 Record retention.

To prevent the unfair and deceptive acts or practices specified in this Rule, business opportunity sellers and their principals must prepare, retain, and make available for inspection by Commission officials copies of the following documents for a period of three years:

(a) Each materially different version of all documents required by this Rule;

(b) Each purchaser's disclosure receipt;

(c) Each executed written contract with a purchaser; and

(d) All substantiation upon which the seller relies for each earnings claim from the time each such claim is made.

### § 437.8 Franchise exemption.

The provisions of this Rule shall not apply to any business opportunity that constitutes a "franchise," as defined in the Franchise Rule, 16 CFR part 436; *provided, however,* that the provisions of this Rule shall apply to any such franchise if it is exempted from the provisions of part 436 because, either:

(a) Under § 436.8(a)(1), the total of the required payments or commitments to make a required payment, to the franchisor or an affiliate that are made

any time from before to within six months after commencing operation of the franchisee's business is less than $500, or

(b) Under § 436.8(a)(7), there is no written document describing any material term or aspect of the relationship or arrangement.

### § 437.9  Outstanding orders; preemption.

(a) A business opportunity required by prior FTC or court order to follow the Franchise Rule, 16 CFR part 436, may petition the Commission to amend the order or to stipulate to an amendment of the court order so that the business opportunity may follow the provisions of this part.

(b) The FTC does not intend to preempt the business opportunity sales practices laws of any state or local government, except to the extent of any conflict with this part. A law is not in conflict with this Rule if it affords prospective purchasers equal or greater protection, such as registration of disclosure documents or more extensive disclosures. All such disclosures, however, must be made in a separate state disclosure document.

### § 437.10  Severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, the remaining provisions shall continue in effect.

**BILLING CODE 6750–01–P**

## APPENDIX A to PART 437

### DISCLOSURE OF IMPORTANT INFORMATION ABOUT BUSINESS OPPORTUNITY
Required by the Federal Trade Commission, Rule 16 C.F.R. Part 437

Name of Seller:              Address:

Phone:              Salesperson:        Date:

[Name of Seller] has completed this form, which provides important information about the business opportunity it is offering you. The Federal Trade Commission, an agency of the federal government, requires that [Name of Seller] complete this form and give it to you. However, the Federal Trade Commission has not seen this completed form or checked that the information is true. **Make sure that this information is the same as what the salesperson told you about this opportunity.**

---

**LEGAL ACTIONS:** Has [Name of Seller] or any of its key personnel been the subject of a civil or criminal action involving misrepresentation, fraud, securities law violation, or unfair or deceptive practices, including violations of any FTC Rule, within the past 10 years?

☐ **YES** → *If the answer is yes, [Name of Seller] must attach a list of all such legal actions to this form.*
☐ **NO**

---

**CANCELLATION OR REFUND POLICY:** Does [Name of Seller] offer a cancellation or refund policy?

☐ **YES** → *If the answer is yes, [Name of Seller] must attach a statement describing this policy to this form.*
☐ **NO**

---

**EARNINGS:** Has [Name of Seller] or its salesperson discussed how much money purchasers of this business opportunity can earn or have earned? In other words, have they stated or implied that purchasers can earn a specific level of sales, income, or profit?

☐ **YES** → *If the answer is yes, [Name of Seller] must attach an Earnings Claims Statement to this form. Read this statement carefully. You may wish to show this information to an advisor or accountant.*

☐ **NO**

---

**REFERENCES:** In the section below, [Name of Seller] must provide you with contact information for at least 10 people who have purchased a business opportunity from them. If fewer than 10 are listed, this is the total list of all purchasers. **You may wish to contact the people below to compare their experiences with what [Name of Seller] told you about the business opportunity.**

Note: If you purchase a business opportunity from [Name of Seller], your contact information can be disclosed in the future to other potential buyers.

| Name | State | Telephone Number | Name | State | Telephone Number |
|------|-------|------------------|------|-------|------------------|
| 1. | | | 6. | | |
| 2. | | | 7. | | |
| 3. | | | 8. | | |
| 4. | | | 9. | | |
| 5. | | | 10 | | |

---

Signature: _____     Date: _____

By signing above, you are acknowledging that you have received this form. This is not a purchase contract. To give you enough time to research this opportunity, the Federal Trade Commission requires that after you receive this form, [Name of Seller] must wait at least seven calendar days before asking you to sign a purchase contract or make any payments.

**For more information about business opportunities in general:** Visit the FTC's website at www.ftc.gov/bizopps or call 1-877-FTC-HELP (877-382-4357). You can also contact your state's Attorney General.

## APPENDIX B to PART 437

**DIVULGACIÓN DE INFORMACIÓN IMPORTANTE SOBRE OPORTUNIDAD DE NEGOCIO**
Formulario requerido por la Comisión Federal de Comercio (FTC)
Regla 16 de la Parte 437 del Código de Regulaciones Federales

Nombre del Vendedor:  Domicilio:
Teléfono:  Representante de Ventas:  Fecha:

[Nombre del Vendedor] completó el presente formulario y en el mismo le suministra información importante sobre la oportunidad de negocio que le está ofreciendo. La Comisión Federal de Comercio (*Federal Trade Commission*, FTC), una agencia del gobierno federal, le requiere a la compañía [Nombre del Vendedor] que complete el presente formulario y que se lo entregue a usted. Pero la FTC no ha visto este formulario completado por la compañía ni ha verificado que la información indicada sea veraz. **Asegúrese de que la información contenida en el presente formulario coincida con lo que le dijo el representante de ventas respecto de esta oportunidad.**

**ACCIONES LEGALES:** ¿La compañía [Nombre del Vendedor] o alguno de los principales miembros de su personal ha sido sujeto de una acción civil o penal, que involucre falsedad, fraude, infracción de las leyes de títulos y valores, o prácticas desleales o engañosas, incluyendo infracciones de las Reglas o Normas de la FTC, dentro de los 10 últimos años?

☐ **SI** → *Si la respuesta es afirmativa,* [Nombre del Vendedor] *debe adjuntar al formulario una lista completa de dichas acciones legales.*
☐ **NO**

**POLÍTICA DE CANCELACIÓN O REINTEGRO:** ¿Ofrece [Nombre del Vendedor] una política de cancelación o reintegro?

☐ **SÍ** → *Si la respuesta es afirmativa,* [Nombre del Vendedor] *debe adjuntar al formulario una declaración con la descripción de dicha política.*
☐ **NO**

**INGRESOS:** ¿La compañía [Nombre del Vendedor] o alguno de sus representantes de ventas ha manifestado la cantidad de dinero que pueden ganar o que han ganado los compradores de esta oportunidad de negocio? ¿Dicho en otras palabras, han expresado de manera explícita o implícita que los compradores pueden alcanzar un nivel específico de ventas, o ganar un nivel específico de ingresos?

☐ **SÍ** → *Si la respuesta es afirmativa,* [Nombre del Vendedor] *debe adjuntar a este formulario una Declaración de los Ingresos Proclamados. Lea esta declaración atentamente. Puede que desee analizar esta información con un asesor o contador.*
☐ **NO**

**REFERENCIAS:** En esta sección del formulario, [Nombre del Vendedor] debe listar la información de contacto de por lo menos 10 personas que le hayan comprado una oportunidad de negocio. Si le suministran los datos de menos de 10 personas, es porque ésa es la lista completa de todos los compradores. **Puede que desee comunicarse con las personas listadas a continuación para comparar sus respectivas experiencias con lo que le dijo [Nombre del Vendedor] sobre la oportunidad de negocio que le está ofreciendo.**

Nota: Si usted compra una oportunidad de negocio de [Nombre del Vendedor], podrá divulgarse su información de contacto a otros posibles compradores.

| Nombre | Estado | Número de Teléfono | | Nombre | Estado | Número de Teléfono |
|--------|--------|--------------------|--|--------|--------|--------------------|
| 1. | | | 6. | | | |
| 2. | | | 7. | | | |
| 3. | | | 8. | | | |
| 4. | | | 9. | | | |
| 5. | | | 10. | | | |

Firma: _____  Fecha: _____

Por medio de su firma, usted acusa recibo del presente formulario. Esto no es un contrato de compra. La Comisión Federal de Comercio (FTC) establece que con el fin de concederle el tiempo necesario para que usted investigue esta oportunidad, [Nombre del Vendedor] debe esperar un mínimo de siete días naturales o corridos a partir de la fecha en que le entregue este formulario antes de pedirle que firme un contrato de compra o que efectúe un pago.

**Para más información sobre oportunidades de negocio en general:** Visite el sitio Web de la FTC www.ftc.gov/bizopps o llame al 1-877-FTC-HELP (877-382-4357). Usted también puede establecer contacto con el Fiscal General de su estado de residencia.

[FR Doc. 2011–30597 Filed 12–7–11; 8:45 am]
**BILLING CODE 6750-01-C**

# ATTACHMENT B

## FEDERAL TRADE COMMISSION

### FINANCIAL STATEMENT OF INDIVIDUAL DEFENDANT

**Definitions and Instructions:**

1. Complete all items. Enter "None" or "N/A" ("Not Applicable") in the first field only of any item that does not apply to you. If you cannot fully answer a question, explain why.

2. "Dependents" include your spouse, live-in companion, dependent children, or any other person, whom you or your spouse (or your children's other parent) claimed or could have claimed as a dependent for tax purposes at any time during the past five years.

3. "Assets" and "Liabilities" include ALL assets and liabilities, located within the United States or any foreign country or territory, whether held individually or jointly and whether held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

4. Attach continuation pages as needed. On the financial statement, state next to the Item number that the Item is being continued. On the continuation page(s), identify the Item number(s) being continued.

5. Type or print legibly.

6. Initial each page in the space provided in the lower right corner.

7. Sign and date the completed financial statement on the last page.


**Penalty for False Information:**

Federal law provides that any person may be imprisoned for not more than five years, fined, or both, if such person:

(1) "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or devise a material fact; makes any materially false, fictitious or fraudulent statement or representation; or makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry" (18 U.S.C. § 1001);

(2) "in any . . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true" (18 U.S.C. § 1621); or

(3) "in any ( . . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information . . . knowing the same to contain any false material declaration" (18 U.S.C. § 1623).

For a felony conviction under the provisions cited above, federal law provides that the fine may be not more than the greater of (i) $250,000 for an individual or $500,000 for a corporation, or (ii) if the felony results in pecuniary gain to any person or pecuniary loss to any person other than the defendant, the greater of twice the gross gain or twice the gross loss. 18 U.S.C. § 3571.

## BACKGROUND INFORMATION

### Item 1. Information About You

| Full Name | | Social Security No. | | |
|---|---|---|---|---|
| Current Address of Primary Residence | | Driver's License No. | | State Issued |
| | | Phone Numbers<br>Home: (     )<br>Fax:  (     ) | Date of Birth:      /     /<br>(mm/dd/yyyy)<br>Place of Birth | |
| ☐Rent  ☐Own     From (Date):     /     /<br>(mm/dd/yyyy) | | E-Mail Address | | |
| Internet Home Page | | | | |

**Previous Addresses for past five years** (if required, use additional pages at end of form)

| Address | From:     /     /<br>(mm/dd/yyyy)     Until:     /     /<br>(mm/dd/yyyy)<br>☐Rent  ☐Own |
|---|---|
| Address | From:     /     /     Until:     /     /<br>☐Rent  ☐Own |
| Address | From:     /     /     Until:     /     /<br>☐Rent  ☐Own |
| Identify any other name(s) and/or social security number(s) you have used, and the time period(s) during which they were used: | |

### Item 2. Information About Your Spouse or Live-In Companion

| Spouse/Companion's Name | | Social Security No. | Date of Birth<br>/     /<br>(mm/dd/yyyy) |
|---|---|---|---|
| Address (if different from yours) | | Phone Number<br>(     ) | Place of Birth |
| | | ☐Rent  ☐Own     From (Date):     /     /<br>(mm/dd/yyyy) | |
| Identify any other name(s) and/or social security number(s) you have used, and the time period(s) during which they were used: | | | |
| Employer's Name and Address | | Job Title | |
| | | Years in Present Job | Annual Gross Salary/Wages<br>$ |

### Item 3. Information About Your Previous Spouse

| Name and Address | Social Security No. |
|---|---|
| | Date of Birth<br>/     /<br>(mm/dd/yyyy) |

### Item 4. Contact Information (name and address of closest living relative other than your spouse)

| Name and Address | Phone Number<br>(     ) |
|---|---|

Initials: _____

## Item 5. Information About Dependents (whether or not they reside with you)

| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
|---|---|---|
| | Relationship | |
| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
| | Relationship . | |
| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
| | Relationship | |
| Name and Address | Social Security No. | Date of Birth / / (mm/dd/yyyy) |
| | Relationship | |

## Item 6. Employment Information/Employment Income

Provide the following information for this year-to-date and for each of the previous five full years, for each business entity of which you were a director, officer, member, partner, employee (including self-employment), agent, owner, shareholder, contractor, participant or consultant at any time during that period. "Income" includes, but is not limited to, any salary, commissions, distributions, draws, consulting fees, loans, loan payments, dividends, royalties, and benefits for which you did not pay (*e.g.*, health insurance premiums, automobile lease or loan payments) received by you or anyone else on your behalf.

| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. | |
|---|---|---|---|---|
| | From (Month/Year) / | To (Month/Year) / | Year 20 | Income $ $ |
| Ownership Interest? ☐ Yes ☐ No | | | | |
| Positions Held | From (Month/Year) | To (Month/Year) | | $ |
| | / | / | | $ |
| | / | / | | $ |
| | / | / | | $ |
| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. | |
| | From (Month/Year) / | To (Month/Year) / | Year 20 | Income $ $ |
| Ownership Interest? ☐ Yes ☐ No | | | | |
| Positions Held | From (Month/Year) | To (Month/Year) | | $ |
| | / | / | | $ |
| | / | / | | $ |
| | / | / | | $ |
| Company Name and Address | Dates Employed | | Income Received: Y-T-D & 5 Prior Yrs. | |
| | From (Month/Year) / | To (Month/Year) / | Year 20 | Income $ $ |
| Ownership Interest? ☐ Yes ☐ No | | | | |
| Positions Held | From (Month/Year) | To (Month/Year) | | $ |
| | / | / | | $ |
| | / | / | | $ |
| | / | / | | $ |

Initials: _____

## Item 7. Pending Lawsuits Filed By or Against You or Your Spouse

List all pending lawsuits that have been filed by or against you or your spouse in any court or before an administrative agency in the United States or in any foreign country or territory. *Note: At Item 12, list lawsuits that resulted in final judgments or settlements in your favor. At Item 21, list lawsuits that resulted in final judgments or settlements against you.*

| Caption of Proceeding | Court or Agency and Location | Case No. | Nature of Proceeding | Relief Requested | Status or Disposition |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## Item 8. Safe Deposit Boxes

List all safe deposit boxes, located within the United States or in any foreign country or territory, whether held individually or jointly and whether held by you, your spouse, or any of your dependents, or held by others for the benefit of you, your spouse, or any of your dependents.

| Name of Owner(s) | Name & Address of Depository Institution | Box No. | Contents |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Initials: _____

# FINANCIAL INFORMATION

**REMINDER:** When an item asks for information regarding your "assets" and "liabilities" include ALL assets and liabilities, located within the United States or in any foreign country or territory, or institution, whether held individually or jointly, and whether held by you, your spouse, or any of your dependents, or held by others for the benefit of you, your spouse, or any of your dependents. In addition, provide all documents requested in Item 24 with your completed Financial Statement.

## ASSETS

### Item 9. Cash, Bank, and Money Market Accounts

List cash on hand (as opposed to cash in bank accounts or other financial accounts) and all bank accounts, money market accounts, or other financial accounts, including but not limited to checking accounts, savings accounts, and certificates of deposit. The term "cash on hand" includes but is not limited to cash in the form of currency, uncashed checks, and money orders.

| a. Amount of Cash on Hand $ | | Form of Cash on Hand | | |
|---|---|---|---|---|
| b. Name on Account | Name & Address of Financial Institution | | Account No. | Current Balance |
| | | | | $ |
| | | | | $ |
| | | | | $ |
| | | | | $ |
| | | | | $ |

### Item 10. Publicly Traded Securities

List all publicly traded securities, including but not limited to, stocks, stock options, corporate bonds, mutual funds, U.S. government securities (including but not limited to treasury bills and treasury notes), and state and municipal bonds. Also list any U.S. savings bonds.

| Owner of Security | | Issuer | Type of Security | No. of Units Owned |
|---|---|---|---|---|
| Broker House, Address | | Broker Account No. | | |
| | | Current Fair Market Value $ | Loan(s) Against Security $ | |
| Owner of Security | | Issuer | Type of Security | No. of Units Owned |
| Broker House, Address | | Broker Account No. | | |
| | | Current Fair Market Value $ | Loan(s) Against Security $ | |
| Owner of Security | | Issuer | Type of Security | No. of Units Owned |
| Broker House, Address | | Broker Account No. | | |
| | | Current Fair Market Value $ | Loan(s) Against Security $ | |

Initials: _____

## Item 11. Non-Public Business and Financial Interests
List all non-public business and financial interests, including but not limited to any interest in a non-public corporation, subchapter-S corporation, limited liability corporation ("LLC"), general or limited partnership, joint venture, sole proprietorship, international business corporation or personal investment corporation, and oil or mineral lease.

| Entity's Name & Address | Type of Business or Financial Interest (e.g., LLC, partnership) | Owner (e.g., self, spouse) | Ownership % | If Officer, Director, Member or Partner, Exact Title |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## Item 12. Amounts Owed to You, Your Spouse, or Your Dependents

| Debtor's Name & Address | Date Obligation Incurred (Month/Year) / | Original Amount Owed $ | Nature of Obligation (if the result of a final court judgment or settlement, provide court name and docket number) |
|---|---|---|---|
| | Current Amount Owed $ | Payment Schedule $ | |
| Debtor's Telephone | Debtor's Relationship to You | | |
| Debtor's Name & Address | Date Obligation Incurred (Month/Year) / | Original Amount Owed $ | Nature of Obligation (if the result of a final court judgment or settlement, provide court name and docket number) |
| | Current Amount Owed $ | Payment Schedule $ | |
| Debtor's Telephone | Debtor's Relationship to You | | |

## Item 13. Life Insurance Policies
List all life insurance policies (including endowment policies) with any cash surrender value.

| Insurance Company's Name, Address, & Telephone No. | Beneficiary | Policy No. | Face Value $ |
|---|---|---|---|
| | Insured | Loans Against Policy $ | Surrender Value $ |
| Insurance Company's Name, Address, & Telephone No. | Beneficiary | Policy No. | Face Value $ |
| | Insured | Loans Against Policy $ | Surrender Value $ |

## Item 14. Deferred Income Arrangements
List all deferred income arrangements, including but not limited to, deferred annuities, pensions plans, profit-sharing plans, 401(k) plans, IRAs, Keoghs, other retirement accounts, and college savings plans (e.g., 529 Plans).

| Trustee or Administrator's Name, Address & Telephone No. | Name on Account | | Account No. | |
|---|---|---|---|---|
| | Date Established / / (mm/dd/yyyy) | Type of Plan | Surrender Value before Taxes and Penalties $ | |
| Trustee or Administrator's Name, Address & Telephone No. | Name on Account | | Account No. | |
| | Date Established / / | Type of Plan | Surrender Value before Taxes and Penalties $ | |

Initials: _____

## Item 15. Pending Insurance Payments or Inheritances
List any pending insurance payments or inheritances owed to you.

| Type | Amount Expected | Date Expected (mm/dd/yyyy) |
|---|---|---|
| | $ | / / |
| | $ | / / |
| | $ | / / |

## Item 16. Vehicles
List all cars, trucks, motorcycles, boats, airplanes, and other vehicles.

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|---|---|---|---|---|---|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|---|---|---|---|---|---|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|---|---|---|---|---|---|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

| Vehicle Type | Year | Registered Owner's Name | Purchase Price $ | Original Loan Amount $ | Current Balance $ |
|---|---|---|---|---|---|
| Make | | Registration State & No. | Account/Loan No. | Current Value $ | Monthly Payment $ |
| Model | | Address of Vehicle's Location | Lender's Name and Address | | |

## Item 17. Other Personal Property
List all other personal property not listed in Items 9-16 by category, whether held for personal use, investment or any other reason, including but not limited to coins, stamps, artwork, gemstones, jewelry, bullion, other collectibles, copyrights, patents, and other intellectual property.

| Property Category (e.g., artwork, jewelry) | Name of Owner | Property Location | Acquisition Cost | Current Value |
|---|---|---|---|---|
| | | | $ | $ |
| | | | $ | $ |
| | | | $ | $ |

Initials: _____

## Item 18. Real Property
List all real property interests (including any land contract)

| Property's Location | Type of Property | Name(s) on Title or Contract and Ownership Percentages | |
|---|---|---|---|

| Acquisition Date (mm/dd/yyyy) / / | Purchase Price $ | Current Value $ | Basis of Valuation |
|---|---|---|---|

| Lender's Name and Address | Loan or Account No. | Current Balance On First Mortgage or Contract $ |
|---|---|---|
| | | Monthly Payment $ |

| Other Mortgage Loan(s) (describe) | Monthly Payment $ | ☐ Rental Unit |
|---|---|---|
| | Current Balance $ | Monthly Rent Received $ |

| Property's Location | Type of Property | Name(s) on Title or Contract and Ownership Percentages | |
|---|---|---|---|

| Acquisition Date (mm/dd/yyyy) / / | Purchase Price $ | Current Value $ | Basis of Valuation |
|---|---|---|---|

| Lender's Name and Address | Loan or Account No. | Current Balance On First Mortgage or Contract $ |
|---|---|---|
| | | Monthly Payment $ |

| Other Mortgage Loan(s) (describe) | Monthly Payment $ | ☐ Rental Unit |
|---|---|---|
| | Current Balance $ | Monthly Rent Received $ |

## LIABILITIES

## Item 19. Credit Cards
List each credit card account held by you, your spouse, or your dependents, and any other credit cards that you, your spouse, or your dependents use, whether issued by a United States or foreign financial institution.

| Name of Credit Card (e.g., Visa, MasterCard, Department Store) | Account No. | Name(s) on Account | Current Balance |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |

## Item 20. Taxes Payable
List all taxes, such as income taxes or real estate taxes, owed by you, your spouse, or your dependents.

| Type of Tax | Amount Owed | Year Incurred |
|---|---|---|
| | $ | |
| | $ | |
| | $ | |

Initials: _____

## Item 21. Other Amounts Owed by You, Your Spouse, or Your Dependents

List all other amounts, not listed elsewhere in this financial statement, owed by you, your spouse, or your dependents.

| Lender/Creditor's Name, Address, and Telephone No. | Nature of Debt (if the result of a court judgment or settlement, provide court name and docket number) |
|---|---|
| | |
| | Lender/Creditor's Relationship to You |

| Date Liability Was Incurred / / (mm/dd/yyyy) | Original Amount Owed $ | Current Amount Owed $ | Payment Schedule |
|---|---|---|---|

| Lender/Creditor's Name, Address, and Telephone No. | Nature of Debt (if the result of a court judgment or settlement, provide court name and docket number) |
|---|---|
| | |
| | Lender/Creditor's Relationship to You |

| Date Liability Was Incurred / / (mm/dd/yyyy) | Original Amount Owed $ | Current Amount Owed $ | Payment Schedule |
|---|---|---|---|

## OTHER FINANCIAL INFORMATION

### Item 22. Trusts and Escrows

List all funds and other assets that are being held in trust or escrow by any person or entity for you, your spouse, or your dependents. Include any legal retainers being held on your behalf by legal counsel. Also list all funds or other assets that are being held in trust or escrow by you, your spouse, or your dependents, for any person or entity.

| Trustee or Escrow Agent's Name & Address | Date Established (mm/dd/yyyy) | Grantor | Beneficiaries | Present Market Value of Assets* |
|---|---|---|---|---|
| | / / | | | $ |
| | / / | | | $ |
| | / / | | | $ |

*If the market value of any asset is unknown, describe the asset and state its cost, if you know it.

### Item 23. Transfers of Assets

List each person or entity to whom you have transferred, in the aggregate, more than $5,000 in funds or other assets during the previous five years by loan, gift, sale, or other transfer (exclude ordinary and necessary living and business expenses paid to unrelated third parties). For each such person or entity, state the total amount transferred during that period.

| Transferee's Name, Address, & Relationship | Property Transferred | Aggregate Value* | Transfer Date (mm/dd/yyyy) | Type of Transfer (e.g., Loan, Gift) |
|---|---|---|---|---|
| | | $ | / / | |
| | | $ | / / | |
| | | $ | / / | |

*If the market value of any asset is unknown, describe the asset and state its cost, if you know it.

Initials: _____

| Item 24. Document Requests | Provide copies of the following documents with your completed Financial Statement. |
|---|---|

| | |
|---|---|
| | Federal tax returns filed during the last three years by or on behalf of you, your spouse, or your dependents. |
| | All applications for bank loans or other extensions of credit (other than credit cards) that you, your spouse, or your dependents have submitted within the last two years, including by obtaining copies from lenders if necessary. |
| Item 9 | For each bank account listed in Item 9, all account statements for the past 3 years. |
| Item 11 | For each business entity listed in Item 11, provide (including by causing to be generated from accounting records) the most recent balance sheet, tax return, annual income statement, the most recent year-to-date income statement, and all general ledger files from account records. |
| Item 17 | All appraisals that have been prepared for any property listed in Item 17, including appraisals done for insurance purposes. You may exclude any category of property where the total appraised value of all property in that category is less than $2,000. |
| Item 18 | All appraisals that have been prepared for real property listed in Item 18. |
| Item 21 | Documentation for all debts listed in Item 21. |
| Item 22 | All executed documents for any trust or escrow listed in Item 22. Also provide any appraisals, including insurance appraisals that have been done for any assets held by any such trust or in any such escrow. |

## SUMMARY FINANCIAL SCHEDULES

### Item 25. Combined Balance Sheet for You, Your Spouse, and Your Dependents

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on Hand (Item 9) | $ | Loans Against Publicly Traded Securities (Item 10) | $ |
| Funds Held in Financial Institutions (Item 9) | $ | Vehicles - Liens (Item 16) | $ |
| U.S. Government Securities (Item 10) | $ | Real Property – Encumbrances (Item 18) | $ |
| Publicly Traded Securities (Item 10) | $ | Credit Cards (Item 19) | $ |
| Non-Public Business and Financial Interests (Item 11) | $ | Taxes Payable (Item 20) | $ |
| Amounts Owed to You (Item 12) | $ | Amounts Owed by You (Item 21) | $ |
| Life Insurance Policies (Item 13) | $ | **Other Liabilities (Itemize)** | |
| Deferred Income Arrangements (Item 14) | $ | | $ |
| Vehicles (Item 16) | $ | | $ |
| Other Personal Property (Item 17) | $ | | $ |
| Real Property (Item 18) | $ | | $ |
| **Other Assets (Itemize)** | | | $ |
| | $ | | $ |
| | $ | | $ |
| | $ | | $ |
| **Total Assets** | $ | **Total Liabilities** | $ |

### Item 26. Combined Current Monthly Income and Expenses for You, Your Spouse, and Your Dependents

Provide the current monthly income and expenses for you, your spouse, and your dependents. Do not include credit card payments separately; rather, include credit card expenditures in the appropriate categories.

| Income (State source of each item) | | Expenses | |
|---|---|---|---|
| Salary - After Taxes<br>Source: | $ | Mortgage or Rental Payments for Residence(s) | $ |
| Fees, Commissions, and Royalties<br>Source: | $ | Property Taxes for Residence(s) | $ |
| Interest<br>Source: | $ | Rental Property Expenses, Including Mortgage Payments, Taxes, and Insurance | $ |
| Dividends and Capital Gains<br>Source: | $ | Car or Other Vehicle Lease or Loan Payments | $ |
| Gross Rental Income<br>Source: | $ | Food Expenses | $ |
| Profits from Sole Proprietorships<br>Source: | $ | Clothing Expenses | $ |
| Distributions from Partnerships, S-Corporations, and LLCs<br>Source: | $ | Utilities | $ |

Initials: _____

| Item 26.  Combined Current Monthly Income and Expenses for You, Your Spouse, and Your Dependents (cont.) | | | | |
|---|---|---|---|---|
| Distributions from Trusts and Estates<br>Source: | $ | | Medical Expenses, Including Insurance | $ |
| Distributions from Deferred Income Arrangements<br>Source: | $ | | Other Insurance Premiums | $ |
| Social Security Payments | $ | | Other Transportation Expenses | $ |
| Alimony/Child Support Received | $ | | **Other Expenses (Itemize)** | |
| Gambling Income | $ | | | $ |
| **Other Income (Itemize)** | | | | $ |
| | $ | | | $ |
| | $ | | | $ |
| | $ | | | $ |
| **Total Income** | $ | | **Total Expenses** | $ |

<div align="center">

## ATTACHMENTS

</div>

### Item 27. Documents Attached to this Financial Statement
List all documents that are being submitted with this financial statement.  For any Item 24 documents that are not attached, explain why.

| Item No. Document Relates To | Description of Document |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

I am submitting this financial statement with the understanding that it may affect action by the Federal Trade Commission or a federal court.  I have used my best efforts to obtain the information requested in this statement.  The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge.  I have provided all requested documents in my custody, possession, or control.  I know of the penalties for false statements under 18 U.S.C. § 1001, 18 U.S.C. § 1621, and 18 U.S.C. § 1623 (five years imprisonment and/or fines).  I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:

_____
(Date)

_____
Signature

# ATTACHMENT C

# FEDERAL TRADE COMMISSION

## FINANCIAL STATEMENT OF CORPORATE DEFENDANT

**Instructions**:

1.  Complete all items. Enter "None" or "N/A" ("Not Applicable") where appropriate. If you cannot fully answer a question, explain why.

2.  The font size within each field will adjust automatically as you type to accommodate longer responses.

3.  In completing this financial statement, "the corporation" refers not only to this corporation but also to each of its predecessors that are not named defendants in this action.

4.  When an Item asks for information about assets or liabilities "held by the corporation," include <u>ALL</u> such assets and liabilities, located within the United States or elsewhere, held by the corporation or held by others for the benefit of the corporation.

5.  Attach continuation pages as needed. On the financial statement, state next to the Item number that the Item is being continued. On the continuation page(s), identify the Item number being continued.

6.  Type or print legibly.

7.  An officer of the corporation must sign and date the completed financial statement on the last page and initial each page in the space provided in the lower right corner.

**Penalty for False Information**:

Federal law provides that any person may be imprisoned for not more than five years, fined, or both, if such person:

> (1) "in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry" (18 U.S.C. § 1001);

> (2) "in any . . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true" (18 U.S.C. § 1621); or

> (3) "in any (. . . statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information . . . knowing the same to contain any false material declaration." (18 U.S.C. § 1623)

For a felony conviction under the provisions cited above, federal law provides that the fine may be not more than the greater of (i) $250,000 for an individual or $500,000 for a corporation, or (ii) if the felony results in pecuniary gain to any person or pecuniary loss to any person other than the defendant, the greater of twice the gross gain or twice the gross loss. 18 U.S.C. § 3571.

# BACKGROUND INFORMATION

<u>Item 1.</u>　　　**General Information**

Corporation's Full Name _____

Primary Business Address _____ From (Date) _____

Telephone No. _____ Fax No. _____

E-Mail Address_____ Internet Home Page_____

All other current addresses & previous addresses for past five years, including post office boxes and mail drops:

Address_____ From/Until_____

Address_____ From/Until_____

Address_____ From/Until_____

All predecessor companies for past five years:

Name & Address _____ From/Until _____

Name & Address _____ From/Until _____

Name & Address _____ From/Until _____

<u>Item 2.</u>　　　**Legal Information**

Federal Taxpayer ID No. _____ State & Date of Incorporation _____

State Tax ID No. _____ State _____ Profit or Not For Profit _____

Corporation's Present Status: Active _____ Inactive _____ Dissolved _____

If Dissolved: Date dissolved _____ By Whom _____

Reasons _____

Fiscal Year-End (Mo./Day) _____ Corporation's Business Activities _____

<u>Item 3.</u>　　　**Registered Agent**

Name of Registered Agent _____

Address _____ Telephone No. _____

　　　　　　　　　　　　　　　　　Initials _____

**Item 4.**     **Principal Stockholders**

List all persons and entities that own at least 5% of the corporation's stock.

| Name & Address | % Owned |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**Item 5.**     **Board Members**

List all members of the corporation's Board of Directors.

| Name & Address | % Owned | Term (From/Until) |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

**Item 6.**     **Officers**

List all of the corporation's officers, including *de facto* officers (individuals with significant management responsibility whose titles do not reflect the nature of their positions).

| Name & Address | % Owned |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

Initials _____

**Item 7.**     **Businesses Related to the Corporation**

List all corporations, partnerships, and other business entities in which this corporation has an ownership interest.

|               Name & Address               | Business Activities | % Owned |
| ------------------------------------------ | ------------------- | ------- |
| _____  | _____   | _____ |
| _____  | _____   | _____ |
| _____  | _____   | _____ |

State which of these businesses, if any, has ever transacted business with the corporation _____

_____

**Item 8.**     **Businesses Related to Individuals**

List all corporations, partnerships, and other business entities in which the corporation's principal stockholders, board members, or officers (i.e., the individuals listed in Items 4 - 6 above) have an ownership interest.

| Individual's Name      | Business Name & Address            | Business Activities | % Owned |
| ---------------------- | ---------------------------------- | ------------------- | ------- |
| _____   | _____   | _____   | _____ |
| _____   | _____   | _____   | _____ |
| _____   | _____   | _____   | _____ |

State which of these businesses, if any, have ever transacted business with the corporation _____

_____

**Item 9.**     **Related Individuals**

List all related individuals with whom the corporation has had any business transactions during the three previous fiscal years and current fiscal year-to-date. A "related individual" is a spouse, sibling, parent, or child of the principal stockholders, board members, and officers (i.e., the individuals listed in Items 4 - 6 above).

|                 Name and Address                | Relationship      | Business Activities |
| ----------------------------------------------- | ----------------- | ------------------- |
| _____ | _____  | _____   |
| _____ | _____  | _____   |
| _____ | _____  | _____   |

Initials _____

**Item 10.**     **Outside Accountants**

List all outside accountants retained by the corporation during the last three years.

| Name | Firm Name | Address | CPA/PA? |
|------|-----------|---------|---------|
|      |           |         |         |
|      |           |         |         |
|      |           |         |         |
|      |           |         |         |
|      |           |         |         |

**Item 11.**     **Corporation's Recordkeeping**

List all individuals within the corporation with responsibility for keeping the corporation's financial books and records for the last three years.

| Name, Address, & Telephone Number | Position(s) Held |
|-----------------------------------|------------------|
|                                   |                  |
|                                   |                  |
|                                   |                  |
|                                   |                  |

**Item 12.**     **Attorneys**

List all attorneys retained by the corporation during the last three years.

| Name | Firm Name | Address |
|------|-----------|---------|
|      |           |         |
|      |           |         |
|      |           |         |
|      |           |         |
|      |           |         |

Initials _____

**Item 13.**      **Pending Lawsuits Filed by the Corporation**

List all pending lawsuits that have been filed by the corporation in court or before an administrative agency. (List lawsuits that resulted in final judgments or settlements in favor of the corporation in Item 25).

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Opposing Party's Name & Address_____

Court's Name & Address_____

Docket No._____ Relief Requested_____ Nature of Lawsuit_____

_____ Status_____

Initials _____

**Item 14.**  **Current Lawsuits Filed Against the Corporation**

List all pending lawsuits that have been filed against the corporation in court or before an administrative agency.  (List lawsuits that resulted in final judgments, settlements, or orders in Items 26 - 27).

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No._____ Relief Requested _____ Nature of Lawsuit_____

_____ Status _____

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No._____ Relief Requested _____ Nature of Lawsuit_____

_____ Status _____

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No._____ Relief Requested _____ Nature of Lawsuit_____

_____ Status _____

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No._____ Relief Requested _____ Nature of Lawsuit_____

_____ Status _____

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No._____ Relief Requested _____ Nature of Lawsuit_____

_____ Status _____

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No._____ Relief Requested _____ Nature of Lawsuit_____

_____ Status _____

Initials _____

## Item 15.        Bankruptcy Information

List all state insolvency and federal bankruptcy proceedings involving the corporation.

Commencement Date _____ Termination Date _____ Docket No. _____

If State Court: Court & County _____ If Federal Court: District _____

Disposition _____

## Item 16.        Safe Deposit Boxes

List all safe deposit boxes, located within the United States or elsewhere, held by the corporation, or held by others for the benefit of the corporation. *On a separate page, describe the contents of each box.*

| Owner's Name | Name & Address of Depository Institution | Box No. |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

## FINANCIAL INFORMATION

**REMINDER: When an Item asks for information about assets or liabilities "held by the corporation," include ALL such assets and liabilities, located within the United States or elsewhere, held by the corporation or held by others for the benefit of the corporation.**

## Item 17.        Tax Returns

List all federal and state corporate tax returns filed for the last three complete fiscal years. *Attach copies of all returns.*

| Federal/ State/Both | Tax Year | Tax Due Federal | Tax Paid Federal | Tax Due State | Tax Paid State | Preparer's Name |
|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | |
| | | $ | $ | $ | $ | |
| | | $ | $ | $ | $ | |

Initials _____

**Item 18.**       **Financial Statements**

List all financial statements that were prepared for the corporation's last three complete fiscal years and for the current fiscal year-to-date. *Attach copies of all statements, providing audited statements if available.*

| Year | Balance Sheet | Profit & Loss Statement | Cash Flow Statement | Changes in Owner's Equity | Audited? |
|------|---------------|-------------------------|---------------------|---------------------------|----------|
|      |               |                         |                     |                           |          |
|      |               |                         |                     |                           |          |
|      |               |                         |                     |                           |          |
|      |               |                         |                     |                           |          |

**Item 19.**       **Financial Summary**

For each of the last three complete fiscal years and for the current fiscal year-to-date for which the corporation has not provided a profit and loss statement in accordance with Item 18 above, provide the following summary financial information.

|  | Current Year-to-Date | 1 Year Ago | 2 Years Ago | 3 Years Ago |
|--|----------------------|------------|-------------|-------------|
| Gross Revenue | $ | $ | $ | $ |
| Expenses | $ | $ | $ | $ |
| Net Profit After Taxes | $ | $ | $ | $ |
| Payables | $ | | | |
| Receivables | $ | | | |

**Item 20.**       **Cash, Bank, and Money Market Accounts**

List cash and all bank and money market accounts, including but not limited to, checking accounts, savings accounts, and certificates of deposit, held by the corporation. The term "cash" includes currency and uncashed checks.

Cash on Hand $_____  Cash Held for the Corporation's Benefit $_____

| Name & Address of Financial Institution | Signator(s) on Account | Account No. | Current Balance |
|-----------------------------------------|------------------------|-------------|-----------------|
|                                         |                        |             | $ |
|                                         |                        |             | $ |
|                                         |                        |             | $ |
|                                         |                        |             | $ |

Initials _____

**Item 21.**    **Government Obligations and Publicly Traded Securities**

List all U.S. Government obligations, including but not limited to, savings bonds, treasury bills, or treasury notes, held by the corporation.  Also list all publicly traded securities, including but not limited to, stocks, stock options, registered and bearer bonds, state and municipal bonds, and mutual funds, held by the corporation.

Issuer _____ Type of Security/Obligation _____

No. of Units Owned _____ Current Fair Market Value $_____ Maturity Date _____

Issuer _____ Type of Security/Obligation _____

No. of Units Owned _____ Current Fair Market Value $_____ Maturity Date _____


**Item 22.**    **Real Estate**

List all real estate, including leaseholds in excess of five years, held by the corporation.

Type of Property_____ Property's Location _____

Name(s) on Title and Ownership Percentages_____

Current Value $_____ Loan or Account No. _____

Lender's Name and Address_____

Current Balance On First Mortgage $_____ Monthly Payment $_____

Other Loan(s) (describe)_____ Current Balance $_____

Monthly Payment $_____ Rental Unit?_____ Monthly Rent Received $_____


Type of Property_____ Property's Location _____

Name(s) on Title and Ownership Percentages_____

Current Value $_____ Loan or Account No. _____

Lender's Name and Address_____

Current Balance On First Mortgage $_____ Monthly Payment $_____

Other Loan(s) (describe)_____ Current Balance $_____

Monthly Payment $_____ Rental Unit?_____ Monthly Rent Received $_____


Page  10                                                                Initials _____

## Item 23. Other Assets

List all other property, by category, with an estimated value of $2,500 or more, held by the corporation, including but not limited to, inventory, machinery, equipment, furniture, vehicles, customer lists, computer software, patents, and other intellectual property.

| Property Category | Property Location | Acquisition Cost | Current Value |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

## Item 24. Trusts and Escrows

List all persons and other entities holding funds or other assets that are in escrow or in trust for the corporation.

| Trustee or Escrow Agent's Name & Address | Description and Location of Assets | Present Market Value of Assets |
|---|---|---|
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |

## Item 25. Monetary Judgments and Settlements Owed To the Corporation

List all monetary judgments and settlements, recorded and unrecorded, owed to the corporation.

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No._____

Nature of Lawsuit _____ Date of Judgment_____ Amount $_____

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No._____

Nature of Lawsuit _____ Date of Judgment_____ Amount $_____


## Item 26. Monetary Judgments and Settlements Owed By the Corporation

List all monetary judgments and settlements, recorded and unrecorded, owed by the corporation.

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No._____

Nature of Lawsuit _____ Date_____ Amount $_____

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No._____

Nature of Lawsuit _____ Date of Judgment_____ Amount $_____

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No._____

Nature of Lawsuit _____ Date of Judgment_____ Amount $_____

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No._____

Nature of Lawsuit _____ Date of Judgment_____ Amount $_____

Opposing Party's Name & Address _____

Court's Name & Address _____ Docket No._____

Nature of Lawsuit _____ Date of Judgment_____ Amount $_____

Initials _____

**Item 27.**    **Government Orders and Settlements**

List all existing orders and settlements between the corporation and any federal or state government entities.

Name of Agency _____ Contact Person _____

Address _____ Telephone No. _____

Agreement Date _____ Nature of Agreement _____

**Item 28.**    **Credit Cards**

List all of the corporation's credit cards and store charge accounts and the individuals authorized to use them.

| Name of Credit Card or Store | Names of Authorized Users and Positions Held |
| --- | --- |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**Item 29.**    **Compensation of Employees**

List all compensation and other benefits received from the corporation by the five most highly compensated employees, independent contractors, and consultants (other than those individuals listed in Items 5 and 6 above), for the two previous fiscal years and current fiscal year-to-date. "Compensation" includes, but is not limited to, salaries, commissions, consulting fees, bonuses, dividends, distributions, royalties, pensions, and profit sharing plans. "Other benefits" include, but are not limited to, loans, loan payments, rent, car payments, and insurance premiums, whether paid directly to the individuals, or paid to others on their behalf.

| Name/Position | Current Fiscal Year-to-Date | 1 Year Ago | 2 Years Ago | Compensation or Type of Benefits |
| --- | --- | --- | --- | --- |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |
| _____ | $_____ | $_____ | $_____ | _____ |

Initials _____

**Item 30.**     **Compensation of Board Members and Officers**

List all compensation and other benefits received from the corporation by each person listed in Items 5 and 6, for the current fiscal year-to-date and the two previous fiscal years. "Compensation" includes, but is not limited to, salaries, commissions, consulting fees, dividends, distributions, royalties, pensions, and profit sharing plans. "Other benefits" include, but are not limited to, loans, loan payments, rent, car payments, and insurance premiums, whether paid directly to the individuals, or paid to others on their behalf.

| Name/Position | Current Fiscal Year-to-Date | 1 Year Ago | 2 Years Ago | Compensation or Type of Benefits |
|---|---|---|---|---|
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |
| | $ | $ | $ | |

**Item 31.**     **Transfers of Assets Including Cash and Property**

List all transfers of assets over $2,500 made by the corporation, other than in the ordinary course of business, during the previous three years, by loan, gift, sale, or other transfer.

| Transferee's Name, Address, & Relationship | Property Transferred | Aggregate Value | Transfer Date | Type of Transfer (e.g., Loan, Gift) |
|---|---|---|---|---|
| | | $ | | |
| | | $ | | |
| | | $ | | |
| | | $ | | |
| | | $ | | |

Initials _____

**Item 32.**     **Documents Attached to the Financial Statement**

List all documents that are being submitted with the financial statement.

Item No. Document     Description of Document
Relates To

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

          I am submitting this financial statement with the understanding that it may affect action by the Federal Trade Commission or a federal court. I have used my best efforts to obtain the information requested in this statement. The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge. I have provided all requested documents in my custody, possession, or control. I know of the penalties for false statements under 18 U.S.C. § 1001, 18 U.S.C. § 1621, and 18 U.S.C. § 1623 (five years imprisonment and/or fines). I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:

_____          _____

(Date)                                Signature

                                      _____

                                      Corporate Position

# ATTACHMENT D

## CONSENT TO RELEASE OF FINANCIAL RECORDS

I, _____ of _____, do hereby direct any bank, savings and loan association, credit union, depository institution, finance company, commercial lending company, credit card processor, credit card processing entity, electronic funds transfer processing agent, automated clearinghouse processing agent, demand draft processing agent, brokerage house, escrow agent, money market or mutual fund, title company, commodity trading company, trustee, or person that holds, controls or maintains custody of assets, wherever located that are owned or controlled by me or at which I have an account of any kind, or at which a corporation or other entity has a bank account of any kind upon which I am authorized to draw, and its officers, employees and agents, to disclose all information and deliver copies of all documents of every nature in your possession or control which relate to the said accounts to any attorney of the Federal Trade Commission, and to give evidence relevant thereto, in the matter of *Federal Trade Commission v. AWS, LLC, et al.*, No. 2:18-cv-00442-JCM-PAL, now pending in the United States District Court for the District of Nevada, and this shall be irrevocable authority for so doing.

This direction is intended to apply to the laws of countries other than the United States of America which restrict or prohibit the disclosure of bank or other financial information without the consent of the holder of the account, and shall be construed as consent with respect thereto, and the same shall apply to any of the accounts for which I may be a relevant principal.

Dated_____, 2018.

Signature_____

# EXHIBIT 3

Roberto Anguizola
Illinois Bar # 6270874 (Admitted pursuant to LR IA 11-3)
Tel. (202) 326-3284
Email: ranguizola@ftc.gov

Miry Kim
Washington Bar # 31456 (Admitted pursuant to LR IA 11-3)
Tel. (202) 326-3622
Email: mkim@ftc.gov

Gregory J. Evans
DC Bar # 1033184 (Admitted pursuant to LR IA 11-3)
Tel. (202) 326-3425
Email: gevans2@ftc.gov

Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Drop CC-8528
Washington, DC 20580

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>     Plaintiff,<br><br>     v.<br><br>AWS, LLC, a Nevada limited liability company; ADAMS CONSULTING, LLC, a California limited liability company; FBA DISTRIBUTORS, LLC, a Massachusetts limited liability company; FBA STORES, LLC, a Nevada limited liability company; GLOBAL MARKETING SERVICES L.L.C., a Nevada limited liability company; INFO PROS, LLC, a Nevada limited liability company; INFO SOLUTIONS, LLC, a Nevada limited liability company; ONLINE AUCTION LEARNING CENTER, INC., a Massachusetts corporation; ONLINE AUCTION LEARNING CENTER, INC., a Nevada corporation; CHRISTOPHER F. BOWSER; ADAM S. BOWSER; JODY L. MARSHALL; and JEFFREY A. GOMEZ,<br><br>     Defendants. | CASE NO. 2:18-cv-00442-JCM-PAL<br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION AND MONETARY JUDGMENT AS TO DEFENDANTS AWS, LLC, FBA DISTRIBUTORS, LLC, FBA STORES, LLC, INFO PROS, LLC, INFO SOLUTIONS, LLC, ONLINE AUCTION LEARNING CENTER, INC. (MASS. CORP.), ONLINE AUCTION LEARNING CENTER, INC. (NEV. CORP.), CHRISTOPHER F. BOWSER, ADAM S. BOWSER, AND JODY L. MARSHALL** |

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint for Permanent Injunction and Other Equitable Relief, as amended, ("Complaint"), in this matter, pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b. The Commission and Defendants AWS, LLC, FBA Distributors, LLC, FBA Stores, LLC, Info Pros, LLC, Info Solutions, LLC, Online Auction Learning Center, Inc. (Mass. Corp.), Online Auction Learning Center, Inc. (Nev. Corp.), Christopher F. Bowser, Adam S. Bowser, and Jody Marshall ("Settling Defendants") stipulate to the entry of this Stipulated Order for Permanent Injunction and Monetary Judgment ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1. This Court has jurisdiction over this matter.

2. The Complaint charges that Settling Defendants participated in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and in violation of the Business Opportunity Rule, 16 C.F.R. Part 437, in connection with the advertising, marketing, distribution, promotion and sale of business opportunities to consumers throughout the United States.

3. Settling Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Settling Defendants admit the facts necessary to establish jurisdiction.

4. Settling Defendants waive and release any claims that they may have against the Commission and the Receiver, including against any agent of the Commission or the Receiver, that relate to this action.

DocuSign Envelope ID: 5813994A-78EC-4D90-A3D7-32FED1B8A6BF

5.  Settling Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

6.  Individual Defendant Jody Marshall filed a petition for relief under Chapter 13 of the Bankruptcy Code on January 5, 2016.  *In re Jody L. Marshall*, No. BKS-16-10016-MKN (Bankr. D. Nev.) ("Marshall Bankruptcy Case").  The Commission's prosecution of this action and the Order are actions to enforce the Commission's policy or regulatory power.  As a result, if the Marshall Bankruptcy Case is pending as of the date of entry of this Order, then these actions are excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A. **"Business Coaching Program"** means any program, plan, good, or service, including those related to business opportunities, that is represented, expressly or by implication, to coach, train or teach a participant or Purchaser how to establish, operate, or improve the Purchaser's business.

B. **"Business Opportunity"** means a commercial arrangement in which:

 1. A Seller solicits a prospective Purchaser to enter into a new business; and

 2. The prospective Purchaser makes a required payment; and

 3. The Seller, expressly or by implication, orally or in writing, represents that the Seller or one or more Designated Persons will:

  (i) Provide locations for the use or operation of equipment, displays, vending machines, or similar devices, owned, leased, controlled, or paid for by the Purchaser; or

(ii) Provide outlets, accounts, or customers, including Internet outlets, accounts, or customers, for the Purchaser's goods or services; or

(iii) Buy back any or all of the goods or services that the Purchaser makes, produces, fabricates, grows, breeds, modifies, or provides, including providing payment for such services as, for example, stuffing envelopes from the Purchaser's home.

C. **"Designated Person"** means any Person, other than the Seller, whose goods or services the Seller suggests, recommends, or requires that the Purchaser use in establishing or operating a new business.

D. "**Document**" is synonymous in meaning and equal in scope to the usage of "document" and "electronically stored information" in Federal Rule of Civil Procedure 34(a), Fed. R. Civ. P. 34(a), and includes writings, drawings, graphs, charts, photographs, sound and video recordings, images, internet sites, web pages, websites, electronic correspondence, including e-mail and instant messages, contracts, accounting data, advertisements (including advertisements placed on the World Wide Web), FTP Logs, Server Access Logs, USENET Newsgroup postings, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, computer records, customer or sales databases, and any other electronically stored information, including Documents located on remote servers or cloud computing systems, and other data or data compilations from which information can be obtained directly or, if necessary, after translation into a reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

DocuSign Envelope ID: 5813994A-78FC-4D90-A3D7-32FED1B8A6BF

E.    "**Earnings Claim**" means any oral, written, or visual representation to a consumer, prospective Purchaser or investor that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits.  Earnings claims include, but are not limited to any:  (1) chart, table, or mathematical calculation that demonstrates possible results based upon a combination of variables; and (2) statements from which a consumer, prospective Purchaser or investor can reasonably infer that he or she will earn a minimum level of income (e.g., "earn enough to buy a Porsche," "earn a six-figure income," or "earn your investment back within one year").

F.    **"Person"** means a natural person, organization, or legal entity, including a corporation, partnership, proprietorship, association, cooperative, government or governmental subdivision or agency, or any other group or combination acting as an entity.

G.    **"Providing locations, outlets, accounts, or customers"** means furnishing the prospective Purchaser with existing or potential locations, outlets, accounts, or customers; requiring, recommending, or suggesting one or more locators or lead generating companies; providing a list of locator or lead generating companies; collecting a fee on behalf of one or more locators or lead generating companies; offering to furnish a list of locations; or otherwise assisting the prospective Purchaser in obtaining his or her own locations, outlets, accounts, or customers.

H.    **"Purchaser"** means a Person who buys a Business Opportunity or Business Coaching Program.

I.    "**Receiver**" means Robb Evans & Associates LLC, the receiver appointed in Section XI of the Temporary Restraining Order issued on March 14, 2018 [ECF No. 29], and whose

DocuSign Envelope ID: 5813994A-78EC-4D90-A3D7-32EED1B8A6BF

1   appointment is continued in Section VI of this Order, and any deputy receivers that shall be

2   named by Robb Evans & Associates LLC.

3   J.     "**Receivership Estate**" means the assets identified in Section III.C of this Order and all

4   assets of the Settling Corporate Defendants, including: (a) any assets of the Settling Corporate

5   Defendants currently in the possession of the Receiver; (b) all the funds, property, premises,

6   accounts, documents, mail, and all other assets of, or in the possession or under the control of the

7   Settling Corporate Defendants, wherever situated, the income and profits therefrom, all sums of

8   money now or hereafter due or owing to the Settling Corporate Defendants, and any other assets

9   or property belonging or owed to the Settling Corporate Defendants; (c) any assets of the Settling

10   Corporate Defendants held in asset protection trusts; (d) any reserve funds or other accounts

11   associated with any payments processed on behalf of any Settling Corporate Defendant,

12   including such reserve funds held by a payment processor, credit card processor, or bank; and (e)

13   all proceeds from the sale of such assets, except those assets the sale of which the Receiver

14   determines will not add appreciably to the value of the estate.

15   K.     **"Seller"** means a person who offers for sale or sells a Business Opportunity or Business

16   Coaching Program.

17   L.     **"Settling Corporate Defendants**" means AWS, LLC, FBA Distributors, LLC, FBA

18   Stores, LLC, Info Pros, LLC, Info Solutions, LLC, Online Auction Learning Center, Inc. (Mass.

19   Corp.), Online Auction Learning Center, Inc. (Nev. Corp.), and any of their subsidiaries,

20   affiliates, successors, and assigns.

21   M.    "**Settling Defendants**" means all of the Settling Individual Defendants and the Settling

22   Corporate Defendants, individually, collectively, or in any combination.

23

N.     **"Settling Individual Defendants"** means Christopher F. Bowser, Adam S. Bowser, and Jody L. Marshall, individually or collectively.

### ORDER

### I.     BUSINESS OPPORTUNITY AND BUSINESS COACHING BAN

IT IS ORDERED that Settling Defendants are permanently restrained and enjoined from advertising, marketing, distributing, promoting, or offering for sale, or assisting in the advertising, marketing, distributing, promoting, or offering for sale of, any Business Opportunity or Business Coaching Program.

### II.     PROHIBITED BUSINESS ACTIVITIES

IT IS FURTHER ORDERED that Settling Defendants, Settling Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any good or service, are permanently restrained and enjoined from:

A.     making any Earnings Claim, unless the Earnings Claim is non-misleading, and, at the time such claim is made, Settling Defendants: (1) have a reasonable basis for their claim; (2) have in their possession written materials that substantiate the claim; and (3) make the written substantiation available upon request to the consumer, potential Purchaser or investor, and to the Commission; or

B.     misrepresenting or assisting others in misrepresenting, expressly or by implication any other fact material to consumers concerning any product or service, such as the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics.

## III.  MONETARY JUDGMENT AND PARTIAL SUSPENSION

IT IS FURTHER ORDERED that:

A.      Judgment in the amount of One Hundred Two Million, Four Hundred Eighty-One Thousand, Five Hundred Ninety-Six Dollars ($102,481,596.00) is entered in favor of the Commission against Settling Defendants, jointly and severally, as equitable monetary relief.

B.      Settling Individual Defendants are ordered to make the following payments to the Commission, which, as Settling Individual Defendants stipulate, their undersigned counsel holds in escrow for no purpose other than payment to the Commission:

1.      Individual Defendant Christopher F. Bowser is ordered to pay to the Commission Three Hundred, Twenty-Five Thousand Dollars ($325,000.00);

2.      Individual Defendant Adam S. Bowser is ordered to pay to the Commission Three Hundred, Twenty-Five Thousand Dollars ($325,000.00); and

3.      Individual Defendant Jody Marshall is ordered to pay to the Commission Seventy-Five Thousand Dollars ($75,000.00).

Such payments must be made within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

C.      In addition to the payments to the Commission specified in Subsection B above, immediately upon entry of this Order, the Settling Defendants are ordered to surrender to the Commission all control, title, dominion, and interest each has to the following assets:

1.      All interest the Settling Defendants have in funds in any accounts in the name of the Settling Corporate Defendants, eLearn Service, LLC, E-Learn Services, Ltd., EMWW, LLC, Finn Rich Wireless, LLC, Plaza TowneHomes, LLC, Sell On

1  AMZ Inc., Surf Cellular Express, LLC, Vmerica, Inc., Buy Box Wholesale Inc.,

2  Auction Profit Builders LLC, Insider Online Secrets LLC, or Sellers Hangout;

3 2. All cash held by the Receiver;

4 3. All assets owned by the Settling Corporate Defendants, eLearn Service, LLC, E-

5  Learn Services, Ltd., EMWW, LLC, Finn Rich Wireless, LLC, Plaza

6  TowneHomes, LLC, Sell On AMZ Inc., Surf Cellular Express, LLC, Vmerica,

7  Inc., Buy Box Wholesale Inc., Auction Profit Builders LLC, Insider Online

8  Secrets LLC, or Sellers Hangout, including any real, personal, or intellectual

9  property, chattel, goods, instruments, equipment, fixtures, general intangibles,

10  effects, leaseholds, contracts, mail, or other deliveries, shares or stock, securities,

11  inventory, checks, notes, accounts, credits, receivables, insurance policies, lines of

12  credit, cash, trusts (including asset protection trusts), lists of consumer names and

13  reserve funds or any other accounts associated with any payments processed by,

14  or on behalf of, any Settling Corporate Defendants, eLearn Service, LLC, E-Learn

15  Services, Ltd., EMWW, LLC, Finn Rich Wireless, LLC, Plaza TowneHomes,

16  LLC, Sell On AMZ Inc., Surf Cellular Express, LLC, Vmerica, Inc., Buy Box

17  Wholesale Inc., Auction Profit Builders LLC, Insider Online Secrets LLC, or

18  Sellers Hangout;

19 4. All funds held by Bank of America N.A., in the name of Info Pros LLC dba

20  "Online Seller", including the accounts ending in 1812 and 6059;

21 5. All funds held by Bank of America N.A., in the name of FBA Stores LLC dba

22  "AWS", including the accounts ending in 6155 and 3425;

23

DocuSign Envelope ID: 5813994A-78FC-4D90-A3D7-32FED4B8A6BF

6.     All funds held by Bank of America N.A., in the name of FBA Stores LLC, including the account ending in 2607;

7.     All funds held by Bank of America N.A., in the name of FBA Distributors LLC, including the account ending in 5349;

8.     All funds held by Bank of America N.A., in the name of EMWW, LLC LLC, including the account ending in 8299;

9.     All funds held by Bank of America N.A., in the name of Elearn Services LLC dba "Edominance", including the account ending in 1867;

10.    All funds held by Bank of America N.A., in the name of Finn Rich Wireless LLC, including the account ending in 2342;

11.    All funds held by Bank of America N.A., in the name of Vmerica Inc., including the account ending in 5607;

12.    All funds held by America First Credit Union, in the name of Info Solutions LLC, including the account ending in 7992;

13.    All funds held by Washington Federal Bank, in the name of Info Pros LLC, including the account ending in 9156;

14.    All funds held by Washington Federal Bank, in the name of EMWW, LLC, including the account ending in 8182;

15.    All funds held by Rockland Trust Company, in the name of Online Auction Learning Center, Inc., including the Demand Deposit accounts ending in 1323 and 2412;

16.  All funds held by Rockland Trust Company, in the name of Auction Profit Builders LLC dba "Insider Online Secrets", including the Demand Deposit account ending in 1538;

17.  All funds held by Rockland Trust Company, in the name of Finn Rich Wireless LLC, including the Demand Deposit account ending in 6468;

18.  All funds held by Rockland Trust Company, in the name of Surf Cellular Express LLC, including the Demand Deposit account ending in 7031;

19.  All funds held by JP Morgan Chase & Co., in the name of Info Pros LLC, including the account ending in 3922;

20.  All funds held by JP Morgan Chase & Co., in the name of Plaza TowneHomes, LLC, including the account ending in 3929;

21.  All reserve funds or any other accounts held, controlled, or serviced by Stripe, Inc. and associated with any payments processed by, or on behalf of FBA Distributors LLC, including the merchant account with the merchant identification number ("MID") ending in uiJvd;

22.  All reserve funds or any other accounts held, controlled, or serviced by Stripe, Inc. and associated with any payments processed by, or on behalf of Adam Bowser dba "AWS", including the merchant account with the MID ending in K9Yc2;

23.  All reserve funds or any other accounts held, controlled, or serviced by Electronic Merchant Systems and associated with any payments processed by, or on behalf of FBA Stores LLC, including the merchant account with the MID ending in 0179;

DocuSign Envelope ID: 5813994A-78FC-4D90-A3D7-32FED4B8A6BF

24.    All reserve funds or any other accounts held, controlled, or serviced by Electronic Merchant Systems and associated with any payments processed by, or on behalf of Online Auction Learning Center, Inc., including the merchant accounts with the MID ending in 0908;

25.    All reserve funds or any other accounts held, controlled, or serviced by EVO Payments International, LLC and associated with any payments processed by, or on behalf of FBA Stores LLC, including the merchant account with the MID ending in 4353;

26.    All reserve funds or any other accounts held, controlled, or serviced by EVO Payments International, LLC and associated with any payments processed by, or on behalf of Online Auction Learning Center, Inc., including the merchant accounts with the MIDs ending in 2829 and 7498;

27.    All reserve funds or any other accounts held, controlled, or serviced by PayPal, Inc. and associated with any payments processed by, or on behalf of FBA Stores, LLC, including the merchant account with the MID ending in 3735;

28.    All reserve funds or any other accounts held, controlled, or serviced by PayPal, Inc. and associated with any payments processed by, or on behalf of Info Pros LLC, including the merchant account with the MID ending in 4079;

29.    All reserve funds or any other accounts held, controlled, or serviced by PayPal, Inc. and associated with any payments processed by, or on behalf of Info Solutions, LLC, including the merchant account with the MID ending in 0073;

30.    All reserve funds or any other accounts held, controlled, or serviced by PayPal, Inc. and associated with any payments processed by, or on behalf of Online

1        Auction Learning Center, Inc., including the merchant accounts with the MIDs

2        ending in 8564 and 1083;

3    31.    All reserve funds or any other accounts held, controlled, or serviced by Qualpay

4        and associated with any payments processed by, or on behalf of FBA Stores LLC,

5        including the merchant account with the MID ending in 0602; and

6    32.    All reserve funds or any other accounts held, controlled, or serviced by Global

7        Payments, Inc. and associated with any payments processed by, or on behalf of

8        Info Pros LLC dba "On Line Seller" or "Online Seller", including the merchant

9        account with the MID ending in 3060.

10    D.    To the extent they are not already in the possession of the Receiver, Settling

11  Defendants shall deliver the assets identified in Subsection C above to the Receiver's possession

12  within 7 days of the entry of this Order.

13    E.    The Receiver shall, as soon as practicable, commence the sale of the unliquidated

14  assets identified in Subsection C above and surrendered pursuant to this Order using a

15  commercially reasonable procedure.  The Receiver shall hold the surrendered assets, and the

16  proceeds from the sale of the unliquidated assets, for future transfer in accordance with further

17  instructions from the Court.

18    F.    Upon delivery of the payments specified in Subsection B above to the

19  Commission, and of all the assets specified in Subsection C above to the Receiver, the remainder

20  of the judgment is suspended, subject to Subsections G-O below.

21    G.    The Commission's agreement to the suspension of part of the judgment is

22  expressly premised upon the truthfulness, accuracy, and completeness of Settling Defendants'

23

sworn financial statements and related Documents (collectively, "financial representations") submitted to the Commission, namely:

1.  the Financial Statement of Individual Defendant Christopher F. Bowser signed on March 21, 2018, including the attachments;

2.  the Financial Statement of Individual Defendant Adam S. Bowser signed on March 27, 2018, including the attachments;

3.  the Financial Statement of Individual Defendant Jody Marshall, signed on March 28, 2018, including the attachments;

4.  the Financial Statement of Corporate Defendant FBA Stores, LLC signed by Alma Kelly, Internal Accountant, on March 21, 2018, including the attachments; and

5.  the Financial Statement of Corporate Defendant Online Auction Learning Center, Inc. (Mass. Corp.), signed by Christopher F. Bowser, Owner, on March 21, 2018, including the attachments.

H.  The suspension of the judgment will be lifted as to any Settling Defendant if, upon motion by the Commission, the Court finds that Settling Defendant failed to disclose any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in the financial representations identified above.

I.  If the suspension of the judgment is lifted, the judgment becomes immediately due as to that Settling Defendant in the amount specified in Subsection A above (which the parties stipulate only for purposes of this Section represents the consumer injury and unjust enrichment alleged in the Complaint), less any payments previously made pursuant to this Section, plus interest computed from the date of entry of this Order.

1    J.  Settling Defendants relinquish dominion and all legal and equitable right, title,

2 and interest in all assets transferred pursuant to this Order and may not seek the return of any

3 assets.

4    K.  The facts alleged in the Complaint will be taken as true, without further proof, in

5 any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to

6 enforce its rights to any payment or monetary judgment pursuant to this Order, such as a

7 nondischargeability complaint in any bankruptcy case.

8    L.  The facts alleged in the Complaint establish all elements necessary to sustain an

9 action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C.

10 § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

11    M.  Settling Defendants acknowledge that their Taxpayer Identification Numbers

12 (Social Security Numbers or Employer Identification Numbers), which Settling Defendants

13 previously submitted to the Commission, may be used for collecting and reporting on any

14 delinquent amount arising out of this Order, in accordance with 31 U.S.C. §7701.

15    N.  All money paid to the Commission or assets ultimately surrendered to the

16 Commission pursuant to this Order (or any subsequent Court order issued in this matter) and

17 further instructions from the Court may be deposited into a fund administered by the

18 Commission or its designee to be used for equitable relief, including consumer redress and any

19 attendant expenses for the administration of any redress fund.  If a representative of the

20 Commission decides that direct redress to consumers is wholly or partially impracticable or

21 money remains after redress is completed, the Commission may apply any remaining money for

22 such other equitable relief (including consumer information remedies) as it determines to be

23 reasonably related to Settling Defendants' practices alleged in the Complaint.  Any money not

DocuSign Envelope ID: 5813994A-78FC-4D90-A3D7-32FED1B8A6BF

1  used for such equitable relief is to be deposited to the U.S. Treasury as disgorgement.  Settling

2  Defendants have no right to challenge any actions the Commission or its representatives may

3  take pursuant to this Subsection.

4    O.    The asset freeze imposed by the March 14, 2018 Temporary Restraining Order

5  [ECF No. 29], is modified to permit the payment and transfers identified in Subsections B and C

6  above.  Upon completion of those payment and transfers, the asset freeze as to Settling

7  Defendants is dissolved.  Any existing asset freeze as to the remaining non-settling Defendants

8  shall remain in full force and effect.

9                    **IV.  CUSTOMER INFORMATION**

10    IT IS FURTHER ORDERED that Settling Defendants, and their representatives, agents,

11  employees, and attorneys, and all other persons in active concert or participation with any of

12  them, who receive actual notice of this Order, are permanently restrained and enjoined from

13  directly or indirectly:

14    A.    failing to provide sufficient customer information to enable the Commission to

15  efficiently administer consumer redress.  Settling Defendants represent that they have provided

16  this redress information to the Commission.  If a representative of the Commission requests in

17  writing any information related to redress, Settling Defendants must provide it, in the form

18  prescribed by the Commission, within 14 days.

19    B.    disclosing, using, or benefitting from customer information, including the name,

20  address, telephone number, email address, social security number, other identifying information,

21  or any data that enables access to a customer's account (including a credit card, bank account, or

22  other financial account), that any Settling Defendant obtained prior to entry of this Order in

23

1   connection with the advertising, marketing, distribution, promotion and sale of business

2   opportunities to consumers throughout the United States; and

3          C.      failing to destroy such customer information in all forms in their possession,

4   custody, or control within 30 days after receipt of written direction to do so from a representative

5   of the Commission.

6          Provided, however, that customer information need not be disposed of, and may be

7   disclosed, to the extent requested by a government agency or required by law, regulation, or

8   court order.

9                                    **V.  COOPERATION**

10          IT IS FURTHER ORDERED that Settling Defendants must fully cooperate with

11   representatives of the Commission in this case and in any investigation related to or associated

12   with the transactions or the occurrences that are the subject of the Complaint.  Settling

13   Defendants must provide truthful and complete information, evidence, and testimony.  Settling

14   Individual Defendants must appear and Settling Corporate Defendants must cause Settling

15   Corporate Defendants' officers, employees, representatives, or agents to appear for interviews,

16   discovery, hearings, trials, and any other proceedings that a Commission representative may

17   reasonably request upon 5 days written notice, or other reasonable notice, at such places and

18   times as a Commission representative may designate, without the service of a subpoena.

19                                    **VI.  RECEIVERSHIP**

20          IT IS FURTHER ORDERED that Robb Evans & Associates LLC is hereby appointed

21   equity Receiver for the Settling Corporate Defendants for the purpose of taking the necessary

22   steps to wind down the businesses of the Settling Corporate Defendants, liquidate assets, and pay

23   any net proceeds to the Commission to satisfy the monetary judgment in this Order.  In carrying

out these duties, the Receiver shall be the agent of this Court, shall be accountable directly to this Court, and is authorized and directed to:

    A.    Take any and all steps that the Receiver concludes are appropriate to wind down the affairs of the Settling Corporate Defendants.

    B.    Continue to exercise full control over the Settling Corporate Defendants and continue to collect, marshal, and take custody, control, and possession of all the funds, property, premises, accounts, documents, mail, and other assets of, or in the possession or under the control of the Settling Corporate Defendants, wherever situated, the income and profits therefrom, and all sums of money now or hereafter due or owing to the Settling Corporate Defendants.

    C.    Continue to have full control over the management and personnel of the Settling Corporate Defendants.

    D.    Take all steps necessary or advisable, including issuing subpoenas, to locate and liquidate all other assets of the Settling Corporate Defendants, cancel the Settling Corporate Defendants' contracts, collect on amounts owed to the Settling Corporate Defendants, and take such other steps as may be necessary to wind-down the Settling Corporate Defendants efficiently.

    E.    To the extent not already completed, the Receiver shall as soon as practicable after the entry of this Order, take exclusive custody, control, and possession of all assets identified in Section III.C of this Order.

    F.    The Receiver shall give reasonable notice to the Commission of any settlements or compromises by the Receiver concerning the Receivership Estate, before the settlement or

DocuSign Envelope ID: 5813994A-78FC-4D90-A3D7-32EED4B8A6BF

1     compromise is consummated. Within 20 days of this notice, the Commission shall have the

2     opportunity to object to any such settlement, by filing a motion with the Court.

3          G.       Make payments and disbursements from the Receivership Estate that are

4     necessary or advisable for carrying out the directions of, or exercising the authority granted by,

5     this Order. The Receiver shall apply to the Court for prior approval of any payment of any debt

6     or obligation incurred by the Settling Corporate Defendants prior to the date of entry of the

7     temporary restraining order in this action, except payments that the Receiver deems necessary or

8     advisable to ensure assets of the Settling Corporate Defendants are not lost, stolen, or dissipated.

9          H.       Institute actions or proceedings in state, federal, or foreign courts as the Receiver

10    deems necessary and advisable to preserve or recover the assets of the Settling Corporate

11    Defendants, or that the Receiver deems necessary and advisable to carry out the Receiver's

12    mandate under this Order, including actions challenging fraudulent or voidable transfers.

13         I.        Defend any or all actions or proceedings instituted against the Settling Corporate

14    Defendants, as the Receiver deems necessary and advisable to preserve the assets of the Settling

15    Corporate Defendants.

16         J.        Continue to maintain accurate records of all receipts and expenditures incurred as

17    the Receiver.

18         K.       Perform all acts necessary or advisable to complete an accurate accounting of

19    assets of the Receivership Estate, and prevent unauthorized transfer, withdrawal, or

20    misapplication of said assets.

21         L.        Continue to be entitled to reasonable compensation for the performance of the

22    Receiver's duties pursuant to this Order, including duties performed by the Receiver's agents,

23    including accountants and lawyers, and for the cost of actual out-of-pocket expenses incurred by

DocuSign Envelope ID: 5813994A-78FC-4D90-A3D7-32EFD4B8A6BF

1   them, from the assets of the Receivership Estate, at the hourly rate previously agreed to by the

2   Receiver and used as the bases for prior fee applications approved by the Court.

3                       **VII. ORDER ACKNOWLEDGMENTS**

4           IT IS FURTHER ORDERED that Settling Defendants obtain acknowledgments of

5   receipt of this Order:

6           A.      Each Settling Defendant, within 7 days of entry of this Order, must submit to the

7   Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

8           B.      For 10 years after entry of this Order, each Settling Individual Defendant for any

9   business that such Settling Defendant, individually or collectively with any other Settling

10  Defendants, is the majority owner or controls directly or indirectly, and each Settling Corporate

11  Defendant, must deliver a copy of this Order to: (1) all principals, partners, officers, directors,

12  and LLC managers and members; (2) all employees, agents, and representatives who participate

13  in conduct related to the subject matter of the Order; and (3) any business entity resulting from

14  any change in structure as set forth in the Section titled Compliance Reporting. Delivery must

15  occur within 7 days of entry of this Order for current personnel. For all others, delivery must

16  occur before they assume their responsibilities.

17          C.      From each individual or entity to which a Settling Defendant delivered a copy of

18  this Order, that Settling Defendant must obtain, within 30 days, a signed and dated

19  acknowledgment of receipt of this Order.

20                      **VIII. COMPLIANCE REPORTING**

21          IT IS FURTHER ORDERED that Settling Defendants make timely submissions to the

22  Commission:

23

A.     One year after entry of this Order, each Settling Defendant must submit a compliance report, sworn under penalty of perjury:

1.     Each Settling Defendant must: (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Settling Defendant; (b) identify all of that Settling Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Settling Defendant (which Settling Individual Defendants must describe if they know or should know due to their own involvement); (d) describe in detail whether and how that Settling Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

2.     Additionally, each Settling Individual Defendant must: (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Settling Defendant performs services whether as an employee or otherwise and any entity in which such Settling Defendant has any ownership interest; and (c) describe in detail such Settling Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

DocuSign Envelope ID: 5813994A-78FC-4D90-A3D7-32FED4B8A6BF

B.     For 20 years after entry of this Order, each Settling Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.     Each Settling Defendant must report any change in:  (a) any designated point of contact; or (b) the structure of any Settling Corporate Defendant or any entity that Settling Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

2.     Additionally, each Settling Individual Defendant must report any change in:  (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which such Settling Defendant performs services whether as an employee or otherwise and any entity in which such Settling Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

C.     Each Settling Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Settling Defendant within 14 days of its filing.

D.     Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on:  _____" and supplying the date, signatory's full name, title (if applicable), and signature.

DocuSign Envelope ID: 5813994A-78FC-4D90-A3D7-32FED4B8A6BF

1    E.    Unless otherwise directed by a Commission representative in writing, all

2 submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or

3 sent by overnight courier (not the U.S. Postal Service) to:  Associate Director for Enforcement,

4 Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW,

5 Washington, DC 20580.  The subject line must begin:  *FTC v. AWS, LLC et al.*, X180026.

6                          **IX.  RECORDKEEPING**

7    IT IS FURTHER ORDERED that Settling Defendants must create certain records for 20

8 years after entry of the Order, and retain each such record for 5 years.  Specifically, Settling

9 Corporate Defendants and each Settling Individual Defendant for any business that such Settling

10 Defendant, individually or collectively with any other Settling Defendants, is a majority owner

11 or controls directly or indirectly, must create and retain the following records:

12    A.    accounting records showing the revenues from all goods or services sold;

13    B.    personnel records showing, for each person providing services, whether as an

14 employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position;

15 dates of service; and (if applicable) the reason for termination;

16    C.    records of all consumer complaints and refund requests, whether received directly

17 or indirectly, such as through a third party, and any response;

18    D.    all records necessary to demonstrate full compliance with each provision of this

19 Order, including all submissions to the Commission; and

20    E.    a copy of each unique advertisement or other marketing material.

21

22

23

## X. COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Settling Defendants' compliance with this Order, including the financial representations upon which part of the judgment was suspended and any failure to transfer any assets as required by this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission, each Settling Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce Documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B. For matters concerning this Order, the Commission is authorized to communicate directly with each Settling Defendant. Settling Defendant must permit representatives of the Commission to interview any employee or other person affiliated with any Settling Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C. The Commission may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Settling Defendants or any individual or entity affiliated with Settling Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D. Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Settling Individual Defendants, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

# XI.  RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for

purposes of construction, modification, and enforcement of this Order.

**SO ORDERED** June 15, 2018.

_____

United States District Judge

**STIPULATED AND AGREED TO BY:**

**FOR SETTLING DEFENDANTS**:

DocuSigned by:

*Suzette Moore*

361E3E50CB3841C...                                        Date: 4/25/2018

Suzette Michele M. Moore
Shumaker
Bank of America Plaza, Suite 2800
101 East Kennedy Boulevard
Tampa, FL 33602
Tel. (813) 227-2272
Email: smoore@slk-law.com

**Attorney for defendants AWS, LLC, FBA**
**Distributors, LLC, FBA Stores, LLC, Info**
**Pros, LLC, Info Solutions, LLC, Online**
**Auction Learning Center, Inc. (Mass.**
**Corp.), Online Auction Learning Center,**
**Inc. (Nev. Corp.), Christopher F. Bowser,**
**Adam S. Bowser, and Jody L. Marshall**

DocuSign Envelope ID: 5813994A-78FC-4D90-A3D7-32FED1B8A6BF

**DEFENDANTS:**

_Chris Bowser_                          Date: 4/25/2018

Christopher F. Bowser, Individually and as
Vice President and Manager of FBA
Distributors, LLC; Vice President of FBA
Stores, LLC, Managing Member of Info
Solutions, LLC; President of Online Auction
Learning Center (Mass. Corp.) and Online
Auction Learning Center (Nev. Corp.)

_Adam Bowser_                          Date: 4/25/2018

Adam S. Bowser, Individually and as Manager
of AWS, LLC; Manager and President of FBA
Distributors, LLC; Managing Member of Info
Solutions, LLC; Officer of Online Auction
Learning Center (Mass. Corp.) and Online
Auction Learning Center (Nev. Corp.)

_Jody L. Marshall_                          Date: 04/23/2018

Jody L. Marshall, Individually and as Manager
of Info Pros, LLC; Managing Member of Info
Solutions, LLC; Owner of FBA Distributors,
LLC

**FOR FEDERAL TRADE COMMISSION:**

_Robert Anguizola_                          Date: 6/12/2018

Roberto Anguizola
Illinois Bar # 6270874
(Admitted pursuant to LR IA 11-3)
Tel. (202) 326-3284
Email: ranguizola@ftc.gov

26

1   Miry Kim
    Washington Bar # 31456
2   (Admitted pursuant to LR IA 11-3)
    Tel. (202) 326-3622
3   Email: mkim@ftc.gov

4   Gregory J. Evans
    DC Bar # 1033184
5   (Admitted pursuant to LR IA 11-3)
    Tel. (202) 326-3425
6   Email: gevans2@ftc.gov

7   Federal Trade Commission
    600 Pennsylvania Avenue, N.W.
8   Mail Drop CC-8528
    Washington, D.C. 20580

9

10  **Attorneys for Plaintiff**
    **FEDERAL TRADE COMMISSION**

11

12

13

14

15

16

17

18

19

20

21

22

23

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2018, I caused the foregoing document to be filed with the Clerk of the Court via the Court's CM/ECF electronic filing system. Additionally, I served all of the counsel and parties listed on the attached Service List by the methods indicated therein.

       /s/ Roberto Anguizola
Roberto Anguizola
Attorney for Plaintiff
FEDERAL TRADE COMMISSION

1

## SERVICE LIST

2
Suzette Michele M. Moore
S. Moore Law
3
4720 Cleveland Heights Blvd.
Suite 201
4
Lakeland, FL 33813
Tel. (863) 229-2140
5
Email: s.moore@smoorelaw.com

6
**Attorney for defendants AWS, LLC, FBA**
**Distributors, LLC, FBA Stores, LLC,**
7
**Info Pros, LLC, Online Auction Learning**
**Center, Inc. (Mass. Corp.), Online**
8
**Auction Learning Center, Inc. (Nev.**
**Corp.), Christopher F. Bowser, Adam S.**
9
**Bowser, and Jody Marshall**

10
**Seeking admission Pro Hac Vice**

11
**Served via email**

12
Brick Kane
President
13
Robb Evans & Associates LLC
11450 Sheldon Street
14
Sun Valley, California 91352-1121
Tel: (818) 768-8100
15
Fax: (818) 768-8802
Email: bkane@robbevans.com

16
**Court Appointed Receiver**

17
**Served via email**

18

19

20

21

22

23

Ronald D. Green (NV Bar No. 7360)
LaTeigra C. Cahill (NV Bar No. 14352)
Randazza Legal Group, PLLC
4035 S. El Capitan Way
Las Vegas, NV 89147
Tel. (702) 420 2001
Email: lcc@randazza.com,
rdg@randazza.com

**Attorney for defendants AWS, LLC,**
**FBA Distributors, LLC, FBA Stores,**
**LLC, Info Pros, LLC, Online Auction**
**Learning Center, Inc. (Mass. Corp.),**
**Online Auction Learning Center, Inc.**
**(Nev. Corp.), Christopher F. Bowser,**
**Adam S. Bowser, and Jody Marshall**

**Served via email**

Gary Owen Caris
Barnes & Thornburg LLP
2029 Century Park E., Suite 300
Los Angeles, California 90067-2904
Tel. (424) 363-2920
Email: gcaris@btlaw.com

**Attorney for the Court Appointed**
**Receiver Robb Evans & Associates**
**LLC**

**Served via email**

James C. Bastian, Jr.
Shulman Hodges & Bastian LLP
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
Tel. (949) 340-3400
Email: jbastian@shbllp.com

**Attorney for defendants Adams
Consulting, LLC, Global Marketing
Services L.L.C, and Jeffery A. Gomez**

**Served via email**

# EXHIBIT 4

FILED

18 NOV 07 AM 10:26

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-31392-1 SEA

**STATE OF WASHINGTON**
**KING COUNTY SUPERIOR COURT**

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 17-2-31392-1-SEA |
| Plaintiff, | JUDGMENT AND CONSENT DECREE |
| v. | **[CLERK'S ACTION REQUIRED]** |
| ADAM BOWSER, individually and on behalf of his marital community; CHRISTOPHER BOWSER, individually and on behalf of his marital community; AWS, LLC, a Nevada limited liability company; FBA DISTRIBUTORS, LLC, a Massachusetts limited liability company; FBA STORES, LLC, a Nevada limited liability company; and DOE Companies 1-20, | |
| Defendants. | |

## I.   JUDGMENT SUMMARY

1.1   Judgment Creditor:              State of Washington

1.2   Judgment Debtors:              AWS, LLC, FBA Distributors, LLC, and FBA Stores, LLC (jointly and severally)

1.3   Principal Judgment Amount:    N/A.

1.4   Post Judgment Interest Rate:   N/A.

1.5   Attorneys for Judgment Creditor:   M. Elizabeth Howe, Joshua G. Studor, and Andrea M. Alegrett Assistant Attorneys General

JUDGMENT AND CONSENT DECREE - 1

1

      1.6     Attorneys for Judgment Debtors:      Gary Owen Caris and

2

                                              Jennifer C. Baker
Barnes & Thornburg LLP,

3

                                              attorneys for Robb Evans &
Associates LLC, Receiver of AWS,

4

                                              LLC, FBA Distributors, LLC and
FBA Stores, LLC, *et al.*

5

## II.    BACKGROUND AND FTC SETTLEMENT

6

      2.1     Plaintiff State of Washington (State) conducted an investigation and commenced

7

this action by filing a Complaint pursuant to RCW 19.86, the Consumer Protection Act (CPA),

8

and RCW 19.110, the Business Opportunity Fraud Act (BOFA), against Defendants AWS, LLC,

9

FBA Distributors, LLC, and FBA Stores, LLC (FBA Defendants) and Defendants Adam Bowser

10

and Christopher Bowser (Bowser Defendants) (collectively, Defendants).   The Complaint

11

alleges that Defendants committed violations of the CPA and BOFA while offering or selling

12

business opportunities within the State of Washington and to Washington consumers.

13

*See* Dkt. No. 1.

14

      2.2     While the State's action was pending, the State cooperated with the Federal Trade

15

Commission (FTC) in the FTC's investigation of Defendants for potential violations of federal

16

law with respect to consumers in Washington and elsewhere.   The FTC subsequently filed a

17

separate action against Defendants, among others, in the United States District Court for the

18

District of Nevada (Nevada District Court), alleging violations of Section 5(a) of the FTC Act,

19

15 U.S.C. § 45(a), and the Business Opportunity Rule, 16 C.F.R. Part 437.   *See Fed. Trad.*

20

*Comm. v. AWS, LLC, et al.*, No. 2:18-cv-00442-JCM-PAL (D. Nev., Mar. 12, 2018) (Dkt. No. 1).

21

      2.3     On March 14, 2018, the Nevada District Court entered Temporary Restraining

22

Order and appointed Robb Evans & Associates LLC, as Temporary Receiver for FBA

23

Defendants, *et al.* (Receiver). *See Id.* (Dkt. No. 29) (Temporary Restraining Order). Defendants'

24

25

26

JUDGMENT AND CONSENT DECREE - 2

business was shut down and their assets frozen pending a hearing on the Temporary Restraining Order, and the Receiver was given temporary control of FBA Defendants. *Id.*

2.4     On June 15, 2018, the Nevada District Court entered a Stipulated Order for Permanent Injunction and Monetary Judgment approving a settlement between the FTC and Defendants, among others, in the FTC's action. *Id.* (Dkt. No. 80) (FTC Consent Order), at 19. Pursuant to the FTC Consent Order, judgment was entered against the Defendants, among others, in the amount of One Hundred Two Million, Four Hundred Eighty-One Thousand, Five Hundred Ninety-Six Dollars ($102,481,596.00). *Id.* at 8. This judgment will be suspended in part following receipt of an anticipated settlement amount of approximately $10.8 million from all settling defendants. *Id.* at 14; Press Release, June 18, 2018 (available at https://www.ftc.gov/news-events/press-releases/2018/06/operators-get-rich-amazon-scheme-settle-ftc) (FTC Press Release).

2.5     Pursuant to the FTC Consent Order, the settling defendants in the FTC's action (including Defendants in the instant action) are subject to injunctive terms and have been ordered to pay certain sums to the FTC to "be deposited into a fund administered by the Commission or its designee to be used for equitable relief, including consumer redress." *Id.* at 15; *see also* FTC Press Release (describing that Defendants are "banned from marketing and selling business opportunities and business coaching services" and "will surrender millions of dollars for return to consumers."). It is anticipated that all affected consumers (including Washington consumers) will be able to seek some form of redress from the FTC for consumer losses stemming from FBA Defendants' activities.

2.6     The FTC Consent Order also permanently appointed the Receiver as equity receiver for FBA Defendants "for the purpose of taking the necessary steps to wind down the business of [FBA Defendants, *et al.*] liquidate assets, and pay any net proceeds to the

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    Commission to satisfy the money judgment in this Order." FTC Consent Order at 17.  FBA

2    Defendants have agreed and been ordered to pay all of their assets to the FTC.  *Id.* at 9.

3                     **III.    PARTIES' INTENT TO COMPROMISE**

4         3.1     FBA Defendants having been served with the Summons and Complaint in this

5    action or having waived service; and the State, appearing by and through its attorneys, Robert

6    Ferguson, Attorney General, and M. Elizabeth Howe, Joshua G. Studor, and Andrea M. Alegrett,

7    Assistant Attorneys General; and the Receiver, appearing by and though its attorneys, Barnes &

8    Thornburg, LLP, being authorized to appear and appearing on behalf of FBA Defendants; and

9         3.2     Receiver, being authorized and directed to "[d]efend any or all actions or

10    proceedings instituted against the [FBA Defendants, *et al.*], as the Receiver deems necessary and

11    advisable to preserve the assets of" FBA Defendants, FTC Consent Order at 19, and to pay such

12    assets to the FTC "for equitable relief, including consumer redress," *id.* at 15; and

13         3.3     The State, acknowledging that all assets of FBA Defendants are to be liquidated

14    pursuant to the FTC Consent Order and the net proceeds paid in settlement to the FTC for the

15    purpose of equitable relief, including consumer redress, *id.* at 9; and

16         3.4     The State, acknowledging that the Receiver now "exercise[s] full control" over

17    FBA Defendants as an agent of the Nevada District Court, *id.* at 18, and that FBA Defendants

18    are no longer operated, controlled, or administered by Bowser Defendants or any other persons

19    or entities whom the State's Complaint alleges to have violated the CPA or BOFA; and

20         3.5     The State and the Receiver having agreed on a basis for the settlement of the

21    matters alleged in the Complaint and to the entry of this Judgment and Consent Decree against

22    FBA Defendants without the need for trial or adjudication of any issue of law or fact; and

23         3.6     The Receiver, on behalf of FBA Defendants, recognizes and states this Judgment

24    and Consent Decree is entered into voluntarily and that no promises, representations, or threats

25    have been made by the Attorney General's Office or any member, officer, agent, or

26

JUDGMENT AND CONSENT DECREE - 4

1  representative thereof to induce the Receiver to enter into this Judgment and Consent Decree,

2  except for the promises and representations provided herein; and

3      3.7    The Receiver, on behalf of FBA Defendants, waives any right it may have to

4  appeal from this Judgment and Consent Decree or to otherwise contest the validity of this

5  Judgment and Consent Decree; and

6      3.8    The Receiver, on behalf of FBA Defendants, further agrees this Court will retain

7  jurisdiction of this action and jurisdiction over FBA Defendants for the purpose of implementing

8  and enforcing the terms and conditions of this Judgment and Consent Decree and for all other

9  purposes related to this matter; and

10      The Court, finding no just reason for delay;

11      NOW, THEREFORE, it is hereby ORDERED, ADJUDGED, AND DECREED as

12  follows:

13                        **IV.   GENERAL**

14      4.1    This Court has jurisdiction of the subject matter of this action and of FBA

15  Defendants as relates to the subject matter herein.

16      4.2    This Judgment and Consent Decree or the fact of its entry does not constitute

17  evidence or an admission by any party regarding the existence or non-existence of any issue,

18  fact, or violation of any law alleged by the State. To the contrary, FBA Defendants have denied

19  and continue to deny any and all wrongdoing of any kind whatsoever and retain, and do not

20  waive, any and all defenses FBA Defendants may have with respect to such matters.

21      4.3    The Receiver, and any successor receiver or designee, consistent with its

22  fiduciary duties and orders of the Nevada District Court, agrees to cooperate with the State in its

23  continued litigation against Bowser Defendants in the above-captioned action, and any other

24  owner, manager, employee, or agent of FBA Defendants, for as long as Receiver remains

25  receiver of FBA Defendants, by providing access to documents or other information obtained

26  from FBA Defendants by Receiver that are relevant to the State's claims in this action and that

JUDGMENT AND CONSENT DECREE - 5

1  are in Receiver's possession, custody, or control.  The State will coordinate with Receiver to
2  minimize costs and expenses incurred in the course of such cooperation and prevent diminution
3  of the receivership estate.

4       4.4    This Judgment and Consent Decree fully and finally resolves and forever
5  discharges and releases all claims and causes of action under the CPA and BOFA that the State
6  has filed or may in the future file against FBA Defendants arising out of or relating to the facts
7  and matters specifically described in the Complaint, except that FBA Defendants' material
8  failure to comply with this Judgment and Consent Decree and/or the FTC Consent Order will
9  permit the Attorney General of Washington to take such further action against FBA Defendants
10  as provided for herein.  This Judgment and Consent Decree will not be construed to operate as a
11  release of the State's claims against Bowser Defendants, or any other owner, manager, employee,
12  or agent of FBA Defendants.

13         **V.   INJUNCTIONS**

14       5.1    The injunctive provisions of this Judgment and Consent Decree will apply to FBA
15  Defendants and to their successors and assigns.  However, nothing herein may be construed in
16  any manner to require the Receiver to breach its fiduciary duties or violate any Court Order
17  issued by the Nevada District Court.

18       5.2    FBA Defendants agree, acknowledge, and declare that each and every contract
19  between FBA Defendants and any Washington consumers for the provision of educational,
20  coaching, advisory, wholesaler, supplier, or distributor services related to online sales is void,
21  and will not demand or accept any fees in connection with those contracts, or make any attempt
22  to enforce those contracts.

23       5.3    FBA Defendants will not advertise, market, distribute, promote, or offer for sale
24  or lease any products or services related to online sales (including, but not limited to educational,
25  coaching, advisory, wholesaler, supplier, or distributor services) in any way that is false,
26  misleading, deceptive, or unfair, including without limitation using trademarks or trade dress

JUDGMENT AND CONSENT DECREE - 6

1   associated with Amazon.com, Inc. (Amazon), expressly or implicitly misrepresenting the total

2   cost, value, or investment or time commitment associated with products or services offered,

3   making unsubstantiated or misleading earnings claims, or subjecting consumers to high pressure

4   sales techniques.

5       5.4    FBA Defendants will not advertise, market, distribute, promote, or offer for sale

6   or lease any products or services in any manner designed to give consumers the net impression

7   that FBA Defendants and Bowser Defendants are affiliated with, sponsored by, or otherwise

8   endorsed by Amazon.

9       5.5    FBA Defendants will not advertise, market, distribute, promote, or offer for sale

10  or lease any products or services in any manner designed to give consumers the net impression

11  that FBA Defendants and Bowser Defendants have developed strategies, secrets, insider

12  knowledge, or expertise that will result in substantial financial gain for purchasers of their

13  business opportunities.

14      5.6    FBA Defendants will not advertise, market, distribute, promote, or offer for sale

15  or lease any products or services in any manner designed to give consumers the net impression

16  that purchasers of business opportunities from FBA Defendants and Bowser Defendants will

17  make substantial profits by purchasing those opportunities.

18      5.7    FBA Defendants will not engage in unfair and deceptive practices within the

19  meaning of RCW 19.86.020.

20      5.8    FBA Defendants will comply with all statutory requirements for the offer, sale,

21  or lease, in Washington or to Washington consumers, of products, equipment, supplies or

22  services to enable a purchaser to start a business. *See* RCW 19.110.020.

23      5.9    FBA Defendants will register with the Washington State Department of Financial

24  Institutions (DFI) prior to advertising, soliciting, or making any offer, sale, or lease of any

25  business opportunity in Washington or to Washington consumers. *See* RCW 19.110.050.

26

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    5.10    FBA Defendants will include a valid DFI registration number in every business

2  opportunity advertisement in Washington. *See* RCW19.110.050.

3    5.11    FBA Defendants will provide purchasers of any business opportunity in

4  Washington or by Washington consumers with written disclosures conforming to those set forth

5  by statute at least forty-eight hours in advance of requiring a purchaser to sign any business

6  opportunity contract. *See* RCW19.110.070.

7    5.12    FBA Defendants will not request or require the payment of consideration by any

8  purchaser in advance of such purchaser's signing of a business opportunity contract. *See* RCW

9  19.110.110.

10    5.13    FBA Defendants will include the disclosures set forth by statute in every business

11  opportunity contract in Washington, including, but not limited to provisions setting forth the

12  right to cancel the contract for any reason within seven days. *See* RCW 19.110.110.

13    5.14    FBA Defendants will permit cancellation of business opportunity contracts and

14  return payments and products within the time requirements and in the manner required by statute.

15  *See* RCW 19.110.110.

16    5.15    FBA Defendants will not make misleading statements of material fact or

17  omissions of material fact in Washington or to Washington consumers in connection with the

18  offer, sale, or lease of any business opportunity. *See* RCW 19.110.120.

19    5.16    FBA Defendants will fully comply with all requirements and obligations of the

20  FTC Consent Order, and such compliance will be deemed a material condition of this Judgment

21  and Consent Decree.

22    **VI.    ENFORCEMENT**

23    6.1    FBA Defendants must be in full compliance with all requirements and obligations

24  this Judgment and Consent Decree imposes on FBA Defendants by the date of entry of this

25  Judgment and Consent Decree, except as otherwise indicated herein.

26

JUDGMENT AND CONSENT DECREE - 8

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

6.2     For the duration of Receiver's appointment as Receiver for FBA Defendants, Receiver will provide notice to the State of any change in the name, ownership, corporate structure or status, officers, directors, or principal place of business of any FBA Defendant within ten (10) business days of such change.  Receiver will provide the State with notice of the filing of any insolvency proceeding, bankruptcy petition, or court or regulatory proceeding brought by or against any FBA Defendant within ten (10) business days of instituting or receiving notice of such proceeding. In the event that Receiver ceases to be Receiver for any FBA Defendant for any reason other than the dissolution and winding up of such FBA Defendant, Receiver will provide notice to the State within five (5) business days of the event leading to termination of Receiver's appointment as Receiver with respect to such FBA Defendant.  For the avoidance of doubt, FBA Defendants' duties to comply with all requirements and obligations imposed by this Judgment and Consent Decree will survive the termination of Receiver's appointment as Receiver.

6.3     If any FBA Defendant violates a material condition of this Judgment and Consent Decree, and if such FBA Defendant does not cure the violation within a reasonable time after notice by the State, the State may seek the imposition of additional conditions, civil penalties of up to $25,000.00 per violation pursuant to RCW 19.86.140, restitution, injunctive relief, attorney's fees, costs, and such other remedies as the Court may deem appropriate at an evidentiary hearing in which such FBA Defendant has an opportunity to be heard, if the Court finds by a preponderance of the evidence that such FBA Defendant has violated a material condition of this Judgment and Consent Decree. In any successful action to enforce this Judgment and Consent Decree against such FBA Defendant, the FBA Defendant will bear the State's reasonable costs, including reasonable attorneys' fees.

6.4     Jurisdiction is retained by this Court for the purpose of enabling any party to this Judgment and Consent Decree to apply to the Court, to the extent permitted herein, for

JUDGMENT AND CONSENT DECREE - 9

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    enforcement of compliance with this Judgment and Consent Decree, to punish violations thereof,

2    or otherwise address the provisions of this Judgment and Consent Decree.

3        6.5    Nothing in this Judgment and Consent Decree will grant any third-party

4    beneficiary or other rights to any person who is not a party to this Judgment and Consent Decree.

5        6.6    Nothing in this Judgment and Consent Decree will be construed to limit or bar

6    any other governmental entity or person from pursuing other available remedies against FBA

7    Defendants or any other persons.

8        6.7    Under no circumstances will this Judgment and Consent Decree, or the name of

9    the State of Washington, this Court, the Office of the Attorney General, the Consumer Protection

10   Division, or any of their employees or representatives be used by FBA Defendants or any of

11   their respective successors and assigns, in connection with any selling, advertising, or promotion

12   of products or services, or as an endorsement or approval of FBA Defendants' acts, practices, or

13   conduct of business.

14       6.8    This Judgment and Consent Decree in no way limits the State from conducting

15   any lawful non-public investigation to monitor FBA Defendants' compliance with this Judgment

16   and Consent Decree or to investigate other alleged violations of the CPA and BOFA, which may

17   include, but is not limited to, interviewing customers or former employees of FBA Defendants.

18       6.9    This Judgment and Consent Decree will be binding upon and inure to the benefit

19   of FBA Defendants' successors and assigns. FBA Defendants and their successors and assigns

20   will notify the Attorney General's Office at least thirty (30) days prior to any change-in-control

21   of any FBA Defendant that would change the identity of the corporate entity responsible for

22   compliance obligations arising under this Judgment and Consent Decree; including, but not

23   limited to, dissolution, assignment, sale, merger, or other action that would result in the

24   emergence of a successor corporation; the creation or dissolution of a subsidiary, parent, or

25   affiliate that engages in any acts or practices subject to this order; the proposed filing of a

26   bankruptcy petition; or a change in the corporate name or address. Provided, however, that with

JUDGMENT AND CONSENT DECREE - 10

1    respect to any proposed change in the corporation about which FBA Defendants and their

2    successors and assigns learn less than thirty (30) days prior to the date such action is to take

3    place, FBA Defendants and their successors and assigns must notify the Attorney General's

4    Office as soon as is practicable after obtaining such knowledge.

5        6.10    Any notice or other communication required or permitted under this Judgment

6    and Consent Decree must be in writing and delivered to the following persons or any person

7    subsequently designated by the parties:

8

9         **For FBA Defendants:**

10             Robb Evans & Associates LLC, Receiver
                    c/o Gary Owen Caris, Esq.

11             Barnes & Thornburg LLP
                    2029 Century Park E., Suite 300

12             Los Angeles, CA, 90067-2904
                    gcaris@btlaw.com

13             Tel.: (424) 363-2920

14         **For the State of Washington:**

15             M. Elizabeth Howe
                    Assistant Attorney General

16             bethh2@atg.wa.gov

17             Tel.: (206) 233-3380

18             Joshua G. Studor
                    Assistant Attorney General

19             joshuas@atg.wa.gov
                    Tel.: (206) 233-3388

20

21             Andrea M. Alegrett
                    Assistant Attorney General

22             andreaa1@atg.wa.gov
                    Tel.: (206) 389-3813

23

24             Consumer Protection Division
                    Office of the Washington Attorney General

25             800 Fifth Avenue, Suite 2000
                    Seattle, WA 98104

26

JUDGMENT AND CONSENT DECREE - 11

1        6.11    Pursuant to CR 54(b), the Court expressly directs that final judgment be entered

2  immediately against FBA Defendants.  The Court finds that there is no just reason for delaying

3  final entry of judgment against FBA Defendants for the following reasons: (i) immediate entry

4  of judgment against FBA Defendants will facilitate administration of the receivership estate;

5  (ii) immediate entry of final judgment will facilitate payment and distribution of restitution funds

6  from the receivership estate pursuant to the FTC Consent Order; (iii) immediate entry of final

7  judgment against FBA Defendants is equitable because FBA Defendants have waived their right

8  to appeal from this Judgment and Consent Decree; (iv) immediate entry of final judgment against

9  FBA Defendants will reduce or eliminate further expenditures by the Receiver relating to this

10  case, thereby conserving the receivership estate's assets for payment for equitable relief pursuant

11  to the FTC Consent Order; (v) immediate entry of final judgment against FBA Distributors will

12  not prejudice the remaining defendants, who remain free to dispute their own individual liability.

13        6.12    The Clerk of the Court is ordered to immediately enter the foregoing Judgment

14  and Consent Decree, which shall be a final judgment pursuant to CR 54(b), immediately.

15        DONE IN OPEN COURT this _____ day of November, 2018.

16

17                                     SUPERIOR COURT JUDGE/ COMMISSIONER

18  Presented by:                      Notice of Presentment Waived and

19                                  Approved as to Form by:

20  ROBERT W. FERGUSON           BARNES & THORNBURG LLP
    Attorney General

21

22  M. Elizabeth Howe, WSBA #53140    Jennifer C. Baker, WSBA # 33950
    Joshua G. Studor, WSBA # 47183     Gary Owen Caris

23  Andrea M. Alegrett, WSBA # 50236    Attorneys for Robb Evans & Associates LLC,
    Assistant Attorneys General         Receiver of AWS, LLC, FBA Distributors,

24  Attorneys for Plaintiff State of Washington  LLC and FBA Stores, LLC, *et al*.
    800 Fifth Avenue, Suite 2000        2029 Century Park E., Suite 300

25  Seattle, WA 98104              Los Angeles, CA, 90067-2904
    (206) 464-7744                (310) 284-3880

26

JUDGMENT AND CONSENT DECREE - 12

King County Superior Court
Judicial Electronic Signature Page

Case Number:      17-2-31392-1
Case Title:        STATE OF WASHINGTON VS BOWSER ET AL

Document Title:    Order

Signed by:         Brad Moore
Date:              11/7/2018 10:26:41 AM

Judge/Commissioner: Brad Moore

This document is signed in accordance with the provisions in GR 30.
Certificate Hash:            FC8744E49A72FF0F850BE061D5A0A1A293B475BB
Certificate effective date:  5/22/2017 2:57:35 PM
Certificate expiry date:     5/22/2022 2:57:35 PM
Certificate Issued by:       C=US, E=kcscefiling@kingcounty.gov, OU=kcdja, O=kcdja,
                             CN="Brad Moore: kHmbWor95BGfWFJmHl1GsA=="